**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **AON RISK SERVICES COMPANIES, INC., AON PLC, AND AON GROUP, INC.,** | Case No.  19-cv-7312 |
| Plaintiff, | |
| vs. | |
| **ALLIANT INSURANCE SERVICES, INC., TARA BRUSEK, JAMES JANIC, THOMAS LUBAS, DANIELLE ROSS, JAMIE TAYLOR, JOSHUA VICK, AND MATTHEW WALSH,** | |
| Defendants. | |

## VERIFIED COMPLAINT

Plaintiffs Aon plc, Aon Group, Inc., and Aon Risk Services Companies, Inc. (collectively, "Aon" or "Company"), by and through their counsel, Littler Mendelson, P.C., by way of this Verified Complaint against Defendants Tara Brusek ("Brusek"), James Janic ("Janic"), Thomas Lubas ("Lubas"), Danielle Ross ("Ross"), Jamie Taylor ("Taylor"), Joshua Vick ("Vick"), and Matthew Walsh ("Walsh") (collectively, the "Former Employees"), and their new employer, Alliant Insurance Services, Inc. ("Alliant") (referred to collectively with the Former Employees, "Defendants"), alleges as follows:

## INTRODUCTION

1.      Alliant is presently engaged in a corporate raid on Aon's officers, employees, and clients, achieved by their orchestrating of a targeted exodus of key employees and officers from Aon's Construction Services Group ("CSG"), specifically the Chicago office.  In the past two weeks alone, Aon has lost two clients, one of whom has been a client of Aon for over 20 years,

and which are accountable for over $1 million in annual revenue. In addition, Aon has direct evidence that one of the Former Employees, Taylor, is currently servicing this same client, in plain breach of her post-employment restrictive covenants with Aon.

2. This is just the tip of the iceberg. Indeed, it is Alliant's *modus operandi* to grow its business not through lawful, legitimate means, but by poaching groups of employees from its direct competitors. After poaching these employee groups, Alliant then deploys its new employees to steal key clients of its competitors by utilizing its competitors' confidential and trade secret information, usurping the goodwill the competitors developed with the clients. Alliant **knows** that this unlawful business practice causes the subject employees to breach their restrictive covenants, and **anticipates** that it will be sued for same. Alliant has carefully evaluated the costs and benefits, however, and its actions make clear that it has concluded that it is far cheaper to continue this course of conduct, be sued, and settle, than what it would cost for Alliant to build its own business—with the added benefit of destroying its competitors' business in its wake.

3. This unlawful scheme is well-documented. In just the last three years, Alliant has been the defendant in dozens of lawsuits, all brought by Alliant competitors like Aon, making similar allegations to those here: See Aon PLC v. Heffernan, No. 1:16-cv-1924 (N.D. Ill. Feb. 3, 2016); Willis of Mass., Inc. v. Feinberg, No. 1684-cv-1497 (Mass. Super. Ct., Suffolk Cnty. May 10, 2016); The Hays Group, Inc. v. Peters, No. 0:16-cv-023520PJS-FLN (D. Minn. July 7, 2016); The Hays Corp. v. Peters, No. 423615v (Cir. Ct. of Md., Montgomery Cnty. Aug. 1, 2016); Wells Fargo Ins. Servs. USA, Inc. v. Laman, No. 502016CA009049 (Cir. Ct. of Fla., Palm Beach Cnty. Florida Aug. 11, 2016); Willis of Fla., Inc. v. Powell, No. 16-CA-007824 (Cir. Ct. of Fla., Hillsborough Cnty. Aug. 18, 2016); Marsh USA Inc. v. Moody, No. 651325/2017 (N.Y. Sup. Ct., N.Y. Cnty. Mar. 13, 2017); Wells Fargo Ins. Servs. USA, Inc. v. Alliant Ins. Servs. Inc., No. 2017-

0540 (Del. Ch. July 26, 2017); USI, Inc. v. Call, No. BC 678226 (Cal. Super. Ct., L.A. Cnty. Oct. 2, 2017); Arthur J. Gallagher & Co. v. Long, No. 1:17-cv-12313 (D. Mass. Nov. 22, 2017); Arthur J. Gallagher & Co. v. Kuntz, No. GD-19-002108 (Ct. Com. Pl. of Pa., Allegheny Cnty. Feb. 8, 2018); Corporate Synergies Group, LLC v. Andrews et al., No. 18-cv-13381 (D.N.J. Aug. 30, 2018); Mountain West Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc., No. 2019-0226 (Del. Ch. Mar. 22, 2019); and JLT Specialty Ins. Servs. Inc. v. Riccio, No. 652659/2019 (N.Y. Sup. Ct., N.Y. Cnty. May 6, 2019).

4.     Unfortunately, this is not the first time Alliant has targeted Aon.  Since 2011, Alliant has engaged in multiple raids on Aon's officers, employees and clients.  These raids were designed to: (1) take Aon's trade secrets and confidential information; (2) induce Aon officers and employees to violate their contracts with Aon by breaching restrictive covenants prohibiting the former Aon employees from soliciting Aon's employees to leave Aon and from taking Aon's clients; and (3) induce those Aon officers and employees to breach their fiduciary duties and duties of loyalty to Aon.  See, e.g., Aon Risk Servs. v. Cusak, 34 Misc. 3d 1205(A) (N.Y. Sup. Ct. Dec. 20, 2011) (detailing "systematic and coordinated raid" by Alliant on Aon's clients and employees, describing Alliant's scheme to "enter into some form of mutually acceptable agreement" with Aon, and noting that Alliant "knew it would be sued for its conduct"), aff'd 102 A.D.3d 461 (1st Dept. 2013); Aon PLC, et al. v. Heffernan, et al., No. 16-cv-1924, Dkt. No. 28 (N.D. Ill. Feb. 10, 2016) (temporarily restraining Alliant and former employee from soliciting, accepting, or entering into any business relationship with certain Aon clients, as well as from soliciting certain Aon employees).

5.     Seemingly undeterred, Alliant is back for more. During the week of October 21, 2019, the Former Employees abruptly resigned from Aon without prior notice.  The Former

Employees received years of training, support, development, client introductions, thousands of dollars in client development expense reimbursements, mentorship, and lucrative opportunities from Aon. Then, with the assistance and encouragement of Alliant, these Former Employees immediately embarked on or threatened to embark on an organized scheme to decimate Aon's CSG business, in breach of their contractual commitments and other legal obligations to Aon.

6. Specifically, **prior to departing Aon and while they were in active discussions with Alliant**, **certain of the Former Employees took Aon's confidential, proprietary and trade secret information, for their obvious use when employed by Alliant to compete against Aon.** For example:

- Lubas copied numerous confidential client and other files from his Aon laptop to a USB drive, including client quotes, documents concerning a massive construction opportunity that Aon is currently consulting on for the future placement of insurance, and a project tracker which contains a pipeline of future revenue streams and projects Aon is working on across the country;

- Brusek copied **thousands** of Aon documents to a USB drive, including years' worth of Aon intellectual capital, including a general liability policy optimizer database (a proprietary database created by Aon to direct its clients to carriers with appropriate coverages) which is currently under development and has not gone to market yet, confidential information pertaining to Aon's proprietary weather risk product, and a compilation of years' worth of data concerning approximately 90 clients; and

- Janic printed a list of his professional contacts.

7. Then, before announcing their departures from Aon, **Walsh, Ross, and Taylor furtively called upon and met with key Aon clients in an apparent effort to persuade those clients to leave Aon, and follow the Former Employees to Alliant.** For instance, in one case, they even introduced the client to a competing London broker frequently used by Alliant, their soon-to-be new employer. Walsh, Ross and Taylor attempted to keep the true purpose of these meetings disguised from Aon.

8. The Former Employees then strategically **coordinated their resignations from Aon, all timing their resignations for the week of October 21, 2019**, in a manner calculated to cause maximum impact and disruption to Aon's workforce and its clients.

9. Immediately following their resignations, Ross and Taylor then, on behalf of Alliant, began to call upon, solicit, accept, engage in, service or perform business of the same type or kind as the business performed by Aon from or with respect to Aon clients with whom they formerly worked. For example, a client informed Aon that it was moving its business to Alliant, and that Taylor was to service the account. In addition, without authorization from Aon, immediately after announcing her departure, Ross began calling Aon clients, telling them she was leaving Aon, including, upon information and belief, telling at least one client that a group of employees left Aon for Alliant. Upon information and belief, Ross is also servicing and working for another, former Aon client on a project on behalf of Alliant instead of Aon.

10. Ross, Alliant, and the other Former Employees' unlawful actions immediately bore fruit. As noted above, in just the two weeks since the Former Employees' departures, Defendants have **successfully converted at least two Aon clients—accountable for in excess of $1 million in annual revenue**—to leave Aon and join Alliant. Upon information and belief, the wrongful solicitations, acceptance of business, and servicing of restricted clients are ongoing.

11. Moreover, Alliant continues to solicit several key Aon employees to join Alliant. The key employees Alliant is actively soliciting, not coincidentally, have relationships with some of Aon's largest clients and/or the largest books of business. Alliant's offers to these employees are, upon information and belief, conveniently priced just above the employees' current Aon compensation. The identities of these individuals, their compensation, and the fact that they are responsible for large Aon revenue streams, is not public information. Walsh had access to all of

this information when employed by Aon, and upon information and belief, is directly or indirectly helping Alliant to strategically target these employees.

12.     This action involves claims by Aon against the Former Employees arising out of their blatant disregard of their contractual and other legal obligations to Aon and breaches of duty of loyalty, and against Alliant for its knowing encouragement and interference therewith, among other things.  Aon is forced to take action due to the devastating threat Defendants pose to Aon by and through their wrongful and threatened disclosure, taking, and use of Aon's confidential, trade secret and proprietary information, wrongful solicitation of Aon employees, and wrongful solicitation and servicing of Aon clients.  Moreover, despite Aon's direct request, all of the Former Employees have, through counsel, refused to confirm their intentions to abide by their covenants.

13.     Unchecked, Alliant will continue to build its business by unlawfully raiding Aon's employees and clients, stealing for itself the business Aon has spent years and untold dollars developing.  Aon seeks injunctive relief and damages for the harm caused by Alliant and Former Employees to date, and to prevent Alliant and Former Employees from continuing to cause further damage to Aon.  Defendants' ongoing assault on Aon's business has caused, is continuing to cause, and threatens to cause, immediate, irreparable harm to Aon by, amongst other things, impairing Aon's goodwill and reputation with its clients, destroying Aon's established customer relationships that it has invested years and millions of dollars to build, destroying Aon's employee relationships, disrupting the continuity of Aon's workforce, and threatening the continued disclosure, misuse, and misappropriation of its trade secret, confidential and proprietary business information.  Unless Defendants are stopped, they present a serious threat to Aon's largest clients, key employees, and valuable trade secrets.  These efforts are underway, ongoing, and continuous.

14.     Injunctive relief is critical and necessary.  Just within the last week, **Aon has lost clients valued in excess of $1 million in annual revenue to Alliant**.  Based on Defendants' actions in the last two weeks, coupled with Alliant's well-developed course of conduct, Aon expects it will continue to lose more clients and incur additional substantial revenue losses.  Aon's client and business loss is a direct and proximate result of Defendants' unlawful conduct.

15.     To be clear, Aon does not seek to prevent the Former Employees from working for Alliant.  Rather, Aon seeks to maintain the *status quo* and enforce the Former Employees' limited and tailored non-solicitation and confidentiality covenants that are plainly enforceable under Illinois law.  Aon seeks to hold the Former Employees to their promises to Aon, for which they were richly compensated, and to protect its clients, employees, confidential, proprietary and trade secret information that it has invested years and millions of dollars to cultivate.  Issuance of injunctive relief is necessary and appropriate in order to maintain the *status quo* and halt the irreparable harm that Aon has suffered, and will continue to suffer, absent an injunction.

16.     This is not an unreasonable or unprecedented demand.  Courts, including this Court, have enjoined Alliant for virtually identical conduct.  See Cook Maran & Assocs., Inc., v. Scrocca and Alliant Ins. Servs., Inc., No. C-209-17 (Super. Ct. of N.J., Bergen Cnty., Sept. 13, 2017) (Order granting preliminary injunctive relief against Alliant); Mountain West Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc., 2019 Del. Ch. LEXIS 231, at *70-71, 2019 WL 2536104 (Del. Ch. June 20, 2019) (granting a broad preliminary injunction where Alliant "raided" twenty of a direct competitor's employees holding that "Alliant set out in bad faith on a strategy to induce [plaintiff]'s employees to breach their agreements."); Aon PLC, et al. v. Heffernan, et al., No. 16-cv-1924, Dkt. No. 28 (N.D. Ill. Feb. 10, 2016) (restraining Alliant and former employee from soliciting, accepting, or entering into any business relationship with certain Aon clients, as well as

from soliciting certain Aon employees). This Court should likewise recognize Alliant's unlawful scheme and bring it to a halt.

## THE PARTIES

17.     Plaintiff Aon plc is a United Kingdom public limited company. It is the parent company of, among others, Plaintiffs Aon Group, Inc. and Aon Risk Services Companies, Inc.

18.     Plaintiff Aon Group, Inc. is a Maryland corporation with its principal place of business in Chicago, Illinois.

19.     Plaintiff Aon Risk Services Companies, Inc. is a Maryland corporation with its principal place of business in Chicago, Illinois.

20.     Aon is a leading global professional services firm providing a broad range of conventional and alternative risk management products and services, including (among other things) insurance and reinsurance brokerage services, health, retirement, employee benefits, and human resources solutions on behalf of national and international clients.

21.     Aon's CSG is an unincorporated operating division of Aon Group, Inc. The CSG places appeal bonds, and surety and insurance programs or project-specific coverages for its construction clients, which include general and specialty contractors, project owners, and industry stakeholders. At all relevant times, the insurance products and services provided by the CSG were, and continue to be used in, interstate and foreign commerce.

22.     The Former Employees were in Aon's CSG.

23.     Defendant Matthew Walsh is an adult individual whose permanent home and residence is, upon information and belief, 837 N. Merrill Street, Park Ridge, Illinois 60068. Walsh was Chief Broking Officer and Executive Vice President in Aon's CSG. On October 22, 2019, he

voluntarily resigned to work for Alliant, a direct competitor of Aon, as Alliant's Executive Vice President, Regional Director.

24.     Defendant Danielle Ross is an adult individual whose permanent home and residence is, upon information and belief, 1221 Queen Peggy Lane, Lewisville, Texas 75056.  Ross was a Vice President and National Casualty Broker in Aon's CSG.  On October 21, 2019, she voluntarily resigned to work for Alliant as Alliant's Senior Vice President, Account Executive.

25.     Defendant Jamie Taylor is an adult individual whose permanent home and residence is, upon information and belief, 1601 Larkin Street, Unit 301, San Francisco, California 94109. Taylor was Managing Director and West Risk Leader in Aon's CSG.  On October 22, 2019, she voluntarily resigned to work for Alliant as a Senior Vice President.

26.     Defendant Tara Brusek is an adult individual whose permanent home and residence is, upon information and belief, 313 Elgin Avenue, Unit 202, Forest Park, Illinois 60130.  Brusek was an Account Executive/Broker in Aon's CSG.  On October 23, 2019, she voluntarily resigned to work for Alliant as Vice President, Account Executive.

27.     Defendant Tom Lubas is an adult individual whose permanent home and residence is, upon information and belief, 907 Summerfield Drive, Roselle, Illinois 60172.  Lubas was an Broker in Aon's CSG.  On October 23, 2019, he voluntarily resigned to work for Alliant as First Vice President, Account Executive.

28.     Defendant James Janic is an adult individual whose permanent home and residence is, upon information and belief, 467 Loudon Road Riverside, Illinois, 60546.  Janic was an Account Executive/Broker in Aon's CSG.  On October 23, 2019, he voluntarily resigned to work for Alliant, as Vice President and Senior Account Executive.

29.     Defendant Joshua Vick is an adult individual whose permanent home and residence is, upon information and belief, 924 W. Buena Ave, Apt. 1, Chicago, Illinois 60613. Vick was a Senior Vice President/Account Executive in Aon's CSG. On October 23, 2019, he voluntarily resigned to work for Alliant, as Senior Vice President/Account Executive at Alliant.

30.     Defendant Alliant Insurance Services, Inc. is a Delaware corporation with its principal place of business in Newport Beach, California. According to its website, Alliant has two offices in Chicago, Illinois, as well as offices in Bannockburn and Oakbrook Terrace, Illinois.

31.     Alliant is a direct competitor of Aon in insurance brokerage services, including in the construction industry.

## JURISDICTION AND VENUE

32.     This Court has subject matter jurisdiction over Count I, which is a claim under the Federal Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. §§ 1836 *et seq. See* 28 U.S.C. § 1331. The DTSA is applicable because Aon's trade secrets are related to its insurance products and services used in, and intended for use in, interstate and foreign commerce.

33.     This Court has supplemental jurisdiction over the remaining Counts, because they form part of the same case or controversy as Count I. *See* 28 U.S.C. § 1367.

34.     Under 28 U.S.C. § 1391(b)(2), venue is proper in the Northern District of Illinois because a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in this judicial district.

35.     This Court may exercise personal jurisdiction over the Former Employees because Brusek, Janic, Lubas, Vick, and Walsh live and reside in Illinois. Further, Walsh, Ross, Taylor, Brusek, Lubas, Janic, and Vick expressly consented to venue in the federal court located within Cook County, Illinois in agreements they signed with Aon. See Walsh Restricted Stock Unit

Agreements, dated March 15, 2013, June 12, 2014, December 10, 2015, June 8, 2017, and June 4, 2018 ("Walsh RSU Agreements"), attached as **Exhibit A**, ¶ 10(k), Walsh Leadership Performance Program Agreements dated April 19, 2016 and April 14, 2019 ("LPP Agreements), attached as **Exhibit A**, App'x A, § 2 ; Ross Restricted Stock Unit Agreements, dated September 9, 2015, June 12, 2016, and June 6, 2018 ("Ross RSU Agreements"), attached as **Exhibit B**, ¶ 10(k); Taylor Restricted Stock Unit Agreements, dated June 8, 2016 and August 24, 2018 ("Taylor RSU Agreements"), attached as **Exhibit C**, ¶ 10(k); Brusek Restricted Stock Unit Agreement, dated December 7, 2018 ("Brusek RSU Agreement"), attached as **Exhibit D**, ¶ 10(k); Lubas Restricted Stock Unit Agreements, dated June 12, 2015, June 9, 2016, and June 9, 2019 ("Lubas RSU Agreements"), attached as **Exhibit E**, ¶ 10(k); Janic Restricted Stock Unit Agreement, dated June 7, 2019 ("Janic RSU Agreement"), attached as **Exhibit F,** ¶ 10(k); Vick Restricted Stock Unit Agreements, dated September 7, 2015, June 3, 2016, and June 5, 2019 ("Vick RSU Agreements"), attached as **Exhibit G**, ¶ 10(k).  The Walsh RSU Agreements, Ross RSU Agreements, Taylor RSU Agreements, Brusek RSU Agreement, Lubas RSU Agreements, Janic RSU Agreement, and Vick RSU Agreements are collectively referred to herein as the "RSU Agreements."  All of the Former Employees (with the exception of Vick) reported directly or indirectly to Walsh in Illinois.  All of the Former Employees serviced clients with operations in Illinois, on behalf of Aon; worked with other Aon employees who are located in Illinois; and worked with insurance companies and representatives located in Illinois.

36.     Alliant is subject to personal jurisdiction in Illinois given its continuous contacts with Illinois and purposeful availment of its laws, including, but not limited to, maintenance of multiple office locations in Illinois.

37.     Defendants are also all subject to personal jurisdiction in Illinois given that they engaged in intentional and tortious conduct that was directed at Aon, knowing it is located in Illinois, and calculated to harm Aon in Illinois. Aon, whose principal place of business is Illinois, is damaged and continues to be damaged by Defendants' conduct in Illinois.

## FACTUAL ALLEGATIONS

### Matthew Walsh

38.     Walsh joined Aon in or about August 2001 as a Broker Leader II. Aon invested a significant amount of time and money in developing Walsh. During his employment with Aon, Walsh was promoted several times, including to Executive Vice President and Chief Broking Officer, titles he held at the time of his resignation. In his roles, Walsh was in charge of insurance operations for Aon's CSG. He acted as Aon's senior liaison to the construction insurance markets. Brokerage leaders in each of the regions as well as national brokerage talent reported to Walsh, including Lubas, Ross, and Taylor, all of whom directly reported to Walsh. Indeed, all of the Former Employees except Vick either directly or indirectly reported to Walsh (and Vick sat near Walsh at Aon's Chicago office). Walsh had insider knowledge regarding the high-performing employees in construction services, including their competencies, strengths, weaknesses, compensation, and the like. In addition, Walsh had detailed insider knowledge regarding which employees had critical client relationships and the largest books of business.

39.     Throughout his tenure with Aon, Walsh was also exposed to clients and prospective clients. Walsh played an account management role on some of Aon's largest accounts. An essential element of Aon's business, generally, and Walsh's duties specifically, was developing and maintaining personal contacts and relationships with clients, which Walsh did at Aon's expense.

40.     Specifically, Aon invested considerable time and money to develop and maintain client relationships through Walsh, including paying Walsh's salary, benefits, travel, entertainment, and other business expenses. In 2019, he was paid $450,000 and received a discretionary bonus of $200,000. He also received long-term incentive payments of approximately $100,000 in each of the years 2017-2019. In addition, Aon reimbursed Walsh for over $80,000 in expenses in 2019 alone for client entertainment, meetings and development, among other things. For example, in September 2019, the month before he resigned, Walsh expensed travel to meet with Aon client Dragados. Walsh could not have achieved his success without the support of Aon, which provided Walsh with a team of Aon employees, including almost all of the Former Employees, to support him.

41.     As set forth below in Paragraph 69, Aon also provided Walsh with access to its confidential, proprietary, and trade secret information, including client lists, monthly financials and a highly proprietary monthly client billing list. The monthly client billing list was only provided to Aon's senior executives, and contained information regarding how much revenue was billed to each client each month—a roadmap to Aon's largest and highest grossing clients, broken down by the client, product, line of business, and MTD actuals. Simply put, by virtue of Walsh's access to Aon's highly proprietary, confidential, and trade secret information, Walsh knew exactly how Aon was paid, by whom, in what amount, and which Aon employees had relationships with these key client accounts. In the hands of a competitor, this information could be used to pick off Aon's key employees and highest revenue generating clients.

### Ross

42.     Ross joined Aon in or about September 2014 as Vice President, Regional Broking Leader. Ross reported directly to Walsh. She was promoted to National Casualty Broker in

September 2017. In this role, Ross was responsible for working with some of Aon's most complex construction clients and communicating with them on a daily and weekly basis on the strategy and placement of their insurance programs.

43. Ross was exposed to clients and prospective clients. An essential element of Aon's business generally, and Ross's duties specifically, was developing and maintaining personal contacts and relationships with clients and prospective clients, all at Aon's expense. Aon invested considerable time and money to develop and maintain client relationships through Ross, including paying Ross's salary, benefits, travel, entertainment, and other business expenses. In 2019, Ross received hundreds of thousands of dollars in compensation. In addition, Aon reimbursed Ross for over $130,000 in client entertainment, meeting, and business expenses, among other things, in 2019 alone.

44. In addition, in September and October 2019, during the same time she was talking to Alliant, Ross expensed over $18,000 for transit, accommodations, dinners and meetings with Aon client KB Home, including what she described as a "Marketing Trip." KB Home has since left Aon for Alliant. In September 2019, Ross also expensed a lunch and meeting with Ferrovial. Ferrovial has since reassigned a project from Aon to Alliant and, upon information and belief, Ross is servicing this client at Alliant. In addition, on September 9, 2019, Ross expensed $450 in air travel for a "private prospect appointment," which upon information and belief was to meet with Walsh and client Dragados/DUSA.

45. Ross could not have achieved her success without the support of Aon, including mentoring, training, and other professional development. Indeed, when Ross started at Aon, she did not have a single client, nor did she bring any clients with her.

46.    As set forth below in Paragraph 69, Aon also provided Ross with access to its confidential, proprietary, and trade secret information.

## Taylor

47.    Taylor joined Aon in or about August 2007 as a Managing Director, Environmental Specialty in New York. In or about August 2014 she moved to Chicago and joined CSG.  In or about March 2018 she moved to San Francisco, but remained employed by Aon as Managing Director and the Regional Risk Leader for the Western Region for the CSG brokerage team, the position she held at the time of her resignation. Even after moving to San Francisco, Taylor returned to Chicago on business.  Taylor reported directly to Walsh in Chicago.  According to her LinkedIn profile, Taylor's role included the "coordination and delivery" of risk services to "Aon clients."  These services included "brokerage and analytics, account management, and project solutions." Taylor's focus included "providing support to client relationships and leaderships in all areas of Risk."

48.    As is evident from even Taylor's own description of her job duties, Taylor was exposed to Aon clients and prospective clients. An essential element of Aon's business generally, and Taylor's duties specifically, was developing and maintaining personal contacts and relationships with clients and prospective clients, all of which were done at Aon's expense.

49.    Specifically, Aon invested considerable time and money to develop and maintain client relationships through Taylor, including paying Taylor's salary, benefits, travel, entertainment, and other business expenses. In 2019, Taylor received hundreds of thousands of dollars in compensation.  In 2018, she also received over six figures in incentive pay.  In addition, Aon reimbursed Taylor for over $83,000 in client entertainment, meetings and expenses, among other things, in 2019 alone.  For example, in September and October 2019, Taylor expensed over

$3,100 for meetings, dinner and drinks with Aon client KB Homes. KB Homes has since moved its business to Alliant and is being serviced by Taylor.

50.     Taylor could not have achieved her success without the support of Aon, which provided Taylor with mentoring, training, and other professional development.

51.     As set forth below in Paragraph 69, Aon also provided Taylor with access to its confidential, proprietary, and trade secret information. For example, like Walsh, Taylor also had access to Aon's highly proprietary monthly client billing list.

### Brusek

52.     Brusek joined Aon in or about February 2000 as a Business Analyst. At the time of her resignation, she was an Account Executive/Broker. In this role, Brusek engaged with clients on a daily basis to service clients, including assessing areas where Aon could best provide resources and support to the client's risk management function, managing new business and renewals, and assisting with specific client construction and management projects. Brusek reported to Lubas, who reported to Walsh.

53.     As set forth above, an essential element of Aon's business generally, and Brusek's duties specifically, was developing and maintaining personal contacts and relationships with clients and prospective clients. To that end, Aon invested considerable time and money to develop and maintain client relationships through Brusek, including paying Brusek's salary, benefits, travel, entertainment, and other business expenses. In 2019, Brusek received compensation over six figures. In addition, Aon reimbursed Brusek for over $14,500 in expenses for conferences, internal client strategy meetings, client renewal meetings, and client prospect meetings.

54.     Brusek could not have achieved her success without the support of Aon, which included mentoring, training, and other professional development.

55.     As set forth below in Paragraph 69, Aon also provided Brusek with access to its confidential, proprietary, and trade secret information.

## Lubas

56.     Lubas joined Aon in or about April 2013 as a Broker. In this role, Lubas engaged with clients on a daily basis to service clients including assessing areas where Aon could best provide resources and support to the client's risk management function, managing and coordinating new business and renewals, and assisting with specific client construction and management projects.  According to Lubas's LinkedIn profile, he oversaw "projects utilizing cutting edge delivery methods with an objective to bring pertinent & essential insurance, legal and construction information to clients and colleagues nationwide."  Lubas was also in charge of the Brokerage Analytics & Risk Strategies team, and oversaw the aggregation, delivery, and presentation of micro and macro analytic data regarding program structures, policy forms, jurisdictional and catastrophic risks—all information of immense value to Aon that would also be of immense value to Alliant if disclosed.

57.     As is evident from his own description of his job duties, Lubas had direct contact with Aon's clients on a regular basis. An essential element of Lubas's duties was developing and maintaining personal contacts and relationships with clients and prospective clients.

58.     Aon invested considerable time and money to develop and maintain client relationships through Lubas, including paying Lubas's salary, benefits, travel, entertainment, and other business expenses. In 2019, he received hundreds of thousands of dollars in compensation. He also received generous compensation under Aon's incentive program.  In addition, Aon reimbursed Lubas for over $16,800 in expenses in 2019 alone.

59.     Lubas could not have achieved his success without the support of Aon, which included mentoring, training, and other professional development.

60.     As set forth below in Paragraph 69, Aon provided Lubas with access to its confidential, proprietary, and trade secret information. Lubas had access to volumes of proprietary and trade secret client data. Specifically, Aon collected client data concerning premiums based on exposure, loss history, and line of coverage, and performed actuarial analyses to predict where losses would arise in the future based on the accumulation of this data. Aon's methods, processes, and benchmarking analyses, known to Lubas, are highly confidential and trade secret.

**Janic**

61.     Janic joined Aon in or about December 2001 as an Account Executive/Broker. In that role, he was responsible for developing insurance and other risk funding solutions for CSG clients and worked, specifically, on construction project placements on national accounts. According to LinkedIn: "Jim's expertise [was] utilized to provide depth in the Construction Services Group nationally where Jim supports the Projects Solutions Group and Builders Risk Center of Excellence in a brokerage consultative role." Janic reported, indirectly, to Walsh.

62.     An essential element of Janic's duties was developing and maintaining personal contacts and relationships with clients and prospective clients. Aon invested considerable time and money to develop and maintain client relationships through Janic, including paying Janic's salary, benefits, travel, entertainment, and other business expenses. In 2019, he received hundreds of thousands of dollars in compensation. In addition, in 2019, Janic received thousands of dollars in incentive payments, and reimbursed Janic for over $7,000 in expenses.

63.     Janic could not have achieved his success without the support of Aon, which included mentoring, training, and other professional development.

64.     As set forth below in Paragraph 69, Aon provided Janic with access to its confidential, proprietary, and trade secret information.

## Vick

65.     Vick joined Aon in or about July 2012 as an Associate right out of college.  In March 2018, Aon promoted Vick to Senior Vice President/Account Executive. In this position, Vick was charged with the development, procurement, and consultation of insurance programs that support the risk strategies of Aon's global construction clients.  Vick was active in developing project specific risk management and insurance solutions for large capital expenditure projects. He, like Lubas, was also part of the Brokerage Analytics & Risk Strategies team that oversaw the aggregation, delivery, and presentation of micro and macro analytic data regarding program structures, policy forms, jurisdictional and catastrophic risks.

66.     An essential element of Vick's duties was developing and maintaining personal contacts and relationships with clients and prospective clients.  To that end, Aon invested considerable time and money to develop and maintain client relationships through Vick, including paying Vick's salary, benefits, travel, entertainment, and other business expenses. In 2019, he received hundreds of thousands of dollars in compensation.  He also received, in 2019, tens of thousands of dollars in incentive payments.  Aon also reimbursed Vick for over $46,000 in client entertaining, servicing, and other expenses in just 2019.

67.     Vick could not have achieved his success without Aon's support, mentoring, training, and other professional development.

68.     As set forth below in Paragraph 69, Aon provided Vick with access to its confidential, proprietary, and trade secret information.

**Former Employees' Exposure To Confidential, Proprietary, And Trade Secret Information**

69.     Due to their positions, the Former Employees became intimately familiar with

Aon's confidential, proprietary and trade secret information, including, without limitation:

- Client lists and client contact information, including phone numbers and email addresses, as well as documents compiling information about Aon's clients;
- Prospective client lists and targeted business;
- Current and historical client account information, including client needs and preferences, insurance and bond purchasing and buying preferences, premium amounts, terms of prior insurance policies, loss ratios and experiences, exposure data, surety needs and arrangements, as well as compilations thereof;
- Financial information, such as client pricing information and revenue received per client, as well as compilations thereof;
- Insurance program, project and carrier information;
- Aon's business development plans, products, strategies, revenue projections, financial planning, and accounts receivable information;
- The terms of Aon's agreements and financial arrangements with its clients;
- Aon's internal operating, management, selling, marketing, and administrative materials, including Aon compensation plans and the individual identities and compensation information of Aon employees and related information;
- Employee financial information, such as the size and value to Aon of each employee's client relationships;
- Aon's methods, processes, proprietary databases, and benchmarking analyses, including those utilized and created by Aon's Brokerage Analytics & Risk Strategies team; and
- Sales, marketing and business strategies of Aon.

70.     Aon protects its confidential, proprietary, and trade secret information by requiring

that such information be stored and remain on Aon's password-protected network and devices.

71.     Aon also has policies concerning the protection of confidential information. For

example, employees are required to read and certify annually that they will abide by Aon's Code

of Business Conduct ("Code"), which provides that employees must:

- "Access and share information with colleagues and third parties only on an as-needed basis and only as legally authorized";
- "Never discuss confidential information in places where others may overhear";
- "Never store or transmit Aon or client data on personally-owned devices" unless they received prior approval and "ensured the data on the device is encrypted";
- "Securely dispose of customer-related documents and other confidential information";

- "Use only licensed software authorized by management and installed by approved Aon Software Distribution Systems";
- "Immediately report all incidents involving suspected or actual unauthorized access, disclosure, alteration, loss, damage or destruction of data or personal information";
- "Lock drawers, cabinets and doors where confidential information is stored and clear desks at the end of the day or when leaving a work area"; and
- Encrypt confidential data that is transmitted outside of Aon's custody.

**Exhibit H**.

72.     The Code prohibits employees from utilizing confidential information for their own personal use. See **Exhibit H**.

73.     Aon's "Global Information Governance" and "Email" policies prohibit "use of personal or other third party email accounts to conduct Aon business." **Exhibits I and J**.

74.     Aon's "Electronic Transmission of Protected Information" policy requires that "[e]lectronic transmissions (including emails) containing protected information [i.e., confidential, non-public information] must be sent using a secure channel." **Exhibit K**.

75.     Aon's "Encryption Standard" policy requires use of encryption technology so that confidential information is protected. **Exhibit L**.

76.     Aon's "PCs and Laptops" policy provides that employees are to "never use the firm's hardware for conducting another business"; must not "install personal equipment on Aon PCs or Laptops"; must make "safety and security a priority"; must "ensure the security of our systems through…passwords and PINS"; and that only "Aon approved equipment should be installed on Aon PCs or Laptops." **Exhibit M**.

### The Former Employees' Restricted Stock Unit Agreements

77.     As a client service business, Aon's viability depends on its ability to attract and retain clients and talented employees, and protect its confidential, proprietary, and trade secret information.

78.     The CSG clients serviced by the Former Employees are long-term clients, many of whom have been with Aon for a decade, and some over 20 years. It takes years and significant investment to develop these client relationships. As such, Aon invests substantial time and resources to obtain and develop these near-permanent client relationships.

79.     In order to encourage certain employees to remain in the service of Aon and to incentivize them to contribute to Aon's success, Aon offers select employees an opportunity to participate in an Incentive Plan conditioned upon their agreement to a Restricted Stock Unit ("RSU") Agreement. The employees selected to participate in the Incentive Plan have personal contacts with Aon's clients and prospective clients, supervise and/or have influence over other Aon employees, and/or have access to Aon's highly confidential, proprietary, and trade secret information. Accordingly, the loss of these employees poses a particularly high risk to Aon with respect to Aon's legitimate interests in: its customer and prospective customer relationships; the goodwill Aon has created in the industry; the protection of Aon's confidential, proprietary, and trade secret information; preventing the abuse of mentor/mentee and other special employee relationships; avoiding the orchestration of group departures in a way that harms Aon; Aon's investment in training and mentoring its employees; and the stability of Aon's workforce.

80.     All of the Former Employees were parties to such RSU Agreements. See **Exhibits A-G.** In their positions, each had information regarding Aon's high-performing employees, established client relationships, and/or information useful to a competitor.

81.     The RSU Agreements signed by the Former Employees are materially similar.

82.     Pursuant to the RSU Agreements, the Former Employees were granted RSUs, each RSU representing the right to receive a Class A Ordinary Share of the Company.

83. In consideration for the RSUs granted under the RSU Agreements, the Former Employees agreed to certain restrictive covenants and confidentiality commitments.

84. The RSU Agreements are governed by Illinois law. <u>See</u> **Exhibits A-G**, § 10(j).

85. In the RSU Agreements, the Former Employees agreed that they shall not, during the course of employment and for a period of two years thereafter, "**<u>directly or indirectly, call upon, solicit, accept, engage in, service or perform</u>**" any business of the same type or kind as that performed by Aon for certain clients of Aon. This provision only applies to a small subset of Aon clients to whom they provided services, either alone or with others, or had a business relationship with, or on whose account they worked or became familiar, or supervised directly or indirectly the servicing activities related to such clients, during the 24 months prior to their termination date. The RSU Agreements also contain covenants applicable to prospective clients. <u>See</u> **Exhibits A-G**, § 9(b) (emphasis added).

86. The Former Employees also agreed that they would not, during the course of their employment, and for a period of two years thereafter, "directly or indirectly, solicit [or] induce, or cause any person or other entity to solicit or induce, any employee" of Aon to work for them or any other third party or entity, or to leave the employ of Aon. <u>See</u> **Exhibits A-G**, § 9(c).

87. The Former Employees acknowledged:

> **Acknowledgements.** Aon and [Former Employees] acknowledge and agree that the covenants…are necessary and reasonable for the protection of Aon and are reasonably limited with respect to the activities prohibited, duration, geographical scope and their effect on [Former Employees] and the public. The parties acknowledge that the purpose and effect of the covenants simply are to protect Aon for a limited period of time from unfair competition….

<u>See</u> **Exhibits A-G**, § 9(e).

88. The Former Employees further acknowledged:

**Company's Right to Injunctive Relief; Attorneys' Fees and Costs.** [Former Employees] acknowledges that [their] services to Aon are of a unique character which gives them a special value to Aon, the loss of which cannot reasonably or adequately be compensated in damages in an action at law, and that a breach…will result in irreparable and continuing harm to Aon, and that therefore, in addition to any other remedy which Aon may have at law or in equity, Aon shall be entitled to…injunctive relief for a breach or threatened breach of this Agreement….

See **Exhibits A-G**, § 9(f). A number of the RSU Agreements also provide that in the event that Aon brings an action to enforce the terms and conditions of the agreement that Aon shall recover its costs and expenses, including without limitation, attorneys' fees. Id.

89.     The Former Employees acknowledged that Aon's business depends upon the possession of information not generally known to others, and that the profitability of Aon's business requires that information remain proprietary to Aon. Accordingly, the Former Employees agreed that they would not "disclose or use during or subsequent to the course of employment" any confidential, proprietary, or trade secret information. See **Exhibits A-G**, § 9(g)(i).

### Walsh's LPP Agreement

90.     As a "key member of [Aon's] senior leadership team," Walsh was eligible to participate in the Leadership Performance Program ("LPP") for the performance cycle of January 1, 2016 - December 31, 2018.

91.     Under the LPP, Walsh was granted awards of Performance Share Units pursuant to an agreement ("LPP Agreement") he signed electronically on April 19, 2016. See **Exhibit A**.

92.     The LPP Agreement is governed by Illinois law.

93.     The LPP Agreement states that Walsh will not, during the course of employment and for a period of two years after, "directly or indirectly, call upon, solicit, accept, engage in, service or perform, other than on behalf of Aon, any business of the same type or kind" as that performed by Aon for certain clients of Aon. As with the RSU Agreements, this provision only

applies to a small subset of Aon clients. The LPP Agreement also contains covenants applicable to prospective clients. <u>See</u> **Exhibit A**, App'x B-1, § 1(b).

94.     Walsh also agreed to not, during the course of employment and for a period of two years after, "directly or indirectly, solicit or induce, or cause any person or other entity to solicit or induce, any employee of Aon" to work for himself, any third party, or to leave Aon. <u>See</u> **Exhibit A**, App'x B-1, § 1(c).

95.     In the LPP Agreement, Walsh acknowledged that Aon's business depends upon the possession of information which is not generally known to others, and that the profitability of Aon's business requires that the information remain proprietary to Aon. <u>See</u> **Exhibit A**, App'x B-1, § 1(g).

96.     Accordingly, Walsh agreed that he would not "disclose or use during or subsequent to the course of employment" any confidential, proprietary, or trade secret information. <u>See</u> **Exhibit A**, App'x B-1, § 1(g).

### <u>Ross's, Brusek's, Lubas's and Vick's Non-Solicitation Agreements</u>

97.     Ross, Brusek, Lubas and Vick ("NSA Employees") also signed Non-Solicitation Agreements ("NSAs") containing, <u>inter alia</u>, confidentiality and post-employment non-solicitation, non-disclosure, and non-disparagement covenants. <u>See</u> **Exhibits B, D, E, G**.

98.     The NSA Employees acknowledged that they received consideration for entering into the NSAs.

99.     The NSAs signed by NSA Employees are materially similar in virtually all respects.

100.    The NSAs are governed by the law of the state of the employee's residence. Brusek's, Lubas', and Vick's NSA Agreements are governed by Illinois law. <u>See</u> **Exhibits B, D, E, G**, § 5(c).

101. The NSAs are similar in pertinent part to the RSU Agreements. In the NSAs, the NSA Employees agreed not to solicit clients or prospective clients on the same terms as described in Paragraph 85. <u>See</u> **Exhibits B, D, E, G**, § 1(b).

102. Likewise, in the NSAs, as in the RSU Agreements, the NSA Employees agreed not to solicit Aon employees on the same terms as described in Paragraph 86. <u>See</u> **Exhibits B, D, E, G**, § 1(c).

103. The NSA Employees acknowledged that the covenants were "necessary and reasonable for the protection of Aon, and [ ] reasonably limited." <u>See</u> **Exhibits B, D, E, G**, § 1(e).

104. The NSA Employees acknowledged in their NSA Agreements that Aon's business depends on the possession of information not generally known to others, and that the profitability of Aon's business requires that the information remain proprietary to Aon. <u>See</u> **Exhibits B, D, E, G**, § 3(a)(i).

105. Thus, the NSA Employees agreed they would not "disclose or use subsequent to the course of employment" any confidential, proprietary, or trade secret information. <u>See</u> **Exhibits B, D, E, G**, § 3(a)(i).

## The Post-Employment Covenants Are Reasonable

106. The Agreements described above all impose a continuing contractual relationship on the parties after the employees' termination of employment.

107. The above Agreements are each narrowly tailored to protect Aon's legitimate business interests.

108. Aon has a reputation for expertise in the insurance industry, generally, and specifically in construction services, and has developed through great expense significant goodwill

embodied in its relationships with its clients and the insurance companies whose products are sought by Aon's clients.

109. Aon typically enjoys long-term and near-permanent relationships with its clients. Aon enters into multi-year agreements with many of its clients. Aon employees invest significant time—often years—developing and nurturing relationships with Aon's clients and prospects, and Aon invests significant resources in these efforts. Once clients establish a rapport with and develop trust and confidence in Aon Account Executives and Brokers, clients typically renew their relationships with Aon.

110. The prohibitions on directly or indirectly calling upon, soliciting, servicing or accepting business from certain clients with whom the Former Employees most recently worked protects Aon's legitimate interest in its client relationships—in which it significantly invested.

111. This Court previously enjoined a former employee and Alliant from "soliciting, accepting, or entering into any business relationship with, any client or prospective client of Aon, with respect to whom [the former employee] provided services, or had a business relationship, or on whose account he worked or became familiar, or supervised directly or indirectly any servicing activities, during the 24 months prior to [the former employee's termination of employment], or whom [the former employee] played any role in soliciting during the six months prior to [the termination of the former employee's employment]." Aon PLC, et al. v. Heffernan, et al., No. 16-cv-1924, Dkt. No. 28 (N.D. Ill. Feb. 10, 2016).

112. Aon has also devoted substantial resources to the recruitment, training, mentoring, and compensation of employees so they can perform the necessary services for clients, as well as develop and nurture the close relationships necessary to keep clients and client referral sources satisfied. Aon invests significant resources in developing its employees.

-27-

113.     The prohibitions on directly or indirectly soliciting and inducing, or causing others to solicit or induce, Aon employees to leave their employment with Aon are narrowly tailored to protect Aon's legitimate interest in these employee relationships, in which it has invested, in the stability of its workforce, and in the irreparable damage caused by continued and group employee losses.

114.     This Court previously enjoined a former employee and Alliant from "soliciting any employee of Aon's construction services group who has worked on an Aon project with [the former employee] within the past 24 months to leave Aon or work for Alliant…." Aon PLC, et al. v. Heffernan, et al., No. 16-cv-1924, Dkt. No. 28 (N.D. Ill. Feb. 10, 2016).

115.     In addition, Aon has an interest in prohibiting its employees, to whom it entrusted confidential, proprietary and trade secret information, from the disclosure and use of its confidential information to lure customers and employees away from Aon.

116.     Because the insurance marketplace is a competitive industry, much of the information pertaining to Aon's business plans, products, services, employees and clients is considered by Aon to be confidential and proprietary information, deserving of trade secret protection.   Aon has developed and marketed an extremely successful insurance brokerage operation that is highly dependent upon maintaining the secrecy of this information.   The disclosure of these trade secrets and other confidential and proprietary information would put Aon at a competitive disadvantage, as this information is only valuable to the extent Aon is able to maintain its secrecy.

117.     This Court previously enjoined a former employee and Alliant from using for any purpose or providing to Alliant, or its agents or employees, or any third party any Aon client-specific or employee-specific information not readily available to Alliant personnel through

sources independent of Aon or Aon's former employee.  Aon PLC, et al. v. Heffernan, et al., No. 16-cv-1924, Dkt. No. 28 (N.D. Ill. Feb. 10, 2016).

**<u>The Former Employees' Bad Acts Prior To Their Resignations</u>**

118.    Walsh, and upon information and belief, Ross and Taylor, started communicating with Alliant about leaving Aon and joining Alliant prior to September 2019.

119.    Then, on or about September 9, 2019, and while in discussions with Alliant, **Walsh** and **Ross** secretly met with the Risk Manager for Aon client Dragados in New York City.  Neither Walsh nor Ross live in New York City.  Ross previously worked with Dragados but was transitioned away from this account starting in Q4 of 2018.  Upon information and belief, Walsh had not met with Dragados for at least two years and, while he supervised others on this account, he did not play an active role with this client.  The Aon personnel responsible for this client were not notified of this secret meeting.  On her expense report, Ross never mentioned meeting with Dragados in New York.  Instead, upon information and belief, she expensed this meeting as a "private prospect appointment."

120.    Upon information and belief, Walsh and Ross met with Dragados in anticipation of their departure from Aon and for the purpose of soliciting this client to leave with them when their transition occurred.

121.    Indeed, when Walsh was later asked about the purpose of this meeting and why the Aon team that services this client was excluded, Walsh dismissed the inquiry.

122.    Then, on September 12, 2019, **Ross** and **Taylor** met in London with Aon client KB Homes, a client of Aon's for over 20 years.  Without involving or notifying the Aon Senior Vice President and Account Executive responsible for this client, Ross and Taylor invited the client to a meeting with a wholesale London broker, Besso, that is not an Aon approved broker, and who,

conveniently and upon information and belief, is Alliant's preferred broker in London with whom Alliant has worked for years. This was highly unusual behavior given that Aon has its own brokerage operation in London with whom it exclusively works unless expressly instructed by the client. Upon information and belief, KB Homes did not instruct Ross or Taylor to work with Besso, or invite Besso representatives to the meeting. Moreover, Aon works with a number of approved brokers in the London market—Besso is not one of them.

123. What's more, Ross and Taylor intentionally tried to hide the meeting from Aon. Ross booked her flight to London on her personal card, in violation of Aon's travel policy which requires that all flights be booked through Aon's global travel program. The meeting was not included on the agenda circulated in advance of the trip. Ross and Taylor did not invite Aon's own UK broker to the meeting. In addition, Ross and Taylor tried to exclude the Aon Senior Vice President and Account Executive responsible for the client from the meeting, by telling him that it was just a working meeting and his attendance was not required.

124. **Walsh** was aware of and authorized the meeting with Besso.

125. Ross and Taylor expensed the trip to Aon.

126. Then, on October 16, 2019, at 3:20 am (five days before her resignation), Ross asked the client at KB homes which London wholesaler she would like to use (i.e., not Aon), copying Taylor and Walsh only, and not the Aon Account Executive responsible for the client.

127. KB Homes has since informed Aon that it is moving its business, in excess of $1 million annually, to Alliant, and that Taylor will be servicing the account.

128. Upon information and belief, Ross also met with another client in October 2019 (as she was preparing to leave Aon for Alliant), for the purposes of a "marketing meeting," during

which meeting she told the client that it could change brokers at any time (a statement inimical to Aon's interests). Ross expensed this trip to Aon.

129. Moreover, on or about October 4, 2019, and after discussions and a meeting with Alliant, **Janic** improperly printed a list of his outlook contacts, totaling 39 pages, which included his professional contacts, including client contact persons, phone numbers and email addresses – i.e., essentially a client list with key contact people.

130. In early October, and after **Lubas** was contacted by Alliant, Lubas improperly and without authorization copied confidential materials from his Aon laptop onto an external USB drive. The USB drive contained Aon confidential and trade secret material, including client quotes, documents concerning a massive construction opportunity that Aon is currently consulting on for the future placement of insurance, proposals, a project tracker which contains a pipeline of future revenue streams and projects Aon is working on across the country, and other proprietary materials.

131. In addition, on October 9, 2019, and upon information and belief after she had been approached to leave Aon for Alliant, **Brusek** improperly and without authorization copied **thousands** of documents onto a USB thumb drive containing years' worth of Aon intellectual capital, including a general liability policy optimizer database (a proprietary database created by Aon to direct its clients to carriers with appropriate coverages) which is currently under development and has not gone to market yet, confidential information pertaining to Aon's proprietary weather risk product, client proposal(s), a tremendous amount of client-specific data including policy and other documents, and benchmarking and peer analyses, among other things. For example, one of the files taken by Brusek includes client specific exposure information (payrolls, revenue, etc.), insurance carrier information, policy limits purchased, premiums, Aon

revenue, estimated losses, and loss rates for approximately 90 clients – comprising of up to 4 years of data for these clients.

132.    Also on October 9, 2019, two weeks before his resignation, **Walsh** sent an email to John Buenz, who is responsible for finance at Aon, seeking detailed client specific premium data, broken down by client and line of coverage, which Mr. Buenz provided.  Client premium data is a closely guarded secret at Aon.  In the hands of a competitor, this information could be used to underbid Aon for the client's business.  This, coupled with Walsh's monthly access to the client billing report, provided Walsh with a roadmap as to how to compete against Aon—a copy of the keys to the kingdom.  With this information, Walsh was equipped with confidential, proprietary and trade secret information including, for every single Aon CSG client, how much revenue they were bringing in, how much premium they were paying, and what pricing could be offered to lure those clients away from Aon.  It is highly suspect that Walsh requested this information while he was in active discussions with Alliant and just two weeks before tendering his resignation.

**Defendants Coordinated Group Departure**

133.    On or about October 21, 2019, Ross voluntarily resigned from Aon.

134.    On or about October 22, 2019, Taylor voluntarily resigned from Aon.

135.    On or about October 22, 2019, Walsh voluntarily resigned from Aon.

136.    On or about October 23, 2019, Brusek voluntarily resigned from Aon.

137.    On or about October 23, 2019, Lubas voluntarily resigned from Aon.

138.    On or about October 23, 2019, Vick voluntarily resigned from Aon.

139.    On or about October 23, 2019, Janic voluntarily resigned from Aon.

140.    On or about October 24, 2019, Patrick Walsh, Matthew Walsh's son who also worked for Aon CSG in Chicago, voluntarily resigned from Aon.

141.     Immediately thereafter, all eight of the above-referenced former Aon employees joined Alliant, Aon's direct competitor.  All of these employees reported either directly or indirectly to Walsh when they were employed by Aon, with the exception of Vick, who sat near Walsh in Aon's Chicago office.

142.     Upon information and belief, as part of the raid on Aon conducted by Defendants, Walsh helped Alliant to hire Aon's employees and encouraged Aon employees to leave Aon and join Alliant and coordinated their *en masse* departures, in violation of his contractual agreements and his fiduciary duties to Aon.

143.     Indeed, the Former Employees were close associates who all worked in the CSG, the vast majority of whom worked in Chicago, and who reported either directly or indirectly to Walsh in Chicago (with the exception of Vick, who sat physically near Walsh).  In addition, Walsh is Patrick Walsh's father.

144.     It defies reason that the Former Employees were solicited in isolation by Alliant, without consultation from Walsh, or that they decided to individually leave their high-paying jobs at Aon after, in some cases, years of employment, to join Alliant without knowing who they were going to work with.

145.     Indeed forensic evidence shows that certain of the Former Employees were discussing the terms of each other's arrangements with Alliant, showing their coordination.  For example, on October 15, 2019, the same day that Lubas signed an agreement acknowledging that he was in discussions with Alliant, Brusek messaged Lubas concerning an Aon benefit she would "like to keep" (presumably if she left Aon to join Alliant).

146.     Upon information and belief, Ross also told a client that she "left with a group" to go to Alliant

147.     Alliant's targeted and well-informed solicitations continue. Alliant has aggressively, systematically, and strategically solicited Aon employees (the Former Employees and others) to leave Aon and work for Alliant. Alliant is not cold calling all Aon CSG employees. The employees Alliant is targeting are those with large books of business and/or key client relationships accountable for large sources of revenue for Aon CSG. This information is not publicly available. Upon information and belief, Alliant did not previously call upon or solicit these employees prior to entering into discussions with Walsh.

148.     For example, one employee that Alliant solicited is responsible for a multi-million dollar book of business. Walsh is well aware of this non-public, and highly confidential fact. Another employee that Alliant solicited is viewed as the key client relationship person for a large client accountable for significant revenues. This information is also not publicly available, and is considered highly confidential, proprietary and trade secret information.

149.     Moreover, in its recruitment efforts, Alliant offered at least one of these employees additional compensation equivalent to between 20-25% of the revenue for any accounts that he worked on at Aon that move to Alliant—in other words, Alliant is actively incentivizing employees to breach their non-solicitation covenants and targeting Aon employees based, on information and belief, on backchannel information it has learned about the clients and accounts they service. Upon information and belief, Alliant has similarly incentivized the Former Employees to solicit their former Aon clients. Upon information and belief, Alliant is indemnifying the Former Employees for the anticipated claims brought by Aon in connection with enforcing their duties and covenants to Aon.

150.     It defies reason that Alliant would know which employees to contact without having received insider and back-channel information from Walsh regarding such employees and

their revenue potential. Upon information and belief, Walsh assisted Alliant with its solicitations of Aon employees.

151.    Moreover, it is simply not credible that the Former Employees resigned from Aon the same week without acting in concert. Aon Risk Servs. v. Cusack, No. 651673/11, 2011 WL 6955890, at *1, 10 (Sup. Ct. N.Y. Cnty. Dec. 20, 2011) ("The coordinated departure of the Aon executives the morning of June 13, 2011… followed by the mass exodus of Aon employees that same day, could not have happened without prior planning by the former Aon executives and Alliant."); AON Corp. v. Alliant Ins. Serv., Inc., 2014 NY Slip Op 31735(U), 2014 WL 2990393, at *12 (Sup. Ct. N.Y. Cnty. June 26, 2014) ("It is not credible that senior management and all of the top producers in the Aon central California offices would resign from [Aon] on the same day without acting in concert").

152.    In the past two weeks alone, in order to retain Aon employees targeted by Alliant, Aon has had to spend significant amounts of money to retain the targeted employees.

**Ross' And Taylor's Breaches; Aon Loses Two Clients**

153.    In addition, immediately after her resignation, Ross began violating her post-employment restrictive covenants.

154.    On October 22, 2019, the day after her resignation, Ross called a client with whom she previously worked to inform him that she had resigned from Aon.

155.    On October 23, 2019, Ross contacted Aon client Ferrovial (a client with whom she previously worked), and, upon information and belief, told the client that she "left with a group" to go to Alliant.

156.    On October 25, 2019, KB Homes notified Aon that it was moving its business from Aon to Alliant. KB Homes has been an institutional client of Aon for over 20 years. Taylor was

the Account Executive and Executive Client Contact for this client. Ross was heavily involved in servicing this client as well. Neither Taylor nor Ross had a relationship with this client prior to their employment with Aon. KB Homes is accountable for over $1 million in revenue. This is the same client with whom Ross and Taylor met mere weeks earlier in London with Alliant's preferred broker.

157. Also on October 25, 2019, Ferrovial notified Aon that it was moving a project to Alliant and that Ross was to continue to service the client at Alliant. The project that was transitioned to Alliant was estimated to generate at least hundreds of thousands of dollars in revenue to Aon. Ross did not originate Aon's client relationship with Ferrovial.

158. Upon information and belief, Ross solicited ACS Infrastructure, Dragados' parent company, after her departure from Aon. Dragados is the same client that Ross and Walsh met with, inexplicably, just prior to their resignations. Specifically, upon information and belief, Ross contacted the client, and provided the names of the Aon employees that left Aon for Alliant (even though the client did not even work with those Aon employees), in an apparent effort to scare the client about Aon's ability to continue to service the client's needs.

159. Then, on November 4, 2019, Aon received confirmation that Taylor was directly servicing former Aon client, KB Homes, a client Taylor worked with when employed by Aon.

160. Specifically, the client emailed Aon, attaching a broker of record letter stating that, as of October 25, 2019, KB Home was appointing Alliant Insurance Services, Inc. as its insurance broker. In the client's email, the client stated "[f]or copies of policies and underwriting information, please forward them to Jamie Taylor at Jamie.taylor@alliant.com."

## **Alliant's Knowing Interference With The Former Employees' Agreements**

161.     On October 25, 2019, Aon wrote to Walsh, Ross, Taylor, and Lubas (copying Alliant) to remind them of their existing obligations pursuant to their Agreements, and specifically to advise them that the restrictive covenants continue for two years from the last day of their employment with the Company.  See **Exhibit N**.

162.     The October 25, 2019 letter stated that Walsh, Ross, Taylor, and Lubas could not directly or indirectly solicit, or perform work for or provide services to any of their former clients, and that they were prohibited from soliciting any employee of Aon to work for themselves, a third party, or to leave their employment with Aon.  See **Exhibit N**.

163.     Walsh, Ross, Taylor, Lubas, and Alliant were further advised that "any use of Aon's confidential proprietary information to compete unfairly or to otherwise interfere with business of Aon, is a violation of law."  See **Exhibit N**.

164.     The October 25, 2019 correspondence requested:

While our investigation is continuing, we need immediate assurances from you that you have not retained possession, custody or control of any Company property of any kind in any format and that you have and intend to comply with your obligations. We will also need assurances from you that you [ ] have not and will not use or share Aon's information with Alliant and that to your knowledge none of Aon's information is on Alliant's systems or your personal devices. If it is your position presently that you do not have possession, custody or control of any Company property of any kind in any format, then please provide those assurances in writing immediately. Likewise, please confirm immediately in writing that you have not and will not solicit any employees of Aon to leave Aon on behalf of Alliant or any other party, that you have not and will not solicit, accept, service, perform work for Alliant or any other party with Aon clients as defined in your Agreement. Please note that providing information to other Alliant personnel regarding Aon clients for the purposes of soliciting Aon clients is considered a violation of your agreement and we want confirmation that you have not engaged in such activities. If we do not receive your written assurances of past and current compliance with your obligations by close of business Monday October, 28, we will consider that as your indication that you have not and do not intend to comply with your agreements. See **Exhibit N**.

165.    On October 28, 2019, Walsh, Ross, Taylor, and Lubas responded, through their counsel, Morgan Lewis, who stated that Morgan Lewis also represents Brusek, Vick, Janic, and Patrick Walsh.  See **Exhibit O.** That the Former Employees all quickly retained the same counsel immediately following their resignations further evidences the coordinated nature of this group departure.

166.    In that letter, Morgan Lewis admitted that:

- Janic printed out a list of his personal and professional contacts;
- Brusek was in possession of the external USB drive which contains Aon information;
- Lubas was in possession of an external USB drive which contained Aon materials downloaded from his laptop.

See **Exhibit O.**

167.    The Former Employees refused to provide the assurances requested in the October 25 letter, including the assurance that they would abide by their post-employment restrictive covenants—calling the covenants "unreasonable." See **Exhibit O.**

168.    On October 31, 2019, Aon's counsel wrote to Morgan Lewis to remind Brusek, Vick, and Janic of their obligations pursuant to their Agreements.  See **Exhibit P**.  This letter similarly advised that the employees could not directly or indirectly solicit, or perform work for or provide services to any of their former clients, and that they were prohibited from soliciting any employee of Aon to work for themselves, a third party, or to leave their employment with Aon. See **Exhibit P**.  They were also advised that "any use of Aon's confidential proprietary information to compete unfairly or to otherwise interfere with business of Aon, is a violation of law." See **Exhibit P**.

169.    The October 31, 2019 letter sought the same assurances as those in the October 25, 2019 letter, namely requesting that the Former Employees have and intend to comply with their

contractual and other legal obligations to Aon, including that they will not directly or indirectly solicit employees of Aon to leave Aon, and will not solicit, accept, service or perform work for Alliant with Aon clients, as defined in their respective Agreements. See **Exhibit P**.

170.    On November 1, 2019, Morgan Lewis responded to the October 31, 2019 letter, asking Aon to "confirm" that Taylor is not "subject to any post-employment covenant not to compete or non-solicitation of customer provision," despite her signed Agreements to the contrary. *See* **Exhibit Q**.   The November 1 letter also stated that Aon's request for assurances were "unreasonable."  *See* **Exhibit Q**.

171.    Given their failure to offer assurances of compliance through their attorneys, Aon has reason to believe that the Former Employees are presently continuing to breach their restrictive covenants, with Alliant's assistance, and that absent immediate injunctive relief, they will continue do so or will imminently do so, risking further harm to Aon.

172.    In addition, despite Morgan Lewis' assertion that they utilized a "protocol" to remove Aon's information from the Former Employees' devices and accounts, the purported "protocol" is woefully inadequate and relies entirely on the truthful self-reporting of the Former Employees who Aon has no reason to, does not, and is not legally required to, trust.

**COUNT I**
**VIOLATION OF FEDERAL DEFEND TRADE SECRETS ACT**
**(AGAINST ALL DEFENDANTS)**

173.    Aon repeats and realleges the allegations set forth above as if fully set forth and repeated herein.

174.    Defendants' actions, as described above, constitute violations of one or more provisions of the DTSA.

175.    The DTSA creates a private cause of action in favor of the "owner of a trade secret that is misappropriated…if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1).

176.    The DTSA further provides that "a court may grant an injunction – to prevent any actual or threatened misappropriation described in paragraph (1) on such terms as the court deems reasonable…."  18 U.S.C. § 1836(b)(3)(A).

177.    By engaging in the conduct described above, the various Defendants have misappropriated, threaten to misappropriate, or inevitably will misappropriate Aon's trade secrets related to a product or service used in, or intended for use in, interstate or foreign commerce.

178.    The trade secret information to which the Former Employees had access and which came into their possession include, but is not limited to, those items identified in Paragraph 69, *supra*.  Aon expended substantial time, energy, money and ingenuity in compiling this information based on its own efforts and communications with clients, prospective clients, and others.

179.    Aon has taken reasonable measures to keep this information secret by: (1) limiting the number of employees with access to the information; (2) requiring employees who have access to such information to sign confidentiality agreements; (3) by promulgating confidentiality policies; and/or (4) by requiring that such confidential information be saved on password protected networks and servers.

180.    These trade secrets are related to Aon's products and services, which Aon uses in interstate and foreign commerce.  For example, the trade secrets contain information about services provided to Aon clients or prospective clients with locations across the United States and globally.

181.    As set forth herein,  the Former Employees (and Alliant by virtue of its employment of the Former Employees and its actions of obtaining client information from them)

-40-

misappropriated, threaten to misappropriate, or inevitably will misappropriate these trade secrets by, among other things:

- Janic's printing client names and contact information and removing that information from Aon for the purpose of using it at Alliant and for the benefit of Alliant;

- Lubas and Brusek copying Aon documents without authorization to USB thumb drives for the purpose of using such documents at Alliant and in competition with Aon, among other things;

- By all Defendants by the Former Employees accepting employment at Alliant, Aon's direct competitor, in virtually identical positions and attempting to or threatening to service the same clients, while being incentivized by Alliant to do so through the promise of increased compensation should client accounts follow the Former Employees to Alliant, and where Defendants have refused to assure Aon that they will not service or solicit the same clients which would inevitably involve the use of Aon's confidential information and trade secrets such that misuse of the trade secrets can be inferred under the inevitable disclosure doctrine; and

- By Walsh, Taylor and Ross by using their knowledge of Aon clients and financial information to target Aon clients and to help steer those clients to Alliant either prior to or after their departure from Aon.

182. The Former Employees owed fiduciary and contractual duties to Aon to maintain the secrecy of the trade secrets and limit the use of the trade secrets. The Former Employees (and Alliant by virtue of its employment of the Former Employees and its actions as described herein) threaten acquisition of the trade secrets by improper means.

183.   The trade secrets derive independent economic value and benefit from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic benefit from the disclosure or use of the information by using such information to poach Aon's valuable clients and employees.

184.   Aon communicated these trade secrets to the Former Employees in confidence.

185.   On information and belief, the Former Employees intended to convert or inevitably will convert the trade secrets to the economic benefit of themselves and Alliant, without Aon's consent, for use while at Alliant, to poach clients or prospective clients and Aon employees, for the Former Employees' and Alliant's economic benefit.

186.   Aon's trade secrets were not generally known to, and are not readily ascertainable through proper means by, Alliant.

187.   The Former Employees and Alliant can obtain economic value for the disclosure and use of Aon's trade secrets, for example by utilizing the information therein to solicit, attempt to induce, and induce Aon's clients to switch their business from Aon to Alliant, and derive personal financial gain from such activities.

188.   On information and belief, Alliant acquired, received and possesses, or inevitably will acquire, receive and possess, the trade secrets, knowing same to have been misappropriated without Aon's authorization and in violation of the Former Employees' contractual commitments and other legal duties to Aon.

189.   As a consequence of the foregoing, Aon has suffered and will continue to suffer irreparable harm, injury and loss.  Furthermore, pursuant to the DTSA, actual or threatened misappropriation can be enjoined.  If not enjoined, Aon will continue to suffer irreparable harm that cannot be remedied through money damages.

## COUNT II
## ILLINOIS TRADE SECRET ACT, 765 ILCS 1065/1, ET SEQ.
## (AGAINST ALL DEFENDANTS)

190.     Aon incorporates the preceding allegations as if fully set forth herein.

191.     By the conduct alleged herein and described above, Defendants improperly acquired and misappropriated, or threaten to acquire and misappropriate, or inevitably will acquire and misappropriate, Aon's trade secret information, including the information described in Paragraph 69 above.

192.     Former Employees obtained Aon's trade secrets under circumstances giving rise to a fiduciary and contractual duty owed by Former Employees to Aon to maintain their secrecy and limit their use.

193.     Aon's trade secret information is sufficiently secret to derive economic value from not being generally known to others who can obtain economic value from its disclosure or use.

194.     As set forth above, Aon takes reasonable measures to keep and maintain the secrecy and confidentiality of the trade secrets.

195.     As set forth above, by the conduct alleged herein, Former Employees misappropriated or threatened to misappropriate the trade secrets by, among other things, using and disclosing, or threatening to use and disclose, and inevitably using and disclosing the trade secrets without Aon's consent. On information and belief, the Former Employees and Alliant acquired, threaten to acquire, and inevitably will acquire the trade secrets while knowing or having reason to know that they were doing so by improper means.

196.     On information and belief, Alliant has derived Aon's trade secret information from and through the Former Employees, Alliant's employees and agents, knowing same to have been

misappropriated. Defendants are now, on information and belief, using or inevitably will use Aon's trade secrets to convert Aon clients and employees to Alliant.

197.     By the conduct alleged herein, Former Employees breached or inevitably will breach, and Alliant has induced the breach, of Former Employees' duty to maintain the secrecy of Aon's confidential and trade secret information.

198.     On information and belief, Defendants intend to or inevitably will convert the trade secrets to their economic benefit, without Aon's consent, for anti-competitive use and to convert Aon clients and employees to Alliant, for Defendants' own economic benefit.

199.     As a direct and proximate result of Defendants' misappropriation of trade secrets, Aon has suffered and will continue to suffer immediate irreparable harm, injury, and loss. Pursuant to the Illinois Trade Secret Act, actual or threatened misappropriation may be enjoined. Unless enjoined by this Court, Defendants will continue to use Aon's trade secret information to unfairly compete and enjoy commercial advantage that they would not have but for their misappropriation.

200.     The acts and conduct of Defendants were willful and malicious, justifying an award of exemplary damages and attorneys' fees.

201.     As a direct and proximate result of the conduct of Defendants, Aon is entitled to damages in an amount to be determined at trial.

## COUNT III
## BREACH OF CONTRACT
## (AGAINST WALSH, ROSS, TAYLOR, BRUSEK, LUBAS, JANIC)

202.     Aon incorporates the preceding allegations as if fully set forth herein.

203.     Aon and Walsh entered into valid and enforceable RSU and LPP Agreements, attached as Exhibit A. Aon has performed all duties and obligations under Walsh's RSU and LPP Agreements.

204.    Aon and Ross entered into valid and enforceable RSU and NSA Agreements, attached as Exhibit B. Aon has performed all duties and obligations under Ross's RSU and NSA Agreements.

205.    Aon and Taylor entered into valid and enforceable RSU Agreements, attached as Exhibit C. Aon has performed all duties and obligations under Taylor's RSU Agreements.

206.    Aon and Brusek entered into valid and enforceable RSU and NSA Agreements, attached as Exhibit D. Aon has performed all duties and obligations under Brusek's RSU and NSA Agreements.

207.    Aon and Lubas entered into valid and enforceable RSU and NSA Agreements, attached as Exhibit E. Aon has performed all duties and obligations under Lubas's RSU and NSA Agreements.

208.    Aon and Janic entered into valid and enforceable RSU Agreement, attached as Exhibit F.  Aon has performed all duties and obligations under Janic's Agreements.

209.    As set forth above, Walsh breached his RSU Agreements by, among other things: (1) directly or indirectly calling upon, soliciting, accepting, engaging in, servicing, or performing, other than on behalf of Aon, business of the same type or kind as the business performed by Aon, for those clients to whom he had provided services, had a business relationship, or on whose account he worked or supervised servicing activities; (2) directly or indirectly soliciting or inducing, or causing others to solicit or induce, any employee of Aon to work for Walsh or any third-party, or to leave the employ of Aon; and (3) by disclosing or using Aon's confidential, proprietary, and trade secret information.

210.    As set forth above, Ross breached her RSU Agreements and NSA by, among other things: (1) directly or indirectly calling upon, soliciting, accepting, engaging in, servicing, or

performing business, other than on behalf of Aon, of the same type or kind as the business performed by Aon, for those clients to whom she had provided services, had a business relationship, or on whose account she worked or supervised servicing activities; and (2) by disclosing or using Aon's confidential, proprietary, and trade secret information.

211.     As set forth above, on information and belief, Taylor breached her RSU Agreements by, among other things: (1) directly or indirectly calling upon, soliciting, accepting, engaging in, servicing, or performing business, other than on behalf of Aon, of the same type or kind as the business performed by Aon, for those clients to whom she had provided services, had a business relationship, or on whose account she worked or supervised servicing activities; and (2) by disclosing or using Aon's confidential, proprietary, and trade secret information.

212.     As set forth above, on information and belief, Brusek, Lubas, and Janic breached their RSU and/or NSA Agreements by, among other things, taking, disclosing or using Aon's confidential, proprietary, and trade secret information.

213.     As set forth above, due to the overlap between their jobs at Aon and new jobs at Alliant, and their failure to provide adequate assurances that they will not use or disclose Aon's confidential and trade secret information, the above employees either have already used or disclosed, or inevitably will use or disclose, Aon's confidential information and trade secrets.

214.     As a direct and proximate result of the above breaches, Aon suffered and continues to suffer damages, including, but not limited to, lost business, lost profits, costs of hiring and retaining former and new employees, costs of retaining clients, and damage to goodwill, among other things, in an amount to be determined at trial.   Aon has also suffered and will continue to suffer immediate, irreparable harm warranting temporary, interlocutory and permanent injunctive

relief. Injunctive relief is necessary as Aon is without an adequate remedy at law to prevent this harm to Aon.

215.    Pursuant to the above-referenced Agreements, Aon is entitled to injunctive relief, as well as its costs and expenses, including attorneys' fees, incurred in bringing this action.

## COUNT IV
## BREACH OF FIDUCIARY DUTY
## (AGAINST WALSH, ROSS AND TAYLOR)

216.    Aon incorporates the preceding allegations as if fully set forth herein.

217.    At all times pertinent hereto, Walsh, Ross, and Taylor, by virtue of their respective positions at Aon, owed a fiduciary duty of loyalty to Aon.  They were senior employees and executives, entrusted by Aon with access to its valued clients and to trade secrets and confidential information that allowed them to perform their duties as executives and to develop the relationships and goodwill which form the basis of Aon's business relationships with its clients, all at Aon's expense and direction.  Walsh, Ross, and Taylor owed Aon a fiduciary duty which required them to, *inter alia,* devote all of their time and attention during business hours to the business of Aon, to refrain from engaging in a business or business activity which competed with Aon, and to refrain from conducting activities in any manner inimical to Aon's best interest.

218.    As set forth in detail above, Walsh breached his fiduciary duty to Aon by, for example and without limitation: (1) withholding from his reporting superiors his knowledge of a planned group departure; (2) participating in a planned group departure from Aon; (3) taking steps while employed by Aon to sabotage Aon's business and not devoting his best efforts to Aon; (4) upon information and belief, encouraging, assisting, and enticing other Aon employees to leave Aon while he was still employed by Aon; and (5) upon information and belief, directly or indirectly, recruiting his down-line subordinates to leave Aon.

219.    As set forth in detail above, Ross breached her fiduciary duties to Aon by, for example and without limitation: (1) withholding from her reporting superiors her knowledge of a planned group departure; (2) participating in a planned group departure from Aon; and (3) taking steps while employed by Aon to sabotage Aon's business and not devoting her best efforts to Aon.

220.    As set forth in detail above, Taylor breached her fiduciary duties to Aon by, for example and without limitation: (1) upon information and belief, withholding from her reporting superiors her knowledge of a planned group departure; (2) participating in a planned group departure from Aon; and (3) taking steps while employed by Aon to sabotage Aon's business and not devoting her best efforts to Aon.

221.    As a direct and proximate result, Aon has sustained and will incur damages, including, but not limited to, lost business, lost profits, damage to its goodwill, costs of hiring and retaining former and new employees, as well as the salary and other compensation paid to Walsh, Ross and Taylor during the period of their breaches, in an amount to be proven at trial. Aon has also suffered and will continued to suffer immediate and irreparable harm as a result of such breaches.  If Walsh, Ross and Taylor are not enjoined, Aon will continue to suffer injury until the breaches are enjoined. Injunctive relief is necessary as Aon is without an adequate remedy at law to prevent this continuing harm to Aon.

222.    The aforementioned conduct was intentional, malicious, and in bad faith, and has subjected and will continue to subject Aon to cruel and unjust hardship in conscious disregard of Aon's rights, so as to justify an award of exemplary and punitive damages.

### COUNT V
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (AGAINST ALLIANT, WALSH, ROSS, TAYLOR)

223.    Aon incorporates the preceding allegations as if fully set forth herein.

224.     At all times pertinent hereto, and in all cases prior to October 21, 2019, Alliant was aware that Walsh, Ross, and Taylor understood and assented to Aon that they would act on Aon's behalf and be subject to Aon's control as an agent of Aon in connection with their employment with Aon.

225.     At all times pertinent hereto, and in all cases prior to October 21, 2019, Walsh, Ross, and Taylor each was aware that the others understood and assented to Aon that they would act on Aon's behalf and be subject to Aon's control as an agent of Aon in connection with their employment with Aon.

226.     At all times pertinent hereto, and in all cases prior to October 21, 2019, Alliant, Walsh, Ross, and Taylor were aware of Walsh's, Ross's, and Taylor's senior positions at Aon, and that they were entrusted by Aon with access to its valued clients and to trade secret and confidential information, including but not limited to information about Aon's clients, business strategies, and financial information not available to the general public or within the insurance brokerage industry.

227.     Alliant, Walsh, Taylor and Ross were aware that Aon provided Walsh, Ross and Taylor with access to its valued clients, to allow them to develop relationships and goodwill which form the basis of Aon's business relationships with its clients, all at Aon's expense and direction.

228.     Alliant, Walsh, Taylor and Ross were each aware that Walsh, Taylor and Ross owed Aon a fiduciary duty which required them to, *inter alia*, devote all of their time and attention during business hours to the business of Aon, to refrain from engaging in a business or business activity which competed with Aon, and to refrain from conducting activities in any manner inimical to Aon's best interest.

229.     Alliant, Walsh, Taylor and Ross nevertheless substantially assisted Walsh, Taylor and Ross and encouraged them to breach those duties as described herein.

-49-

230.    On information and belief, Walsh, Ross, and Taylor secretly prepared to work for a competing business utilizing Aon's confidential information.  They laid the groundwork for transferring clients to Alliant while they were still employed by Aon and in conversations with Alliant.  They attempted to hide their acts in preparation for competition, and such nondisclosure was harmful to Aon. Alliant was aware of Walsh's, Ross's, and Taylor's duties to the contrary, and substantially assisted and encouraged them to breach those duties as described herein by, among other things and upon information and belief, incentivizing them by paying them for a percentage of the revenue from clients that followed them to Alliant and indemnifying them for claims by Aon.

231.    As a direct and proximate result of Walsh's, Ross's, and Taylor's breaches of their fiduciary duties, which were substantially assisted and encouraged by Alliant, Aon has sustained and will incur further damages, including, but not limited to, damages reflecting lost business, lost profits, damages to its goodwill, and costs of hiring and retaining former and new employees, as well as the salary and other compensation paid to Walsh and Ross during and period of their breaches, in amounts to be proven at trial. Aon has also suffered and will continue to suffer immediate and irreparable harm, and will continue to suffer injury until the breaches are enjoined.

232.    The aforementioned wrongful conduct was intentional, malicious, and in bad faith, and has subjected and will continue to subject Aon to unjust hardship in conscious disregard of Aon's rights, so as to justify an award of exemplary and punitive damages according to proof at trial.

### COUNT VI
### TORTIOUS INTERFERENCE WITH CONTRACT
### (AGAINST ALLIANT)

233.    Aon incorporates the preceding allegations as if fully set forth herein.

234.    Aon is a party to valid Agreements with the Former Employees.

235.    Upon information and belief, Alliant was aware of the Former Employees' Agreements from times preceding the breaches thereof.

236.    Alliant permitted and/or encouraged the breaches of the Agreements described above (the "Breaches"), and intentionally and without justification induced the Breaches with malicious intent.

237.    Aon suffered actual damages as a result of the Breaches.

238.    Aon suffered and will continue to suffer immediate and irreparable harm as a direct result of the above conduct. If not enjoined, Alliant will induce further breaches of the Agreements, which will result in additional damages and irreparable harm to Aon. Injunctive relief is necessary as Aon is without an adequate remedy of law to prevent this harm to Aon.

**COUNT VII**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
**(AGAINST WALSH, ROSS, TAYLOR, AND ALLIANT)**

239.    Aon incorporates the preceding allegations as if fully set forth herein.

240.    Aon has and had protectable business relationships with the Former Employees, the Aon employees Alliant directly or indirectly solicited/induced, and the clients Walsh, Ross, Taylor, and Alliant solicited/induced or attempted to solicit/induce to leave Aon (the "Prospective Business Relationships").

241.    Aon had a reasonable expectation that (1) its employees would continue their employment with Aon; and (2) its clients would continue utilizing Aon for its services.

242.    Aon would have had greater prospective business advantage with the Prospective Business Relationships, absent improper interference.

243.    At all relevant times, Walsh, Ross, Taylor, and Alliant have and had knowledge of the Prospective Business Relationships.

244.    Walsh, Ross, Taylor, and Alliant permitted and/or encouraged each other to commit the Breaches, induced the Breaches, and/or induced Aon's customers/employees to leave Aon by their acts described above, and have thereby interfered with Aon's prospective business advantage.

245.    Walsh's, Ross's, Taylor's, and Alliant's actions, described herein, were done purposefully and with malicious and unjustifiable intent.

246.    As a direct and proximate result of the above activities, Aon has suffered and will continue to incur actual damages, including, but not limited to, lost business, lost profits, damage to goodwill, and the costs of hiring and retaining former and new employees, among other things.

247.    Walsh, Ross, Taylor and Alliant have succeeded in ending Aon's relationship with its employees and clients, and interfering with Aon's expectancy in those Prospective Business Relationships.

248.    Aon has suffered and will continue to suffer immediate irreparable harm until Walsh, Ross, Taylor and Alliant are enjoined. Injunctive relief is necessary as Aon is without an adequate remedy at law to prevent this harm to Aon.

249.    Punitive damages are warranted due to the malicious nature of the above conduct.

**COUNT VIII**
**DECLARATORY JUDGMENT**
**(AGAINST FORMER EMPLOYEES)**

250.    Aon incorporates the preceding allegations as if fully set forth herein.

251.    The RSU, NSA, and LPP Agreements described herein contain restrictive covenants relating to the Former Employees' obligations to Aon, including, but not limited to (and as set forth more fully above):

- Prohibitions on the direct or indirect calling upon, solicitation, acceptance, engagement in, servicing or performance of services (other than on behalf of Aon) of any business of the same type or kind as the business performed by Aon with respect to a narrow subset of clients or prospective clients with whom the Former Employees previously had a business relationship;

- Prohibitions on directly or indirectly soliciting or inducing, or causing any person or entity to solicit or induce, any employee of Aon to work for the Former Employee, a third-party, or to leave the employ of Aon; and

- The treatment of Aon's confidential and trade secret information.

252. The restrictive covenants contained in the RSU, NSA, and LPP Agreements, including all provisions related to such restrictive covenants, are valid and enforceable.

253. Pursuant to the explicit plain language of the RSU and LPP Agreements, the RSU and LPP Agreements are governed by Illinois law.

254. Aon has performed, or has been excused from performing, any and all of its obligations under the RSU, NSA, and LPP Agreements.

255. Aon wrote to each of the Former Employees and requested assurances that they would abide by the restrictive covenants in their respective agreements.

256. In response, the Former Employees, through Counsel, told Aon that this position was "unreasonable."

257. It is also Taylor's position, as set forth by her Counsel in the November 1, 2019 letter, that the restrictive covenants contained in the RSU Agreements are invalid and unenforceable because Taylor is a relatively recent California resident, and despite the plain language of the RSU Agreements that state they are governed by Illinois law and an Illinois forum selection clause, Taylor contends that her RSU Agreements are governed by California law.

258. A ripe, actual controversy exists over the enforceability of the restrictive covenants contained in the RSU, LPP, and NSA Agreements.

259.     This Court has jurisdiction to enter a declaratory judgment that the restrictive covenants contained in the Agreements are enforceable.

260.     A declaratory judgment is proper to declare the rights and obligations of the Former Employees and Aon.

## PRAYER FOR RELIEF

**WHEREFORE,** Aon demands judgment against Defendants as follows:

1.     A preliminary and permanent injunction, enjoining and restraining:

A.     The Former Employees, and anyone acting in concert with them, including Alliant, from violating, or participating in the violation of, any of the terms of their respective Agreements;

B.     Defendants, and anyone acting in concert with Defendants, from utilizing, divulging, disclosing or misusing any Aon Confidential Information (as defined by the Former Employees' Agreements with Aon) and trade secrets, including, without limitation, lists of clients and prospective clients; contract terms and conditions; client information relating to services, insurance, benefits programs, employees, finances, and compensation; copyrighted materials; corporate, management and business plans and strategies; compensation and revenues; methods and strategies of marketing; market research and data; technical know-how; computer software and manuals; policies and procedures; the conduct of the affairs of Aon; and any of the information listed in Paragraph 69.

2.     Requiring Defendants to immediately return all of Aon's Confidential Information (as defined in the Former Employees' Agreements with Aon) and trade secrets obtained during the Former Employees' employment with Aon.

3.     An order requiring Defendants to preserve all documents, electronically stored information and other information relevant to factual allegations and claims contained within this

Verified Complaint, including any communications, text messages or emails on personal electronic devices, such as cellular telephones, or stored in email or other cloud storage accounts, by and between the Former Employees; between Alliant and the Former Employees; between Defendants and any Aon employee; and between Defendants and any Aon client or prospective client;

4.     An order granting preliminary and permanent injunctive relief in accord with Paragraphs 1 and 2 above, and as separately may be requested at a preliminary injunction hearing and any trial;

5.     A declaratory judgment in Aon's favor that the restrictive covenants contained in the RSU, NSA, and LPP Agreements are valid and enforceable;

6.     A declaratory judgment in Aon's favor that the RSU and LPP Agreements are governed by Illinois law;

7.     A declaratory judgment in Aon's favor stating that Aon has performed, or has been excused from performing, any and all of its obligations under the RSU, NSA, and LPP Agreements;

8.     An order awarding Aon its actual and exemplary damages, in an amount to be determined at trial;

9.     An order awarding Aon pre- and post-judgment interest as allowed by law, as well as its attorneys' fees and costs of this action; and

10.    An order awarding any and all other available damages, including punitive damages and such other and further relief as the Court deems just and proper.

*s/ James M. Witz*
James M. Witz
jwitz@littler.com
Orly Henry
ohenry@littler.com

Matthew Ruza
mruza@littler.com
LITTLER MENDELSON, P.C.
321 N. Clark Street, Suite 1000
Chicago, Illinois 60654
(312) 372-5520

Jessica F. Pizzutelli (*pro hac application forthcoming*)
jpizzutelli@littler.com
LITTLER MENDELSON, P.C.
375 Woodcliff Drive, Suite 2D
Fairport, New York 14450
(585) 203-3400

Dated: November 5, 2019

4836-9297-5019.14 026861.1000

## **VERIFICATION**

Under penalty of perjury, pursuant to 28 U.S.C. § 1746, the undersigned, Paul James Gloriod, Jr., hereby verifies that he is Chief Executive Officer of Aon's Construction Services Group and as such is authorized to make this Verification on behalf of Plaintiffs; that he has read the foregoing Verified Complaint and knows the contents thereof; and that the statements set forth in the Verified Complaint are true and correct, except as to matters therein stated to be on information and belief, and as to such matters, the undersigned certifies as aforesaid that he verily believes the same to be true.

_____

Date: _____11/5/19_____