# EXHIBIT A

**AON CORPORATION**
**2011 INCENTIVE PLAN**
**RESTRICTED STOCK UNIT AGREEMENT**

This Restricted Stock Unit Agreement (the "Agreement") is entered into between Aon plc, a public limited company incorporated under English law (the "Company") and **MATTHEW J WALSH** (the "Participant").

The Company desires to grant the Participant restricted stock units ("RSUs"), each RSU representing the right to receive a Class A Ordinary Share of the Company ("Share"), $.01 par value per Share, to encourage the Participant to remain in the service of the Company or its Subsidiaries, to provide the Participant with an incentive to contribute to the financial progress of the Company, and to encourage ownership of Shares by the Participant. Capitalized terms used but not otherwise defined in the Agreement shall have the meaning ascribed to such terms in the Aon Corporation 2011 Incentive Plan, as amended and restated effective April 2, 2012 and as assumed by the Company as of April 2, 2012 (the "Plan").

NOW, THEREFORE, in consideration of the mutual promises hereinafter set forth, the parties hereto agree as follows:

1. **Grant of Restricted Stock Units.** The Company grants under the Plan an award of **4207** RSUs on **02/21/2013** (the "Grant Date").

2. **Vesting of Restricted Stock Units.** The RSUs will vest in accordance with the schedule set forth in the Participant's account. The Participant must access the www.netbenefits.fidelity.com website and follow the instructions in order to view the vesting schedule. Notwithstanding anything to the contrary in the foregoing, the Committee may cause the RSUs to vest prior to the vesting schedule set forth in the Participant's account in order to satisfy any Tax-Related Items (as defined below) that arise prior to the date of settlement of the RSUs, subject to the limitations set forth in Section 3(d) of this Agreement.

3. **Tax Withholding Obligations.** The Participant acknowledges that, regardless of any action taken by the Company and/or the Participant's employer (the "Employer"), the ultimate liability for all income tax, social insurance, payroll tax, payment on account or other tax-related items related to the Participant's participation in the Plan and legally applicable to the Participant ("Tax-Related Items"), is and remains the Participant's responsibility and may exceed the amount actually withheld by the Company or the Employer. The Participant further acknowledges that the Company and/or the Employer: (a) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the grant of RSUs, including, but not limited to, the grant, vesting or settlement of the RSUs, the issuance of Shares upon settlement of the RSUs, the subsequent sale of Shares acquired pursuant to such vesting/settlement and the receipt of any dividends and/or dividend equivalents; and (b) do not commit to and are under no obligation to structure the terms of the grant or any aspect of the RSUs to reduce or eliminate the Participant's liability for Tax-Related Items or achieve any particular tax result. Further, if the Participant is subject to Tax-Related Items in more than one jurisdiction between the Grant Date and the date of any relevant taxable or tax withholding event, as applicable, the Participant acknowledges that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

   a) Prior to any relevant taxable or tax withholding event, as applicable, the Participant agrees to make adequate arrangements satisfactory to the Company or the Employer, to satisfy all Tax-Related Items. In this regard, the Participant authorizes the Company and/or the Employer, or their respective agents, at the Company's discretion, to satisfy the obligations with regard to all Tax-Related Items by one or a combination of the following:

      (i) withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer; or

(ii)     withholding in Shares to be issued upon vesting/settlement of the RSUs; or

(iii)    withholding from the proceeds of the sale of Shares acquired upon vesting/settlement of the RSUs either through a voluntary sale or through a mandatory sale arranged by the Company (on the Participant's behalf pursuant to this authorization without further consent); provided, however, that if the Participant is a Section 16 officer under the U.S. Securities and Exchange Act of 1934, the Committee shall establish the method of withholding from alternatives (i) – (iii) herein and if the Committee does not exercise its discretion prior to the Tax-Related Items withholding event, then the Participant shall be entitled to elect the method of withholding from the alternatives above.

b)   Depending on the withholding method, the Company may withhold or account for Tax-Related Items by considering applicable minimum statutory withholding amounts or other applicable withholding rates, including maximum applicable rates, in which case, the Participant will receive a refund of any over-withheld amount in cash and will have no entitlement to the equivalent Shares.  If the obligation for Tax-Related Items is satisfied by withholding in Shares, for tax purposes, the Participant shall be deemed to have been issued the full number of Shares subject to the vested RSUs, notwithstanding that a number of Shares are held back solely for the purpose of paying the Tax-Related Items.

c)   Finally, the Participant shall pay to the Company and/or the Employer any amount of Tax-Related Items that the Company and/or the Employer may be required to withhold as a result of the Participant's participation in the Plan that cannot be satisfied by the means previously described.  The Company may refuse to deliver the Shares or the proceeds of the sale of Shares if the Participant fails to comply with the Participant's obligations in connection with the Tax-Related Items.

d)   Notwithstanding anything in this Section 3 to the contrary, to avoid a prohibited distribution under Code Section 409A, if Shares underlying the RSUs will be withheld (or sold on the Participant's behalf) to satisfy any Tax-Related Items arising prior to the date of settlement of the RSUs for any portion of the RSUs that is considered "nonqualified deferred compensation" subject to Code Section 409A ("Deferred Compensation"), then the number of Shares withheld (or sold on the Participant's behalf) shall not exceed the number of Shares that equals the liability for the Tax-Related Items.

4.   **Nominal Value.**  At the time of settlement this Award will be subject to the Participant's appropriate undertaking to pay a nominal value of $.01 per share (as determined in the sole discretion of the Company and in accordance with the U.K. Companies Act 2006, as amended from time to time), and such obligation may be satisfied by the Participant in any manner to be established by the Company in its sole discretion, including but not limited to withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer.

5.   **Effect of Termination of Employment.**
     a)   <u>**Voluntary termination prior to age 55.**</u>  The unvested portion of the RSU will be forfeited.
     b)   <u>**Termination due to death.**</u>  All unvested RSUs will be fully vested immediately and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof.
     c)   <u>**Termination due to disability.**</u>  All unvested RSUs will be fully vested immediately and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof.  "Disability" for purposes of this Agreement, shall mean disability pursuant to the standards set forth in the long-term disability plan of the Employer.  In the absence of such a plan, the Committee shall have exclusive discretion to determine whether a Participant's employment is terminated due to disability.
     d)   <u>**Involuntary termination (other than for cause) or voluntary termination on or after age 55.**</u>  The RSU shall be immediately vested pro rata and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof.  The pro rata portion of the vested RSUs shall be calculated by multiplying (i) the number of RSUs subject to the award, by (ii) a fraction, the numerator of which shall be the number of days that have elapsed between the Grant Date and the date of the Participant's termination, and the denominator of which shall be the total number of days in the vesting

schedule set forth in the Participant's account, and subtracting from the resulting product the number of RSUs previously vested. The remaining unvested portion of the RSU shall be forfeited.

e) **Termination for cause.** All unvested shares shall be forfeited. Termination for cause shall mean performing an act of dishonesty, fraud, theft, embezzlement, or misappropriation involving the Participant's employment with the Company, or breach of the duty of loyalty to the Company; performing an act of race, sex, national origin, religion, disability, or age-based discrimination which after investigation, counsel to the Company reasonably concludes will result in liability being imposed on the Company and / or the Participant; material violation of Company policies and procedures including, but not limited to, the Aon Business Conduct Guidelines and the Aon Code of Ethics; material non-compliance with any terms of an employment agreement; or, performing an act resulting in a criminal felony charge brought against the Participant or a criminal conviction of the Participant (other than conviction of a minor traffic violation).

6. **Receipt by the Participant of the Prospectus.** The Participant acknowledges receipt of the Plan prospectus that contains the entire Plan, and is incorporated herein by reference. The Participant represents and warrants that the Participant has read the Plan and agrees that all RSUs awarded under it shall be subject to all of the terms and conditions of the Plan.

7. **Issuance of Shares.** RSUs shall be converted to Shares as of the vesting date. Shares will be issued to the Participant as soon as practicable (within 60 days) after the vesting date, subject to Sections 3 and 4 of this Agreement. Notwithstanding the foregoing, for purposes of complying with Code Section 409A, if the RSUs are considered Deferred Compensation and the Shares are to be settled in connection with a termination contemplated under Section 5(c) or 5(d), the Company and the Participant shall take all steps necessary (including with regard to any post-termination services by the Participant) to ensure that a termination contemplated under Section 5 constitutes a "separation from service" within the meaning of Code Section 409A. In addition, if the RSUs are Deferred Compensation, the RSUs are settled upon the Participant's separation from service and the Participant is a "specified employee," within the meaning of Code Section 409A, on the date the Participant experiences a separation from service, then the RSUs shall be settled on the first business day of the seventh month following the Participant's separation from service, or, if earlier, on the date of the Participant's death, to the extent such delayed payment is required in order to avoid a prohibited distribution under Code Section 409A.

8. **Rights as Shareholder.** The Participant may not have voting or any other right as a shareholder of the Company with respect to the RSUs. Upon issuance of the Shares upon vesting, the Participant will obtain full voting and other rights as a shareholder of the Company.

9. **Business Considerations; Restrictive Covenants; Acknowledgments; Injunctive Relief; Confidential Information; Incentive Repayment Policy.**

a) **Business Considerations.** The Company and its Subsidiary, Aon Group, Inc., a Maryland corporation with its corporate and business headquarters in Chicago, Illinois, and Aon Group, Inc.'s Subsidiaries and affiliates (and divisions thereof) (collectively, with the Company, "Aon") are in the business of providing conventional and alternative risk management products and services covering the businesses of insurance brokerage, reinsurance brokerage, benefits consulting, compensation consulting, human resources consulting, human resources and benefits outsourcing management, investigatory and security consulting, managing underwriting and related services, including accounting, actuarial, claims management and handling, and information systems on behalf of commercial and individual clients which are national and international and are not confined to any geographic area (the "Business"). An essential element of the Business is the development and maintenance of personal contacts and relationships with clients and prospective clients. Aon invests considerable time and money to develop and maintain personal contacts and relationships with clients and prospective clients. Aon invests considerable time and money to develop and maintain client relationships, including payment of employees' salaries, benefits, travel, entertainment and other business expenses and assistance in servicing clients by making available to its employees

specially developed and researched industry data, client-specific information, legal advice, accounting support, marketing, advertising and other corporate services, as well as providing training and professional development and valuable confidential business and professional information, toward the development and maintenance of its client relationships and related goodwill. While these clients and prospective clients may be secured or serviced by Aon employees, including the Participant, the Participant acknowledges that such clients and prospective clients remain at all times the clients and prospective clients of Aon and that the goodwill engendered by the relationships is intended to inure only to the benefit of Aon; the goodwill is owned by Aon; and Aon shall be the sole beneficiary of such goodwill during and after termination of the Participant's employment with Aon. In addition, the Participant acknowledges that he has acquired and/or will acquire, solely for the purpose of furthering the Business, knowledge of Aon's confidential and proprietary information; the Participant further acknowledges Aon's legitimate interest in safeguarding confidential and proprietary information from disclosure.

The personal identification of clients of Aon with an employee, including the Participant, creates the potential for the Participant's appropriation of the benefits of the relationships developed with clients on behalf of and at the expense of Aon. Since Aon would suffer irreparable harm if the Participant left its employ and solicited the Business of the clients and prospective clients of Aon, it is reasonable to protect Aon against certain competitive activities by the Participant for a limited period of time after the Participant leaves employment so that Aon may renew or restore its business relationship with its clients and prospective clients. Consequently, the Participant is willing to enter into the covenants set forth herein in order to provide Aon with reasonable protection for its client and prospective client relationships and its investment therein as above-described, its goodwill, and its confidential and proprietary information.

b) **Covenant Not to Solicit.** The Participant hereby covenants and agrees that, except with the prior written consent of Aon, the Participant (on the Participant's own behalf or on behalf of any other person or entity) will not, during the course of employment, and for a period of two (2) years after the Participant's Termination Date, directly or indirectly, call upon, solicit, accept, engage in, service or perform, other than on behalf of Aon, any business of the same type or kind as the business performed by Aon from or with respect to (i) clients of Aon with respect to whom the Participant provided services, either alone or with others, or had a business relationship, or on whose account he worked or became familiar, or supervised directly or indirectly the servicing activities related to such clients, during the twenty-four (24) months prior to the Participant's Termination Date or within twelve (12) months prior to such Termination Date and (ii) prospective clients of Aon which the Participant alone, in combination with others, or in a supervisory capacity, solicited during the six (6) months prior to the Participant's Termination Date and to which a proposal for services was rendered by Aon during the six (6) months prior to the Participant's Termination Date. "Client" means any person or entity listed on the books of Aon as such.

c) **Covenant Not to Hire.** The Participant hereby also agrees, for the duration of the term of the covenant set forth in Section 9(b) herein not to, directly or indirectly, solicit or induce, or cause any person or other entity to solicit or induce, any employee of Aon to work for the Participant or for any third party or entity, or to leave the employ of the Company.

d) **Prior Covenants.** Notwithstanding any other language in the Agreement, including, but not limited to that found in Section 10(b), this Agreement does not preclude the enforceability of any restrictive covenant provision contained in any prior agreement entered into by the Participant. Further, no prior restrictive covenant precludes the enforceability of any provision contained in this Agreement.

e) **Acknowledgments.** Aon and the Participant acknowledge and agree that the covenants contained in Sections 9(b) and 9(c) herein are necessary and reasonable for the protection of Aon and are reasonably limited with respect to the activities prohibited, duration, geographical scope and their effect on the Participant and the public. The parties acknowledge that the purpose and effect of the covenants simply are to protect Aon for a limited period of time from unfair competition by the Participant.

The Participant acknowledges that there is no general geographical restriction contained in the preceding paragraph because the restriction applies only to the specified clients of Aon. Nothing in this Agreement shall prohibit the Participant from obtaining a livelihood for himself or herself or his or her family by being

engaged in the Business. The intent of the parties is that the Participant's restrictive covenant is limited only to those clients as above specified.

**f)** **Company's Right to Injunctive Relief; Attorneys' Fees.** The Participant acknowledges that the Participant's services to Aon are of a unique character which gives them a special value to Aon, the loss of which cannot reasonably or adequately be compensated in damages in an action at law, and that a breach of this Agreement will result in irreparable and continuing harm to Aon, and that therefore, in addition to any other remedy which Aon may have at law or in equity, Aon shall be entitled to injunctive relief for a breach of this Agreement by the Participant. The parties acknowledge and agree that Aon Group, Inc. is an intended third-party beneficiary of this Agreement, and may be a named plaintiff in any subsequent suit brought by the Company to enforce the terms of this Agreement. In the event that Aon brings an action to enforce the terms and conditions of the Agreement, the Participant shall pay the costs and expenses incurred by Aon in bringing such action, including legal fees.

**g)** **Trade Secrets and Confidential Information.** The Participant acknowledges that Aon's business depends to a significant degree upon the possession of information which is not generally known to others, and that the profitability of such business requires that this information remain proprietary to Aon. The Participant shall not, except as required in the course of employment by Aon, disclose or use during or subsequent to the course of employment, any trade secrets or confidential or proprietary information relating to the business of Aon of which the Participant becomes aware by reason of being employed or to which the Participant gains access during his or her employment by Aon and which has not been publicly disclosed (other than by the Participant in breach of this provision).

Such information includes, without limitation, lists of clients and prospective clients; contract terms and conditions; client information relating to services, insurance, benefits programs, employees, finances, and compensation; copyrighted materials; corporate, management and business plans and strategies; compensation and revenues; methods and strategies of marketing; market research and data; technical know-how; computer software and manuals; policies and procedures; and the conduct of the affairs of Aon. All records and equipment and other materials relating in any way to any confidential information relating to clients or business of Aon shall be and remain the sole property of Aon during and after the end of employment.

**h)** **Incentive Repayment Policy.** If the Participant has been designated and notified by the board of directors of the Company that he or she is a reporting officer for purposes of Section 16 of the U.S. Securities and Exchange Act of 1934, the Participant is subject to Aon's Incentive Repayment Policy (the "Policy"). The Policy provides that the Company will have the discretion to cancel or require reimbursement to the Company of the long-term equity based incentive award set forth in this Agreement if the grant or vesting was based on the achievement of financial results that were subsequently restated. The Participant can obtain a copy of the Policy from the Global Compensation team. If the Participant is subject to the Policy, by accepting this agreement, the Participant hereby agrees and acknowledges that he or she will be bound by it.

**10.** **Other Provisions.**

**a)** **Plan Terms Take Precedence over Agreement Terms.** RSUs are granted pursuant to the Plan, the terms and conditions of which are incorporated into this Agreement by reference. If there are any inconsistencies between the terms of this Agreement and the Plan, the terms of the Plan will govern.

**b)** **Prior Agreement(s) Will Not Control.** The Participant's acceptance of this Agreement will supersede provisions of any prior agreement that could be construed as governing the terms of this grant.

**c)** **Section 409A.** The RSUs and amounts payable thereunder are intended to be exempt from or compliant with Code Section 409A and the U.S. Treasury Regulations relating thereto so as not to subject the Participant to the payment of additional taxes and interest under Code Section 409A or other adverse tax consequences. In furtherance of this intent, the provisions of this Agreement will be

interpreted, operated, and administered in a manner consistent with these intentions. The Committee may modify the terms of this Agreement, the Plan or both, without the consent of the Participant, in the manner that the Committee may determine to be necessary or advisable in order to comply with Code Section 409A or to mitigate any additional tax, interest and/or penalties or other adverse tax consequences that may apply under Code Section 409A if compliance is not practical. This Section 10(c) does not create an obligation on the part of the Company to modify the terms of this Agreement or the Plan and does not guarantee that the RSUs or the delivery of Shares upon vesting/settlement of the RSUs will not be subject to taxes, interest and penalties or any other adverse tax consequences under Code Section 409A. Nothing in this Agreement shall provide a basis for any person to take any action against the Company or any of its Subsidiaries or Affiliates based on matters covered by Code Section 409A, including the tax treatment of any amounts paid under this Agreement, and neither the Company nor any of its Subsidiaries or Affiliates will have any liability under any circumstances to the Participant or any other party if the RSUs, the delivery of Shares upon vesting/settlement of the RSUs or other payment or tax event hereunder that is intended to be exempt from, or compliant with, Code Section 409A, is not so exempt or compliant or for any action taken by the Committee with respect thereto. Further, settlement of any portion of the RSUs that is Deferred Compensation may not be accelerated or postponed except to the extent permitted by Code Section 409A.

**d) Restriction on Transfer.** RSUs may not be sold, transferred, pledged, assigned, or otherwise alienated at any time.

**e) Right of Employment.** Grants of RSUs under the Plan and of this Agreement do not confer upon the Participant any right to continue in the employ or service of the Employer.

**f) Electronic Delivery and Acceptance.** The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means. The Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

**g) Need to Accept Grant.** The Participant acknowledges that this grant must be accepted within ninety (90) days of the Grant Date in order to be eligible to receive any benefits from this grant. If this grant is not accepted within the ninety (90)-day period specified in the foregoing sentence, all benefits under this grant may be forfeited, as determined in the sole discretion of the Committee. To accept this grant, the Participant must access the www.netbenefits.fidelity.com website and follow the instructions for acceptance. If this grant was distributed to the Participant via mail, the Participant must sign the agreement and return it to Aon's Executive Compensation Department within ninety (90) days.

**h) Waiver.** Waiver of any term or condition of this Agreement by any party shall not be construed as a waiver of a subsequent breach or failure of the same term or condition, or a waiver of any other term or condition of this Agreement. Any waiver must be in writing.

**i) Severability.** To the extent that the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable for any reason, such word, phrase, clause or sentence shall be modified or deleted in such manner so as to afford the Company the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws, and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent.

**j) Governing Law.** The validity, interpretation**,** instruction, performance, enforcement and remedies of or relating to this Agreement, and the rights and obligations of the parties hereunder, shall be governed by and construed in accordance with the substantive laws of the State of Illinois, without regard to the conflict of law principles, rules or statutes of any jurisdiction.

**k) Venue and Jurisdiction.** Venue for any legal proceedings instituted related to this Agreement shall be Cook County, Illinois and the Participant agrees to submit to the jurisdiction of the State of Illinois.

l) **Notice.** All notices given hereunder shall be in writing and, if intended for the Company, shall be addressed to it or delivered to it at its principal office to the attention of the Executive Compensation Department. If intended for the Participant, notices shall be delivered personally or shall be addressed (if sent by mail) to the Participant's then current residence address as shown on the Company's records, or to such other address as the Participant directs in a notice to the Company. All notices shall be deemed to be given on the date received at the address of the addressee or, if delivered personally, on the date delivered.

m) **No Advice Regarding Grant.** The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding the Participant's participation in the Plan, or the acquisition or sale of the underlying Shares. The Participant is hereby advised to consult with his or her own personal tax, legal and financial advisors regarding his or her participation in the Plan before taking any action related to the Plan.

n) **Imposition of Other Requirements.** The Company reserves the right to impose other requirements on the Participant's participation in the Plan, on the RSUs and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable for legal or administrative reasons, and to require the Participant to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

IN WITNESS WHEREOF, the parties have accepted this Agreement as of the date hereof.

**AON CORPORATION**

*Gregory C. Case*

Gregory C. Case
President and Chief Executive Officer

**Signed Electronically**                              **03/15/2013**
**RSU Recipient (Participant)**                                   **Date**

```
D8R49RB0
03/15/2013 07:17 am U.S. Eastern Standard Time
ACCEPTED
```

**AON CORPORATION**
**2011 INCENTIVE PLAN**
**RESTRICTED STOCK UNIT AGREEMENT**

This Restricted Stock Unit Agreement (the "Agreement") is entered into between Aon plc, a public limited company incorporated under English law (the "Company") and **MATTHEW J WALSH** (the "Participant").

The Company desires to grant the Participant restricted stock units ("RSUs"), each RSU representing the right to receive a Class A Ordinary Share of the Company ("Share"), $.01 par value per Share, to encourage the Participant to remain in the service of the Company or its Subsidiaries or Affiliates, to provide the Participant with an incentive to contribute to the financial progress of the Company, and to encourage ownership of Shares by the Participant. Capitalized terms used but not otherwise defined in the Agreement shall have the meaning ascribed to such terms in the Aon Corporation 2011 Incentive Plan, as amended and restated effective April 2, 2012 and as assumed by the Company as of April 2, 2012 (the "Plan").

NOW, THEREFORE, in consideration of the mutual promises hereinafter set forth, the parties hereto agree as follows:

1. **Grant of Restricted Stock Units.** The Company grants under the Plan an award of **1140** RSUs on **05/21/2014** (the "Grant Date").

2. **Vesting of Restricted Stock Units.** The RSUs will vest in accordance with the schedule set forth in the Participant's account. The Participant must access the www.netbenefits.fidelity.com website and follow the instructions in order to view the vesting schedule. Notwithstanding anything to the contrary in the foregoing, the Committee may cause the RSUs to vest prior to the vesting schedule set forth in the Participant's account in order to satisfy any Tax-Related Items (as defined below) that arise prior to the date of settlement of the RSUs, subject to the limitations set forth in Section 3(d) of this Agreement.

3. **Tax Withholding Obligations.** The Participant acknowledges that, regardless of any action taken by the Company and/or the Participant's employer (the "Employer"), the ultimate liability for all income tax, social insurance, payroll tax, payment on account or other tax-related items related to the Participant's participation in the Plan and legally applicable to the Participant ("Tax-Related Items"), is and remains the Participant's responsibility and may exceed the amount actually withheld by the Company or the Employer. The Participant further acknowledges that the Company and/or the Employer: (a) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the grant of RSUs, including, but not limited to, the grant, vesting or settlement of the RSUs, the issuance of Shares upon settlement of the RSUs, the subsequent sale of Shares acquired pursuant to such vesting/settlement and the receipt of any dividends and/or dividend equivalents; and (b) do not commit to and are under no obligation to structure the terms of the grant or any aspect of the RSUs to reduce or eliminate the Participant's liability for Tax-Related Items or achieve any particular tax result. Further, if the Participant is subject to Tax-Related Items in more than one jurisdiction between the Grant Date and the date of any relevant taxable or tax withholding event, as applicable, the Participant acknowledges that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

   a) Prior to any relevant taxable or tax withholding event, as applicable, the Participant agrees to make adequate arrangements satisfactory to the Company or the Employer, to satisfy all Tax-Related Items. In this regard, the Participant authorizes the Company and/or the Employer, or their respective agents, at the Company's discretion, to satisfy the obligations with regard to all Tax-Related Items by one or a combination of the following:

      (i) withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer; or

    **(ii)**    withholding in Shares to be issued upon vesting/settlement of the RSUs; or

    **(iii)**    withholding from the proceeds of the sale of Shares acquired upon vesting/settlement of the RSUs either through a voluntary sale or through a mandatory sale arranged by the Company (on the Participant's behalf pursuant to this authorization without further consent); provided, however, that if the Participant is a Section 16 officer under the U.S. Securities and Exchange Act of 1934, the Committee shall establish the method of withholding from alternatives (i) – (iii) herein and if the Committee does not exercise its discretion prior to the Tax-Related Items withholding event, then the Participant shall be entitled to elect the method of withholding from the alternatives above.

**b)**    Depending on the withholding method, the Company may withhold or account for Tax-Related Items by considering applicable minimum statutory withholding amounts or other applicable withholding rates, including maximum applicable rates, in which case, the Participant will receive a refund of any over-withheld amount in cash and will have no entitlement to the equivalent Shares.  If the obligation for Tax-Related Items is satisfied by withholding in Shares, for tax purposes, the Participant shall be deemed to have been issued the full number of Shares subject to the vested RSUs, notwithstanding that a number of Shares are held back solely for the purpose of paying the Tax-Related Items.

**c)**    Finally, the Participant shall pay to the Company and/or the Employer any amount of Tax-Related Items that the Company and/or the Employer may be required to withhold as a result of the Participant's participation in the Plan that cannot be satisfied by the means previously described.  The Company may refuse to deliver the Shares or the proceeds of the sale of Shares if the Participant fails to comply with the Participant's obligations in connection with the Tax-Related Items.

**d)**    Notwithstanding anything in this Section 3 to the contrary, to avoid a prohibited distribution under Code Section 409A, if Shares underlying the RSUs will be withheld (or sold on the Participant's behalf) to satisfy any Tax-Related Items arising prior to the date of settlement of the RSUs for any portion of the RSUs that is considered "nonqualified deferred compensation" subject to Code Section 409A ("Deferred Compensation"), then the number of Shares withheld (or sold on the Participant's behalf) shall not exceed the number of Shares that equals the liability for the Tax-Related Items.

**4.**  **Nominal Value.**  At the time of settlement, this Award will be subject to the Participant's appropriate undertaking to pay a nominal value of $.01 per share (as determined in the sole discretion of the Company and in accordance with the U.K. Companies Act 2006, as amended from time to time), and such obligation may be satisfied by the Participant in any manner to be established by the Company in its sole discretion, including but not limited to withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer.

**5.**  **Effect of Termination of Employment.**
    **a)**  <u>**Voluntary termination prior to Retirement.**</u>  The unvested portion of the RSU will be forfeited.
    **b)**  <u>**Termination due to death.**</u>  All unvested RSUs will be fully vested immediately and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof.
    **c)**  <u>**Termination due to disability.**</u>  All unvested RSUs will be fully vested immediately and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof. "Disability" for purposes of this Agreement, shall mean disability pursuant to the standards set forth in, or in circumstances where the Participant qualifies for receipt of benefits under, the long-term disability plan of the Employer.  In the absence of such a plan, the Committee shall have exclusive discretion to determine whether a Participant's employment is terminated due to disability.
    **d)**  <u>**Involuntary termination (other than for cause) or voluntary termination on or after Retirement.**</u> The RSU shall be immediately vested pro rata and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof.   The pro rata portion of the vested RSUs shall be calculated by multiplying (i) the number of RSUs subject to the award, by (ii) a fraction, the numerator of which shall be the number of days that have elapsed between the Grant Date and the date of the Participant's termination, and the denominator of which shall be the total number of days in the vesting

schedule set forth in the Participant's account, and subtracting from the resulting product the number of RSUs previously vested. The remaining unvested portion of the RSU shall be forfeited. For purposes of this Agreement, "Retire" or "Retirement" shall have the following meaning: For a Participant residing outside of the European Union, the term means a voluntary termination of employment on or after the Participant's 55th birthday. For a Participant residing in the European Union, the term means the Participant's voluntary retirement from the workforce in circumstances where the Participant intends permanently to stop carrying out compensated work and the Participant does not carry out compensated work for at least a year following the Retirement. In order for a termination of a European Union based Participant to be considered a Retirement for the purposes of the Plan and this Agreement, the Participant must sign and complete on or before the 10th day prior to his or her departure date a certification in a form provided by the Company attesting to the Participant's intention to Retire and permanently to stop carrying out compensated work. Further, the cash value of any Shares delivered to the European Union based Participant or payments made or benefits conferred on the Participant as a result of the Participant's termination of employment being treated as a Retirement shall be immediately repayable to the Company if the certification that the Participant has given turns out to be false or the Participant carries out compensated work in the year following the Retirement. For purposes of the Plan and this Agreement, a reference to compensated work includes, without limitation, any compensated work carried out for any employer or other organization, any consultancy work and any work that the Participant carries out in business on his or her own account, in a partnership or in any other business.

**e)** **Termination for cause.** All unvested shares shall be forfeited. Termination for cause shall mean performing a deliberate act of dishonesty, fraud, theft, embezzlement, or misappropriation involving the Participant's employment with the Company or its Subsidiaries or Affiliates, or breach of the duty of loyalty to the Company, its Subsidiaries or Affiliates; performing an act of race, sex, national origin, religion, disability, or age-based discrimination which after investigation, counsel to the Company reasonably concludes will result in liability being imposed on the Company, its Subsidiaries or Affiliates and / or the Participant; material violation of Company policies and procedures including, but not limited to, the Aon Code of Business Conduct; material non-compliance with any terms of an employment agreement; or, performing any criminal act resulting in a criminal felony charge brought against the Participant or a criminal conviction of the Participant (other than conviction of a minor traffic violation).

**6.** **Receipt by the Participant of the Prospectus.** The Participant acknowledges receipt of the Plan prospectus that contains the entire Plan, and is incorporated herein by reference. The Participant represents and warrants that the Participant has read the Plan and agrees that all RSUs awarded under it shall be subject to all of the terms and conditions of the Plan.

**7.** **Issuance of Shares.** RSUs shall be converted to Shares as of the vesting date. Shares will be issued to the Participant as soon as practicable (within 60 days) after the vesting date, subject to Sections 3 and 4 of this Agreement. Notwithstanding the foregoing, for purposes of complying with Code Section 409A, if the RSUs are considered Deferred Compensation and the Shares are to be settled in connection with a termination contemplated under Section 5(c) or 5(d), the Company and the Participant shall take all steps necessary (including with regard to any post-termination services by the Participant) to ensure that a termination contemplated under Section 5 constitutes a "separation from service" within the meaning of Code Section 409A. In addition, if the RSUs are Deferred Compensation, the RSUs are settled upon the Participant's separation from service and the Participant is a "specified employee," within the meaning of Code Section 409A, on the date the Participant experiences a separation from service, then the RSUs shall be settled on the first business day of the seventh month following the Participant's separation from service, or, if earlier, on the date of the Participant's death, to the extent such delayed payment is required in order to avoid a prohibited distribution under Code Section 409A.

**8.** **Rights as Shareholder.** The Participant may not have voting or any other right as a shareholder of the Company with respect to the RSUs. Upon issuance of the Shares upon vesting, the Participant will obtain full voting and other rights as a shareholder of the Company.

9. **Business Considerations; Restrictive Covenants; Acknowledgments; Injunctive Relief; Confidential Information; Incentive Repayment Policy.**

   a) **Business Considerations.** The Company and its Subsidiary, Aon Group, Inc., a Maryland corporation with its corporate and business headquarters in Chicago, Illinois, and Aon Group, Inc.'s Subsidiaries and affiliates (and divisions thereof) (collectively, with the Company, "Aon") are in the business of providing conventional and alternative risk management products and services covering the businesses of insurance brokerage, reinsurance brokerage, benefits consulting, compensation consulting, human resources consulting, human resources and benefits outsourcing management, investigatory and security consulting, managing underwriting and related services, including accounting, actuarial, claims management and handling, and information systems on behalf of commercial and individual clients which are national and international and are not confined to any geographic area (the "Business"). An essential element of the Business is the development and maintenance of personal contacts and relationships with clients and prospective clients. Aon invests considerable time and money to develop and maintain personal contacts and relationships with clients and prospective clients. Aon invests considerable time and money to develop and maintain client relationships, including payment of employees' salaries, benefits, travel, entertainment and other business expenses and assistance in servicing clients by making available to its employees specially developed and researched industry data, client-specific information, legal advice, accounting support, marketing, advertising and other corporate services, as well as providing training and professional development and valuable confidential business and professional information, toward the development and maintenance of its client relationships and related goodwill. While these clients and prospective clients may be secured or serviced by Aon employees, including the Participant, the Participant acknowledges that such clients and prospective clients remain at all times the clients and prospective clients of Aon and that the goodwill engendered by the relationships is intended to inure only to the benefit of Aon; the goodwill is owned by Aon; and Aon shall be the sole beneficiary of such goodwill during and after termination of the Participant's employment with Aon. In addition, the Participant acknowledges that he has acquired and/or will acquire, solely for the purpose of furthering the Business, knowledge of Aon's confidential and proprietary information; the Participant further acknowledges Aon's legitimate interest in safeguarding confidential and proprietary information from disclosure.

   The personal identification of clients of Aon with an employee, including the Participant, creates the potential for the Participant's appropriation of the benefits of the relationships developed with clients on behalf of and at the expense of Aon. Since Aon would suffer irreparable harm if the Participant left its employ and solicited the Business of the clients and prospective clients of Aon, it is reasonable to protect Aon against certain competitive activities by the Participant for a limited period of time after the Participant leaves employment so that Aon may renew or restore its business relationship with its clients and prospective clients. Consequently, the Participant is willing to enter into the covenants set forth herein in order to provide Aon with reasonable protection for its client and prospective client relationships and its investment therein as above-described, its goodwill, and its confidential and proprietary information.

   b) **Covenant Not to Solicit.** The Participant hereby covenants and agrees that, except with the prior written consent of Aon, the Participant (on the Participant's own behalf or on behalf of any other person or entity) will not, during the course of employment, and for a period of two (2) years after the Participant's Termination Date, directly or indirectly, call upon, solicit, accept, engage in, service or perform, other than on behalf of Aon, any business of the same type or kind as the business performed by Aon from or with respect to (i) clients of Aon with respect to whom the Participant provided services, either alone or with others, or had a business relationship, or on whose account he worked or became familiar, or supervised directly or indirectly the servicing activities related to such clients, during the twenty-four (24) months prior to the Participant's Termination Date and, further provided, such clients were clients of Aon either on the Participant's Termination Date or within twelve (12) months prior to such Termination Date and (ii) prospective clients of Aon which the Participant alone, in combination with others, or in a supervisory capacity, solicited during the six (6) months prior to the Participant's Termination Date and to which a proposal for services was rendered by Aon during the six (6) months prior to the Participant's Termination Date. "Client" means any person or entity listed on the books of Aon as such.

c) **Covenant Not to Hire.** The Participant hereby also agrees, for the duration of the term of the covenant set forth in Section 9(b) herein not to, directly or indirectly, solicit or induce, or cause any person or other entity to solicit or induce, any employee of Aon to work for the Participant or for any third party or entity, or to leave the employ of Aon.

d) **Prior Covenants.** Notwithstanding any other language in the Agreement, including, but not limited to that found in Section 10(b), this Agreement does not preclude the enforceability of any restrictive covenant provision contained in any prior agreement entered into by the Participant. Further, no prior restrictive covenant precludes the enforceability of any provision contained in this Agreement.

e) **Acknowledgments.** Aon and the Participant acknowledge and agree that the covenants contained in Sections 9(b) and 9(c) herein are necessary and reasonable for the protection of Aon and are reasonably limited with respect to the activities prohibited, duration, geographical scope and their effect on the Participant and the public. The parties acknowledge that the purpose and effect of the covenants simply are to protect Aon for a limited period of time from unfair competition by the Participant.

The Participant acknowledges that there is no general geographical restriction contained in the preceding paragraph because the restriction applies only to the specified clients of Aon. Nothing in this Agreement shall prohibit the Participant from obtaining a livelihood for himself or herself or his or her family by being engaged in the Business. The intent of the parties is that the Participant's restrictive covenant is limited only to those clients as above specified.

f) **Company's Right to Injunctive Relief; Attorneys' Fees.** The Participant acknowledges that the Participant's services to Aon are of a unique character which gives them a special value to Aon, the loss of which cannot reasonably or adequately be compensated in damages in an action at law, and that a breach of this Agreement will result in irreparable and continuing harm to Aon, and that therefore, in addition to any other remedy which Aon may have at law or in equity, Aon shall be entitled to injunctive relief for a breach of this Agreement by the Participant. The parties acknowledge and agree that Aon Group, Inc. is an intended third-party beneficiary of this Agreement, and may be a named plaintiff in any subsequent suit brought by the Company to enforce the terms of this Agreement. In the event that Aon brings an action to enforce the terms and conditions of the Agreement, the Participant shall pay the costs and expenses incurred by Aon in bringing such action, including legal fees.

g) **Trade Secrets and Confidential Information.** The Participant acknowledges that Aon's business depends to a significant degree upon the possession of information which is not generally known to others, and that the profitability of such business requires that this information remain proprietary to Aon. The Participant shall not, except as required in the course of employment by Aon, disclose or use during or subsequent to the course of employment, any trade secrets or confidential or proprietary information relating to the business of Aon of which the Participant becomes aware by reason of being employed or to which the Participant gains access during his or her employment by Aon and which has not been publicly disclosed (other than by the Participant in breach of this provision).

Such information includes, without limitation, lists of clients and prospective clients; contract terms and conditions; client information relating to services, insurance, benefits programs, employees, finances, and compensation; copyrighted materials; corporate, management and business plans and strategies; compensation and revenues; methods and strategies of marketing; market research and data; technical know-how; computer software and manuals; policies and procedures; and the conduct of the affairs of Aon. All records and equipment and other materials relating in any way to any confidential information relating to clients or business of Aon shall be and remain the sole property of Aon during and after the end of employment.

h) **Incentive Repayment Policy.** If the Participant has been designated and notified by the board of directors of the Company that he or she is a reporting officer for purposes of Section 16 of the U.S. Securities and Exchange Act of 1934, the Participant is subject to Aon's Incentive Repayment Policy (the "Policy"). The Policy provides that the Company will have the discretion to cancel or require reimbursement to the

Company of the long-term equity based incentive award set forth in this Agreement if the grant or vesting was based on the achievement of financial results that were subsequently restated. The Participant can obtain a copy of the Policy from the Global Compensation team. If the Participant is subject to the Policy, by accepting this Agreement, the Participant hereby agrees and acknowledges that he or she will be bound by it.

10. **Other Provisions.**

    a) **Plan Terms Take Precedence over Agreement Terms.** RSUs are granted pursuant to the Plan, the terms and conditions of which are incorporated into this Agreement by reference. If there are any inconsistencies between the terms of this Agreement and the Plan, the terms of the Plan will govern.

    b) **Prior Agreement(s) Will Not Control.** The Participant's acceptance of this Agreement will supersede provisions of any prior agreement that could be construed as governing the terms of this grant.

    c) **Section 409A.** The RSUs and amounts payable thereunder are intended to be exempt from or compliant with Code Section 409A and the U.S. Treasury Regulations relating thereto so as not to subject the Participant to the payment of additional taxes and interest under Code Section 409A or other adverse tax consequences. In furtherance of this intent, the provisions of this Agreement will be interpreted, operated, and administered in a manner consistent with these intentions. The Committee may modify the terms of this Agreement, the Plan or both, without the consent of the Participant, in the manner that the Committee may determine to be necessary or advisable in order to comply with Code Section 409A or to mitigate any additional tax, interest and/or penalties or other adverse tax consequences that may apply under Code Section 409A if compliance is not practical. This Section 10(c) does not create an obligation on the part of the Company to modify the terms of this Agreement or the Plan and does not guarantee that the RSUs or the delivery of Shares upon vesting/settlement of the RSUs will not be subject to taxes, interest and penalties or any other adverse tax consequences under Code Section 409A. Nothing in this Agreement shall provide a basis for any person to take any action against the Company or any of its Subsidiaries or Affiliates based on matters covered by Code Section 409A, including the tax treatment of any amounts paid under this Agreement, and neither the Company nor any of its Subsidiaries or Affiliates will have any liability under any circumstances to the Participant or any other party if the RSUs, the delivery of Shares upon vesting/settlement of the RSUs or other payment or tax event hereunder that is intended to be exempt from, or compliant with, Code Section 409A, is not so exempt or compliant or for any action taken by the Committee with respect thereto. Further, settlement of any portion of the RSUs that is Deferred Compensation may not be accelerated or postponed except to the extent permitted by Code Section 409A.

    d) **Restriction on Transfer.** RSUs may not be sold, transferred, pledged, assigned, or otherwise alienated at any time.

    e) **Right of Employment.** Grants of RSUs under the Plan and of this Agreement do not confer upon the Participant any right to continue in the employ or service of the Employer.

    f) **Electronic Delivery and Acceptance.** The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means. The Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

    g) **Need to Accept Grant.** The Participant acknowledges that this grant must be accepted within ninety (90) days of the Grant Date in order to be eligible to receive any benefits from this grant. If this grant is not accepted within the ninety (90)-day period specified in the foregoing sentence, all benefits under this grant may be forfeited, as determined in the sole discretion of the Committee. To accept this grant, the Participant must access the www.netbenefits.fidelity.com website and follow the instructions for acceptance. If this grant was distributed to the Participant via mail, the Participant must sign the Agreement and return it to Aon's Executive Compensation Department within ninety (90) days.

**h) Waiver.** Waiver of any term or condition of this Agreement by any party shall not be construed as a waiver of a subsequent breach or failure of the same term or condition, or a waiver of any other term or condition of this Agreement. Any waiver must be in writing.

**i) Severability.** To the extent that the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable for any reason, such word, phrase, clause or sentence shall be modified or deleted in such manner so as to afford the Company the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws, and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent.

**j) Governing Law.** The validity, interpretation**,** instruction, performance, enforcement and remedies of or relating to this Agreement, and the rights and obligations of the parties hereunder, shall be governed by and construed in accordance with the substantive laws of the State of Illinois, without regard to the conflict of law principles, rules or statutes of any jurisdiction.

**k) Venue and Jurisdiction.** Venue for any legal proceedings instituted related to this Agreement shall be Cook County, Illinois and the Participant agrees to submit to the jurisdiction of the State of Illinois.

**l) Notice.** All notices given hereunder shall be in writing and, if intended for the Company, shall be addressed to it or delivered to it at its principal office in London, England to the attention of the Chief Human Resources Officer or its principal office in Chicago, Illinois to the attention of the Executive Compensation Department. If intended for the Participant, notices shall be delivered personally or shall be addressed (if sent by mail) to the Participant's then current residence address as shown on the Company's records, or to such other address as the Participant directs in a notice to the Company. All notices shall be deemed to be given on the date received at the address of the addressee or, if delivered personally, on the date delivered.

**m) No Advice Regarding Grant.** The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding the Participant's participation in the Plan, or the acquisition or sale of the underlying Shares. The Participant is hereby advised to consult with his or her own personal tax, legal and financial advisors regarding his or her participation in the Plan before taking any action related to the Plan.

**n) Imposition of Other Requirements.** The Company reserves the right to impose other requirements on the Participant's participation in the Plan, on the RSUs and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable for legal or administrative reasons, and to require the Participant to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

IN WITNESS WHEREOF, the parties have accepted this Agreement as of the date hereof.

**AON CORPORATION**

*Gregory C. Case*

Gregory C. Case
President and Chief Executive Officer

**Signed Electronically**                          **06/12/2014**
**RSU Recipient (Participant)**                     **Date**

EH0C65EV
06/12/2014 08:44 pm U.S. Eastern Standard Time
ACCEPTED

**RESTRICTED STOCK UNIT AGREEMENT**
**UNDER AMENDED AND RESTATED**
**AON PLC 2011 INCENTIVE PLAN**

This Restricted Stock Unit Agreement (the "Agreement") is entered into between Aon plc, a public limited company incorporated under English law, and its subsidiary Aon Group, Inc., a Maryland corporation with its principal place of business at 200 East Randolph Street, Chicago, Illinois (collectively, the "Company") and **MATTHEW J WALSH** (the "Participant").

The Company desires to grant the Participant restricted stock units ("RSUs"), each RSU representing the right to receive a Class A Ordinary Share of the Company ("Share"), $.01 par value per Share, to encourage the Participant to remain in the service of the Company or its Subsidiaries or Affiliates, to provide the Participant with an incentive to contribute to the financial progress of the Company, and to encourage ownership of Shares by the Participant. Capitalized terms used but not otherwise defined in the Agreement shall have the meaning ascribed to such terms in the Amended and Restated Aon plc 2011 Incentive Plan, as approved by the shareholders of Aon plc on June 24, 2014 (the "Plan").

NOW, THEREFORE, in consideration of the mutual promises hereinafter set forth, the parties hereto agree as follows:

1. **Grant of Restricted Stock Units.** The Company grants under the Plan an award of **1054** RSUs on **11/20/2015** (the "Grant Date"). The Participant understands and agrees that the Participant has no obligation to accept this award (as a condition of employment or otherwise), and that the Participant's decision to do so by signing this Agreement, and thereby to accept all of the terms and conditions of this Agreement, is the Participant's knowing and voluntary choice after having had a full and fair opportunity to consult with legal counsel (at the Participant's cost).

2. **Vesting of Restricted Stock Units.** The RSUs will vest in accordance with the schedule set forth in the Participant's account. The Participant must access the www.netbenefits.fidelity.com website and follow the instructions in order to view the vesting schedule. Notwithstanding anything to the contrary in the foregoing, the Committee may cause the RSUs to vest prior to the vesting schedule set forth in the Participant's account in order to satisfy any Tax-Related Items (as defined below) that arise prior to the date of settlement of the RSUs, subject to the limitations set forth in Section 3(d) of this Agreement.

3. **Tax Withholding Obligations.** The Participant acknowledges that, regardless of any action taken by the Company and/or the Participant's employer (the "Employer"), the ultimate liability for all income tax, social insurance, payroll tax, payment on account or other tax-related items related to the Participant's participation in the Plan and legally applicable to the Participant ("Tax-Related Items"), is and remains the Participant's responsibility and may exceed the amount actually withheld by the Company or the Employer. The Participant further acknowledges that the Company and/or the Employer: (a) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the grant of RSUs, including, but not limited to, the grant, vesting or settlement of the RSUs, the issuance of Shares upon settlement of the RSUs, the subsequent sale of Shares acquired pursuant to such vesting/settlement and the receipt of any dividends and/or dividend equivalents; and (b) do not commit to and are under no obligation to structure the terms of the grant or any aspect of the RSUs to reduce or eliminate the Participant's liability for Tax-Related Items or achieve any particular tax result. Further, if the Participant is subject to Tax-Related Items in more than one jurisdiction, the Participant acknowledges that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

   a) Prior to any relevant taxable or tax withholding event, as applicable, the Participant agrees to make adequate arrangements satisfactory to the Company or the Employer, to satisfy all Tax-Related Items. In this regard, the Participant authorizes the Company and/or the Employer, or their respective agents, at the

Company's discretion, to satisfy the obligations with regard to all Tax-Related Items by one or a combination of the following:

**(i)**    withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer; or

**(ii)**    withholding in Shares to be issued upon vesting/settlement of the RSUs; or

**(iii)**    withholding from the proceeds of the sale of Shares acquired upon vesting/settlement of the RSUs either through a voluntary sale or through a mandatory sale arranged by the Company (on the Participant's behalf pursuant to this authorization without further consent); provided, however, that if the Participant is a Section 16 officer under the U.S. Securities Exchange Act of 1934, the Committee shall establish the method of withholding from alternatives (i) – (iii) herein and if the Committee does not exercise its discretion prior to the Tax-Related Items withholding event, then the Participant shall be entitled to elect the method of withholding from the alternatives above.

**b)**    Depending on the withholding method, the Company may withhold or account for Tax-Related Items by considering applicable minimum statutory withholding amounts or other applicable withholding rates, including maximum applicable rates, in which case, the Participant will receive a refund of any over-withheld amount in cash and will have no entitlement to the equivalent Shares.  If the obligation for Tax-Related Items is satisfied by withholding in Shares, for tax purposes, the Participant shall be deemed to have been issued the full number of Shares subject to the vested RSUs, notwithstanding that a number of Shares are held back solely for the purpose of paying the Tax-Related Items.

**c)**    Finally, the Participant shall pay to the Company and/or the Employer any amount of Tax-Related Items that the Company and/or the Employer may be required to withhold as a result of the Participant's participation in the Plan that cannot be satisfied by the means previously described.  The Company may refuse to deliver the Shares or the proceeds of the sale of Shares if the Participant fails to comply with the Participant's obligations in connection with the Tax-Related Items.

**d)**    Notwithstanding anything in this Section 3 to the contrary, to avoid a prohibited distribution under Code Section 409A, if Shares underlying the RSUs will be withheld (or sold on the Participant's behalf) to satisfy any Tax-Related Items arising prior to the date of settlement of the RSUs for any portion of the RSUs that is considered "nonqualified deferred compensation" subject to Code Section 409A ("Deferred Compensation"), then the number of Shares withheld (or sold on the Participant's behalf) shall not exceed the number of Shares that equals the liability for the Tax-Related Items.

**4.    Nominal Value.**    At the time of settlement, this Award will be subject to the Participant's appropriate undertaking to pay to Aon plc a nominal value of $.01 per share (as determined in the sole discretion of Aon plc, subject to the provisions of Aon plc's articles of association and the U.K. Companies Act 2006, as amended from time to time), and such obligation may be satisfied by the Participant in cash in any manner to be established by Aon plc in its sole discretion, including but not limited to withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer.

**5.    Effect of Termination of Employment.**
    **a)**    <u>Voluntary termination prior to Retirement.</u>    In the event that the Participant's Termination Date occurs because of the Participant's voluntary termination prior to Retirement (as defined in Section 5(d) below), the unvested portion of the RSU will be forfeited.
    **b)**    <u>Termination due to death.</u>    In the event that the Participant's Termination Date occurs due to the Participant's death, all unvested RSUs will be fully vested immediately and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof.
    **c)**    <u>Termination due to disability.</u>    In the event that the Participant's Termination Date occurs due to the Participant's disability, all unvested RSUs will be fully vested immediately and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof. "Disability" for purposes of this Agreement, shall mean disability pursuant to the standards set forth in, or

in circumstances where the Participant qualifies for receipt of benefits under, the long-term disability plan of the Employer.  In the absence of such a plan, the Committee shall have exclusive discretion to determine whether a Participant's employment is terminated due to disability.

**d)** **Involuntary termination (other than for cause) or voluntary termination on or after Retirement.**   In the event that the Participant's Termination Date occurs as a result of the Participant's involuntary termination (other than for cause) or the Participant's voluntary termination on or after Retirement, the RSUs shall be immediately vested pro rata and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof.   The pro rata portion of the vested RSUs shall be calculated by multiplying (i) the number of RSUs subject to the award, by (ii) a fraction, the numerator of which shall be the number of days that have elapsed between the Grant Date and the date of the Participant's termination, and the denominator of which shall be the total number of days in the vesting schedule set forth in the Participant's account, and subtracting from the resulting product the number of RSUs previously vested.  The remaining unvested portion of the RSU shall be forfeited.  For purposes of this Agreement, "Retire" or "Retirement" means a voluntary termination of employment on or after the Participant's 55th birthday for employees whose principal place of work is outside of the European Union ("EU").  A Participant on secondment will be subject to the vesting rule applicable to his or her home country.  For a Participant whose principal place of work is inside the EU, the unvested portion of the RSU will be forfeited.  The Committee shall have exclusive discretion to determine a Participant's principal place of work for purposes of this Section 5(d).

**e)** **Termination for cause.**  In the event that the Participant's Termination Date occurs because the Participant is terminated for cause, all unvested shares shall be forfeited.  Termination for cause shall mean performing a deliberate act of dishonesty, fraud, theft, embezzlement, or misappropriation involving the Participant's employment with the Company or its Subsidiaries or Affiliates, or breach of the duty of loyalty to the Company, its Subsidiaries or Affiliates; performing an act of race, sex, national origin, religion, disability, or age-based discrimination which after investigation, counsel to the Company reasonably concludes will result in liability being imposed on the Company, its Subsidiaries or Affiliates and / or the Participant; material violation of Company policies and procedures including, but not limited to, the Aon Code of Business Conduct; material non-compliance with any terms of this Agreement or an employment agreement; or, performing any criminal act resulting in a criminal felony charge brought against the Participant or a criminal conviction of the Participant (other than conviction of a minor traffic violation).

**6.** **Receipt by the Participant of the Prospectus.**   The Participant acknowledges receipt of the Plan prospectus that contains the entire Plan, and is incorporated herein by reference.  The Participant represents and warrants that the Participant has read the Plan and agrees that all RSUs awarded under it shall be subject to all of the terms and conditions of the Plan.

**7.** **Issuance of Shares.**   RSUs shall be converted to Shares as of the vesting date. Shares will be issued to the Participant as soon as practicable (within 60 days) after the vesting date, subject to Sections 3 and 4 of this Agreement.  Notwithstanding the foregoing, for purposes of complying with Code Section 409A, if the RSUs are considered Deferred Compensation and the Shares are to be settled in connection with a termination contemplated under Section 5(c) or 5(d), the Company and the Participant shall take all steps necessary (including with regard to any post-termination services by the Participant) to ensure that a termination contemplated under Section 5 constitutes a "separation from service" within the meaning of Code Section 409A.  In addition, if the RSUs are Deferred Compensation, the RSUs are settled upon the Participant's separation from service and the Participant is a "specified employee," within the meaning of Code Section 409A, on the date the Participant experiences a separation from service, then the RSUs shall be settled on the first business day of the seventh month following the Participant's separation from service, or, if earlier, on the date of the Participant's death, to the extent such delayed payment is required in order to avoid a prohibited distribution under Code Section 409A.

**8.** **Rights as Shareholder.**  The Participant shall not have voting or any other right as a shareholder of Aon plc with respect to the RSUs. Upon issuance of the Shares pursuant to and in accordance with Section 7, the Participant will obtain full voting and other rights as a shareholder of Aon plc.

9. **Business Considerations; Restrictive Covenants; Acknowledgments; Injunctive Relief; Confidential Information; Incentive Repayment Policy.**

a) **Business Considerations.** Aon plc and its Subsidiary, Aon Group, Inc., a Maryland corporation with its corporate and business headquarters in Chicago, Illinois, and Aon Group, Inc.'s Subsidiaries and Affiliates (and divisions thereof) (collectively, with Aon plc, "Aon") are in the business of providing conventional and alternative risk management products and services covering the businesses of insurance brokerage, reinsurance brokerage, benefits consulting, compensation consulting, human resources consulting, human resources and benefits outsourcing management, investigatory and security consulting, managing underwriting and related services, including accounting, actuarial, claims management and handling, and information systems on behalf of commercial and individual clients which are national and international and are not confined to any geographic area (the "Business"). The Participant further acknowledges that the Participant's material employment duties and responsibilities, including without limitation with respect to Aon clients, prospective clients, and other employees, span geographic areas that extend well beyond the state in which the Participant is physically employed and resides. An essential element of the Business is the development and maintenance of personal contacts and relationships with clients and prospective clients. Aon invests considerable time and money to develop and maintain personal contacts and relationships with clients and prospective clients. Aon invests considerable time and money to develop and maintain client relationships, including payment of employees' salaries, benefits, travel, entertainment and other business expenses and assistance in servicing clients by making available to its employees specially developed and researched industry data, client-specific information, legal support, accounting support, marketing, advertising and other corporate services, as well as providing training and professional development and valuable confidential business and professional information, toward the development and maintenance of its client relationships and related goodwill. While these clients and prospective clients may be secured or serviced by Aon employees, including the Participant, the Participant acknowledges that such clients and prospective clients remain at all times the clients and prospective clients of Aon and that the goodwill engendered by the relationships is intended to inure only to the benefit of Aon; the goodwill is owned by Aon; and Aon shall be the sole beneficiary of such goodwill during and after termination of the Participant's employment with Aon. In addition, the Participant acknowledges that the Participant has acquired and/or will acquire, solely for the purpose of furthering the Business, knowledge of Aon's confidential and proprietary information; the Participant further acknowledges Aon's legitimate interest in safeguarding confidential and proprietary information from disclosure.

The personal identification of clients of Aon with an employee, including the Participant, creates the potential for the Participant's appropriation of the benefits of the relationships developed with clients on behalf of and at the expense of Aon. Since Aon would suffer irreparable harm if the Participant left its employ and solicited the Business of the clients and prospective clients of Aon, or solicited the employees of Aon, it is reasonable to protect Aon against certain competitive activities by the Participant for a limited period of time after the Participant leaves employment so that Aon may renew or restore its business relationship with its clients, prospective clients and employees. Consequently, the Participant is willing to enter into the covenants set forth herein in order to provide Aon with reasonable protection for its client, prospective client and employee relationships and its investment therein as above-described, its goodwill, and its confidential and proprietary information.

b) **Covenant Not to Solicit Clients and Prospective Clients.** The Participant hereby covenants and agrees that, except with the prior written consent of Aon, the Participant (on the Participant's own behalf or on behalf of any other person or entity) will not, during the course of employment, and for a period of two (2) years after the Participant's Termination Date, directly or indirectly, call upon, solicit, accept, engage in, service or perform, other than on behalf of Aon, any business of the same type or kind as the Business performed by Aon from or with respect to (i) clients of Aon with respect to whom the Participant provided services, either alone or with others, or had a business relationship, or on whose account the Participant worked or became familiar, or supervised directly or indirectly the servicing activities related to such clients, during the twenty-four (24) months prior to the Participant's Termination Date and, further

provided, such clients were clients of Aon either on the Participant's Termination Date or within twelve (12) months prior to such Termination Date and (ii) prospective clients of Aon which the Participant alone, in combination with others, or in a supervisory capacity, solicited during the six (6) months prior to the Participant's Termination Date and to which a proposal for services was rendered by Aon during the six (6) months prior to the Participant's Termination Date. "Client" means any person or entity listed on the books of Aon as such.

c) **Covenant Not to Solicit Employees.** The Participant hereby also agrees, for the duration of the term of the covenant set forth in Section 9(b) herein not to, directly or indirectly, solicit, induce, or cause any person or other entity to solicit, induce, any employee of Aon to work for the Participant or for any third party or entity, or to leave the employ of Aon.

d) **Other Covenants.** Notwithstanding any other language in the Agreement, including, but not limited to that found in Section 10(b), this Agreement does not preclude the enforceability of any restrictive covenant provision contained in any prior or subsequent agreement entered into by the Participant, (any such covenant, an "Other Covenant"), including without limitation any covenant contained in any Confidentiality and Non-Solicitation Agreement between the Participant and any Aon entity, and further including without limitation any covenant not to compete, to solicit or perform services for clients, or to solicit employees, any confidentiality or intellectual property covenant, and any covenant with respect to a pre-resignation notice period. Further, no Other Covenant precludes the enforceability of any provision contained in this Agreement.

e) **Acknowledgments.** Aon and the Participant acknowledge and agree that the covenants contained in Sections 9(b) and 9(c) herein are necessary and reasonable for the protection of Aon and are reasonably limited with respect to the activities prohibited, duration, geographical scope and their effect on the Participant and the public. The parties acknowledge that the purpose and effect of the covenants simply are to protect Aon for a limited period of time from unfair competition by the Participant.

The Participant acknowledges that there is no general geographical restriction contained in the preceding paragraphs because the restrictions apply only to the specified clients of Aon and because the Participant's material duties, responsibilities and relationships with Aon clients, prospective clients and employees are not limited to any particular geographic area. Nothing in this Agreement shall prohibit the Participant from obtaining a livelihood for himself or herself or his or her family by being engaged in the Business. The intent of the parties is that the Participant's restrictive covenant is limited only to those clients as above specified.

f) **Company's Right to Injunctive Relief; Attorneys' Fees.** The Participant acknowledges that the Participant's services to Aon are of a unique character which gives them a special value to Aon, the loss of which cannot reasonably or adequately be compensated in damages in an action at law, and that a breach of this Agreement will result in irreparable and continuing harm to Aon, and that therefore, in addition to any other remedy which Aon may have at law or in equity, Aon shall be entitled to temporary, preliminary and permanent injunctive relief for a breach or threatened breach of this Agreement by the Participant (without the need to post any bond or other security). The parties acknowledge and agree that Aon Group, Inc. and the Participant's Employer each is an intended third-party beneficiary of this Agreement, and may be a named plaintiff in any subsequent suit brought by the Company to enforce the terms of this Agreement. In the event that Aon brings an action to enforce the terms and conditions of the Agreement, the Participant shall pay the costs and expenses incurred by Aon in bringing such action, including without limitation attorneys' and other legal fees.

g) **Trade Secrets and Confidential Information.** The Participant acknowledges that Aon's business depends to a significant degree upon the possession of information which is not generally known to others, and that the profitability of such business requires that this information remain proprietary to Aon. The Participant shall not, except as required in the course of employment by Aon or by applicable law (provided that the Participant shall first give Aon plc reasonable advance written notice of any subpoena or other legal disclosure requirement (Attn: General Counsel), with a contemporaneous copy to Aon Group, Inc.), disclose or use during or subsequent to the course of employment, any trade secrets or confidential or

proprietary information relating to the business of Aon of which the Participant becomes aware by reason of being employed or to which the Participant gains access during his or her employment by Aon and which has not been publicly disclosed (it being understood and agreed that trade secrets and confidential or proprietary information shall remain subject to this Section 9(g), and shall not be considered "publicly disclosed" for purposes of the preceding clause, if any public disclosure thereof results from a breach by the Participant of this provision, or a breach by the Participant or another person of some other contractual or legal obligation to Aon).

Such information includes, without limitation, lists of clients and prospective clients; contract terms and conditions; client information relating to services, insurance, benefits programs, employees, finances, and compensation; copyrighted materials; corporate, management and business plans and strategies; compensation and revenues; methods and strategies of marketing; market research and data; technical know-how; computer software and manuals; policies and procedures; and the conduct of the affairs of Aon. All records and equipment and other materials constituting or relating in any way to any trade secrets, confidential or proprietary information, or relating to clients or business of Aon, and all other Aon property, shall be and remain the sole property of Aon during and after the end of employment and shall be returned to Aon by the Participant immediately upon its request or the Participant's Termination Date (whichever is earlier).

h) **Incentive Repayment Policy.** If the Participant has been designated and notified by the board of directors of Aon plc that he or she is a reporting officer for purposes of Section 16 of the U.S. Securities Exchange Act of 1934, the Participant is subject to Aon's Incentive Repayment Policy (the "Policy"). The Policy provides that Aon plc will have the discretion to cancel or require reimbursement to the Company of the long-term equity based incentive award set forth in this Agreement if the grant or vesting was based on the achievement of financial results that were subsequently restated. The Participant can obtain a copy of the Policy from the Global Compensation team. If the Participant is subject to the Policy, by accepting this Agreement, the Participant hereby agrees and acknowledges that he or she will be bound by it.

10. **Other Provisions.**

a) **Plan Terms Take Precedence over Agreement Terms.** RSUs are granted pursuant to the Plan, the terms and conditions of which are incorporated into this Agreement by reference. If there are any inconsistencies between the terms of this Agreement and the Plan, the terms of the Plan will govern.

b) **Prior Agreement(s) Will Not Control.** The Participant's acceptance of this Agreement will supersede provisions of any prior agreement that could be construed as governing the terms of this grant.

c) **Section 409A.** The RSUs and amounts payable thereunder are intended to be exempt from or compliant with Code Section 409A and the U.S. Treasury Regulations relating thereto so as not to subject the Participant to the payment of additional taxes and interest under Code Section 409A or other adverse tax consequences. In furtherance of this intent, the provisions of this Agreement will be interpreted, operated, and administered in a manner consistent with these intentions. The Committee may modify the terms of this Agreement, the Plan or both, without the consent of the Participant, in the manner that the Committee may determine to be necessary or advisable in order to comply with Code Section 409A or to mitigate any additional tax, interest and/or penalties or other adverse tax consequences that may apply under Code Section 409A if compliance is not practical. This Section 10(c) does not create an obligation on the part of the Company to modify the terms of this Agreement or the Plan and does not guarantee that the RSUs or the delivery of Shares upon vesting/settlement of the RSUs will not be subject to taxes, interest and penalties or any other adverse tax consequences under Code Section 409A. Nothing in this Agreement shall provide a basis for any person to take any action against the Company or any of its Subsidiaries or Affiliates based on matters covered by Code Section 409A, including the tax treatment of any amounts paid under this Agreement, and neither the Company nor any of its Subsidiaries or Affiliates will have any liability under any circumstances to the Participant or any other party if the RSUs, the delivery of Shares upon vesting/settlement of the RSUs or other payment or tax event hereunder that is intended to be exempt from, or compliant with, Code

Section 409A, is not so exempt or compliant or for any action taken by the Committee with respect thereto. Further, settlement of any portion of the RSUs that is Deferred Compensation may not be accelerated or postponed except to the extent permitted by Code Section 409A.

d) **Restriction on Transfer.** RSUs may not be sold, transferred, pledged, assigned, or otherwise alienated at any time.

e) **Right of Employment.** Grants of RSUs under the Plan and of this Agreement do not confer upon the Participant any right to continue in the employ or service of the Employer. This Agreement shall survive any termination of the Participant's employment for any or no reason.

f) **Electronic Delivery and Acceptance.** The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means. The Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

g) **Need to Accept Grant.** The Participant acknowledges that this grant must be accepted within ninety (90) days of the Grant Date in order to be eligible to receive any benefits from this grant. If this grant is not accepted within the ninety (90)-day period specified in the foregoing sentence, all benefits under this grant may be forfeited, as determined in the sole discretion of the Committee. To accept this grant, the Participant must access the www.netbenefits.fidelity.com website and follow the instructions for acceptance. If this grant was distributed to the Participant via mail, the Participant must sign the Agreement and return it to Aon's Executive Compensation Department within ninety (90) days.

h) **Waiver; Section Headings.** Waiver of any term or condition of this Agreement by any party shall not be construed as a waiver of a subsequent breach or failure of the same term or condition, or a waiver of any other term or condition of this Agreement. Any waiver must be in writing. The Section headings in this Agreement are for convenience only and are not to be used in interpreting this Agreement.

i) **Severability.** To the extent that the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable by a court of competent jurisdiction for any reason, such term, word, phrase, clause or sentence shall be modified in such manner so as to afford the Company the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws. If, however, a court of competent jurisdiction finds that any such term, word, phrase, clause or sentence cannot be so modified and thus made enforceable, or otherwise declines for any reason to do so, such term, word, phrase, clause or sentence shall be deemed severed from this Agreement and of no force and effect, and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent.

j) **Governing Law.** The validity, interpretation, instruction, performance, enforcement and remedies of or relating to this Agreement, and the rights and obligations of the parties hereunder, shall be governed by and construed in accordance with the substantive internal laws of the State of Illinois, without regard to the conflict of law principles, rules or statutes of any jurisdiction. The foregoing provisions of this Section 10(j) shall apply irrespective of whether the Participant is a party to or bound by another restrictive covenant of any kind that may be governed by the laws of another jurisdiction (if any).

k) **Venue and Jurisdiction.** Venue for any legal proceedings instituted related to this Agreement shall be exclusively in the state and/or federal courts located in Cook County, Illinois, and the Participant hereby knowingly, voluntarily and irrevocably agrees, consents and submits to the exclusive jurisdiction and venue of such courts within the State of Illinois. The Participant further hereby knowingly, voluntarily and irrevocably waives, and agrees not to assert, any objection, challenge or defense to such exclusive venue or jurisdiction (including without limitation any defense of forum non conveniens), and further agrees not to file any claim or action related to this Agreement in any other jurisdiction or venue. The foregoing provisions of this Section 10(k) shall apply irrespective of whether the Participant is a party to or bound by another restrictive covenant of any kind that may

provide for or permit venue or jurisdiction with respect to such other restrictive covenant in any other court or forum (if any).

l)   **Notice.**   All notices given hereunder shall be in writing and, if intended for Aon plc, shall be addressed to it or delivered to it at its principal office in London, England to the attention of the General Counsel or its principal office in Chicago, Illinois to the attention of the Chief Human Resources Officer.  If intended for the Participant, notices shall be delivered personally or shall be addressed (if sent by mail) to the Participant's then current residence address as shown on the Company's records, or to such other address as the Participant directs in a notice to the Company.  All notices shall be deemed to be given on the date received at the address of the addressee or, if delivered personally, on the date delivered.

m)   **No Advice Regarding Grant.** The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding the Participant's participation in the Plan, or the acquisition or sale of the underlying Shares.  The Participant is hereby advised to consult with his or her own personal tax, legal and financial advisors regarding his or her participation in the Plan and execution of this Agreement, before executing this Agreement or otherwise taking any action at any time related to the Plan.

n)   **Imposition of Other Requirements.**  The Company reserves the right to impose other requirements on the Participant's participation in the Plan, on the RSUs and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable for legal or administrative reasons, and to require the Participant to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

IN WITNESS WHEREOF, the parties have accepted this Agreement as of the date hereof.


**AON PLC**

*Gregory C. Case*

Gregory C. Case
President and Chief Executive Officer


**AON GROUP, INC.**

*Gregory C. Case*

Gregory C. Case
President and Chief Executive Officer

**Signed Electronically**                                    **12/10/2015**
**RSU Recipient (Participant)**                              **Date**

**FXM823EC**

**12/10/2015 01:53 pm U.S. Eastern Standard Time**

**ACCEPTED**

**RESTRICTED STOCK UNIT AGREEMENT**
**UNDER AMENDED AND RESTATED**
**AON PLC 2011 INCENTIVE PLAN**

This Restricted Stock Unit Agreement (the "Agreement") is entered into between Aon plc, a public limited company incorporated under English law, and its Subsidiary Aon Group, Inc., a Maryland corporation with its principal place of business at 200 East Randolph Street, Chicago, Illinois (collectively, the "Company") and _____**MATTHEW J WALSH**_____ (the "Participant").

The Company desires to grant the Participant restricted stock units ("RSUs"), each RSU representing the right to receive a Class A Ordinary Share of the Company ("Share"), $.01 par value per Share, to encourage the Participant to remain in the service of the Company or its Subsidiaries or Affiliates, to provide the Participant with an incentive to contribute to the financial progress of the Company, and to encourage ownership of Shares by the Participant. Capitalized terms used but not otherwise defined in the Agreement shall have the meaning ascribed to such terms in the Amended and Restated Aon plc 2011 Incentive Plan, as amended from time to time (the "Plan").

NOW, THEREFORE, in consideration of the mutual promises hereinafter set forth, the parties hereto agree as follows:

1. **Grant of Restricted Stock Units.** The Company grants under the Plan an award of _____**786**_____ RSUs on **05/19/2017** (the "Grant Date"). The Participant understands and agrees that the Participant has no obligation to accept this award (as a condition of employment or otherwise), and that the Participant's decision to do so by signing this Agreement, and thereby to accept all of the terms and conditions of this Agreement, is the Participant's knowing and voluntary choice after having had a full and fair opportunity to consult with legal counsel (at the Participant's cost).

2. **Vesting of Restricted Stock Units.** The RSUs will vest in accordance with the schedule set forth in the Participant's account. The Participant must access the www.netbenefits.fidelity.com website and follow the instructions in order to view the vesting schedule. Notwithstanding anything herein to the contrary, the Committee may cause the RSUs to vest prior to the date(s) set forth in the vesting schedule in order to satisfy any Tax-Related Items (as defined below) that arise prior to the date of settlement of the RSUs, subject to the limitations set forth in Section 3(d) of this Agreement.

3. **Tax Withholding Obligations.** The Participant acknowledges that, regardless of any action taken by the Company and/or the Participant's employer (the "Employer"), the ultimate liability for all income tax, social insurance, payroll tax, payment on account or other tax-related items related to the Participant's participation in the Plan and legally applicable to the Participant ("Tax-Related Items"), is and remains the Participant's responsibility and may exceed the amount, if any, actually withheld by the Company or the Employer. The Participant further acknowledges that the Company and/or the Employer: (a) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the grant of RSUs, including, but not limited to, the grant, vesting or settlement of the RSUs, the issuance of Shares upon settlement of the RSUs, the subsequent sale of Shares acquired pursuant to such vesting/settlement and the receipt of any dividends and/or dividend equivalents; and (b) do not commit to and are under no obligation to structure the terms of the grant or any aspect of the RSUs to reduce or eliminate the Participant's liability for Tax-Related Items or achieve any particular tax result. Further, if the Participant is subject to Tax-Related Items in more than one jurisdiction, the Participant acknowledges that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

   a) Prior to any relevant taxable or tax withholding event, as applicable, the Participant agrees to make adequate arrangements satisfactory to the Company or the Employer, to satisfy all Tax-Related Items. In this regard, the Participant authorizes the Company and/or the Employer, or their respective agents, at the Company's discretion, to satisfy the obligations with regard to all Tax-Related Items by one or a combination of the following:

      (i)    withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer; or

      (ii)   withholding in Shares to be issued upon vesting/settlement of the RSUs; or

      (iii)  withholding from the proceeds of the sale of Shares acquired upon vesting/settlement of the RSUs either through a voluntary sale or through a mandatory sale arranged by the Company (on the Participant's behalf pursuant to this authorization without further consent); provided, however, that if the Participant is a Section 16 officer under the U.S. Securities Exchange Act of 1934, the Committee shall establish the method of withholding from alternatives (i) – (iii) herein.

b)   Depending on the withholding method, the Company and/or the Employer may withhold or account for Tax-Related Items by considering applicable minimum statutory withholding amounts or other applicable withholding rates, including maximum applicable rates, in which case, any over-withheld amount may be refunded to the Participant in cash by the Company or the Employer (with no entitlement to the equivalent Shares) or if not refunded, the Participant may seek a refund from the local tax authorities.  If the obligation for Tax-Related Items is satisfied by withholding in Shares, for tax purposes, the Participant shall be deemed to have been issued the full number of Shares subject to the vested RSUs, notwithstanding that a number of Shares are held back solely for the purpose of paying the Tax-Related Items.

c)   Finally, the Participant shall pay to the Company and/or the Employer any amount of Tax-Related Items that the Company and/or the Employer may be required to withhold as a result of the Participant's participation in the Plan that cannot be satisfied by the means previously described.  The Company may refuse to deliver the Shares or the proceeds of the sale of Shares if the Participant fails to comply with the Participant's obligations in connection with the Tax-Related Items.

d)   Notwithstanding anything in this Section 3 to the contrary, to avoid a prohibited distribution under Code Section 409A, if Shares underlying the RSUs will be withheld (or sold on the Participant's behalf) to satisfy any Tax-Related Items arising prior to the date of settlement of the RSUs for any portion of the RSUs that is considered "nonqualified deferred compensation" subject to Code Section 409A ("Deferred Compensation"), then the number of Shares withheld (or sold on the Participant's behalf) shall not exceed the number of Shares that equals the liability for the Tax-Related Items.

4.   **Nominal Value.**  At the time of settlement, this Award will be subject to the Participant's appropriate undertaking to pay to Aon plc a nominal value of $.01 per share (as determined in the sole discretion of Aon plc, subject to the provisions of Aon plc's articles of association and the U.K. Companies Act 2006, as amended from time to time), and such obligation may be satisfied by the Participant in cash in any manner to be established by Aon plc in its sole discretion, including but not limited to withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer.

5.   **Effect of Termination of Employment.**

a)   <u>**Voluntary termination (other than Retirement).**</u>  In the event that the Participant's Termination Date occurs because of the Participant's voluntary termination that does not qualify as Retirement (as defined in Section 5(d) below), the unvested portion of the RSU will be forfeited.

b)   <u>**Termination due to death.**</u>  In the event that the Participant's Termination Date occurs due to the Participant's death, all unvested RSUs will be fully vested immediately and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof.

c)   <u>**Termination due to disability.**</u>  In the event that the Participant's Termination Date occurs due to the Participant's disability, all unvested RSUs will be fully vested immediately and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof. "Disability" for purposes of this Agreement, shall mean disability pursuant to the standards set forth in, or in circumstances where the Participant qualifies for receipt of benefits under, the long-term disability plan of the Employer.  In the absence of such a plan, the Committee shall have exclusive discretion to determine whether a Participant's employment is terminated due to disability.

d)   <u>**Involuntary termination (other than for Cause) or Retirement.**</u>  In the event that the Participant's Termination Date occurs as a result of the Participant's involuntary termination by the Company or Employer (other than for Cause) or the Participant's Retirement, the RSUs shall be immediately vested pro rata and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof.  The pro rata portion of the RSUs that shall vest shall be calculated by multiplying (i) the number of RSUs subject to the award, by (ii) a fraction, the numerator of which shall be the number of days that have elapsed between the Grant Date and the date of the Participant's termination, and the denominator of which shall be the total number of days covered by the vesting schedule set forth in the Participant's account, and subtracting from the resulting product the number of RSUs previously vested.  The remaining unvested portion of the RSUs shall be forfeited.  For purposes of this Agreement, "Retire" or "Retirement" means a voluntary termination of employment on or after the Participant's 55th birthday for employees whose principal place of work is outside of the European Union ("EU").  A Participant on secondment will be subject to the vesting rule applicable to his or her home country.  Participants whose principal place of work is

inside the EU shall not be eligible for Retirement, and their voluntary termination at any age shall be treated in accordance with Section 5(a). The Committee shall have exclusive discretion to determine a Participant's principal place of work for purposes of this Section 5(d).

e) **Termination for Cause.** In the event that the Participant's Termination Date occurs because the Participant is terminated by the Company or Employer for Cause, all unvested RSUs shall be forfeited. "Cause" shall mean the Participant's (i) performing a deliberate act of dishonesty, fraud, theft, embezzlement, or misappropriation involving the Participant's employment with the Company, its Subsidiaries or Affiliates, or breach of the duty of loyalty to the Company, its Subsidiaries or Affiliates; (ii) performing an act of race, sex, national origin, religion, disability, or age-based discrimination which after investigation, counsel to the Company reasonably concludes will result in liability being imposed on the Company, its Subsidiaries or Affiliates and / or the Participant; (iii) material violation of Company policies and procedures including, but not limited to, the Aon Code of Business Conduct; (iv) material noncompliance with any terms of this Agreement or an employment agreement; or (v) performing any criminal act resulting in a criminal felony charge brought against the Participant or a criminal conviction of the Participant (other than conviction of a minor traffic violation).

6. **Receipt by the Participant of the Prospectus.** The Participant acknowledges receipt of the Plan prospectus that contains the entire Plan, and is incorporated herein by reference. The Participant represents and warrants that the Participant has read the Plan and agrees that all RSUs awarded under it shall be subject to all of the terms and conditions of the Plan.

7. **Issuance of Shares.** RSUs shall be converted to Shares as of the applicable vesting date. Shares will be issued to the Participant as soon as practicable (within 60 days) after the vesting date, subject to Sections 3 and 4 of this Agreement. Notwithstanding the foregoing, for purposes of complying with Code Section 409A, if the RSUs are considered Deferred Compensation and the Shares are to be settled in connection with a termination of service, the Company and the Participant shall take all steps necessary (including with regard to any post-termination services by the Participant) to ensure that a termination contemplated under Section 5 constitutes a "separation from service" within the meaning of Code Section 409A. In addition, if the RSUs are Deferred Compensation and payable in connection with the Participant's separation from service, and if the Participant is a "specified employee" within the meaning of Code Section 409A on the date the Participant experiences a separation from service, then the RSUs shall be settled on the first business day of the seventh month following the Participant's separation from service, or, if earlier, on the date of the Participant's death, solely to the extent such delayed payment is required in order to avoid a prohibited distribution under Code Section 409A.

8. **Rights as Shareholder.** The Participant shall not have voting or any other rights as a shareholder of Aon plc with respect to the RSUs. Upon issuance of the Shares pursuant to and in accordance with Section 7, the Participant will obtain full voting and other rights as a shareholder of Aon plc.

9. **Business Considerations; Restrictive Covenants; Acknowledgments; Injunctive Relief; Confidential Information; Incentive Repayment Policy.**

a) **Business Considerations.** Aon plc and its Subsidiary, Aon Group, Inc., a Maryland corporation with its corporate and business headquarters in Chicago, Illinois, and Aon Group, Inc.'s Subsidiaries and Affiliates (and divisions thereof) (collectively, with Aon plc, "Aon") are in the business of providing conventional and alternative risk management products and services covering the businesses of insurance brokerage, reinsurance brokerage, benefits consulting, compensation consulting, human resources consulting, human resources and benefits outsourcing management, investigatory and security consulting, managing underwriting and related services, including accounting, actuarial, claims management and handling, and information systems on behalf of commercial and individual clients which are national and international and are not confined to any geographic area (the "Business"). The Participant further acknowledges that the Participant's material employment duties and responsibilities, including without limitation with respect to Aon clients, prospective clients, and other employees, span geographic areas that extend well beyond the state in which the Participant is physically employed and resides. An essential element of the Business is the development and maintenance of personal contacts and relationships with clients and prospective clients. Aon invests considerable time and money to develop and maintain personal contacts and relationships with clients and prospective clients. Aon invests considerable time and money to develop and maintain client relationships, including payment of employees' salaries, benefits, travel, entertainment and other business expenses and assistance in servicing clients by making available to its employees specially developed and researched industry data, client-specific information, legal support, accounting support, marketing, advertising and other corporate services, as well as providing training and professional development and valuable confidential business and professional information, toward the development and maintenance of its client relationships and related goodwill. While these clients and

prospective clients may be secured or serviced by Aon employees, including the Participant, the Participant acknowledges that such clients and prospective clients remain at all times the clients and prospective clients of Aon and that the goodwill engendered by the relationships is intended to inure only to the benefit of Aon; the goodwill is owned by Aon; and Aon shall be the sole beneficiary of such goodwill during and after termination of the Participant's employment with Aon. In addition, the Participant acknowledges that the Participant has acquired and/or will acquire, solely for the purpose of furthering the Business, knowledge of Aon's confidential and proprietary information; the Participant further acknowledges Aon's legitimate interest in safeguarding confidential and proprietary information from disclosure.

The personal identification of clients of Aon with an employee, including the Participant, creates the potential for the Participant's appropriation of the benefits of the relationships developed with clients on behalf of and at the expense of Aon. Since Aon would suffer irreparable harm if the Participant left its employ and solicited the Business of the clients and prospective clients of Aon, or solicited the employees of Aon, it is reasonable to protect Aon against certain competitive activities by the Participant for a limited period of time after the Participant leaves employment so that Aon may renew or restore its business relationship with its clients, prospective clients and employees. Consequently, the Participant is willing to enter into the covenants set forth herein in order to provide Aon with reasonable protection for its client, prospective client and employee relationships and its investment therein as above-described, its goodwill, and its confidential and proprietary information.

b) **Covenant Not to Solicit Clients and Prospective Clients.** The Participant hereby covenants and agrees that, except with the prior written consent of Aon, the Participant (on the Participant's own behalf or on behalf of any other person or entity) will not, during the course of employment, and for a period of two (2) years after the Participant's Termination Date, directly or indirectly, call upon, solicit, accept, engage in, service or perform, other than on behalf of Aon, any business of the same type or kind as the Business performed by Aon from or with respect to (i) clients of Aon with respect to whom the Participant provided services, either alone or with others, or had a business relationship, or on whose account the Participant worked or became familiar, or supervised directly or indirectly the servicing activities related to such clients, during the twenty-four (24) months prior to the Participant's Termination Date and, further provided, such clients were clients of Aon either on the Participant's Termination Date or within twelve (12) months prior to such Termination Date and (ii) prospective clients of Aon which the Participant alone, in combination with others, or in a supervisory capacity, solicited during the six (6) months prior to the Participant's Termination Date and to which a proposal for services was rendered by Aon during the six (6) months prior to the Participant's Termination Date. "Client" means any person or entity listed on the books of Aon as such.

c) **Covenant Not to Solicit Employees.** The Participant hereby also agrees, for the duration of the term of the covenant set forth in Section 9(b) herein not to, directly or indirectly, solicit, induce, or cause any person or other entity to solicit, induce, any employee of Aon to work for the Participant or for any third party or entity, or to leave the employ of Aon.

d) **Other Covenants.** Notwithstanding any other language in the Agreement, including, but not limited to that found in Section 10(b), this Agreement does not preclude the enforceability of any restrictive covenant provision contained in any prior or subsequent agreement entered into by the Participant, (any such covenant, an "Other Covenant"), including without limitation any covenant contained in any Confidentiality and Non-Solicitation Agreement between the Participant and any Aon entity, and further including without limitation any covenant not to compete, to solicit or perform services for clients, or to solicit employees, any confidentiality or intellectual property covenant, and any covenant with respect to a pre-resignation notice period. Further, no Other Covenant precludes the enforceability of any provision contained in this Agreement.

e) **Acknowledgments.** Aon and the Participant acknowledge and agree that the covenants contained in Sections 9(b) and 9(c) herein are necessary and reasonable for the protection of Aon and are reasonably limited with respect to the activities prohibited, duration, geographical scope and their effect on the Participant and the public. The parties acknowledge that the purpose and effect of the covenants simply are to protect Aon for a limited period of time from unfair competition by the Participant.

The Participant acknowledges that there is no general geographical restriction contained in the preceding paragraphs because the restrictions apply only to the specified clients of Aon and because the Participant's material duties, responsibilities and relationships with Aon clients, prospective clients and employees are not limited to any particular geographic area. Nothing in this Agreement shall prohibit the Participant from obtaining a livelihood for himself or herself or his or her family by being engaged in the Business. The intent of the parties is that the Participant's restrictive covenant is limited only to those clients as above specified.

f) **Company's Right to Injunctive Relief; Attorneys' Fees.** The Participant acknowledges that the Participant's services to Aon are of a unique character which gives them a special value to Aon, the loss of which cannot

reasonably or adequately be compensated in damages in an action at law, and that a breach of this Agreement will result in irreparable and continuing harm to Aon, and that therefore, in addition to any other remedy which Aon may have at law or in equity, Aon shall be entitled to temporary, preliminary and permanent injunctive relief for a breach or threatened breach of this Agreement by the Participant (without the need to post any bond or other security). The parties acknowledge and agree that Aon Group, Inc. and the Participant's Employer each is an intended third-party beneficiary of this Agreement, and may be a named plaintiff in any subsequent suit brought by the Company to enforce the terms of this Agreement. In the event that Aon brings an action to enforce the terms and conditions of the Agreement, the Participant shall pay the costs and expenses incurred by Aon in bringing such action, including without limitation attorneys' and other legal fees.

g) **Trade Secrets and Confidential Information.** The Participant acknowledges that Aon's business depends to a significant degree upon the possession of information which is not generally known to others, and that the profitability of such business requires that this information remain proprietary to Aon. The Participant shall not, except as required in the course of employment by Aon or by applicable law (provided that the Participant shall first give Aon plc reasonable advance written notice of any subpoena (Attn: General Counsel), with a contemporaneous copy to Aon Group, Inc.), disclose or use during or subsequent to the course of employment, any trade secrets or confidential or proprietary information relating to the business of Aon of which the Participant becomes aware by reason of being employed or to which the Participant gains access during his or her employment by Aon and which has not been publicly disclosed (it being understood and agreed that trade secrets and confidential or proprietary information shall remain subject to this Section 9(g), and shall not be considered "publicly disclosed" for purposes of the preceding clause, if any public disclosure thereof results from a breach by the Participant of this provision, or a breach by the Participant or another person of some other contractual or legal obligation to Aon). Nothing in this paragraph is intended to limit the Participant's right or ability to communicate with the U.S. Equal Employment Opportunity Commission, the National Labor Relations Board, the Securities and Exchange Commission, or other federal, state or local agency, and such communication may be initiated by the Participant or in response to the government inquiry.

Such information includes, without limitation, lists of clients and prospective clients; contract terms and conditions; client information relating to services, insurance, benefits programs, employees, finances, and compensation; copyrighted materials; corporate, management and business plans and strategies; compensation and revenues; methods and strategies of marketing; market research and data; technical know-how; computer software and manuals; policies and procedures; and the conduct of the affairs of Aon. All records and equipment and other materials constituting or relating in any way to any trade secrets, confidential or proprietary information, or relating to clients or business of Aon, and all other Aon property, shall be and remain the sole property of Aon during and after the end of employment and shall be returned to Aon by the Participant immediately upon its request or the Participant's Termination Date (whichever is earlier).

h) **Incentive Repayment Policy.** If the Participant has been designated and notified by the board of directors of Aon plc that he or she is a reporting officer for purposes of Section 16 of the U.S. Securities Exchange Act of 1934, the Participant is subject to Aon's Incentive Repayment Policy (the "Policy"). The Policy provides that Aon plc will have the discretion to cancel or require reimbursement to the Company of the long-term equity based incentive award set forth in this Agreement if the grant or vesting was based on the achievement of financial results that were subsequently restated. The Participant can obtain a copy of the Policy from the Global Compensation team. If the Participant is subject to the Policy, by accepting this Agreement, the Participant hereby agrees and acknowledges that he or she will be bound by it.

**10. Other Provisions.**

a) **Plan Terms Take Precedence over Agreement Terms.** RSUs are granted pursuant to the Plan, the terms and conditions of which are incorporated into this Agreement by reference. If there are any inconsistencies between the terms of this Agreement and the Plan, the terms of the Plan will govern.

b) **Prior Agreement(s) Will Not Control.** The Participant's acceptance of this Agreement will supersede provisions of any prior agreement that could be construed as governing the terms of this grant.

c) **Code Section 409A.** The RSUs and amounts payable thereunder are intended to be exempt from or compliant with Code Section 409A and the U.S. Treasury Regulations relating thereto so as not to subject the Participant to the payment of additional taxes and interest under Code Section 409A or other adverse tax consequences. In furtherance of this intent, the provisions of this Agreement will be interpreted, operated, and administered in a manner consistent with these intentions. The Committee may modify the terms of this Agreement and/or the

Plan, without the consent of the Participant, in the manner that the Committee may determine to be necessary or advisable in order to comply with Code Section 409A or to mitigate any additional tax, interest and/or penalties or other adverse tax consequences that may apply under Code Section 409A if compliance is not practical. This Section 10(c) does not create an obligation on the part of the Company to modify the terms of this Agreement or the Plan and does not guarantee that the RSUs or the delivery of Shares upon vesting/settlement of the RSUs will not be subject to taxes, interest and penalties or any other adverse tax consequences under Code Section 409A. Nothing in this Agreement shall provide a basis for any person to take any action against the Company or any of its Subsidiaries or Affiliates based on matters covered by Code Section 409A, including the tax treatment of any amounts paid under this Agreement, and neither the Company nor any of its Subsidiaries or Affiliates will have any liability under any circumstances to the Participant or any other party if the RSUs, the delivery of Shares upon vesting/settlement of the RSUs or other payment or tax event hereunder that is intended to be exempt from, or compliant with, Code Section 409A, is not so exempt or compliant or for any action taken by the Committee with respect thereto. Further, settlement of any portion of the RSUs that is Deferred Compensation may not be accelerated or postponed except to the extent permitted by Code Section 409A.

**d)** **Restriction on Transfer.** RSUs may not be sold, transferred, pledged, assigned, or otherwise alienated at any time.

**e)** **Right of Employment.** Grants of RSUs under the Plan and of this Agreement do not confer upon the Participant any right to continue in the employ or service of the Employer. This Agreement shall survive any termination of the Participant's employment for any or no reason.

**f)** **Electronic Delivery and Acceptance.** The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means. The Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

**g)** **Need to Accept Grant.** The Participant acknowledges that this grant must be accepted within ninety (90) days of the Grant Date in order to be eligible to receive any benefits from this grant. If this grant is not accepted within the ninety (90)-day period specified in the foregoing sentence, all benefits under this grant may be forfeited, as determined in the sole discretion of the Committee. To accept this grant, the Participant must access the www.netbenefits.fidelity.com website and follow the instructions for acceptance. If this grant was distributed to the Participant via mail, the Participant must sign the Agreement and return it to the Company within ninety (90) days.

**h)** **Waiver; Section Headings.** Waiver of any term or condition of this Agreement by any party shall not be construed as a waiver of a subsequent breach or failure of the same term or condition, or a waiver of any other term or condition of this Agreement. Any waiver must be in writing. The Section headings in this Agreement are for convenience only and are not to be used in interpreting this Agreement.

**i)** **Severability.** To the extent that the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable by a court of competent jurisdiction for any reason, such term, word, phrase, clause or sentence shall be modified in such manner so as to afford the Company the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws. If, however, a court of competent jurisdiction finds that any such term, word, phrase, clause or sentence cannot be so modified and thus made enforceable, or otherwise declines for any reason to do so, such term, word, phrase, clause or sentence shall be deemed severed from this Agreement and of no force and effect, and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent.

**j)** **Governing Law.** The validity, interpretation**,** instruction, performance, enforcement and remedies of or relating to this Agreement, and the rights and obligations of the parties hereunder, shall be governed by and construed in accordance with the substantive internal laws of the State of Illinois, without regard to the conflict of law principles, rules or statutes of any jurisdiction. The foregoing provisions of this Section 10(j) shall apply irrespective of whether the Participant is a party to or bound by another restrictive covenant of any kind that may be governed by the laws of another jurisdiction (if any).

**k)** **Venue and Jurisdiction.** Venue for any legal proceedings instituted related to this Agreement shall be exclusively in the state and/or federal courts located in Cook County, Illinois, and the Participant hereby knowingly, voluntarily and irrevocably agrees, consents and submits to the exclusive jurisdiction and venue of such courts within the State of Illinois. The Participant further hereby knowingly, voluntarily and irrevocably waives, and agrees not to assert, any objection, challenge or defense to such exclusive venue or jurisdiction (including without limitation any defense of forum non conveniens), and further agrees not to file any claim or

- 6 -

action related to this Agreement in any other jurisdiction or venue. The foregoing provisions of this Section 10(k) shall apply irrespective of whether the Participant is a party to or bound by another restrictive covenant of any kind that may provide for or permit venue or jurisdiction with respect to such other restrictive covenant in any other court or forum (if any).

**l)** **Notice.** All notices given hereunder shall be in writing and, if intended for Aon plc, shall be addressed to it or delivered to it at its principal office in London, England to the attention of the General Counsel or its principal office in Chicago, Illinois to the attention of the Chief Human Resources Officer. If intended for the Participant, notices shall be delivered personally or shall be addressed (if sent by mail) to the Participant's then current residence address as shown on the Company's records, or to such other address as the Participant directs in a notice to the Company. All notices shall be deemed to be given on the date received at the address of the addressee or, if delivered personally, on the date received.

**m)** **Compliance with Law.** Notwithstanding any other provision of the Plan or this Agreement, unless there is an available exemption from any registration, qualification or other legal requirement applicable to the Shares, the Company shall not be required to deliver any Shares issuable upon vesting/settlement of the RSUs prior to the completion of any registration or qualification of the Shares under any local, state, federal or foreign securities or exchange control law or under rulings or regulations of the U.S. Securities and Exchange Commission ("SEC") or of any other governmental regulatory body, or prior to obtaining any approval or other clearance from any local, state, federal or foreign governmental agency, which registration, qualification or approval the Company shall, in its absolute discretion, deem necessary or advisable. The Participant understands that the Company is under no obligation to register or qualify the Shares with the SEC or any state or foreign securities commission or to seek approval or clearance from any governmental authority for the issuance or sale of the Shares. Further, the Participant agrees that the Company shall have unilateral authority to amend the Plan and the Agreement without the Participant's consent to the extent necessary to comply with securities or other laws applicable to issuance of Shares.

**n)** **Intellectual Property.** The Participant hereby assigns to the Company the Participant's entire right, title and interest in and to all discoveries and improvements, patentable or otherwise, trade secrets and ideas and writings and copyrightable material, which are conceived, developed, reduced to practice, or acquired by the Participant (collectively "IP") during the Participant's employment and which relate to the business of the Company or any of its Affiliates, parent companies or Subsidiaries. The Participant further acknowledges that all original works of authorship which are made by the Participant (solely or jointly with others) within the scope and during the period of his/her employment with the Company and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. The Participant agrees to disclose promptly, fully and in writing all such IP to the Company. The Participant will upon the Company's request, execute, acknowledge and deliver to the Company all instruments and do all other acts which are necessary or desirable to enable the Company or any of its Affiliates, parent companies, or Subsidiaries to file and prosecute applications for, and to acquire, maintain and enforce, all patents, trademarks, and copyrights in all countries. To the extent the Participant is bound by an employee handbook or contract provision that protects the Company's intellectual property at least to the extent provided in this Section 10(n), the provision set forth in such employment handbook or contractual arrangement between the Participant and the Company will prevail and govern.

**o)** **No Advice Regarding Grant.** The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding the Participant's participation in the Plan, or the acquisition or sale of the underlying Shares. The Participant should consult with his or her own personal tax, legal and financial advisors regarding his or her participation in the Plan and execution of this Agreement, before executing this Agreement or otherwise taking any action at any time related to the Plan.

**p)** **Imposition of Other Requirements.** The Company reserves the right to impose other requirements on the Participant's participation in the Plan, on the RSUs and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable for legal or administrative reasons, and to require the Participant to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

SSP 17 US

IN WITNESS WHEREOF, the parties have accepted this Agreement as of the date hereof.

**AON PLC**

*Gregory C. Case*

Gregory C. Case
President and Chief Executive Officer

**AON GROUP, INC.**

*Gregory C. Case*

Gregory C. Case
President and Chief Executive Officer

**Signed Electronically**                                   **06/08/2017**
**RSU Recipient (Participant)**                             **Date**


**HGWDAO8I**

**06/08/2017 10:34 PM U.S. Eastern Standard Time**

**ACCEPTED**

**RESTRICTED STOCK UNIT AGREEMENT**
**UNDER AMENDED AND RESTATED**
**AON PLC 2011 INCENTIVE PLAN**

This Restricted Stock Unit Agreement (the "Agreement") is entered into between Aon plc, a public limited company incorporated under English law, and its Subsidiary Aon Group, Inc., a Maryland corporation with its principal place of business at 200 East Randolph Street, Chicago, Illinois (collectively, the "Company") and **MATTHEW J WALSH** (the "Participant").

The Company desires to grant the Participant restricted stock units ("RSUs"), each RSU representing the right to receive a Class A Ordinary Share of the Company ("Share"), $.01 par value per Share, to encourage the Participant to remain in the service of the Company or its Subsidiaries or Affiliates, to provide the Participant with an incentive to contribute to the financial progress of the Company, and to encourage ownership of Shares by the Participant. Capitalized terms used but not otherwise defined in the Agreement shall have the meaning ascribed to such terms in the Amended and Restated Aon plc 2011 Incentive Plan, as amended from time to time (the "Plan").

NOW, THEREFORE, in consideration of the mutual promises hereinafter set forth, the parties hereto agree as follows:

1.  **Grant of Restricted Stock Units.** The Company grants under the Plan an award of ____**704**____ RSUs on **05/21/2018** (the "Grant Date"). The Participant understands and agrees that the Participant has no obligation to accept this award (as a condition of employment or otherwise), and that the Participant's decision to do so by signing this Agreement, and thereby to accept all of the terms and conditions of this Agreement, is the Participant's knowing and voluntary choice after having had a full and fair opportunity to consult with legal counsel (at the Participant's cost).

2.  **Vesting of Restricted Stock Units.** The RSUs will vest in accordance with the schedule set forth in the Participant's account. The Participant must access the www.netbenefits.fidelity.com website and follow the instructions in order to view the vesting schedule. Notwithstanding anything herein to the contrary, the Committee may cause the RSUs to vest prior to the date(s) set forth in the vesting schedule in order to satisfy any Tax-Related Items (as defined below) that arise prior to the date of settlement of the RSUs, subject to the limitations set forth in Section 3(d) of this Agreement.

3.  **Tax Withholding Obligations.** The Participant acknowledges that, regardless of any action taken by the Company and/or the Participant's employer (the "Employer"), the ultimate liability for all income tax, social insurance, payroll tax, payment on account or other tax-related items related to the Participant's participation in the Plan and legally applicable to the Participant ("Tax-Related Items"), is and remains the Participant's responsibility and may exceed the amount, if any, actually withheld by the Company or the Employer. The Participant further acknowledges that the Company and/or the Employer: (a) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the grant of RSUs, including, but not limited to, the grant, vesting or settlement of the RSUs, the issuance of Shares upon settlement of the RSUs, the subsequent sale of Shares acquired pursuant to such vesting/settlement and the receipt of any dividends and/or dividend equivalents; and (b) do not commit to and are under no obligation to structure the terms of the grant or any aspect of the RSUs to reduce or eliminate the Participant's liability for Tax-Related Items or achieve any particular tax result. Further, if the Participant is subject to Tax-Related Items in more than one jurisdiction, the Participant acknowledges that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

   a)  Prior to any relevant taxable or tax withholding event, as applicable, the Participant agrees to make adequate arrangements satisfactory to the Company or the Employer, to satisfy all Tax-Related Items. In this regard, the Participant authorizes the Company and/or the Employer, or their respective agents, at the Company's discretion, to satisfy the obligations with regard to all Tax-Related Items by one or a

- 1 -

combination of the following:

    **(i)**    withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer; or

    **(ii)**    withholding in Shares to be issued upon vesting/settlement of the RSUs; or

    **(iii)**    withholding from the proceeds of the sale of Shares acquired upon vesting/settlement of the RSUs either through a voluntary sale or through a mandatory sale arranged by the Company (on the Participant's behalf pursuant to this authorization without further consent); provided, however, that if the Participant is a Section 16 officer under the U.S. Securities Exchange Act of 1934, the Committee shall establish the method of withholding from alternatives (i) – (iii) herein.

**b)**  Depending on the withholding method, the Company and/or the Employer may withhold or account for Tax-Related Items by considering applicable minimum statutory withholding amounts or other applicable withholding rates in the Participant's jurisdiction(s), including maximum applicable rates, in which case, any over-withheld amount may be refunded to the Participant in cash by the Company or the Employer (with no entitlement to the equivalent Shares) or if not refunded, the Participant may seek a refund from the local tax authorities.  If the obligation for Tax-Related Items is satisfied by withholding in Shares, for tax purposes, the Participant shall be deemed to have been issued the full number of Shares subject to the vested RSUs, notwithstanding that a number of Shares are held back solely for the purpose of paying the Tax-Related Items.

**c)**  Finally, the Participant shall pay to the Company and/or the Employer any amount of Tax-Related Items that the Company and/or the Employer may be required to withhold as a result of the Participant's participation in the Plan that cannot be satisfied by the means previously described.  The Company may refuse to deliver the Shares or the proceeds of the sale of Shares if the Participant fails to comply with the Participant's obligations in connection with the Tax-Related Items.

**d)**  Notwithstanding anything in this Section 3 to the contrary, to avoid a prohibited distribution under Code Section 409A, if Shares underlying the RSUs will be withheld (or sold on the Participant's behalf) to satisfy any Tax-Related Items arising prior to the date of settlement of the RSUs for any portion of the RSUs that is considered "nonqualified deferred compensation" subject to Code Section 409A ("Deferred Compensation"), then the number of Shares withheld (or sold on the Participant's behalf) shall not exceed the number of Shares that equals the liability for the Tax-Related Items.

**4.**  **Nominal Value.**  At the time of settlement, this Award will be subject to the Participant's appropriate undertaking to pay to Aon plc a nominal value of $.01 per share (as determined in the sole discretion of Aon plc, subject to the provisions of Aon plc's articles of association and the U.K. Companies Act 2006, as amended from time to time), and such obligation may be satisfied by the Participant in cash in any manner to be established by Aon plc in its sole discretion, including but not limited to withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer.

**5.**  **Effect of Termination of Employment.**

    **a)**  <u>**Voluntary termination (other than Retirement)**</u>.  In the event that the Participant's Termination Date occurs because of the Participant's voluntary termination that does not qualify as Retirement (as defined in Section 5(d) below), the unvested portion of the RSU will be forfeited.

    **b)**  <u>**Termination due to death.**</u>  In the event that the Participant's Termination Date occurs due to the Participant's death, all unvested RSUs will be fully vested immediately and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof.

    **c)**  <u>**Termination due to disability.**</u>  In the event that the Participant's Termination Date occurs due to the Participant's disability, all unvested RSUs will be fully vested immediately and the date of such

termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof. "Disability" for purposes of this Agreement, shall mean disability pursuant to the standards set forth in, or in circumstances where the Participant qualifies for receipt of benefits under, the long-term disability plan of the Employer. In the absence of such a plan, the Committee shall have exclusive discretion to determine whether a Participant's employment is terminated due to disability.

**d)** **Involuntary termination (other than for Cause) or Retirement.** In the event that the Participant's Termination Date occurs as a result of the Participant's involuntary termination by the Company or Employer (other than for Cause) or the Participant's Retirement, the RSUs shall be immediately vested pro rata and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof. The pro rata portion of the RSUs that shall vest shall be calculated by multiplying (i) the number of RSUs subject to the award, by (ii) a fraction, the numerator of which shall be the number of days that have elapsed between the Grant Date and the date of the Participant's termination, and the denominator of which shall be the total number of days covered by the vesting schedule set forth in the Participant's account, and subtracting from the resulting product the number of RSUs previously vested. The remaining unvested portion of the RSUs shall be forfeited. For purposes of this Agreement, "Retire" or "Retirement" means a voluntary termination of employment on or after the Participant's 55th birthday for employees whose principal place of work is outside of the European Union ("EU"). A Participant on secondment will be subject to the vesting rule applicable to his or her home country. Participants whose principal place of work is inside the EU shall not be eligible for Retirement, and their voluntary termination at any age shall be treated in accordance with Section 5(a). The Committee shall have exclusive discretion to determine a Participant's principal place of work for purposes of this Section 5(d).

**e)** **Termination for Cause.** In the event that the Participant's Termination Date occurs because the Participant is terminated by the Company or Employer for Cause, all unvested RSUs shall be forfeited. "Cause" shall mean the Participant's (i) performing a deliberate act of dishonesty, fraud, theft, embezzlement, or misappropriation involving the Participant's employment with the Company, its Subsidiaries or Affiliates, or breach of the duty of loyalty to the Company, its Subsidiaries or Affiliates; (ii) performing an act of race, sex, national origin, religion, disability, or age-based discrimination which after investigation, counsel to the Company reasonably concludes will result in liability being imposed on the Company, its Subsidiaries or Affiliates and / or the Participant; (iii) material violation of Company policies and procedures including, but not limited to, the Aon Code of Business Conduct; (iv) material noncompliance with any terms of this Agreement or an employment agreement; or (v) performing any criminal act resulting in a criminal felony charge brought against the Participant or a criminal conviction of the Participant (other than conviction of a minor traffic violation).

**6.** **Receipt by the Participant of the Prospectus.** The Participant acknowledges receipt of the Plan prospectus that contains the entire Plan, and is incorporated herein by reference. The Participant represents and warrants that the Participant has read the Plan and agrees that all RSUs awarded under it shall be subject to all of the terms and conditions of the Plan.

**7.** **Issuance of Shares.** RSUs shall be converted to Shares as of the applicable vesting date. Shares will be issued to the Participant as soon as practicable (within 60 days) after the vesting date, subject to Sections 3 and 4 of this Agreement. Notwithstanding the foregoing, for purposes of complying with Code Section 409A, if the RSUs are considered Deferred Compensation and the Shares are to be settled in connection with a termination of service, the Company and the Participant shall take all steps necessary (including with regard to any post-termination services by the Participant) to ensure that a termination contemplated under Section 5 constitutes a "separation from service" within the meaning of Code Section 409A. In addition, if the RSUs are Deferred Compensation and payable in connection with the Participant's separation from service, and if the Participant is a "specified employee" within the meaning of Code Section 409A on the date the Participant experiences a separation from service, then the RSUs shall be settled on the first business day of the seventh month following the Participant's separation from service, or, if earlier, on the date of the Participant's death, solely to the extent

such delayed payment is required in order to avoid a prohibited distribution under Code Section 409A.

8. **Rights as Shareholder.** The Participant shall not have voting or any other rights as a shareholder of Aon plc with respect to the RSUs. Upon issuance of the Shares pursuant to and in accordance with Section 7, the Participant will obtain full voting and other rights as a shareholder of Aon plc.

9. **Business Considerations; Restrictive Covenants; Acknowledgments; Injunctive Relief; Confidential Information; Incentive Repayment Policy.**

   a) **Business Considerations.** Aon plc and its Subsidiary, Aon Group, Inc., a Maryland corporation with its corporate and business headquarters in Chicago, Illinois, and Aon Group, Inc.'s Subsidiaries and Affiliates (and divisions thereof) (collectively, with Aon plc, "Aon") are in the business of providing conventional and alternative risk management products and services covering the businesses of insurance brokerage, reinsurance brokerage, benefits consulting, compensation consulting, human resources consulting, human resources and benefits outsourcing management, investigatory and security consulting, managing underwriting and related services, including accounting, actuarial, claims management and handling, and information systems on behalf of commercial and individual clients which are national and international and are not confined to any geographic area (the "Business"). The Participant further acknowledges that the Participant's material employment duties and responsibilities, including without limitation with respect to Aon clients, prospective clients, and other employees, span geographic areas that extend well beyond the state in which the Participant is physically employed and resides. An essential element of the Business is the development and maintenance of personal contacts and relationships with clients and prospective clients. Aon invests considerable time and money to develop and maintain client relationships, including payment of employees' salaries, benefits, travel, entertainment and other business expenses and assistance in servicing clients by making available to its employees specially developed and researched industry data, client-specific information, legal support, accounting support, marketing, advertising and other corporate services, as well as providing training and professional development and valuable confidential business and professional information, toward the development and maintenance of its client relationships and related goodwill. While these clients and prospective clients may be secured or serviced by Aon employees, including the Participant, the Participant acknowledges that such clients and prospective clients remain at all times the clients and prospective clients of Aon and that the goodwill engendered by the relationships is intended to inure only to the benefit of Aon; the goodwill is owned by Aon; and Aon shall be the sole beneficiary of such goodwill during and after termination of the Participant's employment with Aon. In addition, the Participant acknowledges that the Participant has acquired and/or will acquire, for the purpose of furthering the Business, knowledge of Aon's confidential and proprietary information; the Participant further acknowledges Aon's legitimate interest in safeguarding confidential and proprietary information from disclosure.

   The personal identification of clients of Aon with an Aon employee, including the Participant, creates the potential for the Participant's appropriation of the benefits of the relationships developed with clients on behalf of and at the expense of Aon. Since Aon would suffer irreparable harm if the Participant left its employ and solicited the Business of the clients and prospective clients of Aon, or solicited the employees of Aon, it is reasonable to protect Aon against certain competitive activities by the Participant for a limited period of time after the Participant leaves employment so that Aon may renew or restore its business relationship with its clients, prospective clients and employees. Consequently, the Participant is willing to enter into the covenants set forth herein in order to provide Aon with reasonable protection for its client, prospective client and employee relationships and its investment therein as above-described, its goodwill, and its confidential and proprietary information.

   b) **Covenant Not to Solicit Clients and Prospective Clients.** The Participant hereby covenants and agrees that, except with the prior written consent of Aon, the Participant (on the Participant's own behalf or on behalf of any other person or entity) will not, during the course of employment, and for a period of two (2) years after the Participant's Termination Date (the "Restricted Period"), directly or indirectly, call upon, solicit, accept, engage in, service or perform, other than on behalf of Aon, any business of the same type or

- 4 -

kind as the Business performed by Aon from or with respect to (i) clients of Aon with respect to whom the Participant provided services, either alone or with others, or had a business relationship, or on whose account the Participant worked or became familiar, or supervised directly or indirectly the servicing activities related to such clients, during the twenty-four (24) months prior to the Participant's Termination Date and, further provided, such clients were clients of Aon either on the Participant's Termination Date or within twelve (12) months prior to such Termination Date and (ii) prospective clients of Aon which the Participant alone, in combination with others, or in a supervisory capacity, solicited during the six (6) months prior to the Participant's Termination Date and to which a proposal for services was rendered by Aon during the six (6) months prior to the Participant's Termination Date. "Client" means any person or entity listed on the books of Aon as such.

c) **Covenant Not to Solicit Employees.** The Participant hereby also agrees, for the duration of the Restricted Period, not to, directly or indirectly, solicit or induce, or cause any person or other entity to solicit or induce, any employee of Aon to work for the Participant or for any third party or entity, or to leave the employ of Aon.

d) **Other Covenants.** Notwithstanding any other language in the Agreement, including, but not limited to that found in Section 10(b), this Agreement does not preclude the enforceability of any restrictive covenant provision contained in any prior or subsequent agreement entered into by the Participant, (any such covenant, an "Other Covenant"), including without limitation any covenant contained in any Confidentiality and Non-Solicitation Agreement between the Participant and any Aon entity, and further including without limitation any covenant not to compete, to solicit or perform services for clients, or to solicit employees, any confidentiality or intellectual property covenant, and any covenant with respect to a pre-resignation notice period. Further, no Other Covenant precludes the enforceability of any provision contained in this Agreement. No subsequent agreement entered into by the Participant may amend, supersede, or override the covenants contained herein unless such subsequent agreement specifically references subsections (b) and (c) of this Section.

e) **Acknowledgments.** Aon and the Participant acknowledge and agree that the covenants contained in subsections (b) and (c) of this Section are necessary and reasonable for the protection of Aon and are reasonably limited with respect to the activities prohibited, duration, geographical scope and their effect on the Participant and the public. The parties acknowledge that the purpose and effect of the covenants simply are to protect Aon for a limited period of time from unfair competition by the Participant.

The Participant acknowledges that there is no general geographical restriction contained in the preceding paragraphs because the restrictions apply only to the specified clients of Aon and because the Participant's material duties, responsibilities, and relationships with Aon clients, prospective clients, and employees are not limited to any particular geographic area. Nothing in this Agreement shall prohibit the Participant from obtaining a livelihood for the Participant or the Participant's family by being engaged in the Business.

f) **Company's Right to Injunctive Relief; Attorneys' Fees and Costs.** The Participant acknowledges that the Participant's services to Aon are of a unique character which gives them a special value to Aon, the loss of which cannot reasonably or adequately be compensated in damages in an action at law, and that a breach of Section 9 of this Agreement will result in irreparable and continuing harm to Aon, and that therefore, in addition to any other remedy which Aon may have at law or in equity, Aon shall be entitled to temporary, preliminary and permanent injunctive relief for a breach or threatened breach of this Agreement by the Participant (without the need to post any bond or other security). The parties acknowledge and agree that each Aon entity is an intended third-party beneficiary of this Agreement, and may be a named plaintiff in any subsequent suit brought by Aon to enforce the terms of this Agreement. In the event that any action is filed to enforce the terms and conditions of this Agreement, the prevailing party in the action will recover from the non-prevailing party, in addition to any other sum that either party may be called upon to pay, a reasonable sum for the prevailing party's attorney's fees and costs.

g) **Trade Secrets and Confidential Information.**

(i) The Participant acknowledges that Aon's Business depends to a significant degree upon the possession

- 5 -

of confidential, proprietary, and trade secret information which is not generally known to others, and that the profitability of such Business requires that this information remain proprietary to Aon. The Participant recognizes that, by virtue of the Participant's employment with Aon, and to assist the Participant in the solicitation, production and servicing of client Business, the Participant will be granted otherwise prohibited access to such information. This information (hereinafter referred to as "Confidential Information") includes, without limitation, lists of clients and prospective clients; contract terms and conditions; client information relating to services, insurance, benefits programs, employees, finances, and compensation; copyrighted materials; corporate, management and business plans and strategies; compensation and revenues; methods and strategies of marketing; market research and data; technical know-how; computer software and manuals; policies and procedures; and the conduct of the affairs of Aon. Confidential Information does not include any information that lawfully is or has become generally or publicly known other than through the Participant's breach of this Agreement or a breach by another person of some other obligation to Aon.  The Participant shall not, except as required in the course of employment by Aon or as otherwise provided by applicable law or in this subsection (g), disclose or use during or subsequent to the course of employment, any Confidential Information.

(ii)   The Participant understands that nothing contained in this Agreement limits the Participant's ability to report possible violations of law or regulation to, or file a charge or complaint with, the Securities and Exchange Commission, the Equal Employment Opportunity Commission, the National Labor Relations Board, the Occupational Safety and Health Administration, the Department of Justice, the Congress, any Inspector General, or any other federal, state or local governmental agency or commission ("Government Agencies").  The Participant further understands that this Agreement does not limit the Participant's ability to participate in any investigation or proceeding that may be conducted by any Government Agency, without notice to the Company.

Nothing in this Agreement shall limit the Participant's ability under applicable United States federal law to (i) disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law or (ii) disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure.

(iii)  Upon termination of employment or upon Aon's request (whichever is earlier), the Participant will promptly return to Aon all Confidential Information and all materials and all copies or tangible embodiments of materials involving Confidential Information, and all other Aon property, in the Participant's possession or control, except as otherwise provided by law or in this subsection (g).  The Participant agrees to represent in writing to Aon upon termination of employment that he or she has complied with the provisions of this subsection (g).

h)  **Incentive Repayment Policy.**  If the Participant has been designated and notified by the board of directors of Aon plc that he or she is a reporting officer for purposes of Section 16 of the U.S. Securities Exchange Act of 1934, the Participant is subject to Aon's Incentive Repayment Policy (the "Policy").  The Policy provides that Aon plc will have the discretion to cancel or require reimbursement to the Company of the long-term equity based incentive award set forth in this Agreement if the grant or vesting was based on the achievement of financial results that were subsequently restated.  The Participant can obtain a copy of the Policy from the Global Compensation team.  If the Participant is subject to the Policy, by accepting this Agreement, the Participant hereby agrees and acknowledges that he or she will be bound by it.

# 10. Other Provisions.

a)  **Plan Terms Take Precedence over Agreement Terms.**  RSUs are granted pursuant to the Plan, the terms and conditions of which are incorporated into this Agreement by reference.  If there are any inconsistencies between the terms of this Agreement and the Plan, the terms of the Plan will govern.

- 6 -

For the avoidance of doubt, the parties expressly acknowledge and agree that Sections 9, 10(j), and 10(k) of this Agreement are not inconsistent with any term or provision of the Plan, including (without limitation) Section 9.16 of the Plan (and nothing herein shall be construed to state or suggest that any other provision of this Agreement is inconsistent with the Plan).

b) **Prior Agreement(s) Will Not Control.** The Participant's acceptance of this Agreement will supersede provisions of any prior agreement that could be construed as governing the terms of this grant.

c) **Code Section 409A.** The RSUs and amounts payable thereunder are intended to be exempt from or compliant with Code Section 409A and the U.S. Treasury Regulations relating thereto so as not to subject the Participant to the payment of additional taxes and interest under Code Section 409A or other adverse tax consequences. In furtherance of this intent, the provisions of this Agreement will be interpreted, operated, and administered in a manner consistent with these intentions. The Committee may modify the terms of this Agreement and/or the Plan, without the consent of the Participant, in the manner that the Committee may determine to be necessary or advisable in order to comply with Code Section 409A or to mitigate any additional tax, interest and/or penalties or other adverse tax consequences that may apply under Code Section 409A if compliance is not practical. This Section 10(c) does not create an obligation on the part of the Company to modify the terms of this Agreement or the Plan and does not guarantee that the RSUs or the delivery of Shares upon vesting/settlement of the RSUs will not be subject to taxes, interest and penalties or any other adverse tax consequences under Code Section 409A. Nothing in this Agreement shall provide a basis for any person to take any action against the Company or any of its Subsidiaries or Affiliates based on matters covered by Code Section 409A, including the tax treatment of any amounts paid under this Agreement, and neither the Company nor any of its Subsidiaries or Affiliates will have any liability under any circumstances to the Participant or any other party if the RSUs, the delivery of Shares upon vesting/settlement of the RSUs or other payment or tax event hereunder that is intended to be exempt from, or compliant with, Code Section 409A, is not so exempt or compliant or for any action taken by the Committee with respect thereto. Further, settlement of any portion of the RSUs that is Deferred Compensation may not be accelerated or postponed except to the extent permitted by Code Section 409A.

d) **Restriction on Transfer.** RSUs may not be sold, transferred, pledged, assigned, or otherwise alienated at any time.

e) **Right of Employment.** Grants of RSUs under the Plan and of this Agreement do not confer upon the Participant any right to continue in the employ or service of the Employer. This Agreement shall survive any termination of the Participant's employment for any or no reason.

f) **Electronic Delivery and Acceptance.** The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means. The Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

g) **Need to Accept Grant.** The Participant acknowledges that this grant must be accepted within ninety (90) days of the Grant Date in order to be eligible to receive any benefits from this grant. If this grant is not accepted within the ninety (90)-day period specified in the foregoing sentence, all benefits under this grant may be forfeited, as determined in the sole discretion of the Committee. To accept this grant, the Participant must access the www.netbenefits.fidelity.com website and follow the instructions for acceptance. If this grant was distributed to the Participant via mail, the Participant must sign the Agreement and return it to the Company within ninety (90) days.

h) **Waiver; Section Headings.** Waiver of any term or condition of this Agreement by any party shall not be construed as a waiver of a subsequent breach or failure of the same term or condition, or a waiver of any other term or condition of this Agreement. Any waiver must be in writing. The Section headings in this Agreement are for convenience only and are not to be used in interpreting this Agreement.

i) **Severability.** To the extent that the terms set forth in this Agreement or any word, phrase, clause or

sentence is found to be illegal or unenforceable by a court of competent jurisdiction for any reason, such term, word, phrase, clause or sentence shall be modified in such manner so as to afford the Company the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws.  If, however, a court of competent jurisdiction finds that any such term, word, phrase, clause or sentence cannot be so modified and thus made enforceable, or otherwise declines for any reason to do so, such term, word, phrase, clause or sentence shall be deemed severed from this Agreement and of no force and effect, and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent.

**j)** **Governing Law.**  The validity, interpretation**,** instruction, performance, enforcement and remedies of or relating to Section 9 of this Agreement, and the rights and obligations of the parties thereunder, shall be governed by and construed in accordance with the substantive internal laws of the State of Illinois, without regard to the conflict of law principles, rules or statutes of any jurisdiction.  With respect to all other Sections of this Agreement, the validity, interpretation, instruction, performance, enforcement and remedies of or relating to those Sections, and the rights and obligations of the parties thereunder, shall be governed and construed in accordance with the substantive internal laws of the State of Delaware, without regard to the conflict of law principles, rules or statutes of any jurisdiction.  The foregoing provisions of this subsection shall apply irrespective of whether the Participant is a party to or bound by another restrictive covenant of any kind that may be governed by the laws of another jurisdiction (if any).

**k)** **Venue and Jurisdiction.**  Venue for any legal proceedings instituted related to this Agreement shall be exclusively in the state and/or federal courts located in Cook County, Illinois, and the Participant hereby knowingly, voluntarily and irrevocably agrees, consents and submits to the exclusive jurisdiction and venue of such courts within the State of Illinois.  The Participant further hereby knowingly, voluntarily and irrevocably waives, and agrees not to assert, any objection, challenge or defense to such exclusive venue or jurisdiction (including without limitation any defense of forum non conveniens), and further agrees not to file any claim or action related to this Agreement in any other jurisdiction or venue.  The foregoing provisions of this Section 10(k) shall apply irrespective of whether the Participant is a party to or bound by another restrictive covenant of any kind that may provide for or permit venue or jurisdiction with respect to such other restrictive covenant in any other court or forum (if any).

**l)** **Notice.**  All notices given hereunder shall be in writing and, if intended for Aon plc, shall be addressed to it or delivered to it at its principal office in London, England to the attention of the General Counsel or its principal office in Chicago, Illinois to the attention of the Chief Human Resources Officer.  If intended for the Participant, notices shall be delivered personally or shall be addressed (if sent by mail) to the Participant's then current residence address as shown on the Company's records, or to such other address as the Participant directs in a notice to the Company.  All notices shall be deemed to be given on the date received at the address of the addressee or, if delivered personally, on the date delivered.

**m)** **Compliance with Law.**  Notwithstanding any other provision of the Plan or this Agreement, unless there is an available exemption from any registration, qualification or other legal requirement applicable to the Shares, the Company shall not be required to deliver any Shares issuable upon vesting/settlement of the RSUs prior to the completion of any registration or qualification of the Shares under any local, state, federal or foreign securities or exchange control law or under rulings or regulations of the U.S. Securities and Exchange Commission ("SEC") or of any other governmental regulatory body, or prior to obtaining any approval or other clearance from any local, state, federal or foreign governmental agency, which registration, qualification or approval the Company shall, in its absolute discretion, deem necessary or advisable.  The Participant understands that the Company is under no obligation to register or qualify the Shares with the SEC or any state or foreign securities commission or to seek approval or clearance from any governmental authority for the issuance or sale of the Shares.  Further, the Participant agrees that the Company shall have unilateral authority to amend the Plan and the Agreement without the Participant's consent to the extent necessary to comply with securities or other laws applicable to issuance of Shares.

**n)** **Intellectual Property.** The Participant hereby assigns to the Company the Participant's entire right, title and interest in and to all discoveries and improvements, patentable or otherwise, trade secrets and ideas and writings and copyrightable material, which are conceived, developed, reduced to practice, or acquired by the Participant (collectively "IP") during the Participant's employment and which relate to the business of the Company or any of its Affiliates, parent companies or Subsidiaries. The Participant further acknowledges that all original works of authorship which are made by the Participant (solely or jointly with others) within the scope of and during the period of his/her employment with the Company and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. The Participant agrees to disclose promptly, fully and in writing all such IP to the Company. The Participant will upon the Company's request, execute, acknowledge and deliver to the Company all instruments and do all other acts which are necessary or desirable to enable the Company or any of its Affiliates, parent companies, or Subsidiaries to file and prosecute applications for, and to acquire, maintain and enforce, all patents, trademarks, and copyrights in all countries. To the extent the Participant is bound by an employee handbook or contract provision that protects the Company's intellectual property at least to the extent provided in this Section 10(n), the provision set forth in such employment handbook or contractual arrangement between the Participant and the Company will prevail and govern.

**o)** **No Advice Regarding Grant.** The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding the Participant's participation in the Plan, or the acquisition or sale of the underlying Shares. The Participant should consult with his or her own personal tax, legal and financial advisors regarding his or her participation in the Plan and execution of this Agreement, before executing this Agreement or otherwise taking any action at any time related to the Plan.

**p)** **Imposition of Other Requirements.** The Company reserves the right to impose other requirements on the Participant's participation in the Plan, on the RSUs and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable for legal or administrative reasons, and to require the Participant to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

IN WITNESS WHEREOF, the parties have accepted this Agreement as of the date hereof.

**AON PLC**

*Gregory C. Case*

Gregory C. Case
President and Chief Executive Officer

**AON GROUP, INC.**

*Gregory C. Case*

Gregory C. Case
President and Chief Executive Officer

**Signed Electronically**                 **06/04/2018**
**RSU Recipient (Participant)**             **Date**

**IGS501XL**

**06/04/2018 08:40 AM U.S. Eastern Standard Time**

**ACCEPTED**

Aon RSU AA 2018 SSP-US – Non-California
6676729-v5\GESDMS

# Leadership Performance Program

*Aon plc*

*For the Performance Cycle: January 1, 2016 through December 31, 2018*



**Table of Contents**

| | |
|---|---|
| **Performance Award Certificate** | **3** |
| Appendix A | 4 |
| Appendix B-1 | 9 |
| Appendix B-2 | 12 |
| Appendix B-3 | 18 |
| Appendix C | 22 |
| **LPP Plan Document** | **44** |
| **LPP Goals and Payout Scales For 2016-2018 LPP** | **50** |



**LEADERSHIP PERFORMANCE PROGRAM**
**PERFORMANCE AWARD CERTIFICATE**
In Connection with the Performance Cycle
January 1, 2016 through December 31, 2018

Aon plc (the "Company") has determined that the following key member of the Company's senior leadership team (the "Participant") is eligible for participation in the Leadership Performance Program (the "Program"), effective for the Performance Cycle starting January 1, 2016 and ending December 31, 2018 ( "LPP 11"):

**Participant's Name: MATTHEW J WALSH**

The Participant has been granted an Award of **962** Performance Share Units under LPP 11, which Performance Share Units shall be subject to the terms and conditions set forth in the Program and this Performance Award Certificate, including Appendices A, B and C, which are attached hereto and made a part hereof (the "Agreement"). Capitalized terms not defined in this Agreement shall have the meanings assigned under the Program and the Stock Plan.

Signed: *A. R. Goland*

> Anthony R. Goland
>
> Chief Human Resources Officer

**Participant's Acknowledgement**:

The Participant (1) agrees and acknowledges that the Award of Performance Share Units is subject to the terms and conditions of this Agreement, the Program, and the Stock Plan; (2) agrees to be bound by the terms and conditions of this Agreement, the Program, and the Stock Plan, including the restrictive covenants contained in the Agreement and any Appendices; and (3) acknowledges that the Performance Share Units may be subject to increase, reduction or forfeiture as specified in the Program and the Stock Plan. Furthermore, the Participant understands and agrees that he or she has no obligation to accept this Award (as a condition of employment or otherwise), and that the decision to do so by signing this Agreement, and thereby to accept all of the terms and conditions of this Agreement, is the Participant's knowing and voluntary choice after having had a full and fair opportunity to consult with legal counsel (at the Participant's cost).

Signed: **Signed Electronically** Date: **04/19/2016**
Participant's Signature

**APPENDIX A**

**LEADERSHIP PERFORMANCE PROGRAM**
**PERFORMANCE AWARD CERTIFICATE**
In Connection with Performance Cycle
January 1, 2016 through December 31, 2018

The following terms and conditions apply to all Participants unless otherwise noted herein or in Appendices B or C.

1.  **Governing Law.**  The validity, interpretation, instruction, performance, enforcement and remedies of or relating to this Agreement, and the rights and obligations of the parties hereunder, shall be governed by and construed in accordance with the substantive internal laws of the State of Illinois, without regard to the conflict of law principles, rules or statutes of any jurisdiction.  The foregoing provisions of this Section 1 shall apply irrespective of whether the Participant is a party to or bound by another restrictive covenant of any kind that may be governed by the laws of another jurisdiction (if any).

2.  **Venue and Jurisdiction.**  Venue for any legal proceedings instituted related to this Agreement shall be exclusively in the state and/or federal courts located in Cook County, Illinois, and the Participant hereby knowingly, voluntarily and irrevocably agrees, consents and submits to the exclusive jurisdiction and venue of such courts within the State of Illinois.  The Participant further hereby knowingly, voluntarily and irrevocably waives, and agrees not to assert, any objection, challenge or defense to such exclusive venue or jurisdiction (including without limitation any defense of forum non conveniens), and further agrees not to file any claim or action related to this Agreement in any other jurisdiction or venue.  The foregoing provisions of this Section 2 shall apply irrespective of whether the Participant is a party to or bound by another restrictive covenant of any kind that may provide for or permit venue or jurisdiction with respect to such other restrictive covenant in any other court or forum (if any).

3.  **No Advice Regarding Grant.** The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding the Participant's participation in the Program, or the acquisition or sale of Ordinary Shares.  The Participant should consult with his or her own personal tax, legal and financial advisors regarding his or her participation in the Program and execution of this Agreement, before executing this Agreement or otherwise taking any action at any time related to the Program.

4.  **Waiver; Section Headings.**  Waiver of any term or condition of this Agreement by any party shall not be construed as a waiver of a subsequent breach or failure of the same term or condition, or a waiver of any other term or condition of this Agreement.  Any waiver must be in writing.  The section headings in this Agreement are for convenience only and are not to be used in interpreting this Agreement.

5.  **Severability.**  To the extent that the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable by a court of competent jurisdiction for any reason, such term, word, phrase, clause or sentence shall be modified in such manner so as to afford the Company the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws.  If, however, a court of competent jurisdiction finds that any such term, word, phrase, clause or sentence cannot be so modified and thus made enforceable, or otherwise declines for any reason to do so, such term, word, phrase, clause or sentence shall be deemed severed from this Agreement and of no force and effect, and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent.  The foregoing provisions of this Section 5 shall not apply to a Participant who resides in California.

6.  **Intellectual Property.**  The Participant hereby assigns to the Company the Participant's entire right, title and interest in and to all discoveries and improvements, patentable or otherwise, trade secrets and ideas and writings and copyrightable material, which are conceived, developed, reduced to practice, or acquired by the Participant (collectively, "IP") during the Participant's employment and which relate to the business of the Company or any of its Affiliates, parent companies or Subsidiaries.  The Participant further acknowledges that all original works of authorship which are made by the Participant (solely or jointly with others) within the scope of and during the period of his/her employment with the Company and which are

protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act.  The Participant agrees to disclose promptly, fully and in writing all such IP to the Company. The Participant will upon the Company's request, execute, acknowledge and deliver to the Company all instruments and do all other acts which are necessary or desirable to enable the Company or any of its Affiliates, parent companies, or Subsidiaries to file and prosecute applications for, and to acquire, maintain and enforce, all patents, trademarks, and copyrights in all countries.  To the extent the Participant is bound by an employee handbook or contract provision that protects the Company's intellectual property at least to the extent provided in this Section 6, the provision set forth in such employment handbook or contractual arrangement between the Participant and the Company will prevail and govern.

7.  **Incentive Repayment Policy.**  If the Participant has been designated and notified by the board of directors of the Company that he or she is a reporting officer for purposes of Section 16 of the U.S. Securities Exchange Act of 1934, the Participant is subject to Aon's Incentive Repayment Policy (the "Policy").  The Policy provides that the Company will have the discretion to cancel or require reimbursement to the Company of the long-term equity based incentive award set forth in this Agreement if the grant or vesting was based on the achievement of financial results that were subsequently restated.  The Participant can obtain a copy of the Policy from the Company's Global Compensation team.  If the Participant is subject to the Policy, by accepting this Agreement, the Participant hereby agrees and acknowledges that he or she will be bound by it.  Notwithstanding the foregoing, to the extent the Participant is bound by an employee handbook or contract provision that protects the Company's intellectual property at least to the extent provided in this Section 7, the provision set forth in such employment handbook or contractual arrangement between the Participant and the Company will prevail and govern.

8.  **Compliance with Law.**  Notwithstanding any other provision of the Program or this Agreement, unless there is an available exemption from any registration, qualification or other legal requirement applicable to the Ordinary Shares, the Company shall not be required to deliver any Ordinary Shares issuable upon vesting/settlement of the Performance Share Units prior to the completion of any registration or qualification of the Ordinary Shares under any local, state, federal or foreign securities or exchange control law or under rulings or regulations of the U.S. Securities and Exchange Commission ("SEC") or of any other governmental regulatory body, or prior to obtaining any approval or other clearance from any local, state, federal or foreign governmental agency, which registration, qualification or approval the Company shall, in its absolute discretion, deem necessary or advisable.  The Participant understands that the Company is under no obligation to register or qualify the Ordinary Shares with the SEC or any state or foreign securities commission or to seek approval or clearance from any governmental authority for the issuance or sale of the Ordinary Shares.  Further, the Participant agrees that the Company shall have unilateral authority to amend the Program and the Agreement without the Participant's consent to the extent necessary to comply with securities or other laws applicable to issuance of Ordinary Shares.

9.  **Appendices.**  Notwithstanding any provision of this Agreement to the contrary, if the Participant resides in a country outside the United States or is otherwise subject to the laws of a country other than the United States, the Performance Share Units shall be subject to Appendix C to this Agreement.   In addition, the terms of Appendix B-1 shall apply if the Participant resides in the United States other than in the state of California, the terms of Appendix B-2 shall apply if the Participant resides in the state of California, and the terms of Appendix B-3 shall apply if the Participant permanently resides in (or is otherwise remunerated through the local payroll of) a country outside the United States.  Moreover, if the Participant relocates to one of the countries included in Appendix C, the special terms and conditions for such country will apply to the Participant, to the extent the Company determines that the application of such terms and conditions is necessary or advisable for legal or administrative reasons.

10.  **Imposition of Other Requirements.**  The Company reserves the right to impose other requirements on the Participant's participation in the Program, on the Performance Share Units and on any Ordinary Shares acquired under the Program, to the extent the Company determines it is necessary or advisable for legal or administrative reasons, and to require the Participant to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

11.     *Data Privacy.*

*The Participant hereby explicitly and unambiguously consents to the collection, use and transfer, in electronic or other form, of the Participant's personal data as described in this Agreement and any other Performance Share Units grant materials ("Data") by and among, as necessary and applicable, the Participant's employer (the "Employer"), the Company, its Subsidiaries and Affiliates for the exclusive purpose of implementing, administering and managing the Participant's participation in the Program.*

*The Participant understands that the Company and the Employer may hold certain personal information about him or her, including, but not limited to, the Participant's name, home address and telephone number, date of birth, social insurance number or other identification number, salary, nationality, job title, any shares or directorships held in the Company, details of all Performance Share Units, options or any other entitlement to Ordinary Shares awarded, canceled, exercised, vested, unvested or outstanding in the Participant's favor, for the purpose of implementing, administering and managing the Program.*

*The Participant understands that Data will be transferred to any third parties assisting the Company with the implementation, administration and management of the Program. The Participant understands that the recipients of the Data may be located in the United States or elsewhere, and that the recipients' country (e.g., the United States) may have different data privacy laws and protections than the Participant's country.*

*The Participant understands that the Participant may request a list with the names and addresses of any potential recipients of the Data by contacting the Participant's local human resources representative. The Participant authorizes the Company, the Employer and any other possible recipients which may assist the Company (presently or in the future) with implementing, administering and managing the Program to receive, possess, use, retain and transfer the Data, in electronic or other form, for the sole purpose of implementing, administering and managing the Participant's participation in the Program.*

*The Participant understands that Data will be held only as long as is necessary to implement, administer and manage the Participant's participation in the Program.*

*The Participant understands that if the Participant resides outside the United States, the Participant may, at any time, view Data, request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, by contacting in writing the Participant's local human resources representative. Further, the Participant understands that he or she is providing the consents herein on a purely voluntary basis. If the Participant does not consent, or if he or she later seeks to revoke his or her consent, his or her employment status or service with the Employer will not be adversely affected by his or her refusal to consent; the only consequence of refusing or withdrawing the Participant's consent is that the Company would not be able to grant the Participant Performance Share Units or other equity awards or administer or maintain such awards. Therefore, the Participant understands that refusing or withdrawing his or her consent may affect his or her ability to participate in the Program. For more information on the consequences of the Participant's refusal to consent or withdrawal of consent, the Participant understands that the Participant may contact the Participant's local human resources representative.*

12.     **Tax Withholding Obligations.**  The Participant acknowledges that, regardless of any action taken by the Company and/or the Employer, the ultimate liability for all income tax, social insurance, payroll tax, payment on account or other tax-related items related to the Participant's participation in the Program and legally applicable to the Participant ("Tax-Related Items"), is and remains the Participant's responsibility and may exceed the amount actually withheld by the Company or the Employer.  The Participant further acknowledges that the Company and/or the Employer: (a) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the grant of Performance Share Units, including, but not limited to, the grant, vesting or settlement of the Performance Share Units, the issuance of Ordinary Shares upon settlement of the Performance Share Units, the subsequent sale of Ordinary Shares acquired pursuant to such vesting/settlement and the receipt of any

dividends and/or dividend equivalents; and (b) do not commit to and are under no obligation to structure the terms of the grant or any aspect of the Performance Share Units to reduce or eliminate the Participant's liability for Tax-Related Items or achieve any particular tax result.  Further, if the Participant is subject to Tax-Related Items in more than one jurisdiction, the Participant acknowledges that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

a) Prior to any relevant taxable or tax withholding event, as applicable, the Participant agrees to make adequate arrangements satisfactory to the Company or the Employer, to satisfy all Tax-Related Items. In this regard, the Participant authorizes the Company and/or the Employer, or their respective agents, at the Company's discretion, to satisfy the obligations with regard to all Tax-Related Items by one or a combination of the following: (i) withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer; or (ii) withholding in Ordinary Shares to be issued upon vesting/settlement of the Performance Share Units; or (iii) withholding from the proceeds of the sale of Ordinary Shares acquired upon vesting/settlement of the Performance Share Units either through a voluntary sale or through a mandatory sale arranged by the Company (on the Participant's behalf pursuant to this authorization without further consent); provided, however, that if the Participant is a Section 16 officer under the U.S. Securities Exchange Act of 1934, as amended, the Committee shall establish the method of withholding from alternatives (i) - (iii) herein and if the Committee does not exercise its discretion prior to the Tax-Related Items withholding event, then the Participant shall be entitled to elect the method of withholding from the alternatives above.

b) Depending on the withholding method, the Company may withhold or account for Tax-Related Items by considering applicable minimum statutory withholding amounts or other applicable withholding rates, including maximum applicable rates, in which case, any over-withheld amount will be refunded to the Participant in cash by the Company or the Employer (with no entitlement to the equivalent Ordinary Shares) or if not refunded, the Participant may seek a refund from the local tax authorities.  If the obligation for Tax-Related Items is satisfied by withholding in Ordinary Shares, for tax purposes, the Participant shall be deemed to have been issued the full number of Ordinary Shares subject to the vested Performance Share Units, notwithstanding that a number of Ordinary Shares are held back solely for the purpose of paying the Tax-Related Items.

c) Finally, the Participant shall pay to the Company and/or the Employer any amount of Tax-Related Items that the Company and/or the Employer may be required to withhold as a result of the Participant's participation in the Program that cannot be satisfied by the means previously described. The Company may refuse to deliver the Ordinary Shares or the proceeds of the sale of Ordinary Shares if the Participant fails to comply with the Participant's obligations in connection with the Tax-Related Items.

d) Notwithstanding anything in this Section 13 to the contrary, to avoid a prohibited distribution under Code Section 409A in the case of a Participant who is subject to U.S. federal income tax (a "U.S. Taxpayer"), if Ordinary Shares underlying the Performance Share Units will be withheld (or sold on the Participant's behalf) to satisfy any Tax-Related Items arising prior to the date of settlement of the Performance Share Units for any portion of the Performance Share Units that is considered "nonqualified deferred compensation" subject to Code Section 409A, then the number of Ordinary Shares withheld (or sold on the Participant's behalf) shall not exceed the number of Ordinary Shares that equals the liability for the Tax-Related Items.

13. **Language.**  If the Participant has received this Agreement or any other document related to the Program translated into a language other than English and if the meaning of the translated version is different than the English version, the English version will control.

14. **Insider Trading Restrictions/Market Abuse Laws.**  The Participant acknowledges that, depending on the Participant's country, the Participant may be subject to insider trading restrictions and/or market abuse laws, which may affect the Participant's ability to acquire or sell Ordinary Shares or rights to Ordinary Shares (*e.g.,* Performance Share Units) under the Program during such times as the Participant is

considered to have "inside information" regarding the Company (as defined by the laws in the Participant's country). Any restrictions under these laws or regulations are separate from and in addition to any restrictions that may be imposed under any applicable insider trading policy of the Company. The Participant acknowledges that it is the Participant's responsibility to comply with any applicable restrictions, and the Participant should speak to his or her personal advisor on this matter.

15. **Foreign Asset/Account Reporting.** Depending upon the country to which laws the Participant is subject, the Participant may have certain foreign asset and/or account reporting requirements that may affect the Participant's ability to acquire or hold Ordinary Shares under the Program or cash received from participating in the Program (including from any dividends or dividend equivalents or sale proceeds arising from the sale of Ordinary Shares) in a brokerage or bank account outside the Participant's country of residence. The Participant's country may require that he or she report such accounts, assets or transactions to the applicable authorities in the Participant's country. The Participant is responsible for knowledge of and compliance with any such regulations and should speak with his or her own personal tax, legal and financial advisors regarding same.

**APPENDIX B-1**

**LEADERSHIP PERFORMANCE PROGRAM**
**PERFORMANCE AWARD CERTIFICATE FOR U.S. (NON-CALIFORNIA) PARTICIPANTS**
In Connection with the Performance Cycle
January 1, 2016 through December 31, 2018

The following provisions shall apply to Participants who reside in the United States, other than in the state of California.

1. **Business Considerations; Restrictive Covenants; Acknowledgments; Injunctive Relief; Confidential Information.**

   a) **Business Considerations.** Aon plc and its Subsidiary, Aon Group, Inc., a Maryland corporation with its corporate and business headquarters in Chicago, Illinois, and Aon Group, Inc.'s Subsidiaries and Affiliates (and divisions thereof) (collectively, with Aon plc, "Aon") are in the business of providing conventional and alternative risk management products and services covering the businesses of insurance brokerage, reinsurance brokerage, benefits consulting, compensation consulting, human resources consulting, human resources and benefits outsourcing management, investigatory and security consulting, managing underwriting and related services, including accounting, actuarial, claims management and handling, and information systems on behalf of commercial and individual clients which are national and international and are not confined to any geographic area (the "Business"). The Participant further acknowledges that the Participant's material employment duties and responsibilities, including without limitation with respect to Aon clients, prospective clients, and other employees, span geographic areas that extend well beyond the state in which the Participant is physically employed and resides. An essential element of the Business is the development and maintenance of personal contacts and relationships with clients and prospective clients. Aon invests considerable time and money to develop and maintain personal contacts and relationships with clients and prospective clients. Aon invests considerable time and money to develop and maintain client relationships, including payment of employees' salaries, benefits, travel, entertainment and other business expenses and assistance in servicing clients by making available to its employees specially developed and researched industry data, client-specific information, legal support, accounting support, marketing, advertising and other corporate services, as well as providing training and professional development and valuable confidential business and professional information, toward the development and maintenance of its client relationships and related goodwill. While these clients and prospective clients may be secured or serviced by Aon employees, including the Participant, the Participant acknowledges that such clients and prospective clients remain at all times the clients and prospective clients of Aon and that the goodwill engendered by the relationships is intended to inure only to the benefit of Aon; the goodwill is owned by Aon; and Aon shall be the sole beneficiary of such goodwill during and after termination of the Participant's employment with Aon. In addition, the Participant acknowledges that the Participant has acquired and/or will acquire, solely for the purpose of furthering the Business, knowledge of Aon's confidential and proprietary information; the Participant further acknowledges Aon's legitimate interest in safeguarding confidential and proprietary information from disclosure.

   The personal identification of clients of Aon with an employee, including the Participant, creates the potential for the Participant's appropriation of the benefits of the relationships developed with clients on behalf of and at the expense of Aon. Since Aon would suffer irreparable harm if the Participant left its employ and solicited the Business of the clients and prospective clients of Aon, or solicited the employees of Aon, it is reasonable to protect Aon against certain competitive activities by the Participant for a limited period of time after the Participant leaves employment so that Aon may renew or restore its business relationship with its clients, prospective clients and employees. Consequently, the Participant is willing to enter into the covenants set forth herein in order to provide Aon with reasonable protection for its client, prospective client and employee relationships and its investment therein as above-described, its goodwill, and its confidential and proprietary information.

   b) **Covenant Not to Solicit Clients and Prospective Clients.** The Participant hereby covenants and agrees that, except with the prior written consent of Aon, the Participant (on the Participant's own behalf or on behalf of any other person or entity) will not, during the course of employment, and for a period of two (2)

years after the Participant's Termination Date, directly or indirectly, call upon, solicit, accept, engage in, service or perform, other than on behalf of Aon, any business of the same type or kind as the Business performed by Aon from or with respect to (i) clients of Aon with respect to whom the Participant provided services, either alone or with others, or had a business relationship, or on whose account the Participant worked or became familiar, or supervised directly or indirectly the servicing activities related to such clients, during the twenty-four (24) months prior to the Participant's Termination Date and, further provided, such clients were clients of Aon either on the Participant's Termination Date or within twelve (12) months prior to such Termination Date and (ii) prospective clients of Aon which the Participant alone, in combination with others, or in a supervisory capacity, solicited during the six (6) months prior to the Participant's Termination Date and to which a proposal for services was rendered by Aon during the six (6) months prior to the Participant's Termination Date. "Client" means any person or entity listed on the books of Aon as such.

c) **Covenant Not to Solicit Employees.** The Participant hereby also agrees, for the duration of the term of the covenant set forth in Section 1(b) of this Appendix B-1 not to, directly or indirectly, solicit, induce, or cause any person or other entity to solicit, induce, any employee of Aon to work for the Participant or for any third party or entity, or to leave the employ of Aon.

d) **Other Covenants.** Notwithstanding any other language in the Agreement, this Agreement does not preclude the enforceability of any restrictive covenant provision contained in any prior or subsequent agreement entered into by the Participant, (any such covenant, an "Other Covenant"), including without limitation any covenant contained in any Confidentiality and Non-Solicitation Agreement between the Participant and any Aon entity, and further without limitation any covenant not to compete, to solicit or perform services for clients, or to solicit employees, any confidentiality or intellectual property covenant, and any covenant with respect to a pre-resignation notice period. Further, no Other Covenant precludes the enforceability of any provision contained in this Agreement.

e) **Acknowledgments.** Aon and the Participant acknowledge and agree that the covenants contained in Sections 1(b) and 1(c) of this Appendix B-1 are necessary and reasonable for the protection of Aon and are reasonably limited with respect to the activities prohibited, duration, geographical scope and their effect on the Participant and the public. The parties acknowledge that the purpose and effect of the covenants simply are to protect Aon for a limited period of time from unfair competition by the Participant.

The Participant acknowledges that there is no general geographical restriction contained in the preceding paragraphs because the restrictions apply only to the specified clients of Aon and because the Participant's material duties, responsibilities and relationships with Aon clients, prospective clients and employees are not limited to any particular geographic area. Nothing in this Agreement shall prohibit the Participant from obtaining a livelihood for himself or herself or his or her family by being engaged in the Business. The intent of the parties is that the Participant's restrictive covenant is limited only to those clients as above specified.

f) **Company's Right to Injunctive Relief; Attorneys' Fees.** The Participant acknowledges that the Participant's services to Aon are of a unique character which gives them a special value to Aon, the loss of which cannot reasonably or adequately be compensated in damages in an action at law, and that a breach of this Agreement will result in irreparable and continuing harm to Aon, and that therefore, in addition to any other remedy which Aon may have at law or in equity, Aon shall be entitled to temporary, preliminary and permanent injunctive relief for a breach or threatened breach of this Agreement by the Participant (without the need to post any bond or other security). The parties acknowledge and agree that Aon Group, Inc. and the Participant's Employer each is an intended third-party beneficiary of this Agreement, and may be a named plaintiff in any subsequent suit brought by the Company to enforce the terms of this Agreement. In the event that Aon brings an action to enforce the terms and conditions of the Agreement, the Participant shall pay the costs and expenses incurred by Aon in bringing such action, including without limitation attorneys' and other legal fees.

g) **Trade Secrets and Confidential Information.** The Participant acknowledges that Aon's business depends to a significant degree upon the possession of information which is not generally known to others, and that the profitability of such business requires that this information remain proprietary to Aon. The Participant shall not, except as required in the course of employment by Aon or by applicable law

(provided that the Participant shall first give Aon plc reasonable advance written notice of any subpoena (Attn: General Counsel), with a contemporaneous copy to Aon Group, Inc.), disclose or use during or subsequent to the course of employment, any trade secrets or confidential or proprietary information relating to the business of Aon of which the Participant becomes aware by reason of being employed or to which the Participant gains access during his or her employment by Aon and which has not been publicly disclosed (it being understood and agreed that trade secrets and confidential or proprietary information shall remain subject to Section 1(g) of this Appendix B-1, and shall not be considered "publicly disclosed" for purposes of the preceding clause, if any public disclosure thereof results from a breach by the Participant of this provision, or a breach by the Participant or another person of some other contractual or legal obligation to Aon).  Nothing in this paragraph is intended to limit the Participant's right or ability to communicate with the U.S. Equal Employment Opportunity Commission, the National Labor Relations Board, the Securities and Exchange Commission, or other federal, state or local agency, and such communication may be initiated by the Participant or in response to the government inquiry

Such information includes, without limitation, lists of clients and prospective clients; contract terms and conditions; client information relating to services, insurance, benefits programs, employees, finances, and compensation; copyrighted materials; corporate, management and business plans and strategies; compensation and revenues; methods and strategies of marketing; market research and data; technical know-how; computer software and manuals; policies and procedures; and the conduct of the affairs of Aon. All records and equipment and other materials constituting or relating in any way to any trade secrets, confidential or proprietary information, or relating to clients or business of Aon, and all other Aon property, shall be and remain the sole property of Aon during and after the end of employment and shall be returned to Aon by the Participant immediately upon its request or the Participant's Termination Date (whichever is earlier).

APPENDIX B-2

**LEADERSHIP PERFORMANCE PROGRAM**
**PERFORMANCE AWARD CERTIFICATE FOR CALIFORNIA PARTICIPANTS**
In Connection with the Performance Cycle
January 1, 2016 through December 31, 2018

The following provisions shall apply for Participants who reside in California.

1. **Business Considerations; Restrictive Covenants; Acknowledgments; Injunctive Relief; Confidential Information.**

   a) **Business Considerations.** Aon plc and its Subsidiary, Aon Group, Inc., a Maryland corporation with its corporate and business headquarters in Chicago, Illinois, and Aon Group, Inc.'s Subsidiaries and Affiliates (and divisions thereof) (collectively, with Aon plc, "Aon") are in the business of providing conventional and alternative risk management products and services covering the businesses of insurance brokerage, reinsurance brokerage, benefits consulting, compensation consulting, human resources consulting, human resources and benefits outsourcing management, investigatory and security consulting, managing underwriting and related services, including accounting, actuarial, claims management and handling, and information systems on behalf of commercial and individual clients which are national and international and are not confined to any geographic area (the "Business"). The Participant further acknowledges that the Participant's material employment duties and responsibilities, including without limitation with respect to Aon clients, prospective clients, and other employees, span geographic areas that extend well beyond the state in which the Participant is physically employed and resides. An essential element of the Business is the development and maintenance of personal contacts and relationships with clients and prospective clients. Aon invests considerable time and money to develop and maintain personal contacts and relationships with clients and prospective clients. Aon invests considerable time and money to develop and maintain client relationships, including payment of employees' salaries, benefits, travel, entertainment and other business expenses and assistance in servicing clients by making available to its employees specially developed and researched industry data, client-specific information, legal support, accounting support, marketing, advertising and other corporate services, as well as providing training and professional development and valuable confidential business and professional information, toward the development and maintenance of its client relationships and related goodwill. While these clients and prospective clients may be secured or serviced by Aon employees, including the Participant, the Participant acknowledges that such clients and prospective clients remain at all times the clients and prospective clients of Aon and that the goodwill engendered by the relationships is intended to inure only to the benefit of Aon; the goodwill is owned by Aon; and Aon shall be the sole beneficiary of such goodwill during and after termination of the Participant's employment with Aon. In addition, the Participant acknowledges that the Participant has acquired and/or will acquire, solely for the purpose of furthering the Business, knowledge of Aon's confidential and proprietary information; the Participant further acknowledges Aon's legitimate interest in safeguarding confidential and proprietary information from disclosure.

   The personal identification of clients of Aon with an employee, including the Participant, creates the potential for the Participant's appropriation of the benefits of the relationships developed with clients on behalf of and at the expense of Aon. Since Aon would suffer irreparable harm if the Participant left its employ and solicited the Business of the clients and prospective clients of Aon, or solicited the employees of Aon, it is reasonable to protect Aon against certain competitive activities by the Participant for a limited period of time after the Participant leaves employment so that Aon may renew or restore its business relationship with its clients, prospective clients, and employees. Consequently, the Participant is willing to enter into the covenants set forth herein in order to provide Aon with reasonable protection for its client, prospective client and employee relationships and its investment therein as above-described, its goodwill, and its confidential and proprietary information.

   b) **Covenant Not to Solicit Clients and Prospective Clients.** The Participant hereby covenants and agrees that, except with the prior written consent of Aon, the Participant (on the Participant's own behalf or on behalf of any other person or entity) will not, during the course of employment, and for a period of two (2) years after the Participant's Termination Date, directly or indirectly, call upon, solicit, accept, engage in,

service or perform, other than on behalf of Aon, any business of the same type or kind as the Business performed by Aon from or with respect to (i) clients of Aon with respect to whom the Participant provided services, either alone or with others, or had a business relationship, or on whose account the Participant worked or became familiar, or supervised directly or indirectly the servicing activities related to such clients, during the twenty-four (24) months prior to the Participant's Termination Date and, further provided, such clients were clients of Aon either on the Participant's Termination Date or within twelve (12) months prior to such Termination Date and (ii) prospective clients of Aon which the Participant alone, in combination with others, or in a supervisory capacity, solicited during the six (6) months prior to the Participant's Termination Date and to which a proposal for services was rendered by Aon during the six (6) months prior to the Participant's Termination Date. "Client" means any person or entity listed on the books of Aon as such.

c) **Covenant Not to Solicit Employees.** The Participant hereby also agrees, for the duration of the term of the covenant set forth in Section 1(b) of this Appendix B-2 not to, directly or indirectly, solicit induce, or cause any person or other entity to solicit, induce, any employee of Aon to work for the Participant or for any third party or entity, or to leave the employ of Aon.

d) **Other Covenants.** Notwithstanding any other language in the Agreement, this Agreement does not preclude the enforceability of any restrictive covenant provision contained in any prior or subsequent agreement entered into by the Participant (any such covenant, an "Other Covenant"), including without limitation any covenant contained in any Confidentiality and Non-Solicitation Agreement between the Participant and any Aon entity, and further including without limitation any covenant not to compete, to solicit or perform services for clients, or to solicit employees, any confidentiality or intellectual property covenant, and any covenant with respect to a pre-resignation notice period. Further, no Other Covenant precludes the enforceability of any provision contained in this Agreement. To the extent that there is a conflict or overlap between any Other Covenant and a covenant contained in this Agreement, this Agreement shall control.

e) **Acknowledgments.** Aon and the Participant acknowledge and agree that the covenants contained in Sections 1(b) and 1(c) of this Appendix B-2 are necessary and reasonable for the protection of Aon and are reasonably limited with respect to the activities prohibited, duration, geographical scope and their effect on the Participant and the public. The parties acknowledge that the purpose and effect of the covenants simply are to protect Aon for a limited period of time from unfair competition by the Participant.

The Participant acknowledges that there is no general geographical restriction contained in the preceding paragraphs because the restrictions apply only to the specified clients of Aon and because the Participant's material duties, responsibilities and relationships with Aon clients, prospective clients and employees are not limited to any particular geographic area. Nothing in this Agreement shall prohibit the Participant from obtaining a livelihood for himself or herself or his or her family by being engaged in the Business. The intent of the parties is that the Participant's restrictive covenant is limited only to those clients as above specified.

f) **Company's Right to Injunctive Relief; Attorneys' Fees.** The Participant acknowledges that the Participant's services to Aon are of a unique character which gives them a special value to Aon, the loss of which cannot reasonably or adequately be compensated in damages in an action at law, and that a breach of this Agreement will result in irreparable and continuing harm to Aon, and that therefore, in addition to any other remedy which Aon may have at law or in equity in an arbitration pursuant to Section 2 of this Appendix B-2 below, Aon shall be entitled to emergency, injunctive or other interim relief in an arbitration pursuant to Section 2 of this Appendix B-2 below for a breach of this Agreement by the Participant. The parties acknowledge and agree that Aon Group, Inc. is an intended third-party beneficiary of this Agreement, and may be a named plaintiff in any subsequent arbitration brought by the Company to enforce the terms of this Agreement. In the event that Aon brings an arbitration to enforce the terms and conditions of Section 1 of this Appendix B-2 and prevails in whole or in part in such arbitration, the Participant shall pay the costs and expenses incurred by Aon in bringing such action, including legal fees, to the extent so awarded by the arbitrator (except for the fees and costs of the arbitrator and of JAMS that are payable by the Company as provided in Section 2(f) of this Appendix B-2 below).

g) **Trade Secrets and Confidential Information.** The Participant acknowledges that Aon's business

depends to a significant degree upon the possession of information which is not generally known to others, and that the profitability of such business requires that this information remain proprietary to Aon. The Participant shall not, except as required in the course of employment by Aon, or by applicable law (provided that the Participant shall first give Aon plc reasonable advance written notice of any subpoena (Attn: General Counsel), with a contemporaneous copy to Aon Group, Inc.), disclose or use during or subsequent to the course of employment, any trade secrets or confidential or proprietary information relating to the business of Aon of which the Participant becomes aware by reason of being employed or to which the Participant gains access during his or her employment by Aon and which has not been publicly disclosed (it being understood and agreed that trade secrets and confidential or proprietary information shall remain subject to Section 1(g) of this Appendix B-2, and shall not be considered "publicly disclosed" for purposes of the preceding clause, if any public disclosure thereof results from a breach by the Participant of this provision, or a breach by the Participant or another person of some other contractual or legal obligation to Aon). Nothing in this paragraph is intended to limit the Participant's right or ability to communicate with the U.S. Equal Employment Opportunity Commission, the National Labor Relations Board, the Securities and Exchange Commission, or other federal, state or local agency, and such communication may be initiated by the Participant or in response to the government inquiry.

Such information includes, without limitation, lists of clients and prospective clients; contract terms and conditions; client information relating to services, insurance, benefits programs, employees, finances, and compensation; copyrighted materials; corporate, management and business plans and strategies; compensation and revenues; methods and strategies of marketing; market research and data; technical know-how; computer software and manuals; policies and procedures; and the conduct of the affairs of Aon. All records and equipment and other materials constituting or relating in any way to any trade secrets, confidential or proprietary information, or relating to clients or business of Aon, and all other Aon property, shall be and remain the sole property of Aon during and after the end of employment, and shall be returned to Aon by the Participant immediately upon its request or the Participant's Termination Date (whichever is earlier).

2. **Arbitration**

   a) The Participant and the Company (including on behalf of Aon Group, Inc.) agree that, to the maximum extent permitted by law, all claims or disputes between or involving the Participant and Aon (including without limitation any subsidiary of the Company) (i) arising under or relating to this Agreement (including without limitation Section 1 of this Appendix B-2) or any Other Covenant, or (ii) involving the interpretation, applicability, enforceability or formation of this Agreement, any Other Covenant, or any portion thereof (including without limitation the agreement to arbitrate in Section 2 of this Appendix B-2, and further including without limitation any claim or dispute alleging that this Agreement, any Other Covenant, or any portion thereof is a contract of adhesion, lacks consideration, is substantively or procedurally unconscionable, is void against public policy, or otherwise is void or voidable for any reason), shall be determined and resolved exclusively by arbitration in Chicago, Illinois (or such other location to which the Participant and the Company may agree) before a single neutral arbitrator (which may include, as provided below, a single neutral Emergency Arbitrator (defined below) and then a single neutral regular arbitrator), in compliance with and as further provided in Section 2 of this Appendix B-2. Any and all such claims and disputes shall be brought solely in a party's individual capacity and not as a claimant or class member (or similar capacity) in any purported multiple-claimant, class, collective, representative or other similar proceeding, except as otherwise required by law. Unless otherwise indicated in Section 2 of this Appendix B-2 expressly or by context, the term "arbitrator" means an Emergency Arbitrator and/or a regular arbitrator.

   b) The arbitrator shall have the authority to make any award or impose any remedy that is available to a court of general jurisdiction sitting in Chicago, Illinois and that was requested by a party to the claim or dispute, including without limitation the authority to award emergency, injunctive or other interim relief pending the conducting of the arbitration on the merits and the rendering of a final award, whether styled as a temporary or preliminary injunction or otherwise (collectively, "Interim Arbitral Relief"). The arbitrator shall not have the authority to make an award or impose a remedy that is not available to such a court or is not requested by such a party, and the jurisdiction of the arbitrator is limited accordingly. For avoidance of

doubt, the parties hereby acknowledge and agree that the Company (including Aon Group, Inc.) or the Participant may assert a claim or dispute encompassed by Section 2 of this Appendix B-2, and seek a remedy or relief for or associated with such claim or dispute (including without limitation emergency, injunctive or other interim relief, or final relief) only in arbitration pursuant to Section 2 of this Appendix B-2, and may not pursue an action in court for or relating to any such claim, dispute, remedy or relief, other than as provided in Section 2(h) of this Appendix B-2 below solely for the purpose of entering judgment enforcing an interim or final arbitration award.

c)   If a party seeks Interim Arbitral Relief, including without limitation to enforce any covenant in Section 1 of this Appendix B-2 or Other Covenant, the arbitration of such Interim Arbitral Relief request shall be administered by JAMS' Chicago, Illinois office and conducted in accordance with the Emergency Relief Procedures set forth in Section 2(c) of the JAMS Comprehensive Arbitration Rules & Procedures (as in effect or amended from time to time, or any successor provision thereto) (hereafter, the "Emergency Relief Procedures" and the "Comprehensive Rules," respectively), except as otherwise provided (whether or not by reference to specific Rules) in this Section 2.  During the first thirty-six (36) hours after the filing with JAMS and service of the party's Interim Arbitral Relief request (or, if earlier, the first thirty-six (36) hours after the party's notification (whether or not in writing) to the other party of such request), the parties shall make good faith efforts to confer and to agree upon an arbitrator to hear and decide such Interim Arbitral Relief request (the "Emergency Arbitrator").  If, by the end of such thirty-six (36) hour period (or such longer period to which the parties may agree), the parties are unable to so confer or otherwise do not reach agreement on an Emergency Arbitrator, or the respondent to the Interim Arbitral Relief request does not respond to or cooperate in such Emergency Arbitrator selection efforts, the Emergency Arbitrator shall be selected by JAMS' Chicago, Illinois office in accordance with the Emergency Relief Procedures and Section 2 of this Appendix B-2.

d)   If a party demands arbitration and does not seek Interim Arbitral Relief, or if a request for Interim Arbitral Relief has been withdrawn, decided or otherwise resolved (whether by agreement, by an interim award by the Emergency Arbitrator, or otherwise) and the arbitration of the claim or dispute proceeds thereafter, such arbitration shall be administered by JAMS' Chicago, Illinois office and conducted in accordance with the Comprehensive Rules, except as otherwise provided (whether or not by reference to specific Rules) in this Section 2.  The parties expressly are not agreeing to the following Rules (or amended or successor rules thereof) within the Comprehensive Rules, which shall not apply to any arbitration under this Section 2 (whether or not seeking Interim Arbitral Relief):  Rule 16.1 (Application of Expedited Procedures), Rule 32 (Bracketed (or High-Low) Arbitration Option), Rule 33 (Final Offer (or Baseball) Arbitration Option), and Rule 34 (Optional Arbitration Appeal Procedure).  Unless the parties otherwise agree to the selection of an arbitrator for such arbitration (which may be the Emergency Arbitrator if the parties and JAMS so agree, or another arbitrator), the arbitrator shall be selected by JAMS' Chicago, Illinois office in accordance with the Comprehensive Rules and Section 2 of this Appendix B-2.

e)   In selecting an Emergency Arbitrator and/or regular arbitrator (as applicable), JAMS shall select and assign an arbitrator from JAMS' Chicago, Illinois arbitrator roster who shall have reasonably substantial experience in litigating or arbitrating restrictive covenant disputes or, if such arbitrator is not then available, shall select and assign an arbitrator from JAMS' Chicago, Illinois arbitrator roster who shall have reasonably substantial experience as a judge presiding over civil litigation matters in a general civil litigation division (including a general law division or general chancery division) of a federal or state court. Unless the parties otherwise agree, any arbitrator selected pursuant to Section 2 of this Appendix B-2 (whether selected by the parties or by JAMS) shall be based in and reside in the Chicago, Illinois metropolitan area.

f)   The arbitrator shall have no power to modify the provisions of this Agreement (except pursuant to Section 4 below), and furthermore, notwithstanding any other provision of this Agreement, in no event may the arbitrator consolidate or allow any party to join any claims of any other employee or person in a single arbitration proceeding (whether as a multiple-claimant, class, collective, representative or other similar proceeding) without the express written consent of the Company and the Participant (except as otherwise required by law), and in each case the jurisdiction of the arbitrator is limited accordingly.  The arbitrator shall apply the substantive internal law of the State of Illinois, including applicable statutes of limitation,

except as otherwise required by law or provided in Section 2 of this Appendix B-2, and provided further (for avoidance of doubt) that privileges and other immunities from discovery or disclosure (including without limitation the attorney-client privilege and the work product doctrine) shall be governed by, and the arbitrator shall apply to such issues, federal law (including without limitation Rules 26(b)(3), (4) and (5) of the Federal Rules of Civil Procedure (as in effect or amended from time to time) and the attorney-client privilege as articulated in *Upjohn Co. v. United States*, 449 U.S. 383 (1981) and its progeny, but excluding any choice of law rules or principles (e.g., Federal Rule of Evidence 501) that might otherwise cause state law, or some other law besides federal law, to govern the attorney-client privilege or work product doctrine). Each party to the arbitration is entitled to be represented by legal counsel of such party's choosing. The Company shall pay the fees and costs of the arbitrator and of JAMS (including case administration, hearing room and hearing transcription fees), but each party shall be responsible for such party's own attorneys' fees and related arbitration costs and expenses except to the extent otherwise allocated by the arbitrator in accordance with the applicable Emergency Relief Procedures or Comprehensive Rules and Section 1(f) of this Appendix B-2 above.

g)   Adequate discovery and an opportunity to be heard and to present evidence will be permitted by the arbitrator consistent with applicable law and the objectives of arbitration, provided, however, that the parties expressly are not agreeing to Rules 17(a), 17(b) or 17(c) (or amended or successor rules thereof) within the Comprehensive Rules (Exchange of Information), which shall not apply to any arbitration under Section 2 of this Appendix B-2 (whether or not seeking Interim Arbitral Relief). The parties may serve interrogatories, document requests and requests for admission, and take depositions, as provided by and in accordance with the Federal Rules of Civil Procedure (as in effect or amended from time to time), including without limitation any limitations on discovery provided therein, except as otherwise ordered by the arbitrator following motion of a party or as agreed to by the parties. Disclosures with respect to any expert witnesses shall be made as provided by and in accordance with Rule 26(a)(2) (except subpart (D) thereof) of the Federal Rules of Civil Procedure (as in effect or amended from time to time). The timing of discovery and any such disclosures (including without limitation any prehearing disclosures) shall be determined by the arbitrator in accordance with the Comprehensive Rules or as agreed to by the parties. Each party shall have the right to file a Motion (or Motions) for Summary Disposition of any given claim(s) or issue(s), which shall be considered and ruled upon by the arbitrator.

h)   The arbitrator's decision or award (whether an interim decision or award based on a request for Interim Arbitral Relief or a final decision or award deciding or resolving the claim or dispute), shall be in writing summarizing the basis therefor and shall be final and binding, and judgment thereupon may be entered in any Illinois federal or state court.

i)   Any arbitration conducted hereunder, and all communications with respect thereto or in the course thereof, including all transcripts, briefs and exhibits, shall be confidential. Unless the parties otherwise agree in writing or except as required by law or as is necessary to enforce this Agreement or any award, the parties, their representatives, and the arbitrator shall not disclose to any third parties (other than to the parties' respective attorneys, accountants, auditors, financial advisors, and spouses, as applicable, each of whom shall maintain such information in strict confidence, and, in the case of Aon, except as reasonably necessary in the course of its business) any information regarding the arbitration process or proceedings, including any testimony, other evidence and briefs presented and the terms of any award. All written materials and documents produced by a party, and all copies thereof, shall be returned by the other party to the producing party or destroyed (as the producing party shall direct) promptly after the arbitration is concluded, except that legal counsel (both internal and outside, as applicable) for a party may retain copies thereof in legal counsel's confidential files.

3.   **Venue and Jurisdiction.**  Venue for any arbitration proceedings instituted under this Agreement shall be exclusively in Chicago, Illinois (unless the parties otherwise agree), and the parties hereby submit and agree to the exclusive jurisdiction of the State of Illinois for the purposes of any such arbitration. The parties also hereby submit and agree to the exclusive venue and exclusive jurisdiction of the federal and state courts in Chicago, Illinois for the purpose of any claim or action to enter judgment enforcing an arbitration decision or award (whether interim or final) rendered pursuant to Section 2 of this Appendix B-2 above, and for any other claim or action (if any) arising under or relating to this Agreement (whether or not such claim or action is

validly asserted in light of Section 2 of this Appendix B-2 above), and the parties hereby agree that any such claim or action (if any) shall be brought exclusively in such federal and state courts in Chicago, Illinois. Nothing in this Section 3 waives or limits in any way a party's arbitration or other obligations under Section 2 of this Appendix B-2 above or under any other provision of this Agreement.

4. **Severability.** To the extent that the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable for any reason, such word, phrase, clause or sentence shall be modified or deleted in such manner so as to afford the Company the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws, and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent.

**APPENDIX B-3**

**LEADERSHIP PERFORMANCE PROGRAM**
**PERFORMANCE AWARD CERTIFICATE FOR NON-U.S. PARTICIPANTS**
In Connection with the Performance Cycle
January 1, 2016 through December 31, 2018

The following terms and conditions apply for Participants who reside outside the United States or who are otherwise subject to the laws of a country other than the United States.

**Acknowledgement of Nature of the Program and the Performance Share Units**

By accepting the grant of the Performance Share Units, the Participant acknowledges, understands and agrees that:

(1)     the Program is established voluntarily by the Company, it is discretionary in nature, and it may be modified, amended, suspended or terminated by the Company at any time without notice and without compensation;

(2)     the grant of the Performance Share Units is voluntary and occasional and does not create any contractual or other right to receive future grants of Performance Share Units, or benefits in lieu of Performance Share Units, even if Performance Share Units have been granted in the past;

(3)     all decisions with respect to future grants of Performance Share Units, if any, will be at the sole discretion of the Company;

(4)     the Participant's participation in the Program shall not interfere with the ability of the Employer to terminate the Participant's employment or service relationship (if any) at any time;

(5)     the Participant is voluntarily participating in the Program;

(6)     the Performance Share Units and the underlying Ordinary Shares, and the income and value of same, are not intended to replace any pension rights or compensation;

(7)     the Performance Share Units and the underlying Ordinary Shares, and the income and value of same, are extraordinary items that do not constitute compensation of any kind for services of any kind rendered to the Company or the Employer, and which are outside the scope of the Participant's employment or service contract, if any;

(8)     the Performance Share Units and the underlying Ordinary Shares, and the income and value of same, are not part of normal or expected compensation for any purposes, including, but not limited to, calculating any severance, resignation, termination, redundancy, dismissal, end of service payments, bonuses, long-service awards, pension or retirement or welfare benefits or similar payments, and in no event should be considered as compensation for, or relating in any way to, past services for the Company or the Employer or any Subsidiary or Affiliate;

(9)     the grant of the Performance Share Units and the Participant's participation in the Program will not be interpreted to form an employment or service contract with the Company or any Subsidiary or Affiliate;

(10)    the future value of the underlying Ordinary Shares is unknown, indeterminable and cannot be predicted with certainty;

(11)    in the event of termination of the Participant's services (whether or not later found to be invalid or in breach of employment laws in the jurisdiction where the Participant is employed or the terms of the Participant's employment agreement, if any), unless otherwise provided in the Program or this

Agreement or determined by the Company, the Participant's right to vest in the Performance Share Units under the Program, if any, will terminate effective as of the date that the Participant is no longer actively providing services and will not be extended by any notice period (e.g., active services would not include any contractual notice period or any period of "garden leave" or similar period mandated under employment laws in the jurisdiction where the Participant is employed or the terms of the Participant's employment agreement, if any); the Committee shall have the exclusive discretion to determine when the Participant is no longer actively providing services for purposes of the Participant's Award of Performance Share Units (including whether the Participant may still be considered to provide continuous services while on an approved leave of absence);

(12)     no claim or entitlement to compensation or damages shall arise from forfeiture of the Performance Share Units resulting from the Participant's ceasing to provide services to the Employer or the Company (or any Subsidiary or Affiliate) (for any reason whatsoever and whether or not later found to be invalid or in breach of employment laws in the jurisdiction where the Participant is employed or the terms of the Participant's employment agreement, if any) and in consideration of the grant of the Performance Share Units to which the Participant is not otherwise entitled, the Participant irrevocably agrees never to institute any claim against the Company, the Employer or any Subsidiary or Affiliate, waives his or her ability, if any, to bring any such claim and releases the Company, the Employer and any Subsidiary or Affiliate from any such claim; if, notwithstanding the foregoing, any such claim is allowed by a court of competent jurisdiction, then, by accepting the Performance Share Units, the Participant shall be deemed irrevocably to have agreed not to pursue such claim and agrees to execute any and all documents necessary to request dismissal or withdrawal of such claims;

(13)     unless otherwise agreed with the Company, the Performance Share Units and the underlying Ordinary Shares, and the income and value of same, are not granted as consideration for, or in connection with, any service the Participant may provide as a director of a Subsidiary or Affiliate;

(14)     the Performance Share Units and the benefits evidenced by this Agreement do not create any entitlement, not otherwise specifically provided for in the Program document or provided by the Company in its discretion, to have the Performance Share Units or any such benefits transferred to, or assumed by, another company nor to be exchanged, cashed out or substituted for, in connection with any corporate transaction affecting the Shares; and

(15)     neither the Company, the Employer nor any Subsidiary or Affiliate shall be liable for any foreign exchange rate fluctuation between the Participant's local currency and the United States Dollar that may affect the value of the Performance Share Units or of any amounts due to the Participant pursuant to the vesting of the Performance Share Units or the subsequent sale of any Ordinary Shares acquired upon vesting/settlement.

**Conditions**

The Company and its Subsidiary, Aon Group, Inc., a Maryland corporation with its corporate and business headquarters in Chicago, Illinois, and Aon Group, Inc.'s Subsidiaries and Affiliates (and divisions thereof) (collectively referred to in this Appendix B as the "Company") are in the business of providing conventional and alternative risk management products and services covering the businesses of insurance brokerage, reinsurance brokerage, benefits consulting, compensation consulting, human resources consulting, human resources and benefits outsourcing management, investigatory and security consulting, managing underwriting and related services, including accounting, actuarial, claims management and handling, and information systems on behalf of commercial and individual clients which are national and international and are not confined to any geographic area (the "Business").  An essential element of the Business is the development and maintenance of personal contacts and relationships with clients.  Because of these contacts and relationships, it is common for the Company's clients to develop identification with the employee who services its Business needs, rather than with the Company itself.  The personal identification of clients of the Company with a Company employee creates potential for the employee's appropriation of the benefits of the relationships developed with clients on behalf of and at the expense of the Company.  Since the Company would suffer irreparable harm if the employee left its employment and solicited any business of clients of the Company of the same type or kind as the Business performed by Aon  or if the employee

left its employ and solicited other employees of the Company, it is reasonable to protect the Company against solicitation activities by the employee for a limited period of time after the employee leaves the Company and for the Company to make the award of Performance Share Units conditional on the Participant not engaging in such solicitation activities.

It is therefore a condition of this Agreement that:

1.      the Participant agrees that he will not for 12 months after the Participant's Termination Date either directly or indirectly:

      1.1      in competition with the Company solicit, canvass or approach or endeavour to solicit, canvass or approach, or handle or accept business of the same type or kind as the Business performed by Aon from, either on his own behalf or on behalf of any other person, firm or company, any client or prospective client of the Company with which he had material dealings or for which he was responsible or in relation to which he was in possession of confidential information at any time during the Relevant Period; or

      1.2      solicit or entice away or endeavour to solicit or entice away from the Company, either on his own behalf or on behalf of any other person, firm or company, any person who is employed by or is an agent, officer or consultant to the Company with whom he had dealings as a colleague in the Relevant Period and who by reason of their seniority or position is likely to be in possession of confidential information which is likely to be of assistance to any person, firm or company competing with the Company whether or not such person would commit a breach by reason of their leaving the Company;

2.      any unvested Performance Share Units of any Participant will be immediately forfeited if the Company considers that the Participant has at any time in the period of two years after the Participant's Termination Date (without the prior written consent of the Company) either directly or indirectly:

      2.1      in competition with the Company solicited, canvassed or approached or endeavored to solicit, canvass or approach, or handled or accepted business of the same type or kind as the Business performed by Aon from, either on his own behalf or on behalf of any other person, firm or company, any client or prospective client of the Company with which he had material dealings or for which he was responsible or in relation to which he was in possession of confidential information at any time during the Relevant Period; or

      2.2      solicited or enticed away or endeavoured to solicit or entice away from the Company, either on his own behalf or on behalf of any other person, firm or company, any person who is employed by or is an agent, officer or consultant to the Company and with whom he had dealings as a colleague in the Relevant Period and who by reason of their seniority or position is likely to be in possession of confidential information which is likely to be of assistance to any person, firm or company competing with the Company whether or not such person would commit a breach by reason of their leaving the Company.

For the purposes of (1) and (2) above:

(a)      "Relevant Period" means the last 12 months of a Participant's active employment (not including for this purpose any period immediately prior to the termination of the Participant's employment when he was suspended or directed not to carry out his duties for the Company); and

(b)      the period of 12 months in (1) and the period of two years in (2) shall be reduced by the duration of any period immediately prior to the Participant's Termination Date when he was suspended or directed not to carry out his duties for the Company; and

(c)      100% of the Performance Share Units awarded to the Participant have been specifically awarded in consideration of the provisions contained in (1) and (2) above; and

(d)      the parties agree that the provisions contained in (1) and (2) above will apply globally unless the parties have specified a reduced territory in the Participant's employment agreement, in which case the territory specified in the employment agreement will prevail and govern; and

(e)    to the extent the parties have set forth an alternate restraint on competition and/or solicitation in the Participant's employment agreement, the version set forth in the employment agreement will prevail and govern.

### APPENDIX C

### LEADERSHIP PERFORMANCE PROGRAM
### PERFORMANCE AWARD CERTIFICATE
In Connection with the Performance Cycle
January 1, 2016 through December 31, 2018

*Terms and Conditions*

This Appendix C includes special terms and conditions applicable to Participants in the countries below. These terms and conditions are in addition to, or, if so indicated, in place of, the terms and conditions set forth in the Agreement, including Appendices A, B-1, B-2, and B-3.

*Notifications*

This Appendix C also includes notifications relating to exchange control and other issues of which the Participant should be aware with respect to his or her participation in the Program. The information is based on the exchange control, securities and other laws in effect in the respective countries as of March 2016. Such laws are often complex and change frequently. As a result, the Company strongly recommends that the Participant not rely on the information noted herein as the only source of information relating to the consequences of the Participant's participation in the Program because the information may be out of date at the time the Participant vests in the Performance Share Units or sells Ordinary Shares he or she acquires under the Program.

In addition, the information is general in nature and may not apply to the Participant's particular situation, and the Company is not in a position to assure the Participant of any particular result. **Accordingly, the Participant should seek appropriate professional advice as to how the relevant laws in the Participant's country apply to his or her specific situation.**

*If the Participant is a citizen or resident of a country other than the one in which the Participant is currently working, transfers employment and/or residency after the Performance Share Units are granted, or is considered a resident of another country for local law purposes, the notifications contained in this Appendix C may not be applicable to him or her. In addition, the Company shall, in its discretion, determine to what extent the terms and conditions contained herein shall be applicable to the Participant.*

A̲R̲G̲E̲N̲T̲I̲N̲A̲

*Terms and Conditions*

**Appendix B-3.** Appendix B-3 is amended to include a new Section as follows:

Nothing in this Agreement shall affect the Company's right to commence legal proceedings in any appropriate jurisdiction, or concurrently in more than one jurisdiction, or to serve process, pleadings and other legal papers upon the Participant in any manner authorized by the laws of any such jurisdiction for any potential violation of Appendix B-3. In addition, the Participant irrevocably waives, to the fullest extent permitted by applicable law: (i) any objection which it may now or hereafter have to the venue of any action, suit or proceeding brought in any court referred to in this Section; and (ii) any claim that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. To the extent that the Participant may, in any suit, legal action or proceeding brought in a court of the Republic of Argentina or elsewhere arising out of or in connection with this Agreement, be entitled to the benefit of any provision of law requiring the Company in such suit, legal action or proceeding to post security for the Participant's costs or to post a bond or to take similar action, as the case may be, the Participant hereby irrevocably waives such benefit, in each case to the fullest extent now or hereafter permitted under the laws of any applicable jurisdiction. The Participant expressly recognizes that either the Company or its subsidiary employing him or her, Aon Risk Services Argentina S.A.; Aon Assist Argentina S.A.; Hewitt Associates S.A.; Aon Consulting S.A.; Asevasa Argentina S.A.; Aon Benfield Argentina S.A.; or Aon Affinity Argentina S.A., as applicable, may bring any such legal proceeding..

*Notifications*

**Securities Law Notice.** The Performance Share Units and the Ordinary Shares to be issued pursuant to the Performance Share Units are offered as a private transaction. This offering is not subject to supervision by any Argentine governmental authority.

**Exchange Control Information.** Provided proceeds from the sale of Ordinary Shares acquired under the Program are held in a U.S. bank or brokerage account for at least 10 days prior to transfer into Argentina, the Participant should be able to freely transfer such proceeds into Argentina, although the Participant should confirm this with his or her local bank. The Argentine bank handling the transaction may request certain documentation in connection with the request to transfer proceeds into Argentina, including evidence of the sale of Ordinary Shares. If the bank determines that the 10-day rule or any other rule or regulation promulgated by the Argentine Central Bank has not been satisfied, it may require that 30% of the proceeds be placed in a non-interest bearing dollar deposit account for a holding period of 365 days.

Please note that exchange control regulations in Argentina are subject to frequent change. The Participant should consult with his or her personal legal advisor regarding any exchange control obligations that may arise from participation in the Program.

### AUSTRALIA

*Terms and Conditions*

**Venue and Jurisdiction.** The following provision supplements Section 2 of Appendix A:

Nothing in this Section 2 shall (or shall be construed so as to) limit the right of the Company to take proceedings against the Participant in the courts of any country (including the Courts of Australia) relating to or in any way connected with a breach or threatened breach of any of the conditions in Appendix B-3 to this Agreement.

**Appendix B-3.** Appendix B-3 is amended by deleting the final section and replacing it with the following:

For the purposes of (1) and (2) above:

(a)    "Company" means Aon Corporation, a Delaware corporation and each if its affiliates and subsidiaries including, without limitation, the following:

    1.    Aon Benfield Australia Limited an Australian corporation;

    2.    Aon Hewitt Financial Advice Limited an Australian corporation;

    3.    Aon Hewitt Limited an Australian corporation;

    4.    Aon Services Pty Limited an Australian corporation;

    5.    Aon Superannuation Pty Limited an Australian corporation;

    6.    Aon Risk Services Australia Limited, an Australian corporation;

    7.    Aon Hewitt (PNG) Limited a Papua New Guinean corporation;

    8.    Aon Risk Services (PNG) Limited a Papua New Guinean corporation;

    9.    Aon Superannuation (PNG) Limited a Papua New Guinean corporation;

    10.    HIA Insurance Services Pty Limited an Australian corporation; and

    11.    Freeman McMurrick Pty Limited an Australian Corporation.

(b)    "Relevant Period" means the last 12 months of a Participant's active employment (not including for this purpose any period immediately prior to the termination of the Participant's employment when he or she was suspended or directed not to carry out his or her duties for the Company); and

(c)     the period of 12 months in (1) and the period of two years in (2) shall be reduced by the duration of any period immediately prior to the Participant's Termination Date when he or she was suspended or directed not to carry out his duties for the Company; and

(d)     100% of the Performance Share Units awarded to the Participant have been specifically awarded in consideration of the provisions contained in (1) and (2) above; and

(e)     the parties agree that nothing in the provisions contained in (1) and (2), shall (or be construed so as to) limit any restraints on competition and/or solicitation in the Participant's employment agreement.

**Vesting of Performance Share Units.**   The following applies to Participants who are subject to tax in Australia with respect to the Performance Share Units or underlying Ordinary Shares, as determined by the Company in its sole discretion:

Notwithstanding any earlier vesting date included in the Program document, if the Participant's employment terminates for any reason other than due to the Participant's death or disability or involuntary termination without cause prior to the date that is 12 months after the Grant Date, the unvested portion of any Performance Share Units held at the date of termination will be forfeited without consideration, and no Ordinary Shares shall be delivered hereunder.

*Notifications*

**Australia Offer Document.**   The offer of Performance Share Units is intended to comply with the provisions of the Corporations Act 2001, ASIC Regulatory Guide 49 and ASIC Class Order CO 14/1000.  Additional details are set forth in the offer document distributed with this Agreement.

## BELGIUM

*Terms and Conditions*

**Appendix B-3.**   Appendix B-3 is amended to include a new Section as follows:

Nothing in this Agreement shall affect the Company's right to commence legal proceedings in any appropriate jurisdiction, or concurrently in more than one jurisdiction, or to serve process, pleadings and other legal papers upon the Participant in any manner authorized by the laws of any such jurisdiction, including in Belgium, for any potential violation of Appendix B-3.  In addition, the Participant irrevocably waives, to the fullest extent permitted by applicable law: (i) any objection which it may now or hereafter have to the venue of any action, suit or proceeding brought in any court referred to in this Section; and (ii) any claim that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. To the extent that the Participant may, in any suit, legal action or proceeding brought in a court of Belgium or elsewhere arising out of or in connection with this Agreement, be entitled to the benefit of any provision of law requiring the Company in such suit, legal action or proceeding to post security for the Participant's costs or to post a bond or to take similar action, as the case may be, the Participant hereby irrevocably waives such benefit, in each case to the fullest extent now or hereafter permitted under the laws of any applicable jurisdiction.

*Notifications*

**Tax Reporting.**   The Participant is required to report any taxable income attributable to the grant of the Performance Share Units on his or her annual tax return.  In addition, the Participant is required to report any securities  held (*e.g.,* Ordinary Shares acquired under the Program) or bank accounts (including brokerage accounts) opened and maintained outside Belgium on his or her annual tax return.  In a separate report, the Participant must provide the National Bank of Belgium with certain details regarding such foreign accounts (including the account number, bank name and country in which such account was opened).  This report, as well as additional information on how to complete it can be found on the website of the national Bank of Belgium, www.nbb.be, under the *Kredietcentrales / Centrales des crédits* caption.

**BERMUDA**

*Terms and Conditions*

**Third Party Rights.** The Company is entering into this Agreement for itself and as agent for and trustee of the Employer and all other Subsidiaries and Affiliates and is duly authorized to do so. The parties intend that the Employer and each Subsidiary and Affiliate should be able to enforce in its own right the terms of this Agreement which expressly or impliedly confer a benefit on that company subject to and in accordance with applicable statute, law or regulation concerning third party rights.

**Appendix B-3.** Appendix B-3 of this Agreement is deleted in its entirety and replaced with the following.

**Conditions**

The Company (in this Appendix B-3 such term to include the Bermuda Company and all Group Companies as defined below) is in the business of providing insurance brokerage, reinsurance brokerage, benefits consulting, compensation consulting, human resources consulting, managing underwriting and related services including accounting, claims management and handling, contract wording, information systems and actuarial services. An essential element of its business is the development and maintenance of personal contacts and relationships with clients. Because of these contacts and relationships, it is common for the Company's clients to develop identification with the employee who services its insurance needs, rather than with the Company itself. The personal identification of clients of the Company with a Company employee creates potential for the employee's appropriation of the benefits of the relationships developed with clients on behalf of and at the expense of the Company. Since the Company would suffer irreparable harm if the employee left its employment and solicited the insurance or other related business of clients of the Company or if the employee left its employ and solicited other employees of the Company, it is reasonable to protect the Company against solicitation activities by the employee for a limited period of time after the employee leaves the Company and for the Company to make the award of Performance Share Units conditional on the Participant not engaging in such solicitation activities.

In consideration of the granting of Performance Share Units to the Participant, the Participant agrees to the following reasonable conditions and restrictions:

1.  the Participant agrees that he will not for a period of 12 months after the Termination Date (without the prior written consent of the Bermuda Company) either directly or indirectly and whether alone or in conjunction with or on behalf of any other person, organisation or entity and whether as a principal, shareholder, director, employee, agent, consultant, partner or otherwise:

    1.1  be involved in any Capacity with any business concern which is (or intended to be) in competition with any Relevant Product and Services;

    1.2  solicit, canvass or approach or cause to be solicited, canvassed or approached, or deal or contract with or accept business from any Relevant Client in relation to the supply or provision of any Relevant Products or Services, or endeavour to do so; or

    1.3  solicit, induce, encourage, or entice away or endeavour to solicit, induce, encourage or entice away from the Bermuda Company or any Relevant Group Company any person who is employed by or is an agent, officer, independent contractor or consultant appointed or engaged by the Bermuda Company or a Relevant Group Company (i) in a senior, executive, professional, technical or sales capacity and with whom the Participant had material contact in the course of that person's employment, appointment or engagement during the Relevant Period; or (ii) for whom the Participant had direct or indirect managerial responsibility during the Relevant Period, and in either case whether or not such person would commit any breach of his or her contract of employment or engagement by leaving the service of the Bermuda Company or Relevant Group Company;

2. any unvested Performance Share Units of any Participant will be immediately forfeited if the Company considers that the Participant has breached the restrictions at 1 above; and

3. None of the restrictions in clause 1 shall prevent the Participant from:

(i) holding an investment by way of shares or other securities of not more than 5% of the total issued share capital of any company, whether or not it is listed or dealt in on a recognised stock exchange; or

(ii) being engaged or concerned in any business concern, provided that the Participant's duties or work shall relate solely to services or activities of a kind with which the Participant was not concerned to a material extent in the 12 months before the Termination Date.

4. the Participant shall be prohibited both during his or her employment (otherwise than in the proper performance of his or her duties and then only to those who need to know such Confidential Information for legitimate business reasons) or thereafter (except with the prior written consent of the Bermuda Company or as required by law) from:

a) divulging or communicating to any person (including, but not limited to, any representative of the press or broadcasting or other media);

b) causing or facilitating any unauthorised disclosure or publication through any failure by the Participant to exercise all due care, skill and diligence); or

c) making use of or encouraging or permitting the use of (other than for the benefit of the Bermuda Company and any Relevant Group Company), any Confidential Information which may have come to the Participant's knowledge or possession or control during his or her employment. The Participant must also use his or her best endeavours to prevent the publication or disclosure of any such Confidential Information.

This restriction will not apply to:

(i) Confidential Information which the Participant can demonstrate is in the public domain otherwise than through unauthorised disclosure; or

(ii) any disclosure required by the order of a court of competent jurisdiction or as otherwise required by law.

5. For the purposes of (1) through (4) above:

(a) The following words and expressions shall have the following meanings:

(i) "Confidential Information" has the meaning given within the Business Confidentiality provisions of the contractual section of the Bermuda employee handbook, as amended from time to time;

(ii) "Capacity" as agent, consultant, director, employee, owner, partner, shareholder or in any other capacity;

(iii) "Group Company" means the Company and its Holding Companies, its Subsidiary Companies and its Affiliated Companies from time to time ("Holding Company", "Subsidiary Company" and "Affiliated Company" having the meanings set out in section 86 Companies Act 1981);

(iv) "Relevant Client" means any person, firm, company or organisation who or which at any time during the Relevant Period is or was (i) negotiating with or engaged in discussions with the Bermuda Company or Relevant Group Company for the sale or supply of Relevant Products or Services; or (ii) a client or customer of, or in the habit of dealing with, the Bermuda Company or Relevant Group Company for the sale or supply of Relevant Products or Services, and in each case with whom or which the Participant had material contact or dealings or about whom or which the Participant was in possession of Confidential Information during the Relevant Period in the course of his or her employment and/or with whom any Bermuda Company or Relevant Group Company

employees, agents, officers, consultants or independent contractors reporting to the Participant had material contact or dealings during the Relevant Period in the course of their employment or engagement;

(v) "Relevant Group Company" any Group Company (other than the Bermuda Company) for which the Participant has performed services or for or in respect of which he or she has had operational/ management responsibility at any time during the Relevant Period;

(vi) "Relevant Period" means the period of 12 months immediately prior to the Termination Date (not including for this purpose any period during which he or she was suspended or directed not to carry out his or her duties pursuant to his or her contract of employment;

(vii) "Relevant Products or Services" means products or services which are of the same kind as, or of a materially similar kind to or competitive with, any products or services supplied or provided by the Bermuda Company or Relevant Group Company within the Relevant Period and with which the Participant was materially involved in the course of his or her employment during the Relevant Period and with which sale or supply the Participant was directly or otherwise materially concerned or connected or of which he or she had personal knowledge in the Relevant Period;

(viii) "Termination Date" means the date on which the Participant's employment terminates; and

(ix) "Bermuda Company" means Aon Group (Bermuda) Ltd. a company registered in Bermuda with company number 1193;

(b) the period of 12 months in (1) above shall be reduced by the duration of any period immediately prior to the Participant's Termination Date when he or she was suspended, placed on garden leave or directed not to carry out his or her duties; and

(c) 100% of the Performance Share Units awarded to the Participant have been specifically awarded in consideration of the provisions contained in (1) and (2) above; and

(d) the parties agree that the provisions contained above will apply in any area or territory in which the Participant worked for the Bermuda Company or Relevant Group Company during the Relevant Period or any area or territory in which the Company or Relevant Group Company supplied or provided Relevant Products or Services during the Relevant Period; and

(e) to the extent the parties have set forth an alternate restraint on competition and/or solicitation in the Participant's employment agreement, the version set forth in this Agreement will prevail and govern.

(f) **Governing Law**. The validity, interpretation**,** instruction, performance, enforcement and remedies of or relating to Appendix B-3 only, and the rights and obligations of the parties hereunder, shall be governed by and construed in accordance with the substantive laws of Bermuda, without regard to the conflict of law principles, rules or statutes of any jurisdiction;

(g) **Venue and Jurisdiction.** Venue for any legal proceedings instituted related to the rights and obligations contained in this Appendix B-3 shall be the courts of Bermuda and the Participant agrees to submit to the exclusive jurisdiction of the courts of Bermuda for purposes of enforcement of the rights and obligations contained hereunder.

## BRAZIL

### Terms and Conditions

**Appendix B-3.** Appendix B-3 is amended to include a new Section as follows:

Nothing in this Agreement shall affect the Company's right to commence legal proceedings in any appropriate jurisdiction, or concurrently in more than one jurisdiction, or to serve process, pleadings and other legal papers upon the Participant in any manner authorized by the laws of any such jurisdiction for any potential violation of Appendix B-3. In addition, the Participant irrevocably waives, to the fullest extent permitted by applicable law: (i) any objection which it may now or hereafter have to the venue of any action, suit or proceeding brought in any court referred to in this Section; and (ii) any claim that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. To the extent that the Participant may, in any suit, legal action or proceeding brought in a court of Brazil or elsewhere arising out of or in connection with this Agreement, be entitled to the benefit of any provision of law requiring the Company in such suit, legal action or proceeding to post security for the Participant's costs or to post a bond or to take similar action, as the case may be, the Participant hereby irrevocably waives such benefit, in each case to the fullest extent now or hereafter permitted under the laws of any applicable jurisdiction. The Participant expressly recognizes that either the Company or its subsidiary employing him or her, Aon Holdings Corretores de Seguros Ltda.; Aon Benfield Brasil Corretora de Resseguros Ltda.; Benfield do Brasil Participações Ltda.; Aon Affinity do Brasil Serviços e Corretora de Seguros Ltda.; Aon Affinity Administradora de Benefícios Ltda.; Aon Affinity Serviços e Participações Ltda.; Hewitt Associates Serviços de Recursos Humanos Ltda.; or Hewitt Associates Administradora e Corretora de Seguros Ltda., as applicable, may bring any such legal proceeding.

**Compliance with the Law.** In accepting the grant of the Performance Share Units, the Participant acknowledges his or her agreement to comply with applicable Brazilian laws and to pay any and all applicable tax associated with the Performance Share Units and the sale of the Shares acquired under the Program and the receipt of any dividends.

*Notifications*

**Exchange Control Information.** If the Participant is a resident or domiciled in Brazil, he or she will be required to prepare and submit an annual declaration of assets and rights held outside of Brazil to the Central Bank of Brazil if the aggregate value of such assets and rights is equal to or greater than US$100,000. If such amount exceeds US$100,000,000, the referenced declaration must be submitted quarterly. Assets and rights that must be reported include Ordinary Shares issued pursuant to the vesting/settlement of the Performance Share Units.

<u>CANADA</u>

*Terms and Conditions*

**Venue and Jurisdiction**. The following provision supplements Section 2 of Appendix A:

Nothing in this Section 2 shall (or shall be construed so as to) limit the right of the Company to take proceedings against the Participant in the courts of any country (including the Courts of Canada) relating to or in any way connected with a breach or threatened breach of any of the conditions in Appendix B-3 to this Agreement.

**Appendix B-3.** Appendix B-3 is amended by deleting the final Section and replacing it with the following:

For the purposes of (1) and (2) above:

(a)     "Company" means Aon plc, a public limited company incorporated under English law and each if its affiliates and subsidiaries including, without limitation, Aon Canada Inc. and each of its related and/or affiliated companies throughout Canada.

(b)     "Relevant Period" means the last 12 months of a Participant's active employment (not including for this purpose any period immediately prior to the termination of the Participant's employment when he was suspended or directed not to carry out his duties for the Company); and

(c)     the period of 12 months in (1) and the period of two years in (2) shall be reduced by the duration of any period immediately prior to the Participant's Termination Date when he was suspended or directed not to carry out his duties for the Company; and

(d)  100% of the Performance Share Units awarded to the Participant have been specifically awarded in consideration of the provisions contained in (1) and (2) above; and

(e)  the parties agree that the provisions contained in (1) and (2) above will apply globally unless the parties have specified a reduced territory in the Participant's employment agreement, in which case the territory specified in the employment agreement will prevail and govern; and

(f)  to the extent the parties have set forth an alternate restraint on competition and/or solicitation in the Participant's employment agreement, the version set forth in the employment agreement will prevail and govern.

**Form of Payment.**  Notwithstanding any discretion contained in the Program document, the Performance Share Units are payable in Ordinary Shares only.

**Termination of Employment.**  The following provision replaces Section 11 of the Acknowledgments section of Appendix B-3:

> in the event of termination of the Participant's services (whether or not later found to be invalid or in breach of employment laws in the jurisdiction where the Participant is employed or the terms of the Participant's employment agreement, if any), unless otherwise provided in the Program document or this Agreement or determined by the Company, the Participant's right to vest in the Performance Share Units under the Program, if any, will terminate effective as of the later of: (1) the date the Participant receives notice of termination from the Employer, or (2) the date the Participant is no longer actively providing services and will not be extended by any notice period (e.g., active services would not include any contractual notice period or any period of "garden leave" or similar period mandated under employment laws in the jurisdiction where the Participant is employed or the terms of the Participant's employment agreement, if any); the Committee shall have the exclusive discretion to determine when the Participant is no longer actively providing services for purposes of the Participant's Performance Share Units grant (including whether the Participant may still be considered to provide continuous services while on an approved leave of absence);

***The following provisions will apply to the Participants who are residents of Quebec:***

**Language Consent.**  The parties acknowledge that it is their express wish that the Agreement, as well as all documents, notices and legal proceedings entered into, given or instituted pursuant hereto or relating directly or indirectly hereto, be drawn up in English.

*Les parties reconnaissent avoir exigé la rédaction en anglais de cette convention, ainsi que de tous documents, avis et procédures judiciaires, exécutés, donnés ou intentés en vertu de, ou liés directement ou indirectement à, la présente convention.*

**Data Privacy.**  This provision supplements Section 11 of Appendix A of the Agreement:

The Participant hereby authorizes the Company and the Company's representatives to discuss with and obtain all relevant information from all personnel, professional or not, involved in the administration and operation of the Program.  The Participant further authorizes the Company, any Subsidiary or Affiliate and the administrator of the Program to disclose and discuss the Program with their advisors.  The Participant further authorizes the Company and any Subsidiary or Affiliate to record such information and to keep such information in his or her file.

*Notifications*

**Securities Law Notice.** The Participant is permitted to sell Ordinary Shares acquired through the Program through the designated broker appointed under the Program, if any, provided the resale of Ordinary Shares acquired under the Program takes place outside of Canada through the facilities of a stock exchange on which the Ordinary Shares are listed. The Ordinary Shares are currently listed on the New York Stock Exchange.

**Foreign Asset/Account Reporting Information.** Foreign property, including Ordinary Shares and other rights to receive shares (e.g., Performance Share Units) of a non-Canadian company held by Canadian residents must generally be reported annually on a Form T1135 (Foreign Income Verification Statement) if the total cost of the individual's foreign property exceeds C$100,000 at any time during the year. Thus, such Performance Share Units must be reported - generally at a nil cost - if the C$100,000 cost threshold is exceeded because other foreign property is held by the individual. When Ordinary Shares are acquired, their cost generally is the adjusted cost base ("ACB") of the Ordinary Shares. The ACB would ordinarily equal the fair market value of the Ordinary Shares at the time of acquisition, but if the Participant owns other shares of the same company, this ACB may have to be averaged with the ACB of the other shares.

<u>COLOMBIA</u>

*Notifications*

**Securities Law Notice.** The Ordinary Shares are not and will not be registered in the Colombian registry of publicly traded securities (Registro Nacional de Valores y Emisores) and therefore the Ordinary Shares may not be offered to the public in Colombia. Nothing in this document should be construed as the making of a public offer of securities in Colombia.

**Exchange Control Information.** Investment in assets located abroad (such as Ordinary Shares acquired under the Program) does not require prior approval. However, if the value of the Participant's aggregate investments held abroad, including Ordinary Shares (as of December 31 of the applicable calendar year) equals or exceeds US$500,000, these investments must be registered with the Central Bank (Banco de la República). Upon the sale or other disposition of investments (including Ordinary Shares and dividends) which have been registered with the Central Bank, the registration with the Central Bank must be cancelled no later than March 31 of the year following the sale or disposition (or a fine of up to 200% of the value of the infringing payment will apply). When investments held abroad are sold or otherwise disposed of, regardless of whether they have been registered with the Central Bank, Colombian residents must repatriate the proceeds to Colombia by selling currency to a Colombian bank and filing a Form No. 4.

<u>FRANCE</u>

*Terms and Conditions*

**Language Consent.** By clicking on the "I accept" button or signing and returning this document providing for the terms and conditions of this grant, the Participant confirms having read and understood the documents relating to this grant (the Program and this Agreement) which were provided to the Participant in the English language. The Participant accepts the terms of these documents accordingly.

*En cliquant sur le bouton "J'accepte" ou en signant et renvoyant le présent document décrivant les termes et conditions de cette attribution, le Participant confirme avoir lu et compris les documents relatifs à cette attribution (le Programme et ce Contrat) qui ont été communiqués au Participant en langue anglaise. Le Participant en accepte les termes en connaissance de cause.*

*Notifications*

**Exchange Control Information.** The Participant must declare to the customs and excise authorities any cash or securities he or she imports or exports without the use of a financial institution when the value of the cash or securities is equal to or exceeds €10,000. In addition, the Participant must declare any bank or stock account

opened, held or closed abroad to the French tax authorities on an annual basis.

GERMANY

*Notifications*

**Exchange Control Information.**  Cross-border payments in excess of €12,500 must be reported monthly to the German Federal Bank.  If the Participant uses a German bank to transfer a cross-border payment in excess of €12,500 in connection with the sale of Ordinary Shares acquired under the Program, the Participant must complete the appropriate report.

GUAM

No country-specific terms apply.

HONG KONG

*Terms and Conditions*

**Venue and Jurisdiction.**  The following provision supplements Section 2 of Appendix A:

Nothing in this Section 2 shall (or shall be construed so as to) limit the right of the Company to take proceedings against the Participant in the courts of any country (including the Courts of Hong Kong) relating to or in any way connected with a breach or threatened breach of any of the conditions in Appendix B-3 to this Agreement.

**Form of Payment.**  Notwithstanding any discretion contained in the Program document, the Performance Share Units are payable in Ordinary Shares only.

**Sale of Ordinary Shares.**  Ordinary Shares received at vesting are accepted as a personal investment.  In the event the Performance Share Units vest within six months of the Grant Date, the Participant agrees that he or she will not dispose of the Ordinary Shares acquired prior to the six  month anniversary of the Grant Date.

*Notifications*

**Securities Law Notice.**  *Warning:  The contents of this document have not been reviewed by any regulatory authority in Hong Kong.  The Participant should exercise caution in relation to the offer.  If the Participant is in any doubt about any of the contents of the Agreement, including the Appendices, or the Program, the Participant should obtain independent professional advice.  The Performance Share Units and underlying Ordinary Shares issued at vesting do not constitute a public offering of securities under Hong Kong law and are available only to employees of the Company or a Subsidiary or Affiliate.  The Agreement, including the Appendices, the Program document and other incidental communication materials have not been prepared in accordance with and are not intended to constitute a "prospectus" for a public offering of securities under the applicable securities legislation in Hong Kong.  The Performance Share Units are intended only for the personal use of each eligible Participant of the Company and its Subsidiaries or Affiliates and may not be distributed to any other person.*

**Occupational Retirement Schemes Ordinance Alert.**  The Company specifically intends that neither the Performance Share Units nor the Program will be an occupational retirement scheme for purposes of the Occupational Retirement Schemes Ordinance ("ORSO").

INDIA

*Terms and Conditions*

**Venue and Jurisdiction.**  The following provision supplements Section 2 of Appendix A:

Nothing in this Section 2 shall (or shall be construed so as to) limit the right of the Company to seek restraining orders or injunctions against the Participant in the courts of any country (including the Courts of India) relating to or in any way connected with a breach or threatened breach of any of the conditions in Appendix B-3 to this Agreement.

*Notifications*

**Exchange Control Information.**  The Participant understands that any proceeds from the sale of Ordinary Shares acquired under the Program and any cash dividends received in relation to the Ordinary Shares must be repatriated to India within 90 days or 180 days of receipt, respectively.  The Participant must obtain a foreign inward remittance certificate ("FIRC") from the bank where he or she deposits the foreign currency and maintain the FIRC as evidence of the repatriation of funds in the event the Reserve Bank of India or the Employer requests proof of repatriation.

**Foreign Asset/Account Reporting Information.**  The Participant understands that he or she is required to declare any foreign bank accounts and any foreign financial assets (including Ordinary Shares held outside India) in his or her annual tax return.  The Participant is responsible for complying with this reporting obligation and should confer with his or her personal tax advisor in this regard.

IRELAND

*Terms and Conditions*

**Venue and Jurisdiction.**  The following provision supplements Section 2 of Appendix A:

(i)      Nothing in this Section 2 shall (or shall be construed so as to) limit the right of the Company to take proceedings against the Participant in the courts of any country (including the Courts of Ireland) relating to or in any way connected with a breach or threatened breach of any of the conditions in Appendix B-3 to this Agreement.

**Appendix B-3.**  Appendix B-2 is amended by deleting the final section and replacing it with the following:

For the purposes of (1) through (2) above:

(a)      "Company" means Aon plc, a public limited company incorporated under English law and each of its affiliates and subsidiaries including, without limitation, each of its related and/or affiliated companies throughout Ireland;

(b)      "Relevant Period" means the last 12 months of a Participant's active employment (not including for this purpose any period immediately prior to the termination of the Participant's employment when he or she was suspended or directed not to carry out his or her duties for the Company); and

(c)      the period of 12 months in (1) and the period of two years in (2) shall be reduced by the duration of any period immediately prior to the Participant's Termination Date when he or she was suspended or directed not to carry out his duties for the Company; and

(d)      100% of the Performance Share Units awarded to the Participant have been specifically awarded in consideration of the provisions contained in (1) and (2) above; and

(e)      the parties agree that nothing in the provisions contained in (1) and (2), shall (or be construed so as to) limit any restraints on competition and/or solicitation in the Participant's employment agreement.

<u>ITALY</u>

*Terms and Conditions*

**Data Privacy.** Notwithstanding any provision of Section 11 of Appendix A of the Agreement, this section of Appendix C applies in regards to data privacy in Italy.

*The Participant understands that the Company, the Employer and any Subsidiary or Affiliate may hold certain personal information about the Participant, including, but not limited to, the Participant's name, home address and telephone number, date of birth, social insurance or other identification number, salary, nationality, job title, any Ordinary Shares or directorships held in the Company, details of Performance Share Units or any other entitlement to Ordinary Shares awarded, canceled, exercised, vested, unvested or outstanding in the Participant's favor, for the exclusive purpose of implementing, managing and administering the Program ("Data").*

*The Participant also understands that providing the Company with Data is necessary for the performance of the Program and that the Participant's refusal to provide such Data would make it impossible for the Company to perform its contractual obligations and may affect the Participant's ability to participate in the Program. The Controller of personal data processing is Aon plc, with registered offices at 8 Devonshire Square, London England EC2M 4PL, and, pursuant to Legislative Decree no. 196/2003, its representative in Italy is Enrico Boglione who can be reached care of Aon SpA, 8/10 Via Andrea Ponti, Milan, Italy.*

*The Participant understands that Data will not be publicized, but it may be transferred to banks, other financial institutions or brokers involved in the management and administration of the Program. The Participant further understands that the Company, the Employer and/or any Subsidiary or Affiliate will transfer Data among themselves as necessary for the purpose of implementing, administering and managing the Participant's participation in the Program, and that the Company and/or any Subsidiary or Affiliate may each further transfer Data to third parties assisting the Company in the implementation, administration and management of the Program, including any requisite transfer of Data to a broker or other third party with whom the Participant may elect to deposit any Ordinary Shares acquired under the Program. Such recipients may receive, possess, use, retain and transfer Data in electronic or other form, for the purposes of implementing, administering and managing the Participant's participation in the Program. The Participant understands that these recipients may be located in or outside the European Economic Area, such as in the United States or elsewhere. Should the Company exercise its discretion in suspending all necessary legal obligations connected with the management and administration of the Program, it will delete Data as soon as it has accomplished all the necessary legal obligations connected with the management and administration of the Program.*

*The Participant understands that Data processing related to the purposes specified above shall take place under automated or non-automated conditions, anonymously when possible, that comply with the purposes for which Data is collected and with confidentiality and security provisions as set forth by applicable Italian data privacy laws and regulations, with specific reference to Legislative Decree no. 196/2003.*

*The processing activity, including communication, the transfer of Data abroad, including outside of the European Economic Area, as herein specified and pursuant to applicable Italian data privacy laws and regulations, does not require the Participant's consent thereto as the processing is necessary to performance of contractual obligations related to implementation, administration and management of the Program. The Participant understands that, pursuant to Section 7 of the Legislative Decree no. 196/2003, the Participant has the right to, including but not limited to, access, delete, update, correct or stop, for legitimate reason, the Data processing. Furthermore, the Participant is aware that Data will not be used for direct marketing purposes. In addition, Data provided can be reviewed and questions or complaints can be addressed by contacting the Participant's local human resources representative.*

**Program Document Acknowledgement.** In accepting the grant of the Performance Share Units, the Participant acknowledges that he or she has received a copy of the Program document and the Agreement and has reviewed the Program document and the Agreement, including the Appendices, in their entirety and fully understands and accepts all provisions of the Program and the Agreement, including the Appendices.

The Participant further acknowledges that he or she has read and specifically and expressly approves the following sections of the Agreement (including the Appendices): Governing Law; Venue and Jurisdiction; Imposition of Other Requirements; Acknowledgement of Nature of the Program and the Performance Share Units; Tax Withholding Obligations; Language; and the Data Privacy section included in this Appendix C.

*Notifications*

**Foreign Asset/Account Reporting Information.** If the Participant is an Italian resident and holds investments or financial assets outside of Italy (*e.g.,* cash, Performance Share Units, Ordinary Shares) during any fiscal year which may generate income taxable in Italy (or if the Participant is the beneficial owner of such an investment or asset even if the Participant does not directly hold the investment or asset), the Participant is required to report such investments or assets on his or her annual tax return for such fiscal year (on UNICO Form, RW Schedule, or on a special form if the Participant is not required to file a tax return).

## Japan

*Terms and Conditions*

**Venue and Jurisdiction.** The following provision supplements Section 2 of Appendix A:

Nothing in this Section 2 shall (or shall be construed so as to) limit the right of the Company to take proceedings against the Participant in the courts of any country (including the Courts of Japan) relating to or in any way connected with a breach or threatened breach of any of the conditions in Appendix B-3 to this Agreement.

*Notifications*

**Foreign Asset/Account Reporting Information.** The Participant is required to report details of any assets held outside of Japan as of December 31, including Ordinary Shares, to the extent such assets have a total net fair market value exceeding ¥50,000,000. Such report will be due from the Participant by March 15 each year. The Participant is responsible for complying with this reporting obligation and should confer with his or her personal tax advisor in this regard.

## Mexico

*Terms and Conditions*

**No Entitlement or Claims for Compensation.** These provisions supplement the Acknowledgment section of Appendix B-3:

*Modification.* By accepting the Performance Share Units, the Participant understands and agrees that any modification of the Program or the Agreement or its termination shall not constitute a change or impairment of the terms and conditions of employment.

*Policy Statement.* The award of Performance Share Units is unilateral and discretionary and, therefore, the Company reserves the absolute right to amend it and discontinue it at any time without any liability.

The Company, with registered offices at 8 Devonshire Square, London England EC2M 4PL is solely responsible for the administration of the Program and the Participant's participation in the Program and the acquisition of Ordinary Shares does not, in any way, establish an employment relationship between the Participant and the Company since the Participant is participating in the Program on a wholly commercial basis and the sole employer is Aon Benfield México Intermediario de Reaseguro S.A. de C.V., formerly known as Aon RE México Intermediario de Reaseguro, S. A. de C. V., or Aon México Business Support, S.A. de C.V., as applicable, nor does it establish any rights between the Participant and the Employer.

*Program Document Acknowledgment.* By accepting the Performance Share Units, the Participant acknowledges that the Participant has received copies of the Program document, has reviewed the Program document and the Agreement in their entirety and fully understands and accepts all provisions of the Program and the Agreement.

In addition, by accepting the Agreement, the Participant further acknowledges that the Participant has read and specifically and expressly approved the terms and conditions in the Acknowledgment section of Appendix B-3 in which the following is clearly described and established: (i) participation in the Program does not constitute an acquired right; (ii) the Program and participation in the Program is offered by the Company on a wholly discretionary basis; (iii) participation in the Program is voluntary; and (iv) the Company and any Subsidiary are not responsible for any decrease in the value of the Ordinary Shares underlying the Performance Share Units.

Finally, the Participant hereby declares that the Participant does not reserve any action or right to bring any claim against the Company for any compensation or damages as a result of the Participant's participation in the Program and therefore grants a full and broad release to the Employer, the Company and any Subsidiary with respect to any claim that may arise under the Program.

<u>*Sin derecho a compensación o reclamaciones por compensación.*</u> *Estas disposiciones complementan la Sección de Reconocimiento del Anexo B-3:*

*Modificación. Al aceptar las Unidades de Acciones Restringidas, el Participante entiende y acuerda que cualquier modificación al Programa o al Contrato o su terminación no constituirá un cambio o perjuicio a los términos y condiciones de empleo.*

*Declaración de Política. El otorgamiento de las Unidades de Acciones Restringidas que la Compañía está haciendo de conformidad con el Programa es unilateral y discrecional y, por lo tanto, la Compañía se reserva el derecho absoluto de modificar y discontinuar el mismo en cualquier momento, sin responsabilidad alguna.*

*La Compañía, con oficinas registradas ubicadas en 8 Devonshire Square, London England EC2M 4PL es únicamente responsable de la administración del Programa y la participación en el Programa y la adquisición de Acciones Ordinarias no establece, de forma alguna, una relación de trabajo entre el Partícipe y la Compañía, ya que el Partícipe participa en el Programa de una forma totalmente comercial y el único patrón Aon Benfield México Intermediario de Reaseguro S.A. de C.V., antes denominada Aon RE México Intermediario de Reaseguro, S. A. de C. V., o Aon México Business Support, S.A. de C.V., en caso de ser aplicable, y tampoco establece ningún derecho entre el Partícipe y el Patrón.*

*Reconocimiento del Documento del Programa. Al aceptar el Otorgamiento de las Unidades de Acciones Restringidas, el Participante reconoce que el Partícipe ha recibido copias del Programa, ha revisado el Programa y el Contrato en su totalidad y entiende y acepta completamente todas las disposiciones contenidas en el Programa y en el Contrato.*

*Adicionalmente, al aceptar el Contrato, el Participante reconoce que ha leído y específica y expresamente ha aprobado los términos y condiciones de la Sección de Reconocimiento del Anexo B-3, en el que claramente se ha descrito y establecido que: (i) la participación en el Programa no constituye un derecho adquirido; (ii) el Programa y la participación en el Programa es ofrecida por la Compañía de forma enteramente discrecional; (iii) la participación en el Programa es voluntaria; y (iv) la Compañía y cualquier empresa afiliada no son responsables por cualquier disminución en el valor de las Acciones Ordinarias subyacentes a las Unidades de Acciones Restringidas.*

*Finalmente, el Partícipe en este acto declara que el Partícipe no se reserva ninguna acción o derecho para interponer una demanda o reclamación en contra de la Compañía por compensación, daño o perjuicio alguno como resultado de su participación en el Programa y, por lo tanto, otorga el más amplio finiquito al Patrón, la Compañía y cualquier empresa afiliada con respecto a cualquier demanda o reclamación que pudiera surgir en virtud del Programa.*

**NETHERLANDS**

*Terms and Conditions*

**Venue and Jurisdiction.**  The following provision supplements Section 2 of Appendix A:

(a)      Nothing in this Section 2 shall (or shall be construed so as to) limit the right of the Company to take proceedings against the Participant in the courts of any country (including the Courts of The Netherlands) relating to or in any way connected with the place of residency of the Participant, the place where the work is performed, or related to the breach or threatened breach of any of the conditions in Appendix B-3 to this Agreement.

**Appendix B-3.**  Appendix B-3 is amended by deleting the final Section in its entirety and replacing it with the following:

For the purposes of (1) and (2) above:

(a)  "Company" means Aon plc, a public limited company incorporated under English law and each if its affiliates and subsidiaries including, without limitation, Aon Groep Nederland bv and each of its related and/or affiliated companies throughout the Netherlands.

(b)  "Relevant Period" means the last 12 months of a Participant's active employment (not including for this purpose any period immediately prior to the termination of the Participant's employment when he was suspended or directed not to carry out his duties for the Company); and

(c)  the period of 12 months in (1) and the period of two years in (2) shall be reduced by the duration of any period immediately prior to the Participant's Termination Date when he was suspended or directed not to carry out his duties for the Company; and

(d)  100% of the Performance Share Units awarded to the Participant have been specifically awarded in consideration of the provisions contained in (1) and (2) above; and

(e)  the parties agree that the provisions contained in (1) and (2) above will apply globally unless the parties have specified a reduced territory in the Participant's employment agreement, in which case the territory specified in the employment agreement will prevail and govern; and

(f)  to the extent the parties have set forth an alternate restraint on competition and/or solicitation in the Participant's employment agreement, the version set forth in the employment agreement will prevail and govern.

**NEW ZEALAND**

*Terms and Conditions*

**Venue and Jurisdiction.**  The following provision supplements Section 2 of Appendix A:

Nothing in this Section 2 shall (or shall be construed so as to) limit the right of the Company to take proceedings against the Participant in the courts of any country (including the Courts of New Zealand) relating to or in any way connected with a breach or threatened breach of any of the conditions in Appendix B-3 to this Agreement.

**Appendix B-3.**  Appendix B-3 is amended by deleting the final Section in its entirety and replacing it with the following:

For the purposes of (1) and (2) above:

(a)  "Company" means Aon Corporation, a Delaware corporation and each if its affiliates and subsidiaries including, without limitation, the following:

a.  Aon New Zealand a New Zealand corporation;

b.  Aon (Fiji) Limited a Fiji corporation; and

     c.   Aon (Vanuatu) Limited a Vanuatu corporation.

(b)  "Relevant Period" means the last 12 months of a Participant's active employment (not including for this purpose any period immediately prior to the termination of the Participant's employment when he or she was suspended or directed not to carry out his or her duties for the Company); and

(c)  the period of 12 months in (1) and the period of two years in (2) shall be reduced by the duration of any period immediately prior to the Participant's Termination Date when he or she was suspended or directed not to carry out his duties for the Company; and

(d)  100% of the Performance Share Units awarded to the Participant have been specifically awarded in consideration of the provisions contained in (1) and (2) above; and

(e)  the parties agree that nothing in the provisions contained in (1) and (2), shall (or be construed so as to) limit any restraints on competition and/or solicitation in the Participant's employment agreement.

## PUERTO RICO

No country-specific terms apply.

## SINGAPORE

### *Terms and Conditions*

**Venue and Jurisdiction.** The following provision supplements Section 2 of Appendix A:

Nothing in this Section 2 shall (or shall be construed so as to) limit the right of the Company to take proceedings against the Participant in the courts of any country (including the Courts of Singapore) relating to or in any way connected with a breach or threatened breach of any of the conditions in Appendix B-3 to this Agreement to seek the appropriate relief (including, but not limited to, injunctive relief).

### *Notifications*

**Securities Law Notice.** The grant of the Performance Share Units is being made pursuant to the "Qualifying Person" exemption under section 273(1)(f) of the Securities and Futures Act (Chapter 289, 2006 Ed.) ("SFA") and is not made with a view to the underlying Ordinary Shares being subsequently offered for sale to any other party. The Program document has not been lodged or registered as a prospectus with the Monetary Authority of Singapore. The Participant should note that the Performance Share Units are subject to section 257 of the SFA and the Participant should not make any subsequent sale of the Ordinary Shares in Singapore or any offer of such subsequent sale of the Ordinary Shares subject to the Performance Share Units in Singapore, unless such sale or offer is made (i) after six months from the Grant Date or (ii) pursuant to the exemptions under Part XIII Division (1) Subdivision (4) (other than section 280) of the SFA.

**Chief Executive Officer and Director Notification Requirement.** Directors and the Chief Executive Officer ("CEO") of a Singapore Subsidiary or Affiliate are subject to certain notification requirements under the Singapore Companies Act. Directors and the CEO must notify the Singapore Subsidiary or Affiliate in writing of an interest (e.g., Performance Share Units, Ordinary Shares, etc.) in the Company or any related companies within two business days of (i) its acquisition or disposal, (ii) any change in a previously disclosed interest (e.g., when the Ordinary Shares are sold), or (iii) becoming a director / CEO.

SOUTH AFRICA

*Terms and Conditions*

**Tax Notification.** This provision supplements Section 12 of Appendix A:

By accepting the Performance Share Units, the Participant agrees to notify the Employer of the amount of any gain realized upon vesting. If the Participant fails to advise the Employer of the gain realized upon vesting, the Participant may be liable for a fine. The Participant will be responsible for paying any difference between the actual tax liability and the amount of tax withheld.

*Notifications*

**Exchange Control Information.** The Participant is solely responsible for ensuring compliance with applicable exchange control laws and regulations in South Africa. Because no transfer of funds from South Africa is required in connection with the Performance Share Units, no filing or reporting requirements should apply to the Participant when the Performance Share Units are granted or when Ordinary Shares are issued upon vesting/settlement of the Performance Share Units. However, because the exchange control regulations change frequently and without notice, the Participant should consult the Participant's legal advisor prior to the acquisition or sale of Ordinary Shares issued pursuant to the Performance Share Units to ensure compliance with current regulations. As noted above, it is the Participant's responsibility to comply with the South African exchange control laws, and neither the Company nor the Employer will be liable for any fines or penalties resulting from failure to comply with applicable exchange control laws and regulations.

SPAIN

*Terms and Conditions*

**Termination of Employment.** For purposes of the Performance Share Units, a termination of employment includes a termination that is deemed an "unfair dismissal" or a "constructive dismissal."

**Labor Law Acknowledgment.** This provision supplements the Acknowledgment section of Appendix B-3:

In accepting the Performance Share Units, the Participant acknowledges that he or she consents to participation in the Program and has received a copy of the Program.

The Participant understands and agrees that, as a condition of the grant of the Performance Share Units, except as provided for in the Program document or this Agreement, the Participant's termination of employment for any reason (including for the reasons listed below) will automatically result in the cancellation and loss of any Performance Share Units that may have been granted to the Participant and that were not fully vested on the date of termination. In particular, the Participant understands and agrees that the Performance Share Units will be cancelled without entitlement to the Ordinary Shares or to any amount as indemnification if the Participant terminates employment by reason of, including, but not limited to: resignation, disciplinary dismissal adjudged to be with cause, disciplinary dismissal adjudged or recognized to be without cause, individual or collective layoff on objective grounds, whether adjudged to be with cause or adjudged or recognized to be without cause, material modification of the terms of employment under Article 41 of the Workers' Statute, relocation under Article 40 of the Workers' Statute, Article 50 of the Workers' Statute, unilateral withdrawal by the Employer, and under Article 10.3 of Royal Decree 1382/1985.

Furthermore, the Participant understands that the Company has unilaterally, gratuitously and in its sole discretion decided to grant Performance Share Units under the Program to individuals who may be employees of the Company or a Subsidiary or Affiliate throughout the world. The decision is a limited decision that is entered into upon the express assumption and condition that any grant will not economically or otherwise bind the Company or a Subsidiary or Affiliate on an ongoing basis, over and above the specific terms of the Program. Consequently, the Participant understands that the Performance Share Units are granted on the assumption and condition that the Performance Share Units and the Ordinary Shares issued upon vesting/settlement of the Performance Share Units

shall not become a part of any employment contract (either with the Company or a Subsidiary or Affiliate) and shall not be considered a mandatory benefit, salary for any purposes (including severance compensation) or any other right whatsoever. In addition, the Participant understands that the grant of the Performance Share Units would not be made to the Participant but for the assumptions and conditions referred to above; thus, the Participant acknowledges and freely accepts that should any or all of the assumptions be mistaken or should any of the conditions not be met for any reason, then any grant of Performance Share Units shall be null and void.

*Notifications*

**Securities Law Notice.** The Performance Share Units do not qualify as securities under Spanish regulations. No "offer of securities to the public," as defined under Spanish law, has taken place or will take place in the Spanish territory. The present document has not been nor will it be registered with the Comisión Nacional del Mercado de Valores (Spanish Securities Exchange Commission) and does not constitute a public offering prospectus.

**Exchange Control Information.** To participate in the Program, the Participant agrees to comply with exchange control regulations in Spain. The acquisition of Ordinary Shares under the Program must be declared for statistical purposes to the *Dirección General de Comercio e Inversiones* (the "DGCI"). Because the Participant will not acquire the Ordinary Shares through the use of a Spanish financial institution, the Participant agrees to make the declaration by filing a D-6 form with the DGCI. Generally, the D-6 form must be filed each January while the Ordinary Shares are owned or to report the sale of Ordinary Shares. In addition, the sale of Ordinary Shares must also be declared on the D-6 form filed with the DGCI in January, unless the sale proceeds exceed the applicable threshold (currently €1,502,530), in which case, the filing is due within one month after the sale.

Further, the Participant is required to electronically declare to the Bank of Spain any foreign accounts (including brokerage accounts held abroad), any foreign instruments (including Ordinary Shares acquired under the Program), and any transactions with non-Spanish residents (including any payments of Ordinary Shares made to the Participant pursuant to the Program) if the balances in such accounts together with the value of such instruments as of December 31, or the volume of transactions with non-Spanish residents during the prior or current year, exceed €1,000,000. Once the €1,000,000 threshold has been surpassed in either respect, the Participant will generally be required to report all foreign accounts, foreign instruments and transactions with non-Spanish residents, even if the relevant threshold has not been crossed for an individual item. Generally, the Participant will only be required to report on an annual basis (by January 20 of each year); however, if the balances in the Participant's foreign accounts together with the value of his or her foreign instruments or the volume of transactions with non-Spanish residents exceed €100,000,000, more frequent reporting will be required.

**Foreign Asset/Account Reporting Information.** To the extent that the Participant holds rights or assets (*e.g.*, cash or Ordinary Shares held in a bank or brokerage account) outside of Spain with a value in excess of €50,000 per type of right or asset as of December 31 each year, the Participant is required to report information on such rights and assets on his or her tax return for such year (or at any time during the year in which the Participant sells or disposes of such right or asset). After such rights or assets are initially reported, the reporting obligation will only apply for subsequent years if the value of any previously-reported rights or assets increases by more than €20,000 or if the Participant transfers or disposes of any previously-reported rights or assets. The Participant should consult with his or her personal tax and legal advisors to ensure compliance with applicable reporting obligations.

<u>SWITZERLAND</u>

*Terms and Conditions*

**Appendix B-3.** Appendix B-3 is amended by deleting the definition of "Relevant Period" in its entirety and replacing it with the following:

"Relevant Period" means the last 12 months of a Participant's active employment (not including for this purpose any period immediately prior to the termination of the Participant's employment when he was suspended or directed not to carry out his duties for the Company); and the Participant undertakes not to engage in any of the activities mentioned under the provisions contained in (1) and (2) of Appendix B-3 within Switzerland; and

Appendix B-3 is further amended to include a new Section (3) to the end thereof as follows:

In addition to the consequences provided in this Appendix B-3, in case of breach of the provisions contained in (1) and (2), the Participant must compensate the Company, any other group entity, including the employing entity, for any damages that the Company, any other group entity, including the employing entity, may have incurred as a result of the breach. Furthermore, the Company and/or any other group entity, including the employing entity, shall have the right to request that the Participant cease and desist from any prohibited activities and to apply to any court of competent jurisdiction, including Swiss courts, for injunctive relief.

*Notifications*

**Securities Law Notice.** The Program and the Performance Share Units are not intended to be publicly offered in or from Switzerland. Because the offer is considered a private offering, it is not subject to registration in Switzerland. Neither this document nor any other materials relating to the offer of Performance Share Units constitutes a prospectus as such term is understood pursuant to article 652a of the Swiss Code of Obligations, and neither this document nor any other materials relating to the Performance Share Units may be publicly distributed or otherwise made publicly available in Switzerland.

## TURKEY

*Notifications*

**Securities Law Notice**. The Performance Share Units are made available only to employees of the Company, its Subsidiaries and its Affiliates, and the offer of participation in the Program is a private offering. The grant of Performance Share Units and the issuance of Ordinary Shares at vesting take place outside of Turkey.

**Financial Intermediary Obligation.** Any activity related to investments in foreign securities (e.g., the sale of Ordinary Shares) should be conducted through a bank or financial intermediary institution licensed by the Turkish Capital Markets Board and should be reported to the Turkish Capital Markets Board. The Participant is solely responsible for complying with this requirement and should consult with a personal legal advisor for further information regarding any obligations in this respect.

## UNITED KINGDOM

*Terms and Conditions*

**Tax Withholding Obligations.** The following supplements Section 12 of Appendix A:

If payment or withholding of any income tax due is not made within 90 days of the end of the U.K. tax year in which event giving rise to the income tax liability occurs or such other period specified in Section 222(1)(c) of the U.K. Income Tax (Earnings and Pensions) Act 2003 (the "Due Date"), the amount of any uncollected income tax shall (assuming the Participant is not a director or executive officer of the Company (within the meaning of Section 13(k) of the U.S. Securities Exchange Act of 1934, as amended)), constitute a loan owed by the Participant to the Employer, effective on the Due Date. The Participant agrees that the loan will bear interest at the then-current Her Majesty's Revenue and Customs ("HMRC") Official Rate, it will be immediately due and repayable, and the Company and/or the Employer may recover it at any time thereafter by any of the means referred to in Section 12 of Appendix A. If the Participant is a director or executive officer and income tax is not collected from or paid by him or her by the Due Date, the amount of any uncollected income tax may constitute a benefit to the Participant on which additional income tax and national insurance contributions ("NICs") may be payable. The Participant will be responsible for paying and reporting any income tax due on this additional benefit directly to HMRC under the self-assessment regime and for reimbursing the Company or the Employer, as applicable, for the value of any NICs due on this additional benefit, which the Company and/or the Employer may recover at any time thereafter by any of the means referred to in Section 12 of Appendix A.

**Third Party Rights.** The Company is entering into this Agreement for itself and as agent for and trustee of the Employer and all other Subsidiaries and Affiliates and is duly authorized to do so. The parties intend that the Employer and each Subsidiary and Affiliate should be able to enforce in its own right the terms of this Agreement

which expressly or impliedly confer a benefit on that company subject to and in accordance with the provisions of the Contracts (Rights of Third Parties) Act 1999 or other applicable statute, law or regulation concerning third party rights.

**Appendix B-3**. The Conditions section of Appendix B-3 of this Agreement is deleted in its entirety and replaced with the following.

**Conditions**

The Company (in this Appendix B-3 such term to include the UK Company and all Group Companies as defined below) is in the business of providing insurance brokerage, reinsurance brokerage, benefits consulting, compensation consulting, human resources consulting, managing underwriting and related services including accounting, claims management and handling, contract wording, information systems and actuarial services. An essential element of its business is the development and maintenance of personal contacts and relationships with clients. Because of these contacts and relationships, it is common for the Company's clients to develop identification with the employee who services its insurance needs, rather than with the Company itself. The personal identification of clients of the Company with a Company employee creates potential for the employee's appropriation of the benefits of the relationships developed with clients on behalf of and at the expense of the Company. Since the Company would suffer irreparable harm if the employee left its employment and solicited the insurance or other related business of clients of the Company or if the employee left its employ and solicited other employees of the Company, it is reasonable to protect the Company against solicitation activities by the employee for a limited period of time after the employee leaves the Company and for the Company to make the award of Performance Share Units conditional on the Participant not engaging in such solicitation activities.

In consideration of the granting of Performance Share Units to the Participant, the Participant agrees to the following conditions:

1. the Participant agrees that he will not for a period of 12 months after the Termination Date (without the prior written consent of the UK Company) either directly or indirectly and whether alone or in conjunction with or on behalf of any other person, organisation or entity and whether as a principal, shareholder, director, employee, agent, consultant, partner or otherwise:

1.1 so as to compete with the UK Company or any Relevant Group Company solicit, canvass or approach or cause to be solicited, canvassed or approached, or deal or contract with or accept business from any Relevant Client in relation to the supply or provision of any Relevant Products or Services, or endeavour to do so; or

1.2 solicit, induce, encourage, or entice away or endeavour to solicit, induce, encourage, or entice away from the UK Company or any Relevant Group Company any person who is employed by or is an agent, officer, independent contractor or consultant appointed or engaged by the UK Company or a Relevant Group Company (i) in a senior, executive, professional, technical or sales or managerial capacity and with whom the Participant had material contact in the course of that person's employment, appointment or engagement during the Relevant Period; or (ii) for whom the Participant had direct or indirect managerial responsibility during the Relevant Period, and in either case whether or not such person would commit any breach of his or her contract of employment or engagement by leaving the service of the UK Company or Relevant Group Company;

2. any unvested Performance Share Units of any Participant will be immediately forfeited if the Company considers that the Participant has breached the restrictions at 1 above;

3. the Participant shall be prohibited both during his or her employment (otherwise than in the proper performance of his or her duties and then only to those who need to know such Confidential Information for legitimate business reasons) or thereafter (except with the prior written consent of the UK Company or as required by law) from:

    a) divulging or communicating to any person (including, but not limited to, any representative of the press or broadcasting or other media);

b) causing or facilitating any unauthorised disclosure or publication through any failure by the Participant to exercise all due care, skill and diligence; or

making use of or encouraging or permitting the use of (other than for the benefit of the UK Company and any Relevant Group Company),

c) any Confidential Information which may have come to the Participant's knowledge or possession or control during his or her employment. The Participant must also use his or her best endeavours to prevent the publication or disclosure of any such Confidential Information.

This restriction will not apply to:

(i) Confidential Information which the Participant can demonstrate is in the public domain otherwise than through unauthorised disclosure; or

(ii) any disclosure required by the order of a court of competent jurisdiction or as otherwise required by law;

(iii) or any protected disclosure made by the Participant within the meaning of Part IV A of the Employment Rights Act 1996 made pursuant to and in accordance with the Public Interest Disclosure Act 1998.

4.      For the purposes of (1) through (3) above:

(a)     The following words and expressions shall have the following meanings:

(i) "Confidential Information" has the meaning given within the Business Confidentiality provisions of the contractual section of the Company's policies and procedures, as amended from time to time;

(ii) "Group Company" means the Company and its Parent Undertakings, its Subsidiary Undertakings and the Subsidiary Undertakings of any of its Parent Undertakings from time to time ("Parent Undertaking" and "Subsidiary Undertaking" having the meanings set out in section 1162 Companies Act 2006);

(iii) "Relevant Client" means any person, firm, company or organisation who or which at any time during the Relevant Period is or was (i) negotiating with or engaged in discussions with the UK Company or Relevant Group Company for the sale or supply of Relevant Products or Services; or (ii) a client or customer of, or in the habit of dealing with, the UK Company or Relevant Group Company for the sale or supply of Relevant Products or Services, and in each case with whom or which the Participant had material contact or dealings or about whom or which the Participant was in possession of Confidential Information during the Relevant Period in the course of his or her employment and/or with whom any UK Company or Relevant Group Company employees, agents, officers, consultants or independent contractors reporting to the Participant had material contact or dealings during the Relevant Period in the course of their employment or engagement;

(iv) "Relevant Group Company" any Group Company (other than the UK Company) for which the Participant has performed services or for or in respect of which he or she has had operational/ management responsibility at any time during the Relevant Period;

(v) "Relevant Period" means the period of 12 months immediately prior to the Termination Date (not including for this purpose any period during which he or she was suspended or directed not to carry out his or her duties pursuant to his or her contract of employment;

(vi) "Relevant Products or Services" means products or services which are of the same kind as, or of a materially similar kind to or competitive with, any products or services supplied or provided by the UK Company or Relevant Group Company within the Relevant Period and with which the Participant was materially involved in the course of his or her employment during the Relevant Period and with which sale or supply the Participant was directly or otherwise materially concerned or connected or of which he or she had personal knowledge in the Relevant Period;

(vii) "Termination Date" means the date on which the Participant's employment terminates; and

(viii)     "UK Company" means Aon UK Limited a company registered in the UK with company number 00210725;

(b)     the period of 12 months in (1) above shall be reduced by the duration of any period immediately prior to the Participant's Termination Date when he or she was suspended or directed not to carry out his or her duties pursuant to his or her contract of employment; and

(c)     100% of the Performance Share Units awarded to the Participant have been specifically awarded in consideration of the provisions contained in (1) and (2) above; and

(d)     the parties agree that the provisions contained in (1) and (2) above will apply in any area or territory in which the Participant worked for the UK Company or Relevant Group Company during the Relevant Period or any area or territory in which the Company or Relevant Group Company supplied or provided Relevant Products or Services during the Relevant Period; and

(e)     to the extent the parties have set forth an alternate restraint on competition and/or solicitation in the Participant's employment agreement, the version set forth in this Agreement will prevail and govern.

(f)     **Governing Law**.  The validity, interpretation**,** instruction, performance, enforcement and remedies of or relating to Appendix B-3 only, and the rights and obligations of the parties hereunder, shall be governed by and construed in accordance with the substantive laws of England & Wales, without regard to the conflict of law principles, rules or statutes of any jurisdiction;

(g)     **Venue and Jurisdiction.** Venue for any legal proceedings instituted related to the rights and obligations contained in this Appendix B-3 shall be the courts of England and Wales and the Participant agrees to submit to the exclusive jurisdiction of the courts of England and Wales for purposes of enforcement of the rights and obligations contained hereunder.

# AON PLC
# LEADERSHIP PERFORMANCE PROGRAM

**1.      Overview**

The Leadership Performance Program (the "Program") of Aon plc (the "Company") has been adopted by the Organization and Compensation Committee of the Company's Board of Directors (the "Committee") as a sub-plan of the Aon plc Amended and Restated 2011 Incentive Plan (the "Stock Plan"), effective as of January 1, 2016. Capitalized terms not defined herein shall have the meaning assigned under the Stock Plan.  The Program and all Awards issued hereunder are subject to the terms and conditions of the Stock Plan; in the event of any inconsistency between the Program and the Stock Plan, the Stock Plan will control to the extent consistent with applicable law.

**2.      Performance Cycle**

The "Performance Cycle" means a three-year period commencing on the first day of the first calendar year of the three-year period, over which performance (as determined by the Committee) will be measured for purposes of the Program.  A Performance Cycle may overlap with any other Performance Cycle under the Program.

**3.      Eligibility**

As recommended by the Company's Chief Executive Officer (the "CEO") and approved by the Committee, key members of the Company's senior leadership team are eligible to participate in the Program. The CEO is also eligible to participate in the Program as approved by the Committee.

**4.      Participation**

The Committee will approve in writing, within the first 90 days of the Performance Cycle (with respect to Covered Employees, as defined below) or otherwise no later than June 30 of the first year of the Performance Cycle, the specific individuals eligible to participate in the Program (the "Participants"), each Participant's Award (denominated as described below), the Target Earnings Per Share (as defined below), the Threshold Earnings Per Share (as defined below), and the Payout Scale (as defined below).  Participants approved by the Committee shall be eligible to participate in the full Performance Cycle, retroactive to the first day of the Performance Cycle.  A change in the Participant's position or role during the Performance Cycle shall not affect the terms of any outstanding Award, subject to the Participant's continued employment with the Company.

**5.      Performance-Based Compensation**

Notwithstanding anything to the contrary herein, Awards under the Program to officers of the Company who are subject to Section 16 of the U.S. Securities Exchange Act of 1934, as amended ("Covered Employees"), are intended to qualify as "Performance-Based Compensation" under the Stock Plan for purposes of Code Section 162(m) and will be administered by the Committee accordingly.

6. **Performance Share Units**

Each Participant's Award shall be denominated in either US dollars or as a target number of performance share units ("Performance Share Units"), each representing a Class A Ordinary Share of the Company (an "Ordinary Share"). If the Award is denominated in US dollars, the target number of Performance Share Units under such Award will be derived by dividing the Award by the Fair Market Value of an Ordinary Share on the date the Award is approved in writing by the Committee (the "Grant Date").

7. **Rules Applicable to Performance Share Units**

(a) To the extent earned, the Performance Share Units will vest as of the date the Committee determines and certifies in writing whether and to what extent the applicable performance criteria have been achieved and the resulting payout (the "Settlement Date"), which shall occur as soon as administratively practicable following the end of the Performance Cycle.

(b) The number of Ordinary Shares into which the Performance Share Units settle upon vesting of such Performance Share Units (i) will be determined based on the Company's actual cumulative Adjusted Earnings Per Share during the Performance Cycle, as compared to the Target Earnings Per Share, and (ii) will range from 0% to 200% of the target number of Performance Share Units awarded, as set forth in the Payout Scale.

(c) The Performance Share Units will settle into Ordinary Shares during the calendar year immediately following the end of the Performance Cycle.

(d) The Company shall have the right to satisfy all federal, state and local withholding tax requirements with respect to a settled Award by withholding Ordinary Shares equivalent in value to the amount of the required withholding (based on the Fair Market Value of an Ordinary Share on the Settlement Date).

(e) The Performance Share Units are not transferable and may not be sold, assigned, pledged, hypothecated or otherwise encumbered.

(f) Until the Settlement Date, the Participant will not be treated as a shareholder as to those Ordinary Shares relating to the Performance Share Units. No cash payments will be provided for dividend equivalents or other distributions.

(g) Each Award will be evidenced by a Performance Award Certificate (the "Certificate") issued to the Participant. The Certificate, inclusive of its appendices, will set forth the target number of Performance Share Units granted to the Participant, among other terms and conditions. The Participant must sign and return to the Company the Certificate to indicate that he or she agrees to be bound by the provisions of the Program, including any restrictive covenants set forth in the Certificate. Failure to return a signed Certificate to the Company will result in forfeiture of the Performance Share Units.

(h) Notwithstanding anything herein to the contrary, if a Participant's employment with the Company terminates before the last day of the Performance Cycle, the following rules will apply to the vesting and settlement of the Performance Share Units:

| Termination Event | Impact on Performance Share Units |
|---|---|
| Retirement (solely for Participants whose principal place of work is outside the EU)

Termination by Company without Cause

Termination by | The Participant will vest in a fraction (determined based on actual cumulative Adjusted EPS achieved as of the last full calendar quarter preceding or on the Participant's termination date, as compared to actual cumulative Adjusted EPS achieved for the Performance Cycle) of the Performance Share Units that would have vested and settled following the end of the Performance Cycle based on actual cumulative Adjusted EPS achieved during the Performance Cycle determined in accordance with the Payout Scale, as follows: $$\left(\frac{Cumulative\ Adjusted\ EPS\ as\ of\ quarter\ preceding\ term.\ date}{(Cumulative\ Adjusted\ EPS\ for\ Performance\ Cycle)}\right) x\ Applicable\ Percent$$ |

| Termination Event | Impact on Performance Share Units |
|---|---|
| Participant for Good Reason | To the extent earned, Performance Share Units will be settled in Ordinary Shares in accordance with Section 7(c) above. |
| Death or Total and Permanent Disability | If the Participant's death or Total and Permanent Disability occurs in the first or second calendar years of the Performance Cycle, the Participant (or his or her estate) will vest in the target number of Performance Share Units, which will be settled in Ordinary Shares as soon as administratively feasible following such death or Total and Permanent Disability. If the Participant's death or Total Permanent Disability occurs in the third calendar year of the Performance Cycle, the Participant (or his or her estate) will vest in the target number of Performance Share Units or, if greater, the number of Performance Share Units earned based on actual cumulative Adjusted EPS during the Performance Cycle, determined in accordance with the Payout Scale. Performance Share Units will be settled in Ordinary Shares in accordance with Section 7(c) above. |
| Voluntary Resignation (other than for Good Reason) | Performance Share Units will be forfeited in their entirety. |
| Termination by Company for Cause | Performance Share Units will be forfeited in their entirety. |
| Certain Terminations Following a Change in Control | Following a Change in Control, the Performance Share Units will be subject to the following rules: (i) If the Participant's employment is terminated by the Company without Cause or by the Participant for Good Reason after the Change in Control but prior to the end of the Performance Cycle, the Participant's Performance Share Units will immediately vest at the greater of the target Performance Share Units or the number of units that would have been earned based on the proportion of achievement of the Target Earnings Per Share as of the last full calendar quarter preceding or on the Participant's termination date. Performance Share Units will be settled in Ordinary Shares upon, or as soon as administratively feasible following, the Participant's termination of employment. (ii) If the Participant's employment is terminated by the Company for Cause, by the Participant other than for Good Reason, or by reason of the Participant's death or Total and Permanent Disability, the terms of the Program shall continue to apply to the Performance Share Units as if the Change in Control had not occurred. (iii) If the Company is not the ultimate parent entity following the Change in Control, then all Performance Share Units will be converted into rights to acquire shares of the ultimate parent entity in accordance with Section 5.2 of the Stock Plan, and performance measures will be based on performance of the ultimate parent company (subject to adjustment in accordance with Section 5.2 of the Stock Plan), and not the Company. |

(i)     Notwithstanding the foregoing, in the event an employment agreement or other binding written arrangement between a Participant and the Company provides for more favorable vesting of Performance Share Units upon termination of employment or includes restrictive covenants specifically intended to apply to Awards under the Program,  the provisions of such employment agreement or binding written arrangement will control if such provisions are approved by the Committee on or before the Grant Date (but, with respect to Covered Employees, only to the extent consistent with the requirements applicable to Performance-Based Compensation).

(j)     Notwithstanding the foregoing, if the successor to the Company does not assume and continue this Program substantially in its current form, the Performance Share Units shall become immediately vested at the greater of the target Performance Share Units or the number of units that would have been earned based on the proportion of achievement of the Target Earnings Per Share as of the last full calendar quarter as of or preceding the effective date of the Change in Control.  Such Units will be settled in Ordinary Shares upon, or as soon as practicable following, the Change in Control.

**8.     Performance Measure for Performance Share Units**

The performance measure for the Performance Share Units will be expressed as a target cumulative Adjusted Earnings Per Share for the Performance Cycle, as approved by the Committee by resolution (the "Target Earnings Per Share").

Following the end of the Performance Cycle, the Committee will determine in its sole discretion the payout, which determination shall be final and binding.  Performance Share Units will be subject to complete forfeiture if the Company's performance for the Performance Cycle does not meet or exceed the minimum cumulative Adjusted Earnings Per Share approved by the Committee (the "Threshold Earnings Per Share") by resolution, and the payout for performance at or above that level will be calculated using the "Applicable Percentage" as set forth on the payout scale approved by the Committee by resolution (the "Payout Scale").

**9.     Adjustments to Performance Measures or Results**

The Committee will make appropriate adjustments to actual Adjusted Earnings Per Share to take into account material and/or significant items or events as publicly reported in the Company's annual Form 10-K or quarterly Form 10-Q, including the following and to the extent consistent with the Stock Plan, as amended: gain/loss on disposition of assets or business; extraordinary legal/regulatory judgments, settlements, fines, penalties, and other related expenses; extraordinary market conditions; effects of natural or man-made disasters (e.g., World Trade Center); hyperinflation (e.g., greater than 15%); foreign exchange impact; changes in applicable laws, regulations or accounting principles; and items that are unusual in nature and/or infrequently occurring.  With respect to Covered Employees, any adjustment described above will be made in a manner consistent with Code Section 162(m).  The Committee may not otherwise amend the Payout Scale in a manner that would be adverse to a Participant without the Participant's consent.

**10.     Nominal Value**

As required under the U.K. Companies Act 2006, at the time of settlement of Ordinary Shares under this Program, the settlement of Ordinary Shares shall be subject to the Participant's payment of a nominal value (as determined in the sole discretion of the Company and in accordance with such law, as amended from time to time), and such obligation may be satisfied by the Participant in any manner to be established by the Company in its sole discretion.

**11.     Restrictive Covenants**

Awards under the Program shall be subject to and contingent upon the Participant's acceptance of and compliance with any restrictive covenants set forth in the applicable Performance Award Certificate.

**12.     Administration**

It is expressly understood by the Participant that the Committee has the discretionary authority to administer, construe, and make all determinations necessary or appropriate to the administration of the Program, all of which will be binding upon the Participant.  The Committee may delegate its authority to one or more of its members, or to one or more members of the Company's senior management team, to offer participation in this Program to eligible individuals; provided, however, that the Committee shall not delegate its authority with respect to the participation of any Covered Employee.  The Company shall, as necessary, adopt conforming amendments to this Program as are necessary to comply with applicable law.

**13.     General Provisions**

All obligations of the Company under this Program with respect to payout of Awards, and the corresponding rights granted thereunder, shall be binding on any successor to the Company, whether the existence of such successor is the result of a direct or indirect purchase, merger, consolidation or other acquisition of all or substantially all of the business and/or assets of the Company.

This Program, together with the Stock Plan and any applicable Performance Award Certificate, constitutes a legal document which governs all matters involved with its interpretation and administration and supersedes any writing or representation inconsistent with its terms.

**14.    Reservation and Retention of Company Rights**

The selection of any individual for participation in this Program will not give that Participant any right to be retained in the employ of the Company. No Participant will at any time have a right to be selected for participation in a future performance-based incentive program despite having been selected for participation in this Program or a previous program.

**15.    Code Section 409A**

The Company intends that this Program and the Awards granted hereunder to U.S. participants be interpreted and construed to be exempt from, or otherwise comply with, Code Section 409A to the extent applicable thereto. Notwithstanding any provision of the Program to the contrary, the Program shall be interpreted and construed consistent with this intent, provided that the Company shall not be required to assume any increased economic burden in connection therewith. With respect to any payment subject to Code Section 409A that is triggered by a "specified employee's" "separation from service" under Code Section 409A (as such terms are defined under Code Section 409A), such payment shall be delayed until the earlier to occur of the Participant's death or the date that is six months and one day following the Participant's termination of employment (the "Delay Period"). Upon the expiration of the Delay Period, all payments delayed pursuant to this section shall be paid to the Participant. For purposes of the Program, the terms "retirement," "termination of employment," "terminated," "termination," and variations thereof, as used in this Program, shall mean a "separation from service" under Code Section 409A. The time or schedule of any payout of Ordinary Shares pursuant to Performance Share Units may not be accelerated for U.S. participants except as otherwise permitted under Code Section 409A. Although the Committee intends to administer the Program so that it will comply with the applicable requirements of Code Section 409A, neither the Company nor the Committee represents or warrants that the Program will comply with Code Section 409A or any other provision of federal, state, local, or non-United States law. Neither the Company, its Subsidiaries, nor their respective directors, officers, employees or advisers shall be liable to any Participant (or any other individual claiming a benefit through any Participant) for any tax, interest, or penalties any participant may owe as a result of compensation paid under the Program, and the Company and its subsidiaries shall have no obligation to indemnify or otherwise protect the Participant from the obligation to pay any taxes pursuant to Code Section 409A.

**16.    Definitions**

(a)    "Adjusted Earnings Per Share" or "Adjusted EPS" means the Company's adjusted earnings per share from continuing operations as publicly reported each quarter, and on an annual basis, in the Company's earnings release and Form 10-K.

(b)    "Cause" means such term as defined in any written binding employment agreement entered into between the Participant and the Company and approved by the Committee prior to the Grant Date, or, in the absence of any such agreement or defined term, means the Participant's: (1) performance of a deliberate act of dishonesty, fraud, theft, embezzlement or misappropriation involving the Participant's employment with the Company, or breach of the duty of loyalty to the Company; (2) performance of an act of race, sex, national origin, religion, disability, or age-based discrimination which, after investigation, counsel to the Company reasonably concludes will result in liability being imposed on the Company and/or the Participant; (3) material violation of Company policies and procedures including, but not limited to, the Aon Code of Business Conduct; or (4) performance of a criminal act resulting in a criminal felony charge (or equivalent offense in a non-US jurisdiction) brought against the Participant or a criminal conviction of the Participant (other than a conviction of a minor traffic violation). The existence of "Cause" shall be determined by the Committee in its sole discretion.

(c)    "Code Section 162(m)" means Section 162(m) of the Internal Revenue Code of 1986, as amended, and all regulatory or other interpretive guidance issued thereunder.

(d)    "Code Section 409A" means Section 409A of the Internal Revenue Code of 1986, as amended, and all regulatory or other interpretive guidance issued thereunder.

(e)      "Fair Market Value" means the per share value of the Ordinary Shares as determined by using the closing price of such shares as reported by the New York Stock Exchange on such date (or, if the New York Stock Exchange was not open for trading or the shares were not traded on that day, the next preceding day that the New York Stock Exchange was open for trading and Ordinary Shares were traded).

(f)      "Good Reason" means such term as defined in any written binding employment agreement entered into between the Participant and the Company and approved by the Committee prior to the Grant Date.  If there is no such agreement, or such agreement does not define "Good Reason," the Participant's voluntary termination of employment shall be treated as a voluntary resignation.

(g)      "Retirement" means, solely with respect to a Participant whose principal place of work is outside the European Union, a voluntary termination of employment upon or after the Participant's attainment of age 55. For purposes of this definition, the principal place of work for a Participant on secondment shall be considered to be the Participant's home country.  With respect to a Participant whose principal place of work is within the European Union, the Participant's voluntary termination of employment at any age shall be treated as a voluntary resignation.

(h)      "Total and Permanent Disability" means (1) for US employees, entitlement to long-term disability benefits under the Company's long-term disability program, as amended from time to time, and (2) for non-US employees, such term as established by applicable Company policy or as required by applicable local law or regulations.

# EXHIBIT B

**RESTRICTED STOCK UNIT AGREEMENT
UNDER AMENDED AND RESTATED
AON PLC 2011 INCENTIVE PLAN**

This Restricted Stock Unit Agreement (the "Agreement") is entered into between Aon plc, a public limited company incorporated under English law, and its subsidiary Aon Group, Inc., a Maryland corporation with its principal place of business at 200 East Randolph Street, Chicago, Illinois (collectively, the "Company") and **DANIELLE ROSS** (the "Participant").

The Company desires to grant the Participant restricted stock units ("RSUs"), each RSU representing the right to receive a Class A Ordinary Share of the Company ("Share"), $.01 par value per Share, to encourage the Participant to remain in the service of the Company or its Subsidiaries or Affiliates, to provide the Participant with an incentive to contribute to the financial progress of the Company, and to encourage ownership of Shares by the Participant. Capitalized terms used but not otherwise defined in the Agreement shall have the meaning ascribed to such terms in the Amended and Restated Aon plc 2011 Incentive Plan, as approved by the shareholders of Aon plc on June 24, 2014 (the "Plan").

NOW, THEREFORE, in consideration of the mutual promises hereinafter set forth, the parties hereto agree as follows:

1. **Grant of Restricted Stock Units.** The Company grants under the Plan an award of **518** RSUs on **08/21/2015** (the "Grant Date"). The Participant understands and agrees that the Participant has no obligation to accept this award (as a condition of employment or otherwise), and that the Participant's decision to do so by signing this Agreement, and thereby to accept all of the terms and conditions of this Agreement, is the Participant's knowing and voluntary choice after having had a full and fair opportunity to consult with legal counsel (at the Participant's cost).

2. **Vesting of Restricted Stock Units.** The RSUs will vest in accordance with the schedule set forth in the Participant's account. The Participant must access the www.netbenefits.fidelity.com website and follow the instructions in order to view the vesting schedule. Notwithstanding anything to the contrary in the foregoing, the Committee may cause the RSUs to vest prior to the vesting schedule set forth in the Participant's account in order to satisfy any Tax-Related Items (as defined below) that arise prior to the date of settlement of the RSUs, subject to the limitations set forth in Section 3(d) of this Agreement.

3. **Tax Withholding Obligations.** The Participant acknowledges that, regardless of any action taken by the Company and/or the Participant's employer (the "Employer"), the ultimate liability for all income tax, social insurance, payroll tax, payment on account or other tax-related items related to the Participant's participation in the Plan and legally applicable to the Participant ("Tax-Related Items"), is and remains the Participant's responsibility and may exceed the amount actually withheld by the Company or the Employer. The Participant further acknowledges that the Company and/or the Employer: (a) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the grant of RSUs, including, but not limited to, the grant, vesting or settlement of the RSUs, the issuance of Shares upon settlement of the RSUs, the subsequent sale of Shares acquired pursuant to such vesting/settlement and the receipt of any dividends and/or dividend equivalents; and (b) do not commit to and are under no obligation to structure the terms of the grant or any aspect of the RSUs to reduce or eliminate the Participant's liability for Tax-Related Items or achieve any particular tax result. Further, if the Participant is subject to Tax-Related Items in more than one jurisdiction, the Participant acknowledges that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

   a) Prior to any relevant taxable or tax withholding event, as applicable, the Participant agrees to make adequate arrangements satisfactory to the Company or the Employer, to satisfy all Tax-Related Items. In this regard, the Participant authorizes the Company and/or the Employer, or their respective agents, at the

Company's discretion, to satisfy the obligations with regard to all Tax-Related Items by one or a combination of the following:

**(i)**     withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer; or

**(ii)**    withholding in Shares to be issued upon vesting/settlement of the RSUs; or

**(iii)**   withholding from the proceeds of the sale of Shares acquired upon vesting/settlement of the RSUs either through a voluntary sale or through a mandatory sale arranged by the Company (on the Participant's behalf pursuant to this authorization without further consent); provided, however, that if the Participant is a Section 16 officer under the U.S. Securities Exchange Act of 1934, the Committee shall establish the method of withholding from alternatives (i) – (iii) herein and if the Committee does not exercise its discretion prior to the Tax-Related Items withholding event, then the Participant shall be entitled to elect the method of withholding from the alternatives above.

**b)**   Depending on the withholding method, the Company may withhold or account for Tax-Related Items by considering applicable minimum statutory withholding amounts or other applicable withholding rates, including maximum applicable rates, in which case, the Participant will receive a refund of any over-withheld amount in cash and will have no entitlement to the equivalent Shares. If the obligation for Tax-Related Items is satisfied by withholding in Shares, for tax purposes, the Participant shall be deemed to have been issued the full number of Shares subject to the vested RSUs, notwithstanding that a number of Shares are held back solely for the purpose of paying the Tax-Related Items.

**c)**   Finally, the Participant shall pay to the Company and/or the Employer any amount of Tax-Related Items that the Company and/or the Employer may be required to withhold as a result of the Participant's participation in the Plan that cannot be satisfied by the means previously described. The Company may refuse to deliver the Shares or the proceeds of the sale of Shares if the Participant fails to comply with the Participant's obligations in connection with the Tax-Related Items.

**d)**   Notwithstanding anything in this Section 3 to the contrary, to avoid a prohibited distribution under Code Section 409A, if the RSUs underlying the RSUs will be withheld (or sold on the Participant's behalf) to satisfy any Tax-Related Items arising prior to the date of settlement of the RSUs for any portion of the RSUs that is considered "nonqualified deferred compensation" subject to Code Section 409A ("Deferred Compensation"), then the number of Shares withheld (or sold on the Participant's behalf) shall not exceed the number of Shares that equals the liability for the Tax-Related Items.

**4.**   **Nominal Value.**   At the time of settlement, this Award will be subject to the Participant's appropriate undertaking to pay to Aon plc a nominal value of $.01 per share (as determined in the sole discretion of Aon plc, subject to the provisions of Aon plc's articles of association and the U.K. Companies Act 2006, as amended from time to time), and such obligation may be satisfied by the Participant in cash in any manner to be established by Aon plc in its sole discretion, including but not limited to withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer.

**5.**   **Effect of Termination of Employment.**
   **a)**   <u>**Voluntary termination prior to Retirement.**</u>   In the event that the Participant's Termination Date occurs because of the Participant's voluntary termination prior to Retirement (as defined in Section 5(d) below), the unvested portion of the RSU will be forfeited.
   **b)**   <u>**Termination due to death.**</u>   In the event that the Participant's Termination Date occurs due to the Participant's death, all unvested RSUs will be fully vested immediately and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof.
   **c)**   <u>**Termination due to disability.**</u>   In the event that the Participant's Termination Date occurs due to the Participant's disability, all unvested RSUs will be fully vested immediately and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof. "Disability" for purposes of this Agreement, shall mean disability pursuant to the standards set forth in, or

in circumstances where the Participant qualifies for receipt of benefits under, the long-term disability plan of the Employer.  In the absence of such a plan, the Committee shall have exclusive discretion to determine whether a Participant's employment is terminated due to disability.

**d)** **Involuntary termination (other than for cause) or voluntary termination on or after Retirement.**   In the event that the Participant's Termination Date occurs as a result of the Participant's involuntary termination (other than for cause) or the Participant's voluntary termination on or after Retirement, the RSUs shall be immediately vested pro rata and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof.   The pro rata portion of the vested RSUs shall be calculated by multiplying (i) the number of RSUs subject to the award, by (ii) a fraction, the numerator of which shall be the number of days that have elapsed between the Grant Date and the date of the Participant's termination, and the denominator of which shall be the total number of days in the vesting schedule set forth in the Participant's account, and subtracting from the resulting product the number of RSUs previously vested.  The remaining unvested portion of the RSU shall be forfeited.  For purposes of this Agreement, "Retire" or "Retirement" means a voluntary termination of employment on or after the Participant's 55th birthday for employees whose principal place of work is outside of the European Union ("EU").  A Participant on secondment will be subject to the vesting rule applicable to his or her home country.  For a Participant whose principal place of work is inside the EU, the unvested portion of the RSU will be forfeited.  The Committee shall have exclusive discretion to determine a Participant's principal place of work for purposes of this Section 5(d).

**e)** **Termination for cause.**  In the event that the Participant's Termination Date occurs because the Participant is terminated for cause, all unvested shares shall be forfeited.  Termination for cause shall mean performing a deliberate act of dishonesty, fraud, theft, embezzlement, or misappropriation involving the Participant's employment with the Company or its Subsidiaries or Affiliates, or breach of the duty of loyalty to the Company, its Subsidiaries or Affiliates; performing an act of race, sex, national origin, religion, disability, or age-based discrimination which after investigation, counsel to the Company reasonably concludes will result in liability being imposed on the Company, its Subsidiaries or Affiliates and / or the Participant; material violation of Company policies and procedures including, but not limited to, the Aon Code of Business Conduct; material non-compliance with any terms of this Agreement or an employment agreement; or, performing any criminal act resulting in a criminal felony charge brought against the Participant or a criminal conviction of the Participant (other than conviction of a minor traffic violation).

**6.** **Receipt by the Participant of the Prospectus.**   The Participant acknowledges receipt of the Plan prospectus that contains the entire Plan, and is incorporated herein by reference.  The Participant represents and warrants that the Participant has read the Plan and agrees that all RSUs awarded under it shall be subject to all of the terms and conditions of the Plan.

**7.** **Issuance of Shares.**   RSUs shall be converted to Shares as of the vesting date. Shares will be issued to the Participant as soon as practicable (within 60 days) after the vesting date, subject to Sections 3 and 4 of this Agreement.  Notwithstanding the foregoing, for purposes of complying with Code Section 409A, if the RSUs are considered Deferred Compensation and the Shares are to be settled in connection with a termination contemplated under Section 5(c) or 5(d), the Company and the Participant shall take all steps necessary (including with regard to any post-termination services by the Participant) to ensure that a termination contemplated under Section 5 constitutes a "separation from service" within the meaning of Code Section 409A.  In addition, if the RSUs are Deferred Compensation, the RSUs are settled upon the Participant's separation from service and the Participant is a "specified employee," within the meaning of Code Section 409A, on the date the Participant experiences a separation from service, then the RSUs shall be settled on the first business day of the seventh month following the Participant's separation from service, or, if earlier, on the date of the Participant's death, to the extent such delayed payment is required in order to avoid a prohibited distribution under Code Section 409A.

**8.** **Rights as Shareholder.**  The Participant shall not have voting or any other right as a shareholder of Aon plc with respect to the RSUs. Upon issuance of the Shares pursuant to and in accordance with Section 7, the Participant will obtain full voting and other rights as a shareholder of Aon plc.

9.  **Business Considerations; Restrictive Covenants; Acknowledgments; Injunctive Relief; Confidential Information; Incentive Repayment Policy.**

a)  **Business Considerations.**  Aon plc and its Subsidiary, Aon Group, Inc., a Maryland corporation with its corporate and business headquarters in Chicago, Illinois, and Aon Group, Inc.'s Subsidiaries and Affiliates (and divisions thereof) (collectively, with Aon plc, "Aon") are in the business of providing conventional and alternative risk management products and services covering the businesses of insurance brokerage, reinsurance brokerage, benefits consulting, compensation consulting, human resources consulting, human resources and benefits outsourcing management, investigatory and security consulting, managing underwriting and related services, including accounting, actuarial, claims management and handling, and information systems on behalf of commercial and individual clients which are national and international and are not confined to any geographic area (the "Business").  The Participant further acknowledges that the Participant's material employment duties and responsibilities, including without limitation with respect to Aon clients, prospective clients, and other employees, span geographic areas that extend well beyond the state in which the Participant is physically employed and resides.  An essential element of the Business is the development and maintenance of personal contacts and relationships with clients and prospective clients.  Aon invests considerable time and money to develop and maintain personal contacts and relationships with clients and prospective clients. Aon invests considerable time and money to develop and maintain client relationships, including payment of employees' salaries, benefits, travel, entertainment and other business expenses and assistance in servicing clients by making available to its employees specially developed and researched industry data, client-specific information, legal support, accounting support, marketing, advertising and other corporate services, as well as providing training and professional development and valuable confidential business and professional information, toward the development and maintenance of its client relationships and related goodwill.  While these clients and prospective clients may be secured or serviced by Aon employees, including the Participant, the Participant acknowledges that such clients and prospective clients remain at all times the clients and prospective clients of Aon and that the goodwill engendered by the relationships is intended to inure only to the benefit of Aon; the goodwill is owned by Aon; and Aon shall be the sole beneficiary of such goodwill during and after termination of the Participant's  employment with Aon.  In addition, the Participant acknowledges that the Participant has acquired and/or will acquire, solely for the purpose of furthering the Business, knowledge of Aon's confidential and proprietary information; the Participant further acknowledges Aon's legitimate interest in safeguarding confidential and proprietary information from disclosure.

The personal identification of clients of Aon with an employee, including the Participant, creates the potential for the Participant's appropriation of the benefits of the relationships developed with clients on behalf of and at the expense of Aon.  Since Aon would suffer irreparable harm if the Participant left its employ and solicited the Business of the clients and prospective clients of Aon, or solicited the employees of Aon, it is reasonable to protect Aon against certain competitive activities by the Participant for a limited period of time after the Participant leaves employment so that Aon may renew or restore its business relationship with its clients, prospective clients and employees.  Consequently, the Participant is willing to enter into the covenants set forth herein in order to provide Aon with reasonable protection for its client, prospective client and employee relationships and its investment therein as above-described, its goodwill, and its confidential and proprietary information.

b)  **Covenant Not to Solicit Clients and Prospective Clients.**  The Participant hereby covenants and agrees that, except with the prior written consent of Aon, the Participant (on the Participant's own behalf or on behalf of any other person or entity) will not, during the course of employment, and for a period of two (2) years after the Participant's Termination Date, directly or indirectly, call upon, solicit, accept, engage in, service or perform, other than on behalf of Aon, any business of the same type or kind as the Business performed by Aon from or with respect to (i) clients of Aon with respect to whom the Participant provided services, either alone or with others, or had a business relationship, or on whose account the Participant worked or became familiar, or supervised directly or indirectly the servicing activities related to such clients, during the twenty-four (24) months prior to the Participant's Termination Date and, further

provided, such clients were clients of Aon either on the Participant's Termination Date or within twelve (12) months prior to such Termination Date and (ii) prospective clients of Aon which the Participant alone, in combination with others, or in a supervisory capacity, solicited during the six (6) months prior to the Participant's Termination Date and to which a proposal for services was rendered by Aon during the six (6) months prior to the Participant's Termination Date. "Client" means any person or entity listed on the books of Aon as such.

c) **Covenant Not to Solicit Employees.** The Participant hereby also agrees, for the duration of the term of the covenant set forth in Section 9(b) herein not to, directly or indirectly, solicit, induce, or cause any person or other entity to solicit, induce, any employee of Aon to work for the Participant or for any third party or entity, or to leave the employ of Aon.

d) **Other Covenants.** Notwithstanding any other language in the Agreement, including, but not limited to that found in Section 10(b), this Agreement does not preclude the enforceability of any restrictive covenant provision contained in any prior or subsequent agreement entered into by the Participant, (any such covenant, an "Other Covenant"), including without limitation any covenant contained in any Confidentiality and Non-Solicitation Agreement between the Participant and any Aon entity, and further including without limitation any covenant not to compete, to solicit or perform services for clients, or to solicit employees, any confidentiality or intellectual property covenant, and any covenant with respect to a pre-resignation notice period. Further, no Other Covenant precludes the enforceability of any provision contained in this Agreement.

e) **Acknowledgments.** Aon and the Participant acknowledge and agree that the covenants contained in Sections 9(b) and 9(c) herein are necessary and reasonable for the protection of Aon and are reasonably limited with respect to the activities prohibited, duration, geographical scope and their effect on the Participant and the public. The parties acknowledge that the purpose and effect of the covenants simply are to protect Aon for a limited period of time from unfair competition by the Participant.

The Participant acknowledges that there is no general geographical restriction contained in the preceding paragraphs because the restrictions apply only to the specified clients of Aon and because the Participant's material duties, responsibilities and relationships with Aon clients, prospective clients and employees are not limited to any particular geographic area. Nothing in this Agreement shall prohibit the Participant from obtaining a livelihood for himself or herself or his or her family by being engaged in the Business. The intent of the parties is that the Participant's restrictive covenant is limited only to those clients as above specified.

f) **Company's Right to Injunctive Relief; Attorneys' Fees.** The Participant acknowledges that the Participant's services to Aon are of a unique character which gives them a special value to Aon, the loss of which cannot reasonably or adequately be compensated in damages in an action at law, and that a breach of this Agreement will result in irreparable and continuing harm to Aon, and that therefore, in addition to any other remedy which Aon may have at law or in equity, Aon shall be entitled to temporary, preliminary and permanent injunctive relief for a breach or threatened breach of this Agreement by the Participant (without the need to post any bond or other security). The parties acknowledge and agree that Aon Group, Inc. and the Participant's Employer each is an intended third-party beneficiary of this Agreement, and may be a named plaintiff in any subsequent suit brought by the Company to enforce the terms of this Agreement. In the event that Aon brings an action to enforce the terms and conditions of the Agreement, the Participant shall pay the costs and expenses incurred by Aon in bringing such action, including without limitation attorneys' and other legal fees.

g) **Trade Secrets and Confidential Information.** The Participant acknowledges that Aon's business depends to a significant degree upon the possession of information which is not generally known to others, and that the profitability of such business requires that this information remain proprietary to Aon. The Participant shall not, except as required in the course of employment by Aon or by applicable law (provided that the Participant shall first give Aon plc reasonable advance written notice of any subpoena or other legal disclosure requirement (Attn: General Counsel), with a contemporaneous copy to Aon Group, Inc.), disclose or use during or subsequent to the course of employment, any trade secrets or confidential or

proprietary information relating to the business of Aon of which the Participant becomes aware by reason of being employed or to which the Participant gains access during his or her employment by Aon and which has not been publicly disclosed (it being understood and agreed that trade secrets and confidential or proprietary information shall remain subject to this Section 9(g), and shall not be considered "publicly disclosed" for purposes of the preceding clause, if any public disclosure thereof results from a breach by the Participant of this provision, or a breach by the Participant or another person of some other contractual or legal obligation to Aon).

Such information includes, without limitation, lists of clients and prospective clients; contract terms and conditions; client information relating to services, insurance, benefits programs, employees, finances, and compensation; copyrighted materials; corporate, management and business plans and strategies; compensation and revenues; methods and strategies of marketing; market research and data; technical know-how; computer software and manuals; policies and procedures; and the conduct of the affairs of Aon. All records and equipment and other materials constituting or relating in any way to any trade secrets, confidential or proprietary information, or relating to clients or business of Aon, and all other Aon property, shall be and remain the sole property of Aon during and after the end of employment and shall be returned to Aon by the Participant immediately upon its request or the Participant's Termination Date (whichever is earlier).

h) **Incentive Repayment Policy.** If the Participant has been designated and notified by the board of directors of Aon plc that he or she is a reporting officer for purposes of Section 16 of the U.S. Securities Exchange Act of 1934, the Participant is subject to Aon's Incentive Repayment Policy (the "Policy"). The Policy provides that Aon plc will have the discretion to cancel or require reimbursement to the Company of the long-term equity based incentive award set forth in this Agreement if the grant or vesting was based on the achievement of financial results that were subsequently restated. The Participant can obtain a copy of the Policy from the Global Compensation team. If the Participant is subject to the Policy, by accepting this Agreement, the Participant hereby agrees and acknowledges that he or she will be bound by it.

10. **Other Provisions.**

   a) **Plan Terms Take Precedence over Agreement Terms.** RSUs are granted pursuant to the Plan, the terms and conditions of which are incorporated into this Agreement by reference. If there are any inconsistencies between the terms of this Agreement and the Plan, the terms of the Plan will govern.

   b) **Prior Agreement(s) Will Not Control.** The Participant's acceptance of this Agreement will supersede provisions of any prior agreement that could be construed as governing the terms of this grant.

   c) **Section 409A.** The RSUs and amounts payable thereunder are intended to be exempt from or compliant with Code Section 409A and the U.S. Treasury Regulations relating thereto so as not to subject the Participant to the payment of additional taxes and interest under Code Section 409A or other adverse tax consequences. In furtherance of this intent, the provisions of this Agreement will be interpreted, operated, and administered in a manner consistent with these intentions. The Committee may modify the terms of this Agreement, the Plan or both, without the consent of the Participant, in the manner that the Committee may determine to be necessary or advisable in order to comply with Code Section 409A or to mitigate any additional tax, interest and/or penalties or other adverse tax consequences that may apply under Code Section 409A if compliance is not practical. This Section 10(c) does not create an obligation on the part of the Company to modify the terms of this Agreement or the Plan and does not guarantee that the RSUs or the delivery of Shares upon vesting/settlement of the RSUs will not be subject to taxes, interest and penalties or any other adverse tax consequences under Code Section 409A. Nothing in this Agreement shall provide a basis for any person to take any action against the Company or any of its Subsidiaries or Affiliates based on matters covered by Code Section 409A, including the tax treatment of any amounts paid under this Agreement, and neither the Company nor any of its Subsidiaries or Affiliates will have any liability under any circumstances to the Participant or any other party if the RSUs, the delivery of Shares upon vesting/settlement of the RSUs or other payment or tax event hereunder that is intended to be exempt from, or compliant with, Code

Section 409A, is not so exempt or compliant or for any action taken by the Committee with respect thereto. Further, settlement of any portion of the RSUs that is Deferred Compensation may not be accelerated or postponed except to the extent permitted by Code Section 409A.

d) **Restriction on Transfer.** RSUs may not be sold, transferred, pledged, assigned, or otherwise alienated at any time.

e) **Right of Employment.** Grants of RSUs under the Plan and of this Agreement do not confer upon the Participant any right to continue in the employ or service of the Employer. This Agreement shall survive any termination of the Participant's employment for any or no reason.

f) **Electronic Delivery and Acceptance.** The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means. The Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

g) **Need to Accept Grant.** The Participant acknowledges that this grant must be accepted within ninety (90) days of the Grant Date in order to be eligible to receive any benefits from this grant. If this grant is not accepted within the ninety (90)-day period specified in the foregoing sentence, all benefits under this grant may be forfeited, as determined in the sole discretion of the Committee. To accept this grant, the Participant must access the www.netbenefits.fidelity.com website and follow the instructions for acceptance. If this grant was distributed to the Participant via mail, the Participant must sign the Agreement and return it to Aon's Executive Compensation Department within ninety (90) days.

h) **Waiver; Section Headings.** Waiver of any term or condition of this Agreement by any party shall not be construed as a waiver of a subsequent breach or failure of the same term or condition, or a waiver of any other term or condition of this Agreement. Any waiver must be in writing. The Section headings in this Agreement are for convenience only and are not to be used in interpreting this Agreement.

i) **Severability.** To the extent that the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable by a court of competent jurisdiction for any reason, such term, word, phrase, clause or sentence shall be modified in such manner so as to afford the Company the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws. If, however, a court of competent jurisdiction finds that any such term, word, phrase, clause or sentence cannot be so modified and thus made enforceable, or otherwise declines for any reason to do so, such term, word, phrase, clause or sentence shall be deemed severed from this Agreement and of no force and effect, and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent.

j) **Governing Law.** The validity, interpretation, instruction, performance, enforcement and remedies of or relating to this Agreement, and the rights and obligations of the parties hereunder, shall be governed by and construed in accordance with the substantive internal laws of the State of Illinois, without regard to the conflict of law principles, rules or statutes of any jurisdiction. The foregoing provisions of this Section 10(j) shall apply irrespective of whether the Participant is a party to or bound by another restrictive covenant of any kind that may be governed by the laws of another jurisdiction (if any).

k) **Venue and Jurisdiction.** Venue for any legal proceedings instituted related to this Agreement shall be exclusively in the state and/or federal courts located in Cook County, Illinois, and the Participant hereby knowingly, voluntarily and irrevocably agrees, consents and submits to the exclusive jurisdiction and venue of such courts within the State of Illinois. The Participant further hereby knowingly, voluntarily and irrevocably waives, and agrees not to assert, any objection, challenge or defense to such exclusive venue or jurisdiction (including without limitation any defense of forum non conveniens), and further agrees not to file any claim or action related to this Agreement in any other jurisdiction or venue. The foregoing provisions of this Section 10(k) shall apply irrespective of whether the Participant is a party to or bound by another restrictive covenant of any kind that may

provide for or permit venue or jurisdiction with respect to such other restrictive covenant in any other court or forum (if any).

l)   **Notice.**   All notices given hereunder shall be in writing and, if intended for Aon plc, shall be addressed to it or delivered to it at its principal office in London, England to the attention of the General Counsel or its principal office in Chicago, Illinois to the attention of the Chief Human Resources Officer.  If intended for the Participant, notices shall be delivered personally or shall be addressed (if sent by mail) to the Participant's then current residence address as shown on the Company's records, or to such other address as the Participant directs in a notice to the Company.  All notices shall be deemed to be given on the date received at the address of the addressee or, if delivered personally, on the date delivered.

m)  **No Advice Regarding Grant.** The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding the Participant's participation in the Plan, or the acquisition or sale of the underlying Shares.  The Participant is hereby advised to consult with his or her own personal tax, legal and financial advisors regarding his or her participation in the Plan and execution of this Agreement, before executing this Agreement or otherwise taking any action at any time related to the Plan.

n)  **Imposition of Other Requirements.**  The Company reserves the right to impose other requirements on the Participant's participation in the Plan, on the RSUs and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable for legal or administrative reasons, and to require the Participant to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

IN WITNESS WHEREOF, the parties have accepted this Agreement as of the date hereof.

**AON PLC**

*Gregory C. Case*

Gregory C. Case
President and Chief Executive Officer

**AON GROUP, INC.**

*Gregory C. Case*

Gregory C. Case
President and Chief Executive Officer

`Signed Electronically`                                    `09/09/2015`
**RSU Recipient (Participant)**                            **Date**

`FP94Z055`

`09/09/2015 08:35 am U.S. Eastern Standard Time`

`ACCEPTED`

**RESTRICTED STOCK UNIT AGREEMENT**
**UNDER AMENDED AND RESTATED**
**AON PLC 2011 INCENTIVE PLAN**

This Restricted Stock Unit Agreement (the "Agreement") is entered into between Aon plc, a public limited company incorporated under English law, and its Subsidiary Aon Group, Inc., a Maryland corporation with its principal place of business at 200 East Randolph Street, Chicago, Illinois (collectively, the "Company") and **DANIELLE ROSS** (the "Participant").

The Company desires to grant the Participant restricted stock units ("RSUs"), each RSU representing the right to receive a Class A Ordinary Share of the Company ("Share"), $.01 par value per Share, to encourage the Participant to remain in the service of the Company or its Subsidiaries or Affiliates, to provide the Participant with an incentive to contribute to the financial progress of the Company, and to encourage ownership of Shares by the Participant. Capitalized terms used but not otherwise defined in the Agreement shall have the meaning ascribed to such terms in the Amended and Restated Aon plc 2011 Incentive Plan, as amended from time to time (the "Plan").

NOW, THEREFORE, in consideration of the mutual promises hereinafter set forth, the parties hereto agree as follows:

1. **Grant of Restricted Stock Units.** The Company grants under the Plan an award of **712** RSUs on **05/20/2016** (the "Grant Date"). The Participant understands and agrees that the Participant has no obligation to accept this award (as a condition of employment or otherwise), and that the Participant's decision to do so by signing this Agreement, and thereby to accept all of the terms and conditions of this Agreement, is the Participant's knowing and voluntary choice after having had a full and fair opportunity to consult with legal counsel (at the Participant's cost).

2. **Vesting of Restricted Stock Units.** The RSUs will vest in accordance with the schedule set forth in the Participant's account. The Participant must access the www.netbenefits.fidelity.com website and follow the instructions in order to view the vesting schedule. Notwithstanding anything herein to the contrary, the Committee may cause the RSUs to vest prior to the date(s) set forth in the vesting schedule in order to satisfy any Tax-Related Items (as defined below) that arise prior to the date of settlement of the RSUs, subject to the limitations set forth in Section 3(d) of this Agreement.

3. **Tax Withholding Obligations.** The Participant acknowledges that, regardless of any action taken by the Company and/or the Participant's employer (the "Employer"), the ultimate liability for all income tax, social insurance, payroll tax, payment on account or other tax-related items related to the Participant's participation in the Plan and legally applicable to the Participant ("Tax-Related Items"), is and remains the Participant's responsibility and may exceed the amount actually withheld by the Company or the Employer. The Participant further acknowledges that the Company and/or the Employer: (a) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the grant of RSUs, including, but not limited to, the grant, vesting or settlement of the RSUs, the issuance of Shares upon settlement of the RSUs, the subsequent sale of Shares acquired pursuant to such vesting/settlement and the receipt of any dividends and/or dividend equivalents; and (b) do not commit to and are under no obligation to structure the terms of the grant or any aspect of the RSUs to reduce or eliminate the Participant's liability for Tax-Related Items or achieve any particular tax result. Further, if the Participant is subject to Tax-Related Items in more than one jurisdiction, the Participant acknowledges that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

   a) Prior to any relevant taxable or tax withholding event, as applicable, the Participant agrees to make adequate arrangements satisfactory to the Company or the Employer, to satisfy all Tax-Related Items. In this regard, the Participant authorizes the Company and/or the Employer, or their respective agents, at the Company's discretion, to satisfy the obligations with regard to all Tax-Related Items by one or a combination of the following:

      (i) withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer; or

      (ii) withholding in Shares to be issued upon vesting/settlement of the RSUs; or

      (iii) withholding from the proceeds of the sale of Shares acquired upon vesting/settlement of the RSUs either through a voluntary sale or through a mandatory sale arranged by the Company (on the Participant's behalf pursuant to this authorization without further consent); provided, however, that if the Participant is a Section 16 officer under the U.S. Securities Exchange Act of 1934, the Committee shall establish the method of withholding from alternatives (i) – (iii) herein and if the Committee does not exercise its discretion prior to the Tax-Related Items withholding event, then the Participant shall be entitled to elect the method of

- 1 -

withholding from the alternatives above.

b) Depending on the withholding method, the Company may withhold or account for Tax-Related Items by considering applicable minimum statutory withholding amounts or other applicable withholding rates, including maximum applicable rates, in which case, any over-withheld amount will be refunded to the Participant in cash by the Company or the Employer (with no entitlement to the equivalent Shares) or if not refunded, the Participant may seek a refund from the local tax authorities. If the obligation for Tax-Related Items is satisfied by withholding in Shares, for tax purposes, the Participant shall be deemed to have been issued the full number of Shares subject to the vested RSUs, notwithstanding that a number of Shares are held back solely for the purpose of paying the Tax-Related Items.

c) Finally, the Participant shall pay to the Company and/or the Employer any amount of Tax-Related Items that the Company and/or the Employer may be required to withhold as a result of the Participant's participation in the Plan that cannot be satisfied by the means previously described. The Company may refuse to deliver the Shares or the proceeds of the sale of Shares if the Participant fails to comply with the Participant's obligations in connection with the Tax-Related Items.

d) Notwithstanding anything in this Section 3 to the contrary, to avoid a prohibited distribution under Code Section 409A, if Shares underlying the RSUs will be withheld (or sold on the Participant's behalf) to satisfy any Tax-Related Items arising prior to the date of settlement of the RSUs for any portion of the RSUs that is considered "nonqualified deferred compensation" subject to Code Section 409A ("Deferred Compensation"), then the number of Shares withheld (or sold on the Participant's behalf) shall not exceed the number of Shares that equals the liability for the Tax-Related Items.

4. **Nominal Value.** At the time of settlement, this Award will be subject to the Participant's appropriate undertaking to pay to Aon plc a nominal value of $.01 per share (as determined in the sole discretion of Aon plc, subject to the provisions of Aon plc's articles of association and the U.K. Companies Act 2006, as amended from time to time), and such obligation may be satisfied by the Participant in cash in any manner to be established by Aon plc in its sole discretion, including but not limited to withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer.

5. **Effect of Termination of Employment.**

a) **Voluntary termination (other than Retirement).** In the event that the Participant's Termination Date occurs because of the Participant's voluntary termination that does not qualify as Retirement (as defined in Section 5(d) below), the unvested portion of the RSU will be forfeited.

b) **Termination due to death.** In the event that the Participant's Termination Date occurs due to the Participant's death, all unvested RSUs will be fully vested immediately and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof.

c) **Termination due to disability.** In the event that the Participant's Termination Date occurs due to the Participant's disability, all unvested RSUs will be fully vested immediately and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof. "Disability" for purposes of this Agreement, shall mean disability pursuant to the standards set forth in, or in circumstances where the Participant qualifies for receipt of benefits under, the long-term disability plan of the Employer. In the absence of such a plan, the Committee shall have exclusive discretion to determine whether a Participant's employment is terminated due to disability.

d) **Involuntary termination (other than for Cause) or Retirement.** In the event that the Participant's Termination Date occurs as a result of the Participant's involuntary termination by the Company or Employer (other than for Cause) or the Participant's Retirement, the RSUs shall be immediately vested pro rata and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof. The pro rata portion of the RSUs that shall vest shall be calculated by multiplying (i) the number of RSUs subject to the award, by (ii) a fraction, the numerator of which shall be the number of days that have elapsed between the Grant Date and the date of the Participant's termination, and the denominator of which shall be the total number of days covered by the vesting schedule set forth in the Participant's account, and subtracting from the resulting product the number of RSUs previously vested. The remaining unvested portion of the RSUs shall be forfeited. For purposes of this Agreement, "Retire" or "Retirement" means a voluntary termination of employment on or after the Participant's 55th birthday for employees whose principal place of work is outside of the European Union ("EU"). A Participant on secondment will be subject to the vesting rule applicable to his or her home country. Participants whose principal place of work is

inside the EU shall not be eligible for Retirement, and their voluntary termination at any age shall be treated in accordance with Section 5(a). The Committee shall have exclusive discretion to determine a Participant's principal place of work for purposes of this Section 5(d).

e) **Termination for Cause.** In the event that the Participant's Termination Date occurs because the Participant is terminated by the Company or Employer for Cause, all unvested RSUs shall be forfeited. "Cause" shall mean the Participant's (i) performing a deliberate act of dishonesty, fraud, theft, embezzlement, or misappropriation involving the Participant's employment with the Company, its Subsidiaries or Affiliates, or breach of the duty of loyalty to the Company, its Subsidiaries or Affiliates; (ii) performing an act of race, sex, national origin, religion, disability, or age-based discrimination which after investigation, counsel to the Company reasonably concludes will result in liability being imposed on the Company, its Subsidiaries or Affiliates and / or the Participant; (iii) material violation of Company policies and procedures including, but not limited to, the Aon Code of Business Conduct; (iv) material non-compliance with any terms of this Agreement or an employment agreement; or (v) performing any criminal act resulting in a criminal felony charge brought against the Participant or a criminal conviction of the Participant (other than conviction of a minor traffic violation).

6. **Receipt by the Participant of the Prospectus.** The Participant acknowledges receipt of the Plan prospectus that contains the entire Plan, and is incorporated herein by reference. The Participant represents and warrants that the Participant has read the Plan and agrees that all RSUs awarded under it shall be subject to all of the terms and conditions of the Plan.

7. **Issuance of Shares.** RSUs shall be converted to Shares as of the applicable vesting date. Shares will be issued to the Participant as soon as practicable (within 60 days) after the vesting date, subject to Sections 3 and 4 of this Agreement. Notwithstanding the foregoing, for purposes of complying with Code Section 409A, if the RSUs are considered Deferred Compensation and the Shares are to be settled in connection with a termination contemplated under Section 5(c) or 5(d), the Company and the Participant shall take all steps necessary (including with regard to any post-termination services by the Participant) to ensure that a termination contemplated under Section 5 constitutes a "separation from service" within the meaning of Code Section 409A. In addition, if the RSUs are Deferred Compensation, the RSUs are settled upon the Participant's separation from service and the Participant is a "specified employee," within the meaning of Code Section 409A, on the date the Participant experiences a separation from service, then the RSUs shall be settled on the first business day of the seventh month following the Participant's separation from service, or, if earlier, on the date of the Participant's death, to the extent such delayed payment is required in order to avoid a prohibited distribution under Code Section 409A.

8. **Rights as Shareholder.** The Participant shall not have voting or any other rights as a shareholder of Aon plc with respect to the RSUs. Upon issuance of the Shares pursuant to and in accordance with Section 7, the Participant will obtain full voting and other rights as a shareholder of Aon plc.

9. **Business Considerations; Restrictive Covenants; Acknowledgments; Injunctive Relief; Confidential Information; Incentive Repayment Policy.**

a) **Business Considerations.** Aon plc and its Subsidiary, Aon Group, Inc., a Maryland corporation with its corporate and business headquarters in Chicago, Illinois, and Aon Group, Inc.'s Subsidiaries and Affiliates (and divisions thereof) (collectively, with Aon plc, "Aon") are in the business of providing conventional and alternative risk management products and services covering the businesses of insurance brokerage, reinsurance brokerage, benefits consulting, compensation consulting, human resources consulting, human resources and benefits outsourcing management, investigatory and security consulting, managing underwriting and related services, including accounting, actuarial, claims management and handling, and information systems on behalf of commercial and individual clients which are national and international and are not confined to any geographic area (the "Business"). The Participant further acknowledges that the Participant's material employment duties and responsibilities, including without limitation with respect to Aon clients, prospective clients, and other employees, span geographic areas that extend well beyond the state in which the Participant is physically employed and resides. An essential element of the Business is the development and maintenance of personal contacts and relationships with clients and prospective clients. Aon invests considerable time and money to develop and maintain personal contacts and relationships with clients and prospective clients. Aon invests considerable time and money to develop and maintain client relationships, including payment of employees' salaries, benefits, travel, entertainment and other business expenses and assistance in servicing clients by making available to its employees specially developed and researched industry data, client-specific information, legal support, accounting support, marketing, advertising and other corporate services, as well as providing training and professional development and valuable confidential business and professional information, toward the development and maintenance of its client relationships and related goodwill. While these clients and

- 3 -

prospective clients may be secured or serviced by Aon employees, including the Participant, the Participant acknowledges that such clients and prospective clients remain at all times the clients and prospective clients of Aon and that the goodwill engendered by the relationships is intended to inure only to the benefit of Aon; the goodwill is owned by Aon; and Aon shall be the sole beneficiary of such goodwill during and after termination of the Participant's employment with Aon. In addition, the Participant acknowledges that the Participant has acquired and/or will acquire, solely for the purpose of furthering the Business, knowledge of Aon's confidential and proprietary information; the Participant further acknowledges Aon's legitimate interest in safeguarding confidential and proprietary information from disclosure.

The personal identification of clients of Aon with an employee, including the Participant, creates the potential for the Participant's appropriation of the benefits of the relationships developed with clients on behalf of and at the expense of Aon. Since Aon would suffer irreparable harm if the Participant left its employ and solicited the Business of the clients and prospective clients of Aon, or solicited the employees of Aon, it is reasonable to protect Aon against certain competitive activities by the Participant for a limited period of time after the Participant leaves employment so that Aon may renew or restore its business relationship with its clients, prospective clients and employees. Consequently, the Participant is willing to enter into the covenants set forth herein in order to provide Aon with reasonable protection for its client, prospective client and employee relationships and its investment therein as above-described, its goodwill, and its confidential and proprietary information.

b) **Covenant Not to Solicit Clients and Prospective Clients.** The Participant hereby covenants and agrees that, except with the prior written consent of Aon, the Participant (on the Participant's own behalf or on behalf of any other person or entity) will not, during the course of employment, and for a period of two (2) years after the Participant's Termination Date, directly or indirectly, call upon, solicit, accept, engage in, service or perform, other than on behalf of Aon, any business of the same type or kind as the Business performed by Aon from or with respect to (i) clients of Aon with respect to whom the Participant provided services, either alone or with others, or had a business relationship, or on whose account the Participant worked or became familiar, or supervised directly or indirectly the servicing activities related to such clients, during the twenty-four (24) months prior to the Participant's Termination Date and, further provided, such clients were clients of Aon either on the Participant's Termination Date or within twelve (12) months prior to such Termination Date and (ii) prospective clients of Aon which the Participant alone, in combination with others, or in a supervisory capacity, solicited during the six (6) months prior to the Participant's Termination Date and to which a proposal for services was rendered by Aon during the six (6) months prior to the Participant's Termination Date. "Client" means any person or entity listed on the books of Aon as such.

c) **Covenant Not to Solicit Employees.** The Participant hereby also agrees, for the duration of the term of the covenant set forth in Section 9(b) herein not to, directly or indirectly, solicit, induce, or cause any person or other entity to solicit, induce, any employee of Aon to work for the Participant or for any third party or entity, or to leave the employ of Aon.

d) **Other Covenants.** Notwithstanding any other language in the Agreement, including, but not limited to that found in Section 10(b), this Agreement does not preclude the enforceability of any restrictive covenant provision contained in any prior or subsequent agreement entered into by the Participant, (any such covenant, an "Other Covenant"), including without limitation any covenant contained in any Confidentiality and Non-Solicitation Agreement between the Participant and any Aon entity, and further including without limitation any covenant not to compete, to solicit or perform services for clients, or to solicit employees, any confidentiality or intellectual property covenant, and any covenant with respect to a pre-resignation notice period. Further, no Other Covenant precludes the enforceability of any provision contained in this Agreement.

e) **Acknowledgments.** Aon and the Participant acknowledge and agree that the covenants contained in Sections 9(b) and 9(c) herein are necessary and reasonable for the protection of Aon and are reasonably limited with respect to the activities prohibited, duration, geographical scope and their effect on the Participant and the public. The parties acknowledge that the purpose and effect of the covenants simply are to protect Aon for a limited period of time from unfair competition by the Participant.

The Participant acknowledges that there is no general geographical restriction contained in the preceding paragraphs because the restrictions apply only to the specified clients of Aon and because the Participant's material duties, responsibilities and relationships with Aon clients, prospective clients and employees are not limited to any particular geographic area. Nothing in this Agreement shall prohibit the Participant from obtaining a livelihood for himself or herself or his or her family by being engaged in the Business. The intent of the parties is that the Participant's restrictive covenant is limited only to those clients as above specified.

f) **Company's Right to Injunctive Relief; Attorneys' Fees.** The Participant acknowledges that the Participant's services to Aon are of a unique character which gives them a special value to Aon, the loss of which cannot

- 4 -

reasonably or adequately be compensated in damages in an action at law, and that a breach of this Agreement will result in irreparable and continuing harm to Aon, and that therefore, in addition to any other remedy which Aon may have at law or in equity, Aon shall be entitled to temporary, preliminary and permanent injunctive relief for a breach or threatened breach of this Agreement by the Participant (without the need to post any bond or other security). The parties acknowledge and agree that Aon Group, Inc. and the Participant's Employer each is an intended third-party beneficiary of this Agreement, and may be a named plaintiff in any subsequent suit brought by the Company to enforce the terms of this Agreement. In the event that Aon brings an action to enforce the terms and conditions of the Agreement, the Participant shall pay the costs and expenses incurred by Aon in bringing such action, including without limitation attorneys' and other legal fees.

**g)** **Trade Secrets and Confidential Information.** The Participant acknowledges that Aon's business depends to a significant degree upon the possession of information which is not generally known to others, and that the profitability of such business requires that this information remain proprietary to Aon. The Participant shall not, except as required in the course of employment by Aon or by applicable law (provided that the Participant shall first give Aon plc reasonable advance written notice of any subpoena (Attn: General Counsel), with a contemporaneous copy to Aon Group, Inc.), disclose or use during or subsequent to the course of employment, any trade secrets or confidential or proprietary information relating to the business of Aon of which the Participant becomes aware by reason of being employed or to which the Participant gains access during his or her employment by Aon and which has not been publicly disclosed (it being understood and agreed that trade secrets and confidential or proprietary information shall remain subject to this Section 9(g), and shall not be considered "publicly disclosed" for purposes of the preceding clause, if any public disclosure thereof results from a breach by the Participant of this provision, or a breach by the Participant or another person of some other contractual or legal obligation to Aon). Nothing in this paragraph is intended to limit the Participant's right or ability to communicate with the U.S. Equal Employment Opportunity Commission, the National Labor Relations Board, the Securities and Exchange Commission, or other federal, state or local agency, and such communication may be initiated by the Participant or in response to the government inquiry.

Such information includes, without limitation, lists of clients and prospective clients; contract terms and conditions; client information relating to services, insurance, benefits programs, employees, finances, and compensation; copyrighted materials; corporate, management and business plans and strategies; compensation and revenues; methods and strategies of marketing; market research and data; technical know-how; computer software and manuals; policies and procedures; and the conduct of the affairs of Aon. All records and equipment and other materials constituting or relating in any way to any trade secrets, confidential or proprietary information, or relating to clients or business of Aon, and all other Aon property, shall be and remain the sole property of Aon during and after the end of employment and shall be returned to Aon by the Participant immediately upon its request or the Participant's Termination Date (whichever is earlier).

**h)** **Incentive Repayment Policy.** If the Participant has been designated and notified by the board of directors of Aon plc that he or she is a reporting officer for purposes of Section 16 of the U.S. Securities Exchange Act of 1934, the Participant is subject to Aon's Incentive Repayment Policy (the "Policy"). The Policy provides that Aon plc will have the discretion to cancel or require reimbursement to the Company of the long-term equity based incentive award set forth in this Agreement if the grant or vesting was based on the achievement of financial results that were subsequently restated. The Participant can obtain a copy of the Policy from the Global Compensation team. If the Participant is subject to the Policy, by accepting this Agreement, the Participant hereby agrees and acknowledges that he or she will be bound by it.

## 10. Other Provisions.

**a)** **Plan Terms Take Precedence over Agreement Terms.** RSUs are granted pursuant to the Plan, the terms and conditions of which are incorporated into this Agreement by reference. If there are any inconsistencies between the terms of this Agreement and the Plan, the terms of the Plan will govern.

**b)** **Prior Agreement(s) Will Not Control.** The Participant's acceptance of this Agreement will supersede provisions of any prior agreement that could be construed as governing the terms of this grant.

**c)** **Code Section 409A.** The RSUs and amounts payable thereunder are intended to be exempt from or compliant with Code Section 409A and the U.S. Treasury Regulations relating thereto so as not to subject the Participant to the payment of additional taxes and interest under Code Section 409A or other adverse tax consequences. In furtherance of this intent, the provisions of this Agreement will be interpreted, operated, and administered in a manner consistent with these intentions. The Committee may modify the terms of this Agreement and/or the

- 5 -

Plan, without the consent of the Participant, in the manner that the Committee may determine to be necessary or advisable in order to comply with Code Section 409A or to mitigate any additional tax, interest and/or penalties or other adverse tax consequences that may apply under Code Section 409A if compliance is not practical. This Section 10(c) does not create an obligation on the part of the Company to modify the terms of this Agreement or the Plan and does not guarantee that the RSUs or the delivery of Shares upon vesting/settlement of the RSUs will not be subject to taxes, interest and penalties or any other adverse tax consequences under Code Section 409A. Nothing in this Agreement shall provide a basis for any person to take any action against the Company or any of its Subsidiaries or Affiliates based on matters covered by Code Section 409A, including the tax treatment of any amounts paid under this Agreement, and neither the Company nor any of its Subsidiaries or Affiliates will have any liability under any circumstances to the Participant or any other party if the RSUs, the delivery of Shares upon vesting/settlement of the RSUs or other payment or tax event hereunder that is intended to be exempt from, or compliant with, Code Section 409A, is not so exempt or compliant or for any action taken by the Committee with respect thereto. Further, settlement of any portion of the RSUs that is Deferred Compensation may not be accelerated or postponed except to the extent permitted by Code Section 409A.

d) **Restriction on Transfer.** RSUs may not be sold, transferred, pledged, assigned, or otherwise alienated at any time.

e) **Right of Employment.** Grants of RSUs under the Plan and of this Agreement do not confer upon the Participant any right to continue in the employ or service of the Employer. This Agreement shall survive any termination of the Participant's employment for any or no reason.

f) **Electronic Delivery and Acceptance.** The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means. The Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

g) **Need to Accept Grant.** The Participant acknowledges that this grant must be accepted within ninety (90) days of the Grant Date in order to be eligible to receive any benefits from this grant. If this grant is not accepted within the ninety (90)-day period specified in the foregoing sentence, all benefits under this grant may be forfeited, as determined in the sole discretion of the Committee. To accept this grant, the Participant must access the www.netbenefits.fidelity.com website and follow the instructions for acceptance. If this grant was distributed to the Participant via mail, the Participant must sign the Agreement and return it to Aon's Executive Compensation Department within ninety (90) days.

h) **Waiver; Section Headings.** Waiver of any term or condition of this Agreement by any party shall not be construed as a waiver of a subsequent breach or failure of the same term or condition, or a waiver of any other term or condition of this Agreement. Any waiver must be in writing. The Section headings in this Agreement are for convenience only and are not to be used in interpreting this Agreement.

i) **Severability.** To the extent that the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable by a court of competent jurisdiction for any reason, such term, word, phrase, clause or sentence shall be modified in such manner so as to afford the Company the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws. If, however, a court of competent jurisdiction finds that any such term, word, phrase, clause or sentence cannot be so modified and thus made enforceable, or otherwise declines for any reason to do so, such term, word, phrase, clause or sentence shall be deemed severed from this Agreement and of no force and effect, and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent.

j) **Governing Law.** The validity, interpretation**,** instruction, performance, enforcement and remedies of or relating to this Agreement, and the rights and obligations of the parties hereunder, shall be governed by and construed in accordance with the substantive internal laws of the State of Illinois, without regard to the conflict of law principles, rules or statutes of any jurisdiction. The foregoing provisions of this Section 10(j) shall apply irrespective of whether the Participant is a party to or bound by another restrictive covenant of any kind that may be governed by the laws of another jurisdiction (if any).

k) **Venue and Jurisdiction.** Venue for any legal proceedings instituted related to this Agreement shall be exclusively in the state and/or federal courts located in Cook County, Illinois, and the Participant hereby knowingly, voluntarily and irrevocably agrees, consents and submits to the exclusive jurisdiction and venue of such courts within the State of Illinois. The Participant further hereby knowingly, voluntarily and irrevocably waives, and agrees not to assert, any objection, challenge or defense to such exclusive venue or jurisdiction (including without limitation any defense of forum non conveniens), and further agrees not to file any claim or

action related to this Agreement in any other jurisdiction or venue. The foregoing provisions of this Section 10(k) shall apply irrespective of whether the Participant is a party to or bound by another restrictive covenant of any kind that may provide for or permit venue or jurisdiction with respect to such other restrictive covenant in any other court or forum (if any).

l)  **Notice.**  All notices given hereunder shall be in writing and, if intended for Aon plc, shall be addressed to it or delivered to it at its principal office in London, England to the attention of the General Counsel or its principal office in Chicago, Illinois to the attention of the Chief Human Resources Officer. If intended for the Participant, notices shall be delivered personally or shall be addressed (if sent by mail) to the Participant's then current residence address as shown on the Company's records, or to such other address as the Participant directs in a notice to the Company. All notices shall be deemed to be given on the date received at the address of the addressee or, if delivered personally, on the date delivered.

m)  **Compliance with Law.**  Notwithstanding any other provision of the Plan or this Agreement, unless there is an available exemption from any registration, qualification or other legal requirement applicable to the Shares, the Company shall not be required to deliver any Shares issuable upon vesting/settlement of the RSUs prior to the completion of any registration or qualification of the Shares under any local, state, federal or foreign securities or exchange control law or under rulings or regulations of the U.S. Securities and Exchange Commission ("SEC") or of any other governmental regulatory body, or prior to obtaining any approval or other clearance from any local, state, federal or foreign governmental agency, which registration, qualification or approval the Company shall, in its absolute discretion, deem necessary or advisable. The Participant understands that the Company is under no obligation to register or qualify the Shares with the SEC or any state or foreign securities commission or to seek approval or clearance from any governmental authority for the issuance or sale of the Shares. Further, the Participant agrees that the Company shall have unilateral authority to amend the Plan and the Agreement without the Participant's consent to the extent necessary to comply with securities or other laws applicable to issuance of Shares.

n)  **Intellectual Property.**  The Participant hereby assigns to the Company the Participant's entire right, title and interest in and to all discoveries and improvements, patentable or otherwise, trade secrets and ideas and writings and copyrightable material, which are conceived, developed, reduced to practice, or acquired by the Participant (collectively "IP") during the Participant's employment and which relate to the business of the Company or any of its Affiliates, parent companies or Subsidiaries. The Participant further acknowledges that all original works of authorship which are made by the Participant (solely or jointly with others) within the scope of and during the period of his/her employment with the Company and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. The Participant agrees to disclose promptly, fully and in writing all such IP to the Company. The Participant will upon the Company's request, execute, acknowledge and deliver to the Company all instruments and do all other acts which are necessary or desirable to enable the Company or any of its Affiliates, parent companies, or Subsidiaries to file and prosecute applications for, and to acquire, maintain and enforce, all patents, trademarks, and copyrights in all countries. To the extent the Participant is bound by an employee handbook or contract provision that protects the Company's intellectual property at least to the extent provided in this Section 10(n), the provision set forth in such employment handbook or contractual arrangement between the Participant and the Company will prevail and govern.

o)  **No Advice Regarding Grant.** The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding the Participant's participation in the Plan, or the acquisition or sale of the underlying Shares. The Participant should consult with his or her own personal tax, legal and financial advisors regarding his or her participation in the Plan and execution of this Agreement, before executing this Agreement or otherwise taking any action at any time related to the Plan.

p)  **Imposition of Other Requirements.**  The Company reserves the right to impose other requirements on the Participant's participation in the Plan, on the RSUs and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable for legal or administrative reasons, and to require the Participant to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

IN WITNESS WHEREOF, the parties have accepted this Agreement as of the date hereof.

**AON PLC**

*Gregory C. Case*

Gregory C. Case
President and Chief Executive Officer

**AON GROUP, INC.**

*Gregory C. Case*

Gregory C. Case
President and Chief Executive Officer

**Signed Electronically**                                    06/12/2016
**RSU Recipient (Participant)**                              **Date**

GH076HY0

06/12/2016 12:06 pm U.S. Eastern Standard Time

ACCEPTED

Aon RSU AA 2016 SSP-US – Non-California
6636492-v4\GESDMS

**RESTRICTED STOCK UNIT AGREEMENT**
**UNDER AMENDED AND RESTATED**
**AON PLC 2011 INCENTIVE PLAN**

This Restricted Stock Unit Agreement (the "Agreement") is entered into between Aon plc, a public limited company incorporated under English law, and its Subsidiary Aon Group, Inc., a Maryland corporation with its principal place of business at 200 East Randolph Street, Chicago, Illinois (collectively, the "Company") and **DANIELLE ROSS** (the "Participant").

The Company desires to grant the Participant restricted stock units ("RSUs"), each RSU representing the right to receive a Class A Ordinary Share of the Company ("Share"), $.01 par value per Share, to encourage the Participant to remain in the service of the Company or its Subsidiaries or Affiliates, to provide the Participant with an incentive to contribute to the financial progress of the Company, and to encourage ownership of Shares by the Participant. Capitalized terms used but not otherwise defined in the Agreement shall have the meaning ascribed to such terms in the Amended and Restated Aon plc 2011 Incentive Plan, as amended from time to time (the "Plan").

NOW, THEREFORE, in consideration of the mutual promises hereinafter set forth, the parties hereto agree as follows:

1. **Grant of Restricted Stock Units.** The Company grants under the Plan an award of _____704_____ RSUs on __05/21/2018__ (the "Grant Date"). The Participant understands and agrees that the Participant has no obligation to accept this award (as a condition of employment or otherwise), and that the Participant's decision to do so by signing this Agreement, and thereby to accept all of the terms and conditions of this Agreement, is the Participant's knowing and voluntary choice after having had a full and fair opportunity to consult with legal counsel (at the Participant's cost).

2. **Vesting of Restricted Stock Units.** The RSUs will vest in accordance with the schedule set forth in the Participant's account. The Participant must access the www.netbenefits.fidelity.com website and follow the instructions in order to view the vesting schedule. Notwithstanding anything herein to the contrary, the Committee may cause the RSUs to vest prior to the date(s) set forth in the vesting schedule in order to satisfy any Tax-Related Items (as defined below) that arise prior to the date of settlement of the RSUs, subject to the limitations set forth in Section 3(d) of this Agreement.

3. **Tax Withholding Obligations.** The Participant acknowledges that, regardless of any action taken by the Company and/or the Participant's employer (the "Employer"), the ultimate liability for all income tax, social insurance, payroll tax, payment on account or other tax-related items related to the Participant's participation in the Plan and legally applicable to the Participant ("Tax-Related Items"), is and remains the Participant's responsibility and may exceed the amount, if any, actually withheld by the Company or the Employer. The Participant further acknowledges that the Company and/or the Employer: (a) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the grant of RSUs, including, but not limited to, the grant, vesting or settlement of the RSUs, the issuance of Shares upon settlement of the RSUs, the subsequent sale of Shares acquired pursuant to such vesting/settlement and the receipt of any dividends and/or dividend equivalents; and (b) do not commit to and are under no obligation to structure the terms of the grant or any aspect of the RSUs to reduce or eliminate the Participant's liability for Tax-Related Items or achieve any particular tax result. Further, if the Participant is subject to Tax-Related Items in more than one jurisdiction, the Participant acknowledges that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

   a) Prior to any relevant taxable or tax withholding event, as applicable, the Participant agrees to make adequate arrangements satisfactory to the Company or the Employer, to satisfy all Tax-Related Items. In this regard, the Participant authorizes the Company and/or the Employer, or their respective agents, at the Company's discretion, to satisfy the obligations with regard to all Tax-Related Items by one or a

combination of the following:

**(i)** withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer; or

**(ii)** withholding in Shares to be issued upon vesting/settlement of the RSUs; or

**(iii)** withholding from the proceeds of the sale of Shares acquired upon vesting/settlement of the RSUs either through a voluntary sale or through a mandatory sale arranged by the Company (on the Participant's behalf pursuant to this authorization without further consent); provided, however, that if the Participant is a Section 16 officer under the U.S. Securities Exchange Act of 1934, the Committee shall establish the method of withholding from alternatives (i) – (iii) herein.

**b)** Depending on the withholding method, the Company and/or the Employer may withhold or account for Tax-Related Items by considering applicable minimum statutory withholding amounts or other applicable withholding rates in the Participant's jurisdiction(s), including maximum applicable rates, in which case, any over-withheld amount may be refunded to the Participant in cash by the Company or the Employer (with no entitlement to the equivalent Shares) or if not refunded, the Participant may seek a refund from the local tax authorities. If the obligation for Tax-Related Items is satisfied by withholding in Shares, for tax purposes, the Participant shall be deemed to have been issued the full number of Shares subject to the vested RSUs, notwithstanding that a number of Shares are held back solely for the purpose of paying the Tax-Related Items.

**c)** Finally, the Participant shall pay to the Company and/or the Employer any amount of Tax-Related Items that the Company and/or the Employer may be required to withhold as a result of the Participant's participation in the Plan that cannot be satisfied by the means previously described. The Company may refuse to deliver the Shares or the proceeds of the sale of Shares if the Participant fails to comply with the Participant's obligations in connection with the Tax-Related Items.

**d)** Notwithstanding anything in this Section 3 to the contrary, to avoid a prohibited distribution under Code Section 409A, if Shares underlying the RSUs will be withheld (or sold on the Participant's behalf) to satisfy any Tax-Related Items arising prior to the date of settlement of the RSUs for any portion of the RSUs that is considered "nonqualified deferred compensation" subject to Code Section 409A ("Deferred Compensation"), then the number of Shares withheld (or sold on the Participant's behalf) shall not exceed the number of Shares that equals the liability for the Tax-Related Items.

**4. Nominal Value.** At the time of settlement, this Award will be subject to the Participant's appropriate undertaking to pay to Aon plc a nominal value of $.01 per share (as determined in the sole discretion of Aon plc, subject to the provisions of Aon plc's articles of association and the U.K. Companies Act 2006, as amended from time to time), and such obligation may be satisfied by the Participant in cash in any manner to be established by Aon plc in its sole discretion, including but not limited to withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer.

**5. Effect of Termination of Employment.**

**a)** **Voluntary termination (other than Retirement).** In the event that the Participant's Termination Date occurs because of the Participant's voluntary termination that does not qualify as Retirement (as defined in Section 5(d) below), the unvested portion of the RSU will be forfeited.

**b)** **Termination due to death.** In the event that the Participant's Termination Date occurs due to the Participant's death, all unvested RSUs will be fully vested immediately and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof.

**c)** **Termination due to disability.** In the event that the Participant's Termination Date occurs due to the Participant's disability, all unvested RSUs will be fully vested immediately and the date of such

termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof. "Disability" for purposes of this Agreement, shall mean disability pursuant to the standards set forth in, or in circumstances where the Participant qualifies for receipt of benefits under, the long-term disability plan of the Employer. In the absence of such a plan, the Committee shall have exclusive discretion to determine whether a Participant's employment is terminated due to disability.

**d)** **Involuntary termination (other than for Cause) or Retirement.** In the event that the Participant's Termination Date occurs as a result of the Participant's involuntary termination by the Company or Employer (other than for Cause) or the Participant's Retirement, the RSUs shall be immediately vested pro rata and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof. The pro rata portion of the RSUs that shall vest shall be calculated by multiplying (i) the number of RSUs subject to the award, by (ii) a fraction, the numerator of which shall be the number of days that have elapsed between the Grant Date and the date of the Participant's termination, and the denominator of which shall be the total number of days covered by the vesting schedule set forth in the Participant's account, and subtracting from the resulting product the number of RSUs previously vested. The remaining unvested portion of the RSUs shall be forfeited. For purposes of this Agreement, "Retire" or "Retirement" means a voluntary termination of employment on or after the Participant's 55th birthday for employees whose principal place of work is outside of the European Union ("EU"). A Participant on secondment will be subject to the vesting rule applicable to his or her home country. Participants whose principal place of work is inside the EU shall not be eligible for Retirement, and their voluntary termination at any age shall be treated in accordance with Section 5(a). The Committee shall have exclusive discretion to determine a Participant's principal place of work for purposes of this Section 5(d).

**e)** **Termination for Cause.** In the event that the Participant's Termination Date occurs because the Participant is terminated by the Company or Employer for Cause, all unvested RSUs shall be forfeited. "Cause" shall mean the Participant's (i) performing a deliberate act of dishonesty, fraud, theft, embezzlement, or misappropriation involving the Participant's employment with the Company, its Subsidiaries or Affiliates, or breach of the duty of loyalty to the Company, its Subsidiaries or Affiliates; (ii) performing an act of race, sex, national origin, religion, disability, or age-based discrimination which after investigation, counsel to the Company reasonably concludes will result in liability being imposed on the Company, its Subsidiaries or Affiliates and / or the Participant; (iii) material violation of Company policies and procedures including, but not limited to, the Aon Code of Business Conduct; (iv) material noncompliance with any terms of this Agreement or an employment agreement; or (v) performing any criminal act resulting in a criminal felony charge brought against the Participant or a criminal conviction of the Participant (other than conviction of a minor traffic violation).

**6.** **Receipt by the Participant of the Prospectus.** The Participant acknowledges receipt of the Plan prospectus that contains the entire Plan, and is incorporated herein by reference. The Participant represents and warrants that the Participant has read the Plan and agrees that all RSUs awarded under it shall be subject to all of the terms and conditions of the Plan.

**7.** **Issuance of Shares.** RSUs shall be converted to Shares as of the applicable vesting date. Shares will be issued to the Participant as soon as practicable (within 60 days) after the vesting date, subject to Sections 3 and 4 of this Agreement. Notwithstanding the foregoing, for purposes of complying with Code Section 409A, if the RSUs are considered Deferred Compensation and the Shares are to be settled in connection with a termination of service, the Company and the Participant shall take all steps necessary (including with regard to any post-termination services by the Participant) to ensure that a termination contemplated under Section 5 constitutes a "separation from service" within the meaning of Code Section 409A. In addition, if the RSUs are Deferred Compensation and payable in connection with the Participant's separation from service, and if the Participant is a "specified employee" within the meaning of Code Section 409A on the date the Participant experiences a separation from service, then the RSUs shall be settled on the first business day of the seventh month following the Participant's separation from service, or, if earlier, on the date of the Participant's death, solely to the extent

such delayed payment is required in order to avoid a prohibited distribution under Code Section 409A.

8. **Rights as Shareholder.**  The Participant shall not have voting or any other rights as a shareholder of Aon plc with respect to the RSUs. Upon issuance of the Shares pursuant to and in accordance with Section 7, the Participant will obtain full voting and other rights as a shareholder of Aon plc.

9. **Business Considerations; Restrictive Covenants; Acknowledgments; Injunctive Relief; Confidential Information; Incentive Repayment Policy.**

   a) **Business Considerations.**  Aon plc and its Subsidiary, Aon Group, Inc., a Maryland corporation with its corporate and business headquarters in Chicago, Illinois, and Aon Group, Inc.'s Subsidiaries and Affiliates (and divisions thereof) (collectively, with Aon plc, "Aon") are in the business of providing conventional and alternative risk management products and services covering the businesses of insurance brokerage, reinsurance brokerage, benefits consulting, compensation consulting, human resources consulting, human resources and benefits outsourcing management, investigatory and security consulting, managing underwriting and related services, including accounting, actuarial, claims management and handling, and information systems on behalf of commercial and individual clients which are national and international and are not confined to any geographic area (the "Business").  The Participant further acknowledges that the Participant's material employment duties and responsibilities, including without limitation with respect to Aon clients, prospective clients, and other employees, span geographic areas that extend well beyond the state in which the Participant is physically employed and resides.  An essential element of the Business is the development and maintenance of personal contacts and relationships with clients and prospective clients.  Aon invests considerable time and money to develop and maintain client relationships, including payment of employees' salaries, benefits, travel, entertainment and other business expenses and assistance in servicing clients by making available to its employees specially developed and researched industry data, client-specific information, legal support, accounting support, marketing, advertising and other corporate services, as well as providing training and professional development and valuable confidential business and professional information, toward the development and maintenance of its client relationships and related goodwill.  While these clients and prospective clients may be secured or serviced by Aon employees, including the Participant, the Participant acknowledges that such clients and prospective clients remain at all times the clients and prospective clients of Aon and that the goodwill engendered by the relationships is intended to inure only to the benefit of Aon; the goodwill is owned by Aon; and Aon shall be the sole beneficiary of such goodwill during and after termination of the Participant's employment with Aon.  In addition, the Participant acknowledges that the Participant has acquired and/or will acquire, for the purpose of furthering the Business, knowledge of Aon's confidential and proprietary information; the Participant further acknowledges Aon's legitimate interest in safeguarding confidential and proprietary information from disclosure.

   The personal identification of clients of Aon with an Aon employee, including the Participant, creates the potential for the Participant's appropriation of the benefits of the relationships developed with clients on behalf of and at the expense of Aon.  Since Aon would suffer irreparable harm if the Participant left its employ and solicited the Business of the clients and prospective clients of Aon, or solicited the employees of Aon, it is reasonable to protect Aon against certain competitive activities by the Participant for a limited period of time after the Participant leaves employment so that Aon may renew or restore its business relationship with its clients, prospective clients and employees.  Consequently, the Participant is willing to enter into the covenants set forth herein in order to provide Aon with reasonable protection for its client, prospective client and employee relationships and its investment therein as above-described, its goodwill, and its confidential and proprietary information.

   b) **Covenant Not to Solicit Clients and Prospective Clients.**  The Participant hereby covenants and agrees that, except with the prior written consent of Aon, the Participant (on the Participant's own behalf or on behalf of any other person or entity) will not, during the course of employment, and for a period of two (2) years after the Participant's Termination Date (the "Restricted Period"), directly or indirectly, call upon, solicit, accept, engage in, service or perform, other than on behalf of Aon, any business of the same type or

- 4 -

kind as the Business performed by Aon from or with respect to (i) clients of Aon with respect to whom the Participant provided services, either alone or with others, or had a business relationship, or on whose account the Participant worked or became familiar, or supervised directly or indirectly the servicing activities related to such clients, during the twenty-four (24) months prior to the Participant's Termination Date and, further provided, such clients were clients of Aon either on the Participant's Termination Date or within twelve (12) months prior to such Termination Date and (ii) prospective clients of Aon which the Participant alone, in combination with others, or in a supervisory capacity, solicited during the six (6) months prior to the Participant's Termination Date and to which a proposal for services was rendered by Aon during the six (6) months prior to the Participant's Termination Date. "Client" means any person or entity listed on the books of Aon as such.

c) **Covenant Not to Solicit Employees.** The Participant hereby also agrees, for the duration of the Restricted Period, not to, directly or indirectly, solicit or induce, or cause any person or other entity to solicit or induce, any employee of Aon to work for the Participant or for any third party or entity, or to leave the employ of Aon.

d) **Other Covenants.** Notwithstanding any other language in the Agreement, including, but not limited to that found in Section 10(b), this Agreement does not preclude the enforceability of any restrictive covenant provision contained in any prior or subsequent agreement entered into by the Participant, (any such covenant, an "Other Covenant"), including without limitation any covenant contained in any Confidentiality and Non-Solicitation Agreement between the Participant and any Aon entity, and further including without limitation any covenant not to compete, to solicit or perform services for clients, or to solicit employees, any confidentiality or intellectual property covenant, and any covenant with respect to a pre-resignation notice period. Further, no Other Covenant precludes the enforceability of any provision contained in this Agreement. No subsequent agreement entered into by the Participant may amend, supersede, or override the covenants contained herein unless such subsequent agreement specifically references subsections (b) and (c) of this Section.

e) **Acknowledgments.** Aon and the Participant acknowledge and agree that the covenants contained in subsections (b) and (c) of this Section are necessary and reasonable for the protection of Aon and are reasonably limited with respect to the activities prohibited, duration, geographical scope and their effect on the Participant and the public. The parties acknowledge that the purpose and effect of the covenants simply are to protect Aon for a limited period of time from unfair competition by the Participant.

The Participant acknowledges that there is no general geographical restriction contained in the preceding paragraphs because the restrictions apply only to the specified clients of Aon and because the Participant's material duties, responsibilities, and relationships with Aon clients, prospective clients, and employees are not limited to any particular geographic area. Nothing in this Agreement shall prohibit the Participant from obtaining a livelihood for the Participant or the Participant's family by being engaged in the Business.

f) **Company's Right to Injunctive Relief; Attorneys' Fees and Costs.** The Participant acknowledges that the Participant's services to Aon are of a unique character which gives them a special value to Aon, the loss of which cannot reasonably or adequately be compensated in damages in an action at law, and that a breach of Section 9 of this Agreement will result in irreparable and continuing harm to Aon, and that therefore, in addition to any other remedy which Aon may have at law or in equity, Aon shall be entitled to temporary, preliminary and permanent injunctive relief for a breach or threatened breach of this Agreement by the Participant (without the need to post any bond or other security). The parties acknowledge and agree that each Aon entity is an intended third-party beneficiary of this Agreement, and may be a named plaintiff in any subsequent suit brought by Aon to enforce the terms of this Agreement. In the event that any action is filed to enforce the terms and conditions of this Agreement, the prevailing party in the action will recover from the non-prevailing party, in addition to any other sum that either party may be called upon to pay, a reasonable sum for the prevailing party's attorney's fees and costs.

g) **Trade Secrets and Confidential Information.**

(i) The Participant acknowledges that Aon's Business depends to a significant degree upon the possession

- 5 -

of confidential, proprietary, and trade secret information which is not generally known to others, and that the profitability of such Business requires that this information remain proprietary to Aon. The Participant recognizes that, by virtue of the Participant's employment with Aon, and to assist the Participant in the solicitation, production and servicing of client Business, the Participant will be granted otherwise prohibited access to such information. This information (hereinafter referred to as "Confidential Information") includes, without limitation, lists of clients and prospective clients; contract terms and conditions; client information relating to services, insurance, benefits programs, employees, finances, and compensation; copyrighted materials; corporate, management and business plans and strategies; compensation and revenues; methods and strategies of marketing; market research and data; technical know-how; computer software and manuals; policies and procedures; and the conduct of the affairs of Aon. Confidential Information does not include any information that lawfully is or has become generally or publicly known other than through the Participant's breach of this Agreement or a breach by another person of some other obligation to Aon. The Participant shall not, except as required in the course of employment by Aon or as otherwise provided by applicable law or in this subsection (g), disclose or use during or subsequent to the course of employment, any Confidential Information.

(ii) The Participant understands that nothing contained in this Agreement limits the Participant's ability to report possible violations of law or regulation to, or file a charge or complaint with, the Securities and Exchange Commission, the Equal Employment Opportunity Commission, the National Labor Relations Board, the Occupational Safety and Health Administration, the Department of Justice, the Congress, any Inspector General, or any other federal, state or local governmental agency or commission ("Government Agencies"). The Participant further understands that this Agreement does not limit the Participant's ability to participate in any investigation or proceeding that may be conducted by any Government Agency, without notice to the Company.

Nothing in this Agreement shall limit the Participant's ability under applicable United States federal law to (i) disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law or (ii) disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure.

(iii) Upon termination of employment or upon Aon's request (whichever is earlier), the Participant will promptly return to Aon all Confidential Information and all materials and all copies or tangible embodiments of materials involving Confidential Information, and all other Aon property, in the Participant's possession or control, except as otherwise provided by law or in this subsection (g). The Participant agrees to represent in writing to Aon upon termination of employment that he or she has complied with the provisions of this subsection (g).

h) **Incentive Repayment Policy.** If the Participant has been designated and notified by the board of directors of Aon plc that he or she is a reporting officer for purposes of Section 16 of the U.S. Securities Exchange Act of 1934, the Participant is subject to Aon's Incentive Repayment Policy (the "Policy"). The Policy provides that Aon plc will have the discretion to cancel or require reimbursement to the Company of the long-term equity based incentive award set forth in this Agreement if the grant or vesting was based on the achievement of financial results that were subsequently restated. The Participant can obtain a copy of the Policy from the Global Compensation team. If the Participant is subject to the Policy, by accepting this Agreement, the Participant hereby agrees and acknowledges that he or she will be bound by it.

**10. Other Provisions.**

a) **Plan Terms Take Precedence over Agreement Terms.** RSUs are granted pursuant to the Plan, the terms and conditions of which are incorporated into this Agreement by reference. If there are any inconsistencies between the terms of this Agreement and the Plan, the terms of the Plan will govern.

For the avoidance of doubt, the parties expressly acknowledge and agree that Sections 9, 10(j), and 10(k) of this Agreement are not inconsistent with any term or provision of the Plan, including (without limitation) Section 9.16 of the Plan (and nothing herein shall be construed to state or suggest that any other provision of this Agreement is inconsistent with the Plan).

b) **Prior Agreement(s) Will Not Control.** The Participant's acceptance of this Agreement will supersede provisions of any prior agreement that could be construed as governing the terms of this grant.

c) **Code Section 409A.** The RSUs and amounts payable thereunder are intended to be exempt from or compliant with Code Section 409A and the U.S. Treasury Regulations relating thereto so as not to subject the Participant to the payment of additional taxes and interest under Code Section 409A or other adverse tax consequences. In furtherance of this intent, the provisions of this Agreement will be interpreted, operated, and administered in a manner consistent with these intentions. The Committee may modify the terms of this Agreement and/or the Plan, without the consent of the Participant, in the manner that the Committee may determine to be necessary or advisable in order to comply with Code Section 409A or to mitigate any additional tax, interest and/or penalties or other adverse tax consequences that may apply under Code Section 409A if compliance is not practical. This Section 10(c) does not create an obligation on the part of the Company to modify the terms of this Agreement or the Plan and does not guarantee that the RSUs or the delivery of Shares upon vesting/settlement of the RSUs will not be subject to taxes, interest and penalties or any other adverse tax consequences under Code Section 409A. Nothing in this Agreement shall provide a basis for any person to take any action against the Company or any of its Subsidiaries or Affiliates based on matters covered by Code Section 409A, including the tax treatment of any amounts paid under this Agreement, and neither the Company nor any of its Subsidiaries or Affiliates will have any liability under any circumstances to the Participant or any other party if the RSUs, the delivery of Shares upon vesting/settlement of the RSUs or other payment or tax event hereunder that is intended to be exempt from, or compliant with, Code Section 409A, is not so exempt or compliant or for any action taken by the Committee with respect thereto. Further, settlement of any portion of the RSUs that is Deferred Compensation may not be accelerated or postponed except to the extent permitted by Code Section 409A.

d) **Restriction on Transfer.** RSUs may not be sold, transferred, pledged, assigned, or otherwise alienated at any time.

e) **Right of Employment.** Grants of RSUs under the Plan and of this Agreement do not confer upon the Participant any right to continue in the employ or service of the Employer. This Agreement shall survive any termination of the Participant's employment for any or no reason.

f) **Electronic Delivery and Acceptance.** The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means. The Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

g) **Need to Accept Grant.** The Participant acknowledges that this grant must be accepted within ninety (90) days of the Grant Date in order to be eligible to receive any benefits from this grant. If this grant is not accepted within the ninety (90)-day period specified in the foregoing sentence, all benefits under this grant may be forfeited, as determined in the sole discretion of the Committee. To accept this grant, the Participant must access the www.netbenefits.fidelity.com website and follow the instructions for acceptance. If this grant was distributed to the Participant via mail, the Participant must sign the Agreement and return it to the Company within ninety (90) days.

h) **Waiver; Section Headings.** Waiver of any term or condition of this Agreement by any party shall not be construed as a waiver of a subsequent breach or failure of the same term or condition, or a waiver of any other term or condition of this Agreement. Any waiver must be in writing. The Section headings in this Agreement are for convenience only and are not to be used in interpreting this Agreement.

i) **Severability.** To the extent that the terms set forth in this Agreement or any word, phrase, clause or

sentence is found to be illegal or unenforceable by a court of competent jurisdiction for any reason, such term, word, phrase, clause or sentence shall be modified in such manner so as to afford the Company the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws. If, however, a court of competent jurisdiction finds that any such term, word, phrase, clause or sentence cannot be so modified and thus made enforceable, or otherwise declines for any reason to do so, such term, word, phrase, clause or sentence shall be deemed severed from this Agreement and of no force and effect, and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent.

**j)** **Governing Law.** The validity, interpretation**,** instruction, performance, enforcement and remedies of or relating to Section 9 of this Agreement, and the rights and obligations of the parties thereunder, shall be governed by and construed in accordance with the substantive internal laws of the State of Illinois, without regard to the conflict of law principles, rules or statutes of any jurisdiction. With respect to all other Sections of this Agreement, the validity, interpretation, instruction, performance, enforcement and remedies of or relating to those Sections, and the rights and obligations of the parties thereunder, shall be governed and construed in accordance with the substantive internal laws of the State of Delaware, without regard to the conflict of law principles, rules or statutes of any jurisdiction. The foregoing provisions of this subsection shall apply irrespective of whether the Participant is a party to or bound by another restrictive covenant of any kind that may be governed by the laws of another jurisdiction (if any).

**k)** **Venue and Jurisdiction.** Venue for any legal proceedings instituted related to this Agreement shall be exclusively in the state and/or federal courts located in Cook County, Illinois, and the Participant hereby knowingly, voluntarily and irrevocably agrees, consents and submits to the exclusive jurisdiction and venue of such courts within the State of Illinois. The Participant further hereby knowingly, voluntarily and irrevocably waives, and agrees not to assert, any objection, challenge or defense to such exclusive venue or jurisdiction (including without limitation any defense of forum non conveniens), and further agrees not to file any claim or action related to this Agreement in any other jurisdiction or venue. The foregoing provisions of this Section 10(k) shall apply irrespective of whether the Participant is a party to or bound by another restrictive covenant of any kind that may provide for or permit venue or jurisdiction with respect to such other restrictive covenant in any other court or forum (if any).

**l)** **Notice.** All notices given hereunder shall be in writing and, if intended for Aon plc, shall be addressed to it or delivered to it at its principal office in London, England to the attention of the General Counsel or its principal office in Chicago, Illinois to the attention of the Chief Human Resources Officer. If intended for the Participant, notices shall be delivered personally or shall be addressed (if sent by mail) to the Participant's then current residence address as shown on the Company's records, or to such other address as the Participant directs in a notice to the Company. All notices shall be deemed to be given on the date received at the address of the addressee or, if delivered personally, on the date delivered.

**m)** **Compliance with Law.** Notwithstanding any other provision of the Plan or this Agreement, unless there is an available exemption from any registration, qualification or other legal requirement applicable to the Shares, the Company shall not be required to deliver any Shares issuable upon vesting/settlement of the RSUs prior to the completion of any registration or qualification of the Shares under any local, state, federal or foreign securities or exchange control law or under rulings or regulations of the U.S. Securities and Exchange Commission ("SEC") or of any other governmental regulatory body, or prior to obtaining any approval or other clearance from any local, state, federal or foreign governmental agency, which registration, qualification or approval the Company shall, in its absolute discretion, deem necessary or advisable. The Participant understands that the Company is under no obligation to register or qualify the Shares with the SEC or any state or foreign securities commission or to seek approval or clearance from any governmental authority for the issuance or sale of the Shares. Further, the Participant agrees that the Company shall have unilateral authority to amend the Plan and the Agreement without the Participant's consent to the extent necessary to comply with securities or other laws applicable to issuance of Shares.

n) **Intellectual Property.** The Participant hereby assigns to the Company the Participant's entire right, title and interest in and to all discoveries and improvements, patentable or otherwise, trade secrets and ideas and writings and copyrightable material, which are conceived, developed, reduced to practice, or acquired by the Participant (collectively "IP") during the Participant's employment and which relate to the business of the Company or any of its Affiliates, parent companies or Subsidiaries. The Participant further acknowledges that all original works of authorship which are made by the Participant (solely or jointly with others) within the scope of and during the period of his/her employment with the Company and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. The Participant agrees to disclose promptly, fully and in writing all such IP to the Company. The Participant will upon the Company's request, execute, acknowledge and deliver to the Company all instruments and do all other acts which are necessary or desirable to enable the Company or any of its Affiliates, parent companies, or Subsidiaries to file and prosecute applications for, and to acquire, maintain and enforce, all patents, trademarks, and copyrights in all countries. To the extent the Participant is bound by an employee handbook or contract provision that protects the Company's intellectual property at least to the extent provided in this Section 10(n), the provision set forth in such employment handbook or contractual arrangement between the Participant and the Company will prevail and govern.

o) **No Advice Regarding Grant.** The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding the Participant's participation in the Plan, or the acquisition or sale of the underlying Shares. The Participant should consult with his or her own personal tax, legal and financial advisors regarding his or her participation in the Plan and execution of this Agreement, before executing this Agreement or otherwise taking any action at any time related to the Plan.

p) **Imposition of Other Requirements.** The Company reserves the right to impose other requirements on the Participant's participation in the Plan, on the RSUs and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable for legal or administrative reasons, and to require the Participant to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

IN WITNESS WHEREOF, the parties have accepted this Agreement as of the date hereof.

**AON PLC**

*Gregory C. Case*

Gregory C. Case
President and Chief Executive Officer

**AON GROUP, INC.**

*Gregory C. Case*

Gregory C. Case
President and Chief Executive Officer

**Signed Electronically**                    **06/06/2018**
**RSU Recipient (Participant)**                     **Date**

**IGU5H7JK**

**06/06/2018 09:20 AM U.S. Eastern Standard Time**

**ACCEPTED**

- 10 -

**Attachment 2**

**NON-SOLICITATION AGREEMENT**

NON-SOLICITATION AGREEMENT ("Agreement") dated as of September 1, 2014 (the "Effective Date") between Aon Risk Services Companies, Inc., a Maryland corporation, including its affiliates, subsidiaries and parent companies (the "Company"), with its headquarters located at 200 East Randolph Street, Chicago, Illinois 60601, and Danielle Ross residing at (the "Employee").

R E C I T A L S

This Agreement is entered into in consideration of the Employee's employment by the Company and the further mutual consideration and covenants by the parties as set forth herein.

NOW, THEREFORE, the Company and the Employee hereby agree to be bound by this Non-Solicitation Agreement, as follows:

Section 1. Recitals and Acknowledgements; Covenants.

(a) **Recitals and Acknowledgments.** Aon Group, Inc., a Maryland corporation with its corporate and business headquarters in Chicago, Illinois, and its subsidiaries and affiliates (and divisions thereof) including the Company, and its parent Aon plc, (collectively "Aon") are in the business of providing conventional and alternative risk management products and services covering the businesses of insurance brokerage, reinsurance brokerage, benefits consulting, compensation consulting, human resources consulting, human resources and benefits outsourcing, management, investigatory and security consulting, managing underwriting and related services, including accounting, actuarial, claims management and handling, and information systems on behalf of commercial and individual clients which are national and international and are not confined to any geographic area (the "Business"). An essential element of the Business is the development and maintenance of personal contacts and relationships with clients and prospective clients. Aon invests considerable time and money to develop and maintain client relationships, including payment of employees' salaries, benefits, travel, entertainment and other business expenses and assistance in servicing clients by making available to its employees specially developed and researched industry data, client-specific information, legal advice, accounting support, marketing, advertising and other corporate services, as well as providing training and professional development and valuable confidential business and professional information, toward the development and maintenance of its client relationships and related goodwill. While these clients and prospective clients may be secured or serviced by Aon employees, including the Employee, the Employee acknowledges that such clients and prospective clients remain at all times the clients and prospective clients of Aon and that the goodwill engendered by the relationships is intended to inure only to the benefit of Aon; the goodwill is owned by Aon; and Aon shall be the sole beneficiary of such goodwill during and after termination of the Employee's employment with Aon.

In addition, the Employee acknowledges that he has acquired and will acquire, solely for the purpose of furthering the Business, knowledge of Aon's Confidential Information, as defined in Section 3 of this Agreement. Employee further acknowledges Aon's legitimate interest in safeguarding Confidential Information from disclosure.

The personal identification of clients of Aon with an Aon employee, including the Employee, creates the potential for the Employee's appropriation of the benefits of the relationships developed with clients on behalf of and at the expense of Aon. Since Aon would suffer irreparable harm if the Employee left its employ and solicited the Business of the clients and prospective clients of Aon, it is reasonable to protect Aon against certain competitive activities by the Employee for a limited period of time after the Employee leaves employment so that Aon may renew or restore its business relationship with its clients and prospective clients.

Consequently, the Employee is willing to enter into the covenants set forth herein in order to provide Aon with reasonable protection for its client and prospective client relationships and its investment therein as above-described, its goodwill, and its Confidential Information, and acknowledges and agrees that the covenants contained in Sections 1(b) and 1(c) below are necessary for the protection of Aon and are reasonably limited with respect to the activities prohibited, duration, geographical scope and their effect on the Employee and the public.

(b)     **Covenant Not to Solicit.**  The Employee hereby covenants and agrees that, except with the prior written consent of Aon, the Employee (on the Employee's own behalf or on behalf of any other person or entity) will not, during the course of employment, and for two (2) years after the end of employment, directly or indirectly, call upon, solicit, accept, engage in, service or perform, other than on behalf of Aon, any business of the same type or kind as the business performed by Aon from or with respect to (i) clients of Aon with respect to whom the Employee provided services, either alone or with others, or had a business relationship, or on whose account he worked or became familiar, or supervised directly or indirectly the servicing activities related to such clients, during the twenty-four (24) months prior to the termination of the Employee's employment with the Company and, further provided, such clients were clients of Aon either on the date of termination of Employee's employment with the Company or within twelve (12) months prior to such termination and (ii)  prospective clients of Aon which the Employee alone, in combination with others, or in a supervisory capacity, solicited during the six (6) months prior to the end of employment and to which a proposal for services was rendered by the Company during the six (6) months prior to the end of the Employee's employment with the Company.  "Client" means any person or entity listed on the books of Aon as such.

The Employee acknowledges that there is no general geographical restriction contained in the preceding paragraph because the restriction applies only to the specified clients of Aon.  Nothing in this Agreement shall prohibit the Employee from obtaining a livelihood for himself or his family by being engaged in the Business.  The intent of the parties is that the Employee's restrictive covenant is limited only to those clients as above specified.

(c)     **Non-Solicitation of Employees and Covenant Not to Hire.**  The Employee hereby also agrees, for the duration of the term of the covenant set forth in Section 1(b) of this Agreement, not to, directly or indirectly, solicit or induce, or to cause any person or other entity to solicit or induce, any employee of Aon to work for Employee or for any third party or entity, or to leave the employ of Aon.

Section 2.  **Company's Right to Injunctive Relief; Attorneys' Fees.**

The Employee acknowledges that the Employee's services to the Company are of a unique character which gives them a special value to the Company, the loss of which cannot reasonably or adequately be compensated in damages in an action at law, and that a breach of Section 1 or 3 of this Agreement will result in irreparable and continuing harm to the Company or Aon, or both, and that therefore, in addition to any other remedy which the Company or Aon, or both, may have at law or in equity, the Company and Aon shall be entitled to injunctive relief for a breach of this Agreement by the Employee.  The parties acknowledge and agree that Aon plc and Aon Group, Inc. are intended third-party beneficiaries of this Agreement, and may be named plaintiffs in any subsequent suit brought by the Company to enforce the terms of this Agreement.  In the event that any action is filed in relation to Section 1 or 3 of this Agreement, the prevailing party in the action shall recover from the non-prevailing party, in addition to any other sum that either party may be called upon to pay, a reasonable sum for the prevailing party's attorney's fees.

Section 3.  **Trade Secrets and Confidential Information; Inventions.**

(a)     **Trade Secrets and Confidential Information.** The Employee acknowledges that Aon's business depends to a significant degree upon the possession of confidential, proprietary and trade secret information which is not generally known to others, and that the profitability of the Business of Aon requires that this information remain proprietary to Aon.  The Employee recognizes that, by virtue of his employment by the Company, and to assist him in the solicitation, production and servicing of client business, he will be granted otherwise prohibited access to such information.  This information (hereinafter referred to as "Confidential Information") includes, without limitation: lists of clients and prospective clients; contract terms and conditions; client information relating to services, insurance, benefits programs, employees, finances, and compensation; copyrighted materials; corporate, management and business plans and strategies; compensation and revenues; methods and strategies of marketing; market research and data; technical know-how; computer software and manuals; policies and procedures; and the conduct of the affairs of Aon.

The Employee shall not, except as required in the course of employment hereunder, disclose or use during or subsequent to the course of employment, any Confidential Information which has not been publicly disclosed (other than by Employee in breach of this provision).   All Confidential Information and all records and equipment and other materials relating in any way to Confidential Information shall be and remain the sole property of Aon during and after the end of employment.

Upon termination of employment, the Employee shall promptly return to the Company all Confidential Information and all materials and all copies or tangible embodiments of materials involving Confidential Information in the Employee's possession or control.  The Employee agrees to represent in writing to the Company upon termination of employment that he has complied with the provisions of this Section 3.

(b)  **Inventions.** The Employee hereby assigns to the Company his entire right, title and interest in and to all discoveries and improvements, patentable or otherwise, trade secrets and ideas, writings and copyrightable material, which may be conceived by the Employee or developed or acquired by him during his employment and which may pertain directly or indirectly to the business of the Company or any of its affiliates, parent companies, or subsidiaries, and which the Employee agrees is work for hire performed in the scope of his employment.  The Employee agrees to disclose fully all such developments to the Company upon its request, which disclosure shall be made in writing promptly following any such request. The Employee shall upon the Company's request, execute, acknowledge and deliver to the Company all instruments and do all other acts which are necessary or desirable to enable the Company or any of its affiliates, parent companies, or subsidiaries to file and prosecute applications for, and to acquire, maintain and enforce, all patents, trademarks, and copyrights in all countries.

Section 4.  **Mergers and Consolidations; Assignability.**

The rights and obligations under this Agreement shall inure to the benefit of and be binding upon the Company and its successors and assigns.  By way of explanation, and without limiting the generality of the foregoing sentence, if the Company or any entity resulting from any merger or consolidation referred to in this Section 4 is merged with or consolidated into any other entity or entities, or if substantially all of the assets of the Company or any such entity are sold or otherwise transferred to another entity, the provisions of this Agreement shall be binding upon and shall inure to the benefit of the continuing entity in or the entity resulting from such merger or consolidation or the entity to which such assets are sold or transferred.  This Agreement shall not be assignable by the Employee.

Section 5.  **Miscellaneous.**

(a)  **Waiver and Modification.**  Waiver of any term or condition of this Agreement by any party shall not be construed as a waiver of a subsequent breach or failure of the same term or condition, or a waiver of any other term or condition of this Agreement.  Any waiver must be in writing. This Agreement may not be amended, altered or modified without the prior written consent of both parties and such instrument must acknowledge that it is an amendment or modification of this Agreement.

(b)  **Captions.**  The captions in this Agreement are not part of its provisions, are merely for reference and have no force or effect.  If any caption is inconsistent with any provision of this Agreement, such provision shall govern.

(c)  **Governing Law.** The validity, interpretation, construction, performance, enforcement and remedies of or relating to this Agreement, and the rights and obligations of the parties hereunder, shall be governed by and construed in accordance with the substantive laws of the state of Employee's residence as indicated above, without regard to the conflict of law principles, rules or statutes of any jurisdiction.

(d)  **Severability.**  To the extent that the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable for any reason, such word, phrase, clause or sentence shall be modified or deleted in such manner so as to afford the Company and Aon the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws, and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent.

(e)  **Employee-at-Will.**  Nothing in this Agreement shall be construed to create contractual employment rights other than as an employee terminable at-will.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first above written.

Aon Risk Services Companies, Inc.

By:  Steve Keogh
Title:  VP and Head of Human Resources - Aon Risk Solutions U.S.

Danielle Ross                8/19/14

Danielle Ross                Date

# EXHIBIT C

### RESTRICTED STOCK UNIT AGREEMENT
### UNDER AMENDED AND RESTATED
### AON PLC 2011 INCENTIVE PLAN

This Restricted Stock Unit Agreement (the "Agreement") is entered into between Aon plc, a public limited company incorporated under English law, and its Subsidiary Aon Group, Inc., a Maryland corporation with its principal place of business at 200 East Randolph Street, Chicago, Illinois (collectively, the "Company") and **JAMIE L TAYLOR** (the "Participant").

The Company desires to grant the Participant restricted stock units ("RSUs"), each RSU representing the right to receive a Class A Ordinary Share of the Company ("Share"), $.01 par value per Share, to encourage the Participant to remain in the service of the Company or its Subsidiaries or Affiliates, to provide the Participant with an incentive to contribute to the financial progress of the Company, and to encourage ownership of Shares by the Participant. Capitalized terms used but not otherwise defined in the Agreement shall have the meaning ascribed to such terms in the Amended and Restated Aon plc 2011 Incentive Plan, as amended from time to time (the "Plan").

NOW, THEREFORE, in consideration of the mutual promises hereinafter set forth, the parties hereto agree as follows:

1. **Grant of Restricted Stock Units.** The Company grants under the Plan an award of **712** RSUs on **05/20/2016** (the "Grant Date"). The Participant understands and agrees that the Participant has no obligation to accept this award (as a condition of employment or otherwise), and that the Participant's decision to do so by signing this Agreement, and thereby to accept all of the terms and conditions of this Agreement, is the Participant's knowing and voluntary choice after having had a full and fair opportunity to consult with legal counsel (at the Participant's cost).

2. **Vesting of Restricted Stock Units.** The RSUs will vest in accordance with the schedule set forth in the Participant's account. The Participant must access the www.netbenefits.fidelity.com website and follow the instructions in order to view the vesting schedule. Notwithstanding anything herein to the contrary, the Committee may cause the RSUs to vest prior to the date(s) set forth in the vesting schedule in order to satisfy any Tax-Related Items (as defined below) that arise prior to the date of settlement of the RSUs, subject to the limitations set forth in Section 3(d) of this Agreement.

3. **Tax Withholding Obligations.** The Participant acknowledges that, regardless of any action taken by the Company and/or the Participant's employer (the "Employer"), the ultimate liability for all income tax, social insurance, payroll tax, payment on account or other tax-related items related to the Participant's participation in the Plan and legally applicable to the Participant ("Tax-Related Items"), is and remains the Participant's responsibility and may exceed the amount actually withheld by the Company or the Employer. The Participant further acknowledges that the Company and/or the Employer: (a) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the grant of RSUs, including, but not limited to, the grant, vesting or settlement of the RSUs, the issuance of Shares upon settlement of the RSUs, the subsequent sale of Shares acquired pursuant to such vesting/settlement and the receipt of any dividends and/or dividend equivalents; and (b) do not commit to and are under no obligation to structure the terms of the grant or any aspect of the RSUs to reduce or eliminate the Participant's liability for Tax-Related Items or achieve any particular tax result. Further, if the Participant is subject to Tax-Related Items in more than one jurisdiction, the Participant acknowledges that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

   a) Prior to any relevant taxable or tax withholding event, as applicable, the Participant agrees to make adequate arrangements satisfactory to the Company or the Employer, to satisfy all Tax-Related Items. In this regard, the Participant authorizes the Company and/or the Employer, or their respective agents, at the Company's discretion, to satisfy the obligations with regard to all Tax-Related Items by one or a combination of the following:

      (i) withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer; or

      (ii) withholding in Shares to be issued upon vesting/settlement of the RSUs; or

      (iii) withholding from the proceeds of the sale of Shares acquired upon vesting/settlement of the RSUs either through a voluntary sale or through a mandatory sale arranged by the Company (on the Participant's behalf pursuant to this authorization without further consent); provided, however, that if the Participant is a Section 16 officer under the U.S. Securities Exchange Act of 1934, the Committee shall establish the method of withholding from alternatives (i) – (iii) herein and if the Committee does not exercise its discretion prior to the Tax-Related Items withholding event, then the Participant shall be entitled to elect the method of

withholding from the alternatives above.

b) Depending on the withholding method, the Company may withhold or account for Tax-Related Items by considering applicable minimum statutory withholding amounts or other applicable withholding rates, including maximum applicable rates, in which case, any over-withheld amount will be refunded to the Participant in cash by the Company or the Employer (with no entitlement to the equivalent Shares) or if not refunded, the Participant may seek a refund from the local tax authorities. If the obligation for Tax-Related Items is satisfied by withholding in Shares, for tax purposes, the Participant shall be deemed to have been issued the full number of Shares subject to the vested RSUs, notwithstanding that a number of Shares are held back solely for the purpose of paying the Tax-Related Items.

c) Finally, the Participant shall pay to the Company and/or the Employer any amount of Tax-Related Items that the Company and/or the Employer may be required to withhold as a result of the Participant's participation in the Plan that cannot be satisfied by the means previously described. The Company may refuse to deliver the Shares or the proceeds of the sale of Shares if the Participant fails to comply with the Participant's obligations in connection with the Tax-Related Items.

d) Notwithstanding anything in this Section 3 to the contrary, to avoid a prohibited distribution under Code Section 409A, if Shares underlying the RSUs will be withheld (or sold on the Participant's behalf) to satisfy any Tax-Related Items arising prior to the date of settlement of the RSUs for any portion of the RSUs that is considered "nonqualified deferred compensation" subject to Code Section 409A ("Deferred Compensation"), then the number of Shares withheld (or sold on the Participant's behalf) shall not exceed the number of Shares that equals the liability for the Tax-Related Items.

4. **Nominal Value.** At the time of settlement, this Award will be subject to the Participant's appropriate undertaking to pay to Aon plc a nominal value of $.01 per share (as determined in the sole discretion of Aon plc, subject to the provisions of Aon plc's articles of association and the U.K. Companies Act 2006, as amended from time to time), and such obligation may be satisfied by the Participant in cash in any manner to be established by Aon plc in its sole discretion, including but not limited to withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer.

5. **Effect of Termination of Employment.**

a) <u>**Voluntary termination (other than Retirement).**</u> In the event that the Participant's Termination Date occurs because of the Participant's voluntary termination that does not qualify as Retirement (as defined in Section 5(d) below), the unvested portion of the RSU will be forfeited.

b) <u>**Termination due to death.**</u> In the event that the Participant's Termination Date occurs due to the Participant's death, all unvested RSUs will be fully vested immediately and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof.

c) <u>**Termination due to disability.**</u> In the event that the Participant's Termination Date occurs due to the Participant's disability, all unvested RSUs will be fully vested immediately and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof. "Disability" for purposes of this Agreement, shall mean disability pursuant to the standards set forth in, or in circumstances where the Participant qualifies for receipt of benefits under, the long-term disability plan of the Employer. In the absence of such a plan, the Committee shall have exclusive discretion to determine whether a Participant's employment is terminated due to disability.

d) <u>**Involuntary termination (other than for Cause) or Retirement.**</u> In the event that the Participant's Termination Date occurs as a result of the Participant's involuntary termination by the Company or Employer (other than for Cause) or the Participant's Retirement, the RSUs shall be immediately vested pro rata and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof. The pro rata portion of the RSUs that shall vest shall be calculated by multiplying (i) the number of RSUs subject to the award, by (ii) a fraction, the numerator of which shall be the number of days that have elapsed between the Grant Date and the date of the Participant's termination, and the denominator of which shall be the total number of days covered by the vesting schedule set forth in the Participant's account, and subtracting from the resulting product the number of RSUs previously vested. The remaining unvested portion of the RSUs shall be forfeited. For purposes of this Agreement, "Retire" or "Retirement" means a voluntary termination of employment on or after the Participant's 55th birthday for employees whose principal place of work is outside of the European Union ("EU"). A Participant on secondment will be subject to the vesting rule applicable to his or her home country. Participants whose principal place of work is

- 2 -

inside the EU shall not be eligible for Retirement, and their voluntary termination at any age shall be treated in accordance with Section 5(a). The Committee shall have exclusive discretion to determine a Participant's principal place of work for purposes of this Section 5(d).

e) **Termination for Cause.** In the event that the Participant's Termination Date occurs because the Participant is terminated by the Company or Employer for Cause, all unvested RSUs shall be forfeited. "Cause" shall mean the Participant's (i) performing a deliberate act of dishonesty, fraud, theft, embezzlement, or misappropriation involving the Participant's employment with the Company, its Subsidiaries or Affiliates, or breach of the duty of loyalty to the Company, its Subsidiaries or Affiliates; (ii) performing an act of race, sex, national origin, religion, disability, or age-based discrimination which after investigation, counsel to the Company reasonably concludes will result in liability being imposed on the Company, its Subsidiaries or Affiliates and / or the Participant; (iii) material violation of Company policies and procedures including, but not limited to, the Aon Code of Business Conduct; (iv) material non-compliance with any terms of this Agreement or an employment agreement; or (v) performing any criminal act resulting in a criminal felony charge brought against the Participant or a criminal conviction of the Participant (other than conviction of a minor traffic violation).

6. **Receipt by the Participant of the Prospectus.** The Participant acknowledges receipt of the Plan prospectus that contains the entire Plan, and is incorporated herein by reference. The Participant represents and warrants that the Participant has read the Plan and agrees that all RSUs awarded under it shall be subject to all of the terms and conditions of the Plan.

7. **Issuance of Shares.** RSUs shall be converted to Shares as of the applicable vesting date. Shares will be issued to the Participant as soon as practicable (within 60 days) after the vesting date, subject to Sections 3 and 4 of this Agreement. Notwithstanding the foregoing, for purposes of complying with Code Section 409A, if the RSUs are considered Deferred Compensation and the Shares are to be settled in connection with a termination contemplated under Section 5(c) or 5(d), the Company and the Participant shall take all steps necessary (including with regard to any post-termination services by the Participant) to ensure that a termination contemplated under Section 5 constitutes a "separation from service" within the meaning of Code Section 409A. In addition, if the RSUs are Deferred Compensation, the RSUs are settled upon the Participant's separation from service and the Participant is a "specified employee," within the meaning of Code Section 409A, on the date the Participant experiences a separation from service, then the RSUs shall be settled on the first business day of the seventh month following the Participant's separation from service, or, if earlier, on the date of the Participant's death, to the extent such delayed payment is required in order to avoid a prohibited distribution under Code Section 409A.

8. **Rights as Shareholder.** The Participant shall not have voting or any other rights as a shareholder of Aon plc with respect to the RSUs. Upon issuance of the Shares pursuant to and in accordance with Section 7, the Participant will obtain full voting and other rights as a shareholder of Aon plc.

9. **Business Considerations; Restrictive Covenants; Acknowledgments; Injunctive Relief; Confidential Information; Incentive Repayment Policy.**

a) **Business Considerations.** Aon plc and its Subsidiary, Aon Group, Inc., a Maryland corporation with its corporate and business headquarters in Chicago, Illinois, and Aon Group, Inc.'s Subsidiaries and Affiliates (and divisions thereof) (collectively, with Aon plc, "Aon") are in the business of providing conventional and alternative risk management products and services covering the businesses of insurance brokerage, reinsurance brokerage, benefits consulting, compensation consulting, human resources consulting, human resources and benefits outsourcing management, investigatory and security consulting, managing underwriting and related services, including accounting, actuarial, claims management and handling, and information systems on behalf of commercial and individual clients which are national and international and are not confined to any geographic area (the "Business"). The Participant further acknowledges that the Participant's material employment duties and responsibilities, including without limitation with respect to Aon clients, prospective clients, and other employees, span geographic areas that extend well beyond the state in which the Participant is physically employed and resides. An essential element of the Business is the development and maintenance of personal contacts and relationships with clients and prospective clients. Aon invests considerable time and money to develop and maintain personal contacts and relationships with clients and prospective clients. Aon invests considerable time and money to develop and maintain client relationships, including payment of employees' salaries, benefits, travel, entertainment and other business expenses and assistance in servicing clients by making available to its employees specially developed and researched industry data, client-specific information, legal support, accounting support, marketing, advertising and other corporate services, as well as providing training and professional development and valuable confidential business and professional information, toward the development and maintenance of its client relationships and related goodwill. While these clients and

- 3 -

prospective clients may be secured or serviced by Aon employees, including the Participant, the Participant acknowledges that such clients and prospective clients remain at all times the clients and prospective clients of Aon and that the goodwill engendered by the relationships is intended to inure only to the benefit of Aon; the goodwill is owned by Aon; and Aon shall be the sole beneficiary of such goodwill during and after termination of the Participant's employment with Aon. In addition, the Participant acknowledges that the Participant has acquired and/or will acquire, solely for the purpose of furthering the Business, knowledge of Aon's confidential and proprietary information; the Participant further acknowledges Aon's legitimate interest in safeguarding confidential and proprietary information from disclosure.

The personal identification of clients of Aon with an employee, including the Participant, creates the potential for the Participant's appropriation of the benefits of the relationships developed with clients on behalf of and at the expense of Aon. Since Aon would suffer irreparable harm if the Participant left its employ and solicited the Business of the clients and prospective clients of Aon, or solicited the employees of Aon, it is reasonable to protect Aon against certain competitive activities by the Participant for a limited period of time after the Participant leaves employment so that Aon may renew or restore its business relationship with its clients, prospective clients and employees. Consequently, the Participant is willing to enter into the covenants set forth herein in order to provide Aon with reasonable protection for its client, prospective client and employee relationships and its investment therein as above-described, its goodwill, and its confidential and proprietary information.

b)  **Covenant Not to Solicit Clients and Prospective Clients.** The Participant hereby covenants and agrees that, except with the prior written consent of Aon, the Participant (on the Participant's own behalf or on behalf of any other person or entity) will not, during the course of employment, and for a period of two (2) years after the Participant's Termination Date, directly or indirectly, call upon, solicit, accept, engage in, service or perform, other than on behalf of Aon, any business of the same type or kind as the Business performed by Aon from or with respect to (i) clients of Aon with respect to whom the Participant provided services, either alone or with others, or had a business relationship, or on whose account the Participant worked or became familiar, or supervised directly or indirectly the servicing activities related to such clients, during the twenty-four (24) months prior to the Participant's Termination Date and, further provided, such clients were clients of Aon either on the Participant's Termination Date or within twelve (12) months prior to such Termination Date and (ii) prospective clients of Aon which the Participant alone, in combination with others, or in a supervisory capacity, solicited during the six (6) months prior to the Participant's Termination Date and to which a proposal for services was rendered by Aon during the six (6) months prior to the Participant's Termination Date. "Client" means any person or entity listed on the books of Aon as such.

c)  **Covenant Not to Solicit Employees.** The Participant hereby also agrees, for the duration of the term of the covenant set forth in Section 9(b) herein not to, directly or indirectly, solicit, induce, or cause any person or other entity to solicit, induce, any employee of Aon to work for the Participant or for any third party or entity, or to leave the employ of Aon.

d)  **Other Covenants.** Notwithstanding any other language in the Agreement, including, but not limited to that found in Section 10(b), this Agreement does not preclude the enforceability of any restrictive covenant provision contained in any prior or subsequent agreement entered into by the Participant, (any such covenant, an "Other Covenant"), including without limitation any covenant contained in any Confidentiality and Non-Solicitation Agreement between the Participant and any Aon entity, and further including without limitation any covenant not to compete, to solicit or perform services for clients, or to solicit employees, any confidentiality or intellectual property covenant, and any covenant with respect to a pre-resignation notice period. Further, no Other Covenant precludes the enforceability of any provision contained in this Agreement.

e)  **Acknowledgments.** Aon and the Participant acknowledge and agree that the covenants contained in Sections 9(b) and 9(c) herein are necessary and reasonable for the protection of Aon and are reasonably limited with respect to the activities prohibited, duration, geographical scope and their effect on the Participant and the public. The parties acknowledge that the purpose and effect of the covenants simply are to protect Aon for a limited period of time from unfair competition by the Participant.

The Participant acknowledges that there is no general geographical restriction contained in the preceding paragraphs because the restrictions apply only to the specified clients of Aon and because the Participant's material duties, responsibilities and relationships with Aon clients, prospective clients and employees are not limited to any particular geographic area. Nothing in this Agreement shall prohibit the Participant from obtaining a livelihood for himself or herself or his or her family by being engaged in the Business. The intent of the parties is that the Participant's restrictive covenant is limited only to those clients as above specified.

f)  **Company's Right to Injunctive Relief; Attorneys' Fees.** The Participant acknowledges that the Participant's services to Aon are of a unique character which gives them a special value to Aon, the loss of which cannot

- 4 -

reasonably or adequately be compensated in damages in an action at law, and that a breach of this Agreement will result in irreparable and continuing harm to Aon, and that therefore, in addition to any other remedy which Aon may have at law or in equity, Aon shall be entitled to temporary, preliminary and permanent injunctive relief for a breach or threatened breach of this Agreement by the Participant (without the need to post any bond or other security). The parties acknowledge and agree that Aon Group, Inc. and the Participant's Employer each is an intended third-party beneficiary of this Agreement, and may be a named plaintiff in any subsequent suit brought by the Company to enforce the terms of this Agreement. In the event that Aon brings an action to enforce the terms and conditions of the Agreement, the Participant shall pay the costs and expenses incurred by Aon in bringing such action, including without limitation attorneys' and other legal fees.

**g) Trade Secrets and Confidential Information.** The Participant acknowledges that Aon's business depends to a significant degree upon the possession of information which is not generally known to others, and that the profitability of such business requires that this information remain proprietary to Aon. The Participant shall not, except as required in the course of employment by Aon or by applicable law (provided that the Participant shall first give Aon plc reasonable advance written notice of any subpoena (Attn: General Counsel), with a contemporaneous copy to Aon Group, Inc.), disclose or use during or subsequent to the course of employment, any trade secrets or confidential or proprietary information relating to the business of Aon of which the Participant becomes aware by reason of being employed or to which the Participant gains access during his or her employment by Aon and which has not been publicly disclosed (it being understood and agreed that trade secrets and confidential or proprietary information shall remain subject to this Section 9(g), and shall not be considered "publicly disclosed" for purposes of the preceding clause, if any public disclosure thereof results from a breach by the Participant of this provision, or a breach by the Participant or another person of some other contractual or legal obligation to Aon). Nothing in this paragraph is intended to limit the Participant's right or ability to communicate with the U.S. Equal Employment Opportunity Commission, the National Labor Relations Board, the Securities and Exchange Commission, or other federal, state or local agency, and such communication may be initiated by the Participant or in response to the government inquiry.

Such information includes, without limitation, lists of clients and prospective clients; contract terms and conditions; client information relating to services, insurance, benefits programs, employees, finances, and compensation; copyrighted materials; corporate, management and business plans and strategies; compensation and revenues; methods and strategies of marketing; market research and data; technical know-how; computer software and manuals; policies and procedures; and the conduct of the affairs of Aon. All records and equipment and other materials constituting or relating in any way to any trade secrets, confidential or proprietary information, or relating to clients or business of Aon, and all other Aon property, shall be and remain the sole property of Aon during and after the end of employment and shall be returned to Aon by the Participant immediately upon its request or the Participant's Termination Date (whichever is earlier).

**h) Incentive Repayment Policy.** If the Participant has been designated and notified by the board of directors of Aon plc that he or she is a reporting officer for purposes of Section 16 of the U.S. Securities Exchange Act of 1934, the Participant is subject to Aon's Incentive Repayment Policy (the "Policy"). The Policy provides that Aon plc will have the discretion to cancel or require reimbursement to the Company of the long-term equity based incentive award set forth in this Agreement if the grant or vesting was based on the achievement of financial results that were subsequently restated. The Participant can obtain a copy of the Policy from the Global Compensation team. If the Participant is subject to the Policy, by accepting this Agreement, the Participant hereby agrees and acknowledges that he or she will be bound by it.

**10. Other Provisions.**

    **a) Plan Terms Take Precedence over Agreement Terms.** RSUs are granted pursuant to the Plan, the terms and conditions of which are incorporated into this Agreement by reference. If there are any inconsistencies between the terms of this Agreement and the Plan, the terms of the Plan will govern.

    **b) Prior Agreement(s) Will Not Control.** The Participant's acceptance of this Agreement will supersede provisions of any prior agreement that could be construed as governing the terms of this grant.

    **c) Code Section 409A.** The RSUs and amounts payable thereunder are intended to be exempt from or compliant with Code Section 409A and the U.S. Treasury Regulations relating thereto so as not to subject the Participant to the payment of additional taxes and interest under Code Section 409A or other adverse tax consequences. In furtherance of this intent, the provisions of this Agreement will be interpreted, operated, and administered in a manner consistent with these intentions. The Committee may modify the terms of this Agreement and/or the

Plan, without the consent of the Participant, in the manner that the Committee may determine to be necessary or advisable in order to comply with Code Section 409A or to mitigate any additional tax, interest and/or penalties or other adverse tax consequences that may apply under Code Section 409A if compliance is not practical. This Section 10(c) does not create an obligation on the part of the Company to modify the terms of this Agreement or the Plan and does not guarantee that the RSUs or the delivery of Shares upon vesting/settlement of the RSUs will not be subject to taxes, interest and penalties or any other adverse tax consequences under Code Section 409A. Nothing in this Agreement shall provide a basis for any person to take any action against the Company or any of its Subsidiaries or Affiliates based on matters covered by Code Section 409A, including the tax treatment of any amounts paid under this Agreement, and neither the Company nor any of its Subsidiaries or Affiliates will have any liability under any circumstances to the Participant or any other party if the RSUs, the delivery of Shares upon vesting/settlement of the RSUs or other payment or tax event hereunder that is intended to be exempt from, or compliant with, Code Section 409A, is not so exempt or compliant or for any action taken by the Committee with respect thereto. Further, settlement of any portion of the RSUs that is Deferred Compensation may not be accelerated or postponed except to the extent permitted by Code Section 409A.

d) **Restriction on Transfer.** RSUs may not be sold, transferred, pledged, assigned, or otherwise alienated at any time.

e) **Right of Employment.** Grants of RSUs under the Plan and of this Agreement do not confer upon the Participant any right to continue in the employ or service of the Employer. This Agreement shall survive any termination of the Participant's employment for any or no reason.

f) **Electronic Delivery and Acceptance.** The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means. The Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

g) **Need to Accept Grant.** The Participant acknowledges that this grant must be accepted within ninety (90) days of the Grant Date in order to be eligible to receive any benefits from this grant. If this grant is not accepted within the ninety (90)-day period specified in the foregoing sentence, all benefits under this grant may be forfeited, as determined in the sole discretion of the Committee. To accept this grant, the Participant must access the www.netbenefits.fidelity.com website and follow the instructions for acceptance. If this grant was distributed to the Participant via mail, the Participant must sign the Agreement and return it to Aon's Executive Compensation Department within ninety (90) days.

h) **Waiver; Section Headings.** Waiver of any term or condition of this Agreement by any party shall not be construed as a waiver of a subsequent breach or failure of the same term or condition, or a waiver of any other term or condition of this Agreement. Any waiver must be in writing. The Section headings in this Agreement are for convenience only and are not to be used in interpreting this Agreement.

i) **Severability.** To the extent that the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable by a court of competent jurisdiction for any reason, such term, word, phrase, clause or sentence shall be modified in such manner so as to afford the Company the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws. If, however, a court of competent jurisdiction finds that any such term, word, phrase, clause or sentence cannot be so modified and thus made enforceable, or otherwise declines for any reason to do so, such term, word, phrase, clause or sentence shall be deemed severed from this Agreement and of no force and effect, and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent.

j) **Governing Law.** The validity, interpretation**,** instruction, performance, enforcement and remedies of or relating to this Agreement, and the rights and obligations of the parties hereunder, shall be governed by and construed in accordance with the substantive internal laws of the State of Illinois, without regard to the conflict of law principles, rules or statutes of any jurisdiction. The foregoing provisions of this Section 10(j) shall apply irrespective of whether the Participant is a party to or bound by another restrictive covenant of any kind that may be governed by the laws of another jurisdiction (if any).

k) **Venue and Jurisdiction.** Venue for any legal proceedings instituted related to this Agreement shall be exclusively in the state and/or federal courts located in Cook County, Illinois, and the Participant hereby knowingly, voluntarily and irrevocably agrees, consents and submits to the exclusive jurisdiction and venue of such courts within the State of Illinois. The Participant further hereby knowingly, voluntarily and irrevocably waives, and agrees not to assert, any objection, challenge or defense to such exclusive venue or jurisdiction (including without limitation any defense of forum non conveniens), and further agrees not to file any claim or

action related to this Agreement in any other jurisdiction or venue. The foregoing provisions of this Section 10(k) shall apply irrespective of whether the Participant is a party to or bound by another restrictive covenant of any kind that may provide for or permit venue or jurisdiction with respect to such other restrictive covenant in any other court or forum (if any).

l)   **Notice.**   All notices given hereunder shall be in writing and, if intended for Aon plc, shall be addressed to it or delivered to it at its principal office in London, England to the attention of the General Counsel or its principal office in Chicago, Illinois to the attention of the Chief Human Resources Officer. If intended for the Participant, notices shall be delivered personally or shall be addressed (if sent by mail) to the Participant's then current residence address as shown on the Company's records, or to such other address as the Participant directs in a notice to the Company. All notices shall be deemed to be given on the date received at the address of the addressee or, if delivered personally, on the date delivered.

m)   <u>**Compliance with Law.**</u>   Notwithstanding any other provision of the Plan or this Agreement, unless there is an available exemption from any registration, qualification or other legal requirement applicable to the Shares, the Company shall not be required to deliver any Shares issuable upon vesting/settlement of the RSUs prior to the completion of any registration or qualification of the Shares under any local, state, federal or foreign securities or exchange control law or under rulings or regulations of the U.S. Securities and Exchange Commission ("SEC") or of any other governmental regulatory body, or prior to obtaining any approval or other clearance from any local, state, federal or foreign governmental agency, which registration, qualification or approval the Company shall, in its absolute discretion, deem necessary or advisable. The Participant understands that the Company is under no obligation to register or qualify the Shares with the SEC or any state or foreign securities commission or to seek approval or clearance from any governmental authority for the issuance or sale of the Shares. Further, the Participant agrees that the Company shall have unilateral authority to amend the Plan and the Agreement without the Participant's consent to the extent necessary to comply with securities or other laws applicable to issuance of Shares.

n)   <u>**Intellectual Property.**</u>   The Participant hereby assigns to the Company the Participant's entire right, title and interest in and to all discoveries and improvements, patentable or otherwise, trade secrets and ideas and writings and copyrightable material, which are conceived, developed, reduced to practice, or acquired by the Participant (collectively "IP") during the Participant's employment and which relate to the business of the Company or any of its Affiliates, parent companies or Subsidiaries. The Participant further acknowledges that all original works of authorship which are made by the Participant (solely or jointly with others) within the scope of and during the period of his/her employment with the Company and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. The Participant agrees to disclose promptly, fully and in writing all such IP to the Company. The Participant will upon the Company's request, execute, acknowledge and deliver to the Company all instruments and do all other acts which are necessary or desirable to enable the Company or any of its Affiliates, parent companies, or Subsidiaries to file and prosecute applications for, and to acquire, maintain and enforce, all patents, trademarks, and copyrights in all countries. To the extent the Participant is bound by an employee handbook or contract provision that protects the Company's intellectual property at least to the extent provided in this Section 10(n), the provision set forth in such employment handbook or contractual arrangement between the Participant and the Company will prevail and govern.

o)   **No Advice Regarding Grant.** The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding the Participant's participation in the Plan, or the acquisition or sale of the underlying Shares. The Participant should consult with his or her own personal tax, legal and financial advisors regarding his or her participation in the Plan and execution of this Agreement, before executing this Agreement or otherwise taking any action at any time related to the Plan.

p)   **Imposition of Other Requirements.**   The Company reserves the right to impose other requirements on the Participant's participation in the Plan, on the RSUs and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable for legal or administrative reasons, and to require the Participant to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

IN WITNESS WHEREOF, the parties have accepted this Agreement as of the date hereof.

**AON PLC**

*Gregory C. Case*

Gregory C. Case
President and Chief Executive Officer

**AON GROUP, INC.**

*Gregory C. Case*

Gregory C. Case
President and Chief Executive Officer

**Signed Electronically**                                           **06/08/2016**
**RSU Recipient (Participant)**                                                    **Date**

**GGW80ZA3**

**06/08/2016 01:49 pm U.S. Eastern Standard Time**

**ACCEPTED**

**RESTRICTED STOCK UNIT AGREEMENT**
**UNDER AMENDED AND RESTATED**
**AON PLC 2011 INCENTIVE PLAN**

This Restricted Stock Unit Agreement (the "Agreement") is entered into between Aon plc, a public limited company incorporated under English law, and its Subsidiary Aon Group, Inc., a Maryland corporation with its principal place of business at 200 East Randolph Street, Chicago, Illinois (collectively, the "Company") and **JAMIE L TAYLOR** (the "Participant").

The Company desires to grant the Participant restricted stock units ("RSUs"), each RSU representing the right to receive a Class A Ordinary Share of the Company ("Share"), $.01 par value per Share, to encourage the Participant to remain in the service of the Company or its Subsidiaries or Affiliates, to provide the Participant with an incentive to contribute to the financial progress of the Company, and to encourage ownership of Shares by the Participant. Capitalized terms used but not otherwise defined in the Agreement shall have the meaning ascribed to such terms in the Amended and Restated Aon plc 2011 Incentive Plan, as amended from time to time (the "Plan").

NOW, THEREFORE, in consideration of the mutual promises hereinafter set forth, the parties hereto agree as follows:

1. **Grant of Restricted Stock Units.** The Company grants under the Plan an award of _____880_____ RSUs on _05/21/2018_ (the "Grant Date"). The Participant understands and agrees that the Participant has no obligation to accept this award (as a condition of employment or otherwise), and that the Participant's decision to do so by signing this Agreement, and thereby to accept all of the terms and conditions of this Agreement, is the Participant's knowing and voluntary choice after having had a full and fair opportunity to consult with legal counsel (at the Participant's cost).

2. **Vesting of Restricted Stock Units.** The RSUs will vest in accordance with the schedule set forth in the Participant's account. The Participant must access the www.netbenefits.fidelity.com website and follow the instructions in order to view the vesting schedule. Notwithstanding anything herein to the contrary, the Committee may cause the RSUs to vest prior to the date(s) set forth in the vesting schedule in order to satisfy any Tax-Related Items (as defined below) that arise prior to the date of settlement of the RSUs, subject to the limitations set forth in Section 3(d) of this Agreement.

3. **Tax Withholding Obligations.** The Participant acknowledges that, regardless of any action taken by the Company and/or the Participant's employer (the "Employer"), the ultimate liability for all income tax, social insurance, payroll tax, payment on account or other tax-related items related to the Participant's participation in the Plan and legally applicable to the Participant ("Tax-Related Items"), is and remains the Participant's responsibility and may exceed the amount, if any, actually withheld by the Company or the Employer. The Participant further acknowledges that the Company and/or the Employer: (a) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the grant of RSUs, including, but not limited to, the grant, vesting or settlement of the RSUs, the issuance of Shares upon settlement of the RSUs, the subsequent sale of Shares acquired pursuant to such vesting/settlement and the receipt of any dividends and/or dividend equivalents; and (b) do not commit to and are under no obligation to structure the terms of the grant or any aspect of the RSUs to reduce or eliminate the Participant's liability for Tax-Related Items or achieve any particular tax result. Further, if the Participant is subject to Tax-Related Items in more than one jurisdiction, the Participant acknowledges that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

   a) Prior to any relevant taxable or tax withholding event, as applicable, the Participant agrees to make adequate arrangements satisfactory to the Company or the Employer, to satisfy all Tax-Related Items. In this regard, the Participant authorizes the Company and/or the Employer, or their respective agents, at the Company's discretion, to satisfy the obligations with regard to all Tax-Related Items by one or a

- 1 -

combination of the following:

**(i)** withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer; or

**(ii)** withholding in Shares to be issued upon vesting/settlement of the RSUs; or

**(iii)** withholding from the proceeds of the sale of Shares acquired upon vesting/settlement of the RSUs either through a voluntary sale or through a mandatory sale arranged by the Company (on the Participant's behalf pursuant to this authorization without further consent); provided, however, that if the Participant is a Section 16 officer under the U.S. Securities Exchange Act of 1934, the Committee shall establish the method of withholding from alternatives (i) – (iii) herein.

**b)** Depending on the withholding method, the Company and/or the Employer may withhold or account for Tax-Related Items by considering applicable minimum statutory withholding amounts or other applicable withholding rates in the Participant's jurisdiction(s), including maximum applicable rates, in which case, any over-withheld amount may be refunded to the Participant in cash by the Company or the Employer (with no entitlement to the equivalent Shares) or if not refunded, the Participant may seek a refund from the local tax authorities. If the obligation for Tax-Related Items is satisfied by withholding in Shares, for tax purposes, the Participant shall be deemed to have been issued the full number of Shares subject to the vested RSUs, notwithstanding that a number of Shares are held back solely for the purpose of paying the Tax-Related Items.

**c)** Finally, the Participant shall pay to the Company and/or the Employer any amount of Tax-Related Items that the Company and/or the Employer may be required to withhold as a result of the Participant's participation in the Plan that cannot be satisfied by the means previously described. The Company may refuse to deliver the Shares or the proceeds of the sale of Shares if the Participant fails to comply with the Participant's obligations in connection with the Tax-Related Items.

**d)** Notwithstanding anything in this Section 3 to the contrary, to avoid a prohibited distribution under Code Section 409A, if Shares underlying the RSUs will be withheld (or sold on the Participant's behalf) to satisfy any Tax-Related Items arising prior to the date of settlement of the RSUs for any portion of the RSUs that is considered "nonqualified deferred compensation" subject to Code Section 409A ("Deferred Compensation"), then the number of Shares withheld (or sold on the Participant's behalf) shall not exceed the number of Shares that equals the liability for the Tax-Related Items.

4. **Nominal Value.** At the time of settlement, this Award will be subject to the Participant's appropriate undertaking to pay to Aon plc a nominal value of $.01 per share (as determined in the sole discretion of Aon plc, subject to the provisions of Aon plc's articles of association and the U.K. Companies Act 2006, as amended from time to time), and such obligation may be satisfied by the Participant in cash in any manner to be established by Aon plc in its sole discretion, including but not limited to withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer.

5. **Effect of Termination of Employment.**

**a)** <u>Voluntary termination (other than Retirement).</u> In the event that the Participant's Termination Date occurs because of the Participant's voluntary termination that does not qualify as Retirement (as defined in Section 5(d) below), the unvested portion of the RSU will be forfeited.

**b)** <u>Termination due to death.</u> In the event that the Participant's Termination Date occurs due to the Participant's death, all unvested RSUs will be fully vested immediately and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof.

**c)** <u>Termination due to disability.</u> In the event that the Participant's Termination Date occurs due to the Participant's disability, all unvested RSUs will be fully vested immediately and the date of such

- 2 -

termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof. "Disability" for purposes of this Agreement, shall mean disability pursuant to the standards set forth in, or in circumstances where the Participant qualifies for receipt of benefits under, the long-term disability plan of the Employer. In the absence of such a plan, the Committee shall have exclusive discretion to determine whether a Participant's employment is terminated due to disability.

d) **Involuntary termination (other than for Cause) or Retirement.** In the event that the Participant's Termination Date occurs as a result of the Participant's involuntary termination by the Company or Employer (other than for Cause) or the Participant's Retirement, the RSUs shall be immediately vested pro rata and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof. The pro rata portion of the RSUs that shall vest shall be calculated by multiplying (i) the number of RSUs subject to the award, by (ii) a fraction, the numerator of which shall be the number of days that have elapsed between the Grant Date and the date of the Participant's termination, and the denominator of which shall be the total number of days covered by the vesting schedule set forth in the Participant's account, and subtracting from the resulting product the number of RSUs previously vested. The remaining unvested portion of the RSUs shall be forfeited. For purposes of this Agreement, "Retire" or "Retirement" means a voluntary termination of employment on or after the Participant's 55th birthday for employees whose principal place of work is outside of the European Union ("EU"). A Participant on secondment will be subject to the vesting rule applicable to his or her home country. Participants whose principal place of work is inside the EU shall not be eligible for Retirement, and their voluntary termination at any age shall be treated in accordance with Section 5(a). The Committee shall have exclusive discretion to determine a Participant's principal place of work for purposes of this Section 5(d).

e) **Termination for Cause.** In the event that the Participant's Termination Date occurs because the Participant is terminated by the Company or Employer for Cause, all unvested RSUs shall be forfeited. "Cause" shall mean the Participant's (i) performing a deliberate act of dishonesty, fraud, theft, embezzlement, or misappropriation involving the Participant's employment with the Company, its Subsidiaries or Affiliates, or breach of the duty of loyalty to the Company, its Subsidiaries or Affiliates; (ii) performing an act of race, sex, national origin, religion, disability, or age-based discrimination which after investigation, counsel to the Company reasonably concludes will result in liability being imposed on the Company, its Subsidiaries or Affiliates and / or the Participant; (iii) material violation of Company policies and procedures including, but not limited to, the Aon Code of Business Conduct; (iv) material noncompliance with any terms of this Agreement or an employment agreement; or (v) performing any criminal act resulting in a criminal felony charge brought against the Participant or a criminal conviction of the Participant (other than conviction of a minor traffic violation).

6. **Receipt by the Participant of the Prospectus.** The Participant acknowledges receipt of the Plan prospectus that contains the entire Plan, and is incorporated herein by reference. The Participant represents and warrants that the Participant has read the Plan and agrees that all RSUs awarded under it shall be subject to all of the terms and conditions of the Plan.

7. **Issuance of Shares.** RSUs shall be converted to Shares as of the applicable vesting date. Shares will be issued to the Participant as soon as practicable (within 60 days) after the vesting date, subject to Sections 3 and 4 of this Agreement. Notwithstanding the foregoing, for purposes of complying with Code Section 409A, if the RSUs are considered Deferred Compensation and the Shares are to be settled in connection with a termination of service, the Company and the Participant shall take all steps necessary (including with regard to any post-termination services by the Participant) to ensure that a termination contemplated under Section 5 constitutes a "separation from service" within the meaning of Code Section 409A. In addition, if the RSUs are Deferred Compensation and payable in connection with the Participant's separation from service, and if the Participant is a "specified employee" within the meaning of Code Section 409A on the date the Participant experiences a separation from service, then the RSUs shall be settled on the first business day of the seventh month following the Participant's separation from service, or, if earlier, on the date of the Participant's death, solely to the extent

such delayed payment is required in order to avoid a prohibited distribution under Code Section 409A.

8. **Rights as Shareholder.**  The Participant shall not have voting or any other rights as a shareholder of Aon plc with respect to the RSUs. Upon issuance of the Shares pursuant to and in accordance with Section 7, the Participant will obtain full voting and other rights as a shareholder of Aon plc.

9. **Business Considerations; Restrictive Covenants; Acknowledgments; Injunctive Relief; Confidential Information; Incentive Repayment Policy.**

   a) **Business Considerations.**  Aon plc and its Subsidiary, Aon Group, Inc., a Maryland corporation with its corporate and business headquarters in Chicago, Illinois, and Aon Group, Inc.'s Subsidiaries and Affiliates (and divisions thereof) (collectively, with Aon plc, "Aon") are in the business of providing conventional and alternative risk management products and services covering the businesses of insurance brokerage, reinsurance brokerage, benefits consulting, compensation consulting, human resources consulting, human resources and benefits outsourcing management, investigatory and security consulting, managing underwriting and related services, including accounting, actuarial, claims management and handling, and information systems on behalf of commercial and individual clients which are national and international and are not confined to any geographic area (the "Business").  The Participant further acknowledges that the Participant's material employment duties and responsibilities, including without limitation with respect to Aon clients, prospective clients, and other employees, span geographic areas that extend well beyond the state in which the Participant is physically employed and resides.  An essential element of the Business is the development and maintenance of personal contacts and relationships with clients and prospective clients.  Aon invests considerable time and money to develop and maintain client relationships, including payment of employees' salaries, benefits, travel, entertainment and other business expenses and assistance in servicing clients by making available to its employees specially developed and researched industry data, client-specific information, legal support, accounting support, marketing, advertising and other corporate services, as well as providing training and professional development and valuable confidential business and professional information, toward the development and maintenance of its client relationships and related goodwill.  While these clients and prospective clients may be secured or serviced by Aon employees, including the Participant, the Participant acknowledges that such clients and prospective clients remain at all times the clients and prospective clients of Aon and that the goodwill engendered by the relationships is intended to inure only to the benefit of Aon; the goodwill is owned by Aon; and Aon shall be the sole beneficiary of such goodwill during and after termination of the Participant's employment with Aon.  In addition, the Participant acknowledges that the Participant has acquired and/or will acquire, for the purpose of furthering the Business, knowledge of Aon's confidential and proprietary information; the Participant further acknowledges Aon's legitimate interest in safeguarding confidential and proprietary information from disclosure.

   The personal identification of clients of Aon with an Aon employee, including the Participant, creates the potential for the Participant's appropriation of the benefits of the relationships developed with clients on behalf of and at the expense of Aon.  Since Aon would suffer irreparable harm if the Participant left its employ and solicited the Business of the clients and prospective clients of Aon, or solicited the employees of Aon, it is reasonable to protect Aon against certain competitive activities by the Participant for a limited period of time after the Participant leaves employment so that Aon may renew or restore its business relationship with its clients, prospective clients and employees.  Consequently, the Participant is willing to enter into the covenants set forth herein in order to provide Aon with reasonable protection for its client, prospective client and employee relationships and its investment therein as above-described, its goodwill, and its confidential and proprietary information.

   b) **Covenant Not to Solicit Clients and Prospective Clients.**  The Participant hereby covenants and agrees that, except with the prior written consent of Aon, the Participant (on the Participant's own behalf or on behalf of any other person or entity) will not, during the course of employment, and for a period of two (2) years after the Participant's Termination Date (the "Restricted Period"), directly or indirectly, call upon, solicit, accept, engage in, service or perform, other than on behalf of Aon, any business of the same type or

- 4 -

kind as the Business performed by Aon from or with respect to (i) clients of Aon with respect to whom the Participant provided services, either alone or with others, or had a business relationship, or on whose account the Participant worked or became familiar, or supervised directly or indirectly the servicing activities related to such clients, during the twenty-four (24) months prior to the Participant's Termination Date and, further provided, such clients were clients of Aon either on the Participant's Termination Date or within twelve (12) months prior to such Termination Date and (ii) prospective clients of Aon which the Participant alone, in combination with others, or in a supervisory capacity, solicited during the six (6) months prior to the Participant's Termination Date and to which a proposal for services was rendered by Aon during the six (6) months prior to the Participant's Termination Date. "Client" means any person or entity listed on the books of Aon as such.

**c)** **Covenant Not to Solicit Employees.** The Participant hereby also agrees, for the duration of the Restricted Period, not to, directly or indirectly, solicit or induce, or cause any person or other entity to solicit or induce, any employee of Aon to work for the Participant or for any third party or entity, or to leave the employ of Aon.

**d)** **Other Covenants.** Notwithstanding any other language in the Agreement, including, but not limited to that found in Section 10(b), this Agreement does not preclude the enforceability of any restrictive covenant provision contained in any prior or subsequent agreement entered into by the Participant, (any such covenant, an "Other Covenant"), including without limitation any covenant contained in any Confidentiality and Non-Solicitation Agreement between the Participant and any Aon entity, and further including without limitation any covenant not to compete, to solicit or perform services for clients, or to solicit employees, any confidentiality or intellectual property covenant, and any covenant with respect to a pre-resignation notice period. Further, no Other Covenant precludes the enforceability of any provision contained in this Agreement. No subsequent agreement entered into by the Participant may amend, supersede, or override the covenants contained herein unless such subsequent agreement specifically references subsections (b) and (c) of this Section.

**e)** **Acknowledgments.** Aon and the Participant acknowledge and agree that the covenants contained in subsections (b) and (c) of this Section are necessary and reasonable for the protection of Aon and are reasonably limited with respect to the activities prohibited, duration, geographical scope and their effect on the Participant and the public. The parties acknowledge that the purpose and effect of the covenants simply are to protect Aon for a limited period of time from unfair competition by the Participant.

The Participant acknowledges that there is no general geographical restriction contained in the preceding paragraphs because the restrictions apply only to the specified clients of Aon and because the Participant's material duties, responsibilities, and relationships with Aon clients, prospective clients, and employees are not limited to any particular geographic area. Nothing in this Agreement shall prohibit the Participant from obtaining a livelihood for the Participant or the Participant's family by being engaged in the Business.

**f)** **Company's Right to Injunctive Relief; Attorneys' Fees and Costs.** The Participant acknowledges that the Participant's services to Aon are of a unique character which gives them a special value to Aon, the loss of which cannot reasonably or adequately be compensated in damages in an action at law, and that a breach of Section 9 of this Agreement will result in irreparable and continuing harm to Aon, and that therefore, in addition to any other remedy which Aon may have at law or in equity, Aon shall be entitled to temporary, preliminary and permanent injunctive relief for a breach or threatened breach of this Agreement by the Participant (without the need to post any bond or other security). The parties acknowledge and agree that each Aon entity is an intended third-party beneficiary of this Agreement, and may be a named plaintiff in any subsequent suit brought by Aon to enforce the terms of this Agreement. In the event that any action is filed to enforce the terms and conditions of this Agreement, the prevailing party in the action will recover from the non-prevailing party, in addition to any other sum that either party may be called upon to pay, a reasonable sum for the prevailing party's attorney's fees and costs.

**g)** **Trade Secrets and Confidential Information.**

**(i)** The Participant acknowledges that Aon's Business depends to a significant degree upon the possession

- 5 -

of confidential, proprietary, and trade secret information which is not generally known to others, and that the profitability of such Business requires that this information remain proprietary to Aon. The Participant recognizes that, by virtue of the Participant's employment with Aon, and to assist the Participant in the solicitation, production and servicing of client Business, the Participant will be granted otherwise prohibited access to such information. This information (hereinafter referred to as "Confidential Information") includes, without limitation, lists of clients and prospective clients; contract terms and conditions; client information relating to services, insurance, benefits programs, employees, finances, and compensation; copyrighted materials; corporate, management and business plans and strategies; compensation and revenues; methods and strategies of marketing; market research and data; technical know-how; computer software and manuals; policies and procedures; and the conduct of the affairs of Aon. Confidential Information does not include any information that lawfully is or has become generally or publicly known other than through the Participant's breach of this Agreement or a breach by another person of some other obligation to Aon. The Participant shall not, except as required in the course of employment by Aon or as otherwise provided by applicable law or in this subsection (g), disclose or use during or subsequent to the course of employment, any Confidential Information.

(ii) The Participant understands that nothing contained in this Agreement limits the Participant's ability to report possible violations of law or regulation to, or file a charge or complaint with, the Securities and Exchange Commission, the Equal Employment Opportunity Commission, the National Labor Relations Board, the Occupational Safety and Health Administration, the Department of Justice, the Congress, any Inspector General, or any other federal, state or local governmental agency or commission ("Government Agencies"). The Participant further understands that this Agreement does not limit the Participant's ability to participate in any investigation or proceeding that may be conducted by any Government Agency, without notice to the Company.

Nothing in this Agreement shall limit the Participant's ability under applicable United States federal law to (i) disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law or (ii) disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure.

(iii) Upon termination of employment or upon Aon's request (whichever is earlier), the Participant will promptly return to Aon all Confidential Information and all materials and all copies or tangible embodiments of materials involving Confidential Information, and all other Aon property, in the Participant's possession or control, except as otherwise provided by law or in this subsection (g). The Participant agrees to represent in writing to Aon upon termination of employment that he or she has complied with the provisions of this subsection (g).

h) **Incentive Repayment Policy.** If the Participant has been designated and notified by the board of directors of Aon plc that he or she is a reporting officer for purposes of Section 16 of the U.S. Securities Exchange Act of 1934, the Participant is subject to Aon's Incentive Repayment Policy (the "Policy"). The Policy provides that Aon plc will have the discretion to cancel or require reimbursement to the Company of the long-term equity based incentive award set forth in this Agreement if the grant or vesting was based on the achievement of financial results that were subsequently restated. The Participant can obtain a copy of the Policy from the Global Compensation team. If the Participant is subject to the Policy, by accepting this Agreement, the Participant hereby agrees and acknowledges that he or she will be bound by it.

## 10. Other Provisions.

a) **Plan Terms Take Precedence over Agreement Terms.** RSUs are granted pursuant to the Plan, the terms and conditions of which are incorporated into this Agreement by reference. If there are any inconsistencies between the terms of this Agreement and the Plan, the terms of the Plan will govern.

- 6 -

For the avoidance of doubt, the parties expressly acknowledge and agree that Sections 9, 10(j), and 10(k) of this Agreement are not inconsistent with any term or provision of the Plan, including (without limitation) Section 9.16 of the Plan (and nothing herein shall be construed to state or suggest that any other provision of this Agreement is inconsistent with the Plan).

b) **Prior Agreement(s) Will Not Control.** The Participant's acceptance of this Agreement will supersede provisions of any prior agreement that could be construed as governing the terms of this grant.

c) **Code Section 409A.** The RSUs and amounts payable thereunder are intended to be exempt from or compliant with Code Section 409A and the U.S. Treasury Regulations relating thereto so as not to subject the Participant to the payment of additional taxes and interest under Code Section 409A or other adverse tax consequences. In furtherance of this intent, the provisions of this Agreement will be interpreted, operated, and administered in a manner consistent with these intentions. The Committee may modify the terms of this Agreement and/or the Plan, without the consent of the Participant, in the manner that the Committee may determine to be necessary or advisable in order to comply with Code Section 409A or to mitigate any additional tax, interest and/or penalties or other adverse tax consequences that may apply under Code Section 409A if compliance is not practical. This Section 10(c) does not create an obligation on the part of the Company to modify the terms of this Agreement or the Plan and does not guarantee that the RSUs or the delivery of Shares upon vesting/settlement of the RSUs will not be subject to taxes, interest and penalties or any other adverse tax consequences under Code Section 409A. Nothing in this Agreement shall provide a basis for any person to take any action against the Company or any of its Subsidiaries or Affiliates based on matters covered by Code Section 409A, including the tax treatment of any amounts paid under this Agreement, and neither the Company nor any of its Subsidiaries or Affiliates will have any liability under any circumstances to the Participant or any other party if the RSUs, the delivery of Shares upon vesting/settlement of the RSUs or other payment or tax event hereunder that is intended to be exempt from, or compliant with, Code Section 409A, is not so exempt or compliant or for any action taken by the Committee with respect thereto. Further, settlement of any portion of the RSUs that is Deferred Compensation may not be accelerated or postponed except to the extent permitted by Code Section 409A.

d) **Restriction on Transfer.** RSUs may not be sold, transferred, pledged, assigned, or otherwise alienated at any time.

e) **Right of Employment.** Grants of RSUs under the Plan and of this Agreement do not confer upon the Participant any right to continue in the employ or service of the Employer. This Agreement shall survive any termination of the Participant's employment for any or no reason.

f) **Electronic Delivery and Acceptance.** The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means. The Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

g) **Need to Accept Grant.** The Participant acknowledges that this grant must be accepted within ninety (90) days of the Grant Date in order to be eligible to receive any benefits from this grant. If this grant is not accepted within the ninety (90)-day period specified in the foregoing sentence, all benefits under this grant may be forfeited, as determined in the sole discretion of the Committee. To accept this grant, the Participant must access the www.netbenefits.fidelity.com website and follow the instructions for acceptance. If this grant was distributed to the Participant via mail, the Participant must sign the Agreement and return it to the Company within ninety (90) days.

h) **Waiver; Section Headings.** Waiver of any term or condition of this Agreement by any party shall not be construed as a waiver of a subsequent breach or failure of the same term or condition, or a waiver of any other term or condition of this Agreement. Any waiver must be in writing. The Section headings in this Agreement are for convenience only and are not to be used in interpreting this Agreement.

i) **Severability.** To the extent that the terms set forth in this Agreement or any word, phrase, clause or

- 7 -

sentence is found to be illegal or unenforceable by a court of competent jurisdiction for any reason, such term, word, phrase, clause or sentence shall be modified in such manner so as to afford the Company the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws. If, however, a court of competent jurisdiction finds that any such term, word, phrase, clause or sentence cannot be so modified and thus made enforceable, or otherwise declines for any reason to do so, such term, word, phrase, clause or sentence shall be deemed severed from this Agreement and of no force and effect, and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent.

**j)** **Governing Law.** The validity, interpretation**,** instruction, performance, enforcement and remedies of or relating to Section 9 of this Agreement, and the rights and obligations of the parties thereunder, shall be governed by and construed in accordance with the substantive internal laws of the State of Illinois, without regard to the conflict of law principles, rules or statutes of any jurisdiction. With respect to all other Sections of this Agreement, the validity, interpretation, instruction, performance, enforcement and remedies of or relating to those Sections, and the rights and obligations of the parties thereunder, shall be governed and construed in accordance with the substantive internal laws of the State of Delaware, without regard to the conflict of law principles, rules or statutes of any jurisdiction. The foregoing provisions of this subsection shall apply irrespective of whether the Participant is a party to or bound by another restrictive covenant of any kind that may be governed by the laws of another jurisdiction (if any).

**k)** **Venue and Jurisdiction.** Venue for any legal proceedings instituted related to this Agreement shall be exclusively in the state and/or federal courts located in Cook County, Illinois, and the Participant hereby knowingly, voluntarily and irrevocably agrees, consents and submits to the exclusive jurisdiction and venue of such courts within the State of Illinois. The Participant further hereby knowingly, voluntarily and irrevocably waives, and agrees not to assert, any objection, challenge or defense to such exclusive venue or jurisdiction (including without limitation any defense of forum non conveniens), and further agrees not to file any claim or action related to this Agreement in any other jurisdiction or venue. The foregoing provisions of this Section 10(k) shall apply irrespective of whether the Participant is a party to or bound by another restrictive covenant of any kind that may provide for or permit venue or jurisdiction with respect to such other restrictive covenant in any other court or forum (if any).

**l)** **Notice.** All notices given hereunder shall be in writing and, if intended for Aon plc, shall be addressed to it or delivered to it at its principal office in London, England to the attention of the General Counsel or its principal office in Chicago, Illinois to the attention of the Chief Human Resources Officer. If intended for the Participant, notices shall be delivered personally or shall be addressed (if sent by mail) to the Participant's then current residence address as shown on the Company's records, or to such other address as the Participant directs in a notice to the Company. All notices shall be deemed to be given on the date received at the address of the addressee or, if delivered personally, on the date delivered.

**m)** **Compliance with Law.** Notwithstanding any other provision of the Plan or this Agreement, unless there is an available exemption from any registration, qualification or other legal requirement applicable to the Shares, the Company shall not be required to deliver any Shares issuable upon vesting/settlement of the RSUs prior to the completion of any registration or qualification of the Shares under any local, state, federal or foreign securities or exchange control law or under rulings or regulations of the U.S. Securities and Exchange Commission ("SEC") or of any other governmental regulatory body, or prior to obtaining any approval or other clearance from any local, state, federal or foreign governmental agency, which registration, qualification or approval the Company shall, in its absolute discretion, deem necessary or advisable. The Participant understands that the Company is under no obligation to register or qualify the Shares with the SEC or any state or foreign securities commission or to seek approval or clearance from any governmental authority for the issuance or sale of the Shares. Further, the Participant agrees that the Company shall have unilateral authority to amend the Plan and the Agreement without the Participant's consent to the extent necessary to comply with securities or other laws applicable to issuance of Shares.

**n)** **Intellectual Property.** The Participant hereby assigns to the Company the Participant's entire right, title and interest in and to all discoveries and improvements, patentable or otherwise, trade secrets and ideas and writings and copyrightable material, which are conceived, developed, reduced to practice, or acquired by the Participant (collectively "IP") during the Participant's employment and which relate to the business of the Company or any of its Affiliates, parent companies or Subsidiaries. The Participant further acknowledges that all original works of authorship which are made by the Participant (solely or jointly with others) within the scope of and during the period of his/her employment with the Company and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. The Participant agrees to disclose promptly, fully and in writing all such IP to the Company. The Participant will upon the Company's request, execute, acknowledge and deliver to the Company all instruments and do all other acts which are necessary or desirable to enable the Company or any of its Affiliates, parent companies, or Subsidiaries to file and prosecute applications for, and to acquire, maintain and enforce, all patents, trademarks, and copyrights in all countries. To the extent the Participant is bound by an employee handbook or contract provision that protects the Company's intellectual property at least to the extent provided in this Section 10(n), the provision set forth in such employment handbook or contractual arrangement between the Participant and the Company will prevail and govern.

**o)** **No Advice Regarding Grant.** The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding the Participant's participation in the Plan, or the acquisition or sale of the underlying Shares. The Participant should consult with his or her own personal tax, legal and financial advisors regarding his or her participation in the Plan and execution of this Agreement, before executing this Agreement or otherwise taking any action at any time related to the Plan.

**p)** **Imposition of Other Requirements.** The Company reserves the right to impose other requirements on the Participant's participation in the Plan, on the RSUs and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable for legal or administrative reasons, and to require the Participant to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

Aon RSU AA 2018 SSP-US – Non-California
6676729-v5\GESDMS

IN WITNESS WHEREOF, the parties have accepted this Agreement as of the date hereof.

**AON PLC**

*Gregory C. Case*

Gregory C. Case
President and Chief Executive Officer

**AON GROUP, INC.**

*Gregory C. Case*

Gregory C. Case
President and Chief Executive Officer

**Signed Electronically**            **08/24/2018**

**RSU Recipient (Participant)**            **Date**

**IMW5N2OG**

**08/24/2018 09:47 AM U.S. Eastern Standard Time**

**ACCEPTED**

Aon RSU AA 2018 SSP-US – Non-California
6676729-v5\GESDMS

# EXHIBIT D

**RESTRICTED STOCK UNIT AGREEMENT**
**UNDER AMENDED AND RESTATED**
**AON PLC 2011 INCENTIVE PLAN**

This Restricted Stock Unit Agreement (the "Agreement") is entered into between Aon plc, a public limited company incorporated under English law, and its Subsidiary Aon Group, Inc., a Maryland corporation with its principal place of business at 200 East Randolph Street, Chicago, Illinois (collectively, the "Company") and **TARA A  BRUSEK** (the "Participant").

The Company desires to grant the Participant restricted stock units ("RSUs"), each RSU representing the right to receive a Class A Ordinary Share of the Company ("Share"), $.01 par value per Share, to encourage the Participant to remain in the service of the Company or its Subsidiaries or Affiliates, to provide the Participant with an incentive to contribute to the financial progress of the Company, and to encourage ownership of Shares by the Participant. Capitalized terms used but not otherwise defined in the Agreement shall have the meaning ascribed to such terms in the Amended and Restated Aon plc 2011 Incentive Plan, as amended from time to time (the "Plan").

NOW, THEREFORE, in consideration of the mutual promises hereinafter set forth, the parties hereto agree as follows:

1.  **Grant of Restricted Stock Units.** The Company grants under the Plan an award of ____93____ RSUs on **11/21/2018** (the "Grant Date"). The Participant understands and agrees that the Participant has no obligation to accept this award (as a condition of employment or otherwise), and that the Participant's decision to do so by signing this Agreement, and thereby to accept all of the terms and conditions of this Agreement, is the Participant's knowing and voluntary choice after having had a full and fair opportunity to consult with legal counsel (at the Participant's cost).

2.  **Vesting of Restricted Stock Units.** The RSUs will vest in accordance with the schedule set forth in the Participant's account. The Participant must access the www.netbenefits.fidelity.com website and follow the instructions in order to view the vesting schedule. Notwithstanding anything herein to the contrary, the Committee may cause the RSUs to vest prior to the date(s) set forth in the vesting schedule in order to satisfy any Tax-Related Items (as defined below) that arise prior to the date of settlement of the RSUs, subject to the limitations set forth in Section 3(d) of this Agreement.

3.  **Tax Withholding Obligations.** The Participant acknowledges that, regardless of any action taken by the Company and/or the Participant's employer (the "Employer"), the ultimate liability for all income tax, social insurance, payroll tax, payment on account or other tax-related items related to the Participant's participation in the Plan and legally applicable to the Participant ("Tax-Related Items"), is and remains the Participant's responsibility and may exceed the amount, if any, actually withheld by the Company or the Employer. The Participant further acknowledges that the Company and/or the Employer: (a) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the grant of RSUs, including, but not limited to, the grant, vesting or settlement of the RSUs, the issuance of Shares upon settlement of the RSUs, the subsequent sale of Shares acquired pursuant to such vesting/settlement and the receipt of any dividends and/or dividend equivalents; and (b) do not commit to and are under no obligation to structure the terms of the grant or any aspect of the RSUs to reduce or eliminate the Participant's liability for Tax-Related Items or achieve any particular tax result. Further, if the Participant is subject to Tax-Related Items in more than one jurisdiction, the Participant acknowledges that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

   a)  Prior to any relevant taxable or tax withholding event, as applicable, the Participant agrees to make adequate arrangements satisfactory to the Company or the Employer, to satisfy all Tax-Related Items. In this regard, the Participant authorizes the Company and/or the Employer, or their respective agents, at the Company's discretion, to satisfy the obligations with regard to all Tax-Related Items by one or a

- 1 -

combination of the following:

    **(i)**    withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer; or

    **(ii)**    withholding in Shares to be issued upon vesting/settlement of the RSUs; or

    **(iii)**    withholding from the proceeds of the sale of Shares acquired upon vesting/settlement of the RSUs either through a voluntary sale or through a mandatory sale arranged by the Company (on the Participant's behalf pursuant to this authorization without further consent); provided, however, that if the Participant is a Section 16 officer under the U.S. Securities Exchange Act of 1934, the Committee shall establish the method of withholding from alternatives (i) – (iii) herein.

**b)**    Depending on the withholding method, the Company and/or the Employer may withhold or account for Tax-Related Items by considering applicable minimum statutory withholding amounts or other applicable withholding rates in the Participant's jurisdiction(s), including maximum applicable rates, in which case, any over-withheld amount may be refunded to the Participant in cash by the Company or the Employer (with no entitlement to the equivalent Shares) or if not refunded, the Participant may seek a refund from the local tax authorities.  If the obligation for Tax-Related Items is satisfied by withholding in Shares, for tax purposes, the Participant shall be deemed to have been issued the full number of Shares subject to the vested RSUs, notwithstanding that a number of Shares are held back solely for the purpose of paying the Tax-Related Items.

**c)**    Finally, the Participant shall pay to the Company and/or the Employer any amount of Tax-Related Items that the Company and/or the Employer may be required to withhold as a result of the Participant's participation in the Plan that cannot be satisfied by the means previously described.  The Company may refuse to deliver the Shares or the proceeds of the sale of Shares if the Participant fails to comply with the Participant's obligations in connection with the Tax-Related Items.

**d)**    Notwithstanding anything in this Section 3 to the contrary, to avoid a prohibited distribution under Code Section 409A, if Shares underlying the RSUs will be withheld (or sold on the Participant's behalf) to satisfy any Tax-Related Items arising prior to the date of settlement of the RSUs for any portion of the RSUs that is considered "nonqualified deferred compensation" subject to Code Section 409A ("Deferred Compensation"), then the number of Shares withheld (or sold on the Participant's behalf) shall not exceed the number of Shares that equals the liability for the Tax-Related Items.

**4.**    **Nominal Value.**  At the time of settlement, this Award will be subject to the Participant's appropriate undertaking to pay to Aon plc a nominal value of $.01 per share (as determined in the sole discretion of Aon plc, subject to the provisions of Aon plc's articles of association and the U.K. Companies Act 2006, as amended from time to time), and such obligation may be satisfied by the Participant in cash in any manner to be established by Aon plc in its sole discretion, including but not limited to withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer.

**5.**    **Effect of Termination of Employment.**

    **a)**    <u>**Voluntary termination (other than Retirement).**</u>  In the event that the Participant's Termination Date occurs because of the Participant's voluntary termination that does not qualify as Retirement (as defined in Section 5(d) below), the unvested portion of the RSU will be forfeited.

    **b)**    <u>**Termination due to death.**</u>  In the event that the Participant's Termination Date occurs due to the Participant's death, all unvested RSUs will be fully vested immediately and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof.

    **c)**    <u>**Termination due to disability.**</u>  In the event that the Participant's Termination Date occurs due to the Participant's disability, all unvested RSUs will be fully vested immediately and the date of such

termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof. "Disability" for purposes of this Agreement, shall mean disability pursuant to the standards set forth in, or in circumstances where the Participant qualifies for receipt of benefits under, the long-term disability plan of the Employer. In the absence of such a plan, the Committee shall have exclusive discretion to determine whether a Participant's employment is terminated due to disability.

d) **Involuntary termination (other than for Cause) or Retirement.** In the event that the Participant's Termination Date occurs as a result of the Participant's involuntary termination by the Company or Employer (other than for Cause) or the Participant's Retirement, the RSUs shall be immediately vested pro rata and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof. The pro rata portion of the RSUs that shall vest shall be calculated by multiplying (i) the number of RSUs subject to the award, by (ii) a fraction, the numerator of which shall be the number of days that have elapsed between the Grant Date and the date of the Participant's termination, and the denominator of which shall be the total number of days covered by the vesting schedule set forth in the Participant's account, and subtracting from the resulting product the number of RSUs previously vested. The remaining unvested portion of the RSUs shall be forfeited. For purposes of this Agreement, "Retire" or "Retirement" means a voluntary termination of employment on or after the Participant's 55th birthday for employees whose principal place of work is outside of the European Union ("EU"). A Participant on secondment will be subject to the vesting rule applicable to his or her home country. Participants whose principal place of work is inside the EU shall not be eligible for Retirement, and their voluntary termination at any age shall be treated in accordance with Section 5(a). The Committee shall have exclusive discretion to determine a Participant's principal place of work for purposes of this Section 5(d).

e) **Termination for Cause.** In the event that the Participant's Termination Date occurs because the Participant is terminated by the Company or Employer for Cause, all unvested RSUs shall be forfeited. "Cause" shall mean the Participant's (i) performing a deliberate act of dishonesty, fraud, theft, embezzlement, or misappropriation involving the Participant's employment with the Company, its Subsidiaries or Affiliates, or breach of the duty of loyalty to the Company, its Subsidiaries or Affiliates; (ii) performing an act of race, sex, national origin, religion, disability, or age-based discrimination which after investigation, counsel to the Company reasonably concludes will result in liability being imposed on the Company, its Subsidiaries or Affiliates and / or the Participant; (iii) material violation of Company policies and procedures including, but not limited to, the Aon Code of Business Conduct; (iv) material noncompliance with any terms of this Agreement or an employment agreement; or (v) performing any criminal act resulting in a criminal felony charge brought against the Participant or a criminal conviction of the Participant (other than conviction of a minor traffic violation).

6. **Receipt by the Participant of the Prospectus.** The Participant acknowledges receipt of the Plan prospectus that contains the entire Plan, and is incorporated herein by reference. The Participant represents and warrants that the Participant has read the Plan and agrees that all RSUs awarded under it shall be subject to all of the terms and conditions of the Plan.

7. **Issuance of Shares.** RSUs shall be converted to Shares as of the applicable vesting date. Shares will be issued to the Participant as soon as practicable (within 60 days) after the vesting date, subject to Sections 3 and 4 of this Agreement. Notwithstanding the foregoing, for purposes of complying with Code Section 409A, if the RSUs are considered Deferred Compensation and the Shares are to be settled in connection with a termination of service, the Company and the Participant shall take all steps necessary (including with regard to any post-termination services by the Participant) to ensure that a termination contemplated under Section 5 constitutes a "separation from service" within the meaning of Code Section 409A. In addition, if the RSUs are Deferred Compensation and payable in connection with the Participant's separation from service, and if the Participant is a "specified employee" within the meaning of Code Section 409A on the date the Participant experiences a separation from service, then the RSUs shall be settled on the first business day of the seventh month following the Participant's separation from service, or, if earlier, on the date of the Participant's death, solely to the extent

such delayed payment is required in order to avoid a prohibited distribution under Code Section 409A.

8. **Rights as Shareholder.** The Participant shall not have voting or any other rights as a shareholder of Aon plc with respect to the RSUs. Upon issuance of the Shares pursuant to and in accordance with Section 7, the Participant will obtain full voting and other rights as a shareholder of Aon plc.

9. **Business Considerations; Restrictive Covenants; Acknowledgments; Injunctive Relief; Confidential Information; Incentive Repayment Policy.**

   a) **Business Considerations.** Aon plc and its Subsidiary, Aon Group, Inc., a Maryland corporation with its corporate and business headquarters in Chicago, Illinois, and Aon Group, Inc.'s Subsidiaries and Affiliates (and divisions thereof) (collectively, with Aon plc, "Aon") are in the business of providing conventional and alternative risk management products and services covering the businesses of insurance brokerage, reinsurance brokerage, benefits consulting, compensation consulting, human resources consulting, human resources and benefits outsourcing management, investigatory and security consulting, managing underwriting and related services, including accounting, actuarial, claims management and handling, and information systems on behalf of commercial and individual clients which are national and international and are not confined to any geographic area (the "Business"). The Participant further acknowledges that the Participant's material employment duties and responsibilities, including without limitation with respect to Aon clients, prospective clients, and other employees, span geographic areas that extend well beyond the state in which the Participant is physically employed and resides. An essential element of the Business is the development and maintenance of personal contacts and relationships with clients and prospective clients. Aon invests considerable time and money to develop and maintain client relationships, including payment of employees' salaries, benefits, travel, entertainment and other business expenses and assistance in servicing clients by making available to its employees specially developed and researched industry data, client-specific information, legal support, accounting support, marketing, advertising and other corporate services, as well as providing training and professional development and valuable confidential business and professional information, toward the development and maintenance of its client relationships and related goodwill. While these clients and prospective clients may be secured or serviced by Aon employees, including the Participant, the Participant acknowledges that such clients and prospective clients remain at all times the clients and prospective clients of Aon and that the goodwill engendered by the relationships is intended to inure only to the benefit of Aon; the goodwill is owned by Aon; and Aon shall be the sole beneficiary of such goodwill during and after termination of the Participant's employment with Aon. In addition, the Participant acknowledges that the Participant has acquired and/or will acquire, for the purpose of furthering the Business, knowledge of Aon's confidential and proprietary information; the Participant further acknowledges Aon's legitimate interest in safeguarding confidential and proprietary information from disclosure.

   The personal identification of clients of Aon with an Aon employee, including the Participant, creates the potential for the Participant's appropriation of the benefits of the relationships developed with clients on behalf of and at the expense of Aon. Since Aon would suffer irreparable harm if the Participant left its employ and solicited the Business of the clients and prospective clients of Aon, or solicited the employees of Aon, it is reasonable to protect Aon against certain competitive activities by the Participant for a limited period of time after the Participant leaves employment so that Aon may renew or restore its business relationship with its clients, prospective clients and employees. Consequently, the Participant is willing to enter into the covenants set forth herein in order to provide Aon with reasonable protection for its client, prospective client and employee relationships and its investment therein as above-described, its goodwill, and its confidential and proprietary information.

   b) **Covenant Not to Solicit Clients and Prospective Clients.** The Participant hereby covenants and agrees that, except with the prior written consent of Aon, the Participant (on the Participant's own behalf or on behalf of any other person or entity) will not, during the course of employment, and for a period of two (2) years after the Participant's Termination Date (the "Restricted Period"), directly or indirectly, call upon, solicit, accept, engage in, service or perform, other than on behalf of Aon, any business of the same type or

kind as the Business performed by Aon from or with respect to (i) clients of Aon with respect to whom the Participant provided services, either alone or with others, or had a business relationship, or on whose account the Participant worked or became familiar, or supervised directly or indirectly the servicing activities related to such clients, during the twenty-four (24) months prior to the Participant's Termination Date and, further provided, such clients were clients of Aon either on the Participant's Termination Date or within twelve (12) months prior to such Termination Date and (ii) prospective clients of Aon which the Participant alone, in combination with others, or in a supervisory capacity, solicited during the six (6) months prior to the Participant's Termination Date and to which a proposal for services was rendered by Aon during the six (6) months prior to the Participant's Termination Date. "Client" means any person or entity listed on the books of Aon as such.

c) **Covenant Not to Solicit Employees.** The Participant hereby also agrees, for the duration of the Restricted Period, not to, directly or indirectly, solicit or induce, or cause any person or other entity to solicit or induce, any employee of Aon to work for the Participant or for any third party or entity, or to leave the employ of Aon.

d) **Other Covenants.** Notwithstanding any other language in the Agreement, including, but not limited to that found in Section 10(b), this Agreement does not preclude the enforceability of any restrictive covenant provision contained in any prior or subsequent agreement entered into by the Participant, (any such covenant, an "Other Covenant"), including without limitation any covenant contained in any Confidentiality and Non-Solicitation Agreement between the Participant and any Aon entity, and further including without limitation any covenant not to compete, to solicit or perform services for clients, or to solicit employees, any confidentiality or intellectual property covenant, and any covenant with respect to a pre-resignation notice period. Further, no Other Covenant precludes the enforceability of any provision contained in this Agreement. No subsequent agreement entered into by the Participant may amend, supersede, or override the covenants contained herein unless such subsequent agreement specifically references subsections (b) and (c) of this Section.

e) **Acknowledgments.** Aon and the Participant acknowledge and agree that the covenants contained in subsections (b) and (c) of this Section are necessary and reasonable for the protection of Aon and are reasonably limited with respect to the activities prohibited, duration, geographical scope and their effect on the Participant and the public. The parties acknowledge that the purpose and effect of the covenants simply are to protect Aon for a limited period of time from unfair competition by the Participant.

The Participant acknowledges that there is no general geographical restriction contained in the preceding paragraphs because the restrictions apply only to the specified clients of Aon and because the Participant's material duties, responsibilities, and relationships with Aon clients, prospective clients, and employees are not limited to any particular geographic area. Nothing in this Agreement shall prohibit the Participant from obtaining a livelihood for the Participant or the Participant's family by being engaged in the Business.

f) **Company's Right to Injunctive Relief; Attorneys' Fees and Costs.** The Participant acknowledges that the Participant's services to Aon are of a unique character which gives them a special value to Aon, the loss of which cannot reasonably or adequately be compensated in damages in an action at law, and that a breach of Section 9 of this Agreement will result in irreparable and continuing harm to Aon, and that therefore, in addition to any other remedy which Aon may have at law or in equity, Aon shall be entitled to temporary, preliminary and permanent injunctive relief for a breach or threatened breach of this Agreement by the Participant (without the need to post any bond or other security). The parties acknowledge and agree that each Aon entity is an intended third-party beneficiary of this Agreement, and may be a named plaintiff in any subsequent suit brought by Aon to enforce the terms of this Agreement. In the event that any action is filed to enforce the terms and conditions of this Agreement, the prevailing party in the action will recover from the non-prevailing party, in addition to any other sum that either party may be called upon to pay, a reasonable sum for the prevailing party's attorney's fees and costs.

g) **Trade Secrets and Confidential Information.**

(i) The Participant acknowledges that Aon's Business depends to a significant degree upon the possession

- 5 -

of confidential, proprietary, and trade secret information which is not generally known to others, and that the profitability of such Business requires that this information remain proprietary to Aon. The Participant recognizes that, by virtue of the Participant's employment with Aon, and to assist the Participant in the solicitation, production and servicing of client Business, the Participant will be granted otherwise prohibited access to such information. This information (hereinafter referred to as "Confidential Information") includes, without limitation, lists of clients and prospective clients; contract terms and conditions; client information relating to services, insurance, benefits programs, employees, finances, and compensation; copyrighted materials; corporate, management and business plans and strategies; compensation and revenues; methods and strategies of marketing; market research and data; technical know-how; computer software and manuals; policies and procedures; and the conduct of the affairs of Aon. Confidential Information does not include any information that lawfully is or has become generally or publicly known other than through the Participant's breach of this Agreement or a breach by another person of some other obligation to Aon. The Participant shall not, except as required in the course of employment by Aon or as otherwise provided by applicable law or in this subsection (g), disclose or use during or subsequent to the course of employment, any Confidential Information.

 **(ii)** The Participant understands that nothing contained in this Agreement limits the Participant's ability to report possible violations of law or regulation to, or file a charge or complaint with, the Securities and Exchange Commission, the Equal Employment Opportunity Commission, the National Labor Relations Board, the Occupational Safety and Health Administration, the Department of Justice, the Congress, any Inspector General, or any other federal, state or local governmental agency or commission ("Government Agencies"). The Participant further understands that this Agreement does not limit the Participant's ability to participate in any investigation or proceeding that may be conducted by any Government Agency, without notice to the Company.

 Nothing in this Agreement shall limit the Participant's ability under applicable United States federal law to (i) disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law or (ii) disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure.

 **(iii)** Upon termination of employment or upon Aon's request (whichever is earlier), the Participant will promptly return to Aon all Confidential Information and all materials and all copies or tangible embodiments of materials involving Confidential Information, and all other Aon property, in the Participant's possession or control, except as otherwise provided by law or in this subsection (g). The Participant agrees to represent in writing to Aon upon termination of employment that he or she has complied with the provisions of this subsection (g).

**h)** **Incentive Repayment Policy.** If the Participant has been designated and notified by the board of directors of Aon plc that he or she is a reporting officer for purposes of Section 16 of the U.S. Securities Exchange Act of 1934, the Participant is subject to Aon's Incentive Repayment Policy (the "Policy"). The Policy provides that Aon plc will have the discretion to cancel or require reimbursement to the Company of the long-term equity based incentive award set forth in this Agreement if the grant or vesting was based on the achievement of financial results that were subsequently restated. The Participant can obtain a copy of the Policy from the Global Compensation team. If the Participant is subject to the Policy, by accepting this Agreement, the Participant hereby agrees and acknowledges that he or she will be bound by it.

## 10. Other Provisions.

**a)** **Plan Terms Take Precedence over Agreement Terms.** RSUs are granted pursuant to the Plan, the terms and conditions of which are incorporated into this Agreement by reference. If there are any inconsistencies between the terms of this Agreement and the Plan, the terms of the Plan will govern.

For the avoidance of doubt, the parties expressly acknowledge and agree that Sections 9, 10(j), and 10(k) of this Agreement are not inconsistent with any term or provision of the Plan, including (without limitation) Section 9.16 of the Plan (and nothing herein shall be construed to state or suggest that any other provision of this Agreement is inconsistent with the Plan).

b) **Prior Agreement(s) Will Not Control.**  The Participant's acceptance of this Agreement will supersede provisions of any prior agreement that could be construed as governing the terms of this grant.

c) **Code Section 409A.**  The RSUs and amounts payable thereunder are intended to be exempt from or compliant with Code Section 409A and the U.S. Treasury Regulations relating thereto so as not to subject the Participant to the payment of additional taxes and interest under Code Section 409A or other adverse tax consequences.  In furtherance of this intent, the provisions of this Agreement will be interpreted, operated, and administered in a manner consistent with these intentions.  The Committee may modify the terms of this Agreement and/or the Plan, without the consent of the Participant, in the manner that the Committee may determine to be necessary or advisable in order to comply with Code Section 409A or to mitigate any additional tax, interest and/or penalties or other adverse tax consequences that may apply under Code Section 409A if compliance is not practical.  This Section 10(c) does not create an obligation on the part of the Company to modify the terms of this Agreement or the Plan and does not guarantee that the RSUs or the delivery of Shares upon vesting/settlement of the RSUs will not be subject to taxes, interest and penalties or any other adverse tax consequences under Code Section 409A.  Nothing in this Agreement shall provide a basis for any person to take any action against the Company or any of its Subsidiaries or Affiliates based on matters covered by Code Section 409A, including the tax treatment of any amounts paid under this Agreement, and neither the Company nor any of its Subsidiaries or Affiliates will have any liability under any circumstances to the Participant or any other party if the RSUs, the delivery of Shares upon vesting/settlement of the RSUs or other payment or tax event hereunder that is intended to be exempt from, or compliant with, Code Section 409A, is not so exempt or compliant or for any action taken by the Committee with respect thereto.  Further, settlement of any portion of the RSUs that is Deferred Compensation may not be accelerated or postponed except to the extent permitted by Code Section 409A.

d) **Restriction on Transfer.**  RSUs may not be sold, transferred, pledged, assigned, or otherwise alienated at any time.

e) **Right of Employment.**  Grants of RSUs under the Plan and of this Agreement do not confer upon the Participant any right to continue in the employ or service of the Employer.  This Agreement shall survive any termination of the Participant's employment for any or no reason.

f) **Electronic Delivery and Acceptance.**  The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means.  The Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

g) **Need to Accept Grant.**  The Participant acknowledges that this grant must be accepted within ninety (90) days of the Grant Date in order to be eligible to receive any benefits from this grant.  If this grant is not accepted within the ninety (90)-day period specified in the foregoing sentence, all benefits under this grant may be forfeited, as determined in the sole discretion of the Committee.  To accept this grant, the Participant must access the www.netbenefits.fidelity.com website and follow the instructions for acceptance.  If this grant was distributed to the Participant via mail, the Participant must sign the Agreement and return it to the Company within ninety (90) days.

h) **Waiver; Section Headings.**  Waiver of any term or condition of this Agreement by any party shall not be construed as a waiver of a subsequent breach or failure of the same term or condition, or a waiver of any other term or condition of this Agreement.  Any waiver must be in writing.  The Section headings in this Agreement are for convenience only and are not to be used in interpreting this Agreement.

i) **Severability.**  To the extent that the terms set forth in this Agreement or any word, phrase, clause or

sentence is found to be illegal or unenforceable by a court of competent jurisdiction for any reason, such term, word, phrase, clause or sentence shall be modified in such manner so as to afford the Company the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws. If, however, a court of competent jurisdiction finds that any such term, word, phrase, clause or sentence cannot be so modified and thus made enforceable, or otherwise declines for any reason to do so, such term, word, phrase, clause or sentence shall be deemed severed from this Agreement and of no force and effect, and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent.

**j)** **Governing Law.** The validity, interpretation**,** instruction, performance, enforcement and remedies of or relating to Section 9 of this Agreement, and the rights and obligations of the parties thereunder, shall be governed by and construed in accordance with the substantive internal laws of the State of Illinois, without regard to the conflict of law principles, rules or statutes of any jurisdiction. With respect to all other Sections of this Agreement, the validity, interpretation, instruction, performance, enforcement and remedies of or relating to those Sections, and the rights and obligations of the parties thereunder, shall be governed and construed in accordance with the substantive internal laws of the State of Delaware, without regard to the conflict of law principles, rules or statutes of any jurisdiction. The foregoing provisions of this subsection shall apply irrespective of whether the Participant is a party to or bound by another restrictive covenant of any kind that may be governed by the laws of another jurisdiction (if any).

**k)** **Venue and Jurisdiction.** Venue for any legal proceedings instituted related to this Agreement shall be exclusively in the state and/or federal courts located in Cook County, Illinois, and the Participant hereby knowingly, voluntarily and irrevocably agrees, consents and submits to the exclusive jurisdiction and venue of such courts within the State of Illinois. The Participant further hereby knowingly, voluntarily and irrevocably waives, and agrees not to assert, any objection, challenge or defense to such exclusive venue or jurisdiction (including without limitation any defense of forum non conveniens), and further agrees not to file any claim or action related to this Agreement in any other jurisdiction or venue. The foregoing provisions of this Section 10(k) shall apply irrespective of whether the Participant is a party to or bound by another restrictive covenant of any kind that may provide for or permit venue or jurisdiction with respect to such other restrictive covenant in any other court or forum (if any).

**l)** **Notice.** All notices given hereunder shall be in writing and, if intended for Aon plc, shall be addressed to it or delivered to it at its principal office in London, England to the attention of the General Counsel or its principal office in Chicago, Illinois to the attention of the Chief Human Resources Officer. If intended for the Participant, notices shall be delivered personally or shall be addressed (if sent by mail) to the Participant's then current residence address as shown on the Company's records, or to such other address as the Participant directs in a notice to the Company. All notices shall be deemed to be given on the date received at the address of the addressee or, if delivered personally, on the date delivered.

**m)** **Compliance with Law.** Notwithstanding any other provision of the Plan or this Agreement, unless there is an available exemption from any registration, qualification or other legal requirement applicable to the Shares, the Company shall not be required to deliver any Shares issuable upon vesting/settlement of the RSUs prior to the completion of any registration or qualification of the Shares under any local, state, federal or foreign securities or exchange control law or under rulings or regulations of the U.S. Securities and Exchange Commission ("SEC") or of any other governmental regulatory body, or prior to obtaining any approval or other clearance from any local, state, federal or foreign governmental agency, which registration, qualification or approval the Company shall, in its absolute discretion, deem necessary or advisable. The Participant understands that the Company is under no obligation to register or qualify the Shares with the SEC or any state or foreign securities commission or to seek approval or clearance from any governmental authority for the issuance or sale of the Shares. Further, the Participant agrees that the Company shall have unilateral authority to amend the Plan and the Agreement without the Participant's consent to the extent necessary to comply with securities or other laws applicable to issuance of Shares.

**n)** **Intellectual Property.** The Participant hereby assigns to the Company the Participant's entire right, title and interest in and to all discoveries and improvements, patentable or otherwise, trade secrets and ideas and writings and copyrightable material, which are conceived, developed, reduced to practice, or acquired by the Participant (collectively "IP") during the Participant's employment and which relate to the business of the Company or any of its Affiliates, parent companies or Subsidiaries. The Participant further acknowledges that all original works of authorship which are made by the Participant (solely or jointly with others) within the scope of and during the period of his/her employment with the Company and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. The Participant agrees to disclose promptly, fully and in writing all such IP to the Company. The Participant will upon the Company's request, execute, acknowledge and deliver to the Company all instruments and do all other acts which are necessary or desirable to enable the Company or any of its Affiliates, parent companies, or Subsidiaries to file and prosecute applications for, and to acquire, maintain and enforce, all patents, trademarks, and copyrights in all countries. To the extent the Participant is bound by an employee handbook or contract provision that protects the Company's intellectual property at least to the extent provided in this Section 10(n), the provision set forth in such employment handbook or contractual arrangement between the Participant and the Company will prevail and govern.

**o)** **No Advice Regarding Grant.** The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding the Participant's participation in the Plan, or the acquisition or sale of the underlying Shares. The Participant should consult with his or her own personal tax, legal and financial advisors regarding his or her participation in the Plan and execution of this Agreement, before executing this Agreement or otherwise taking any action at any time related to the Plan.

**p)** **Imposition of Other Requirements.** The Company reserves the right to impose other requirements on the Participant's participation in the Plan, on the RSUs and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable for legal or administrative reasons, and to require the Participant to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

Aon RSU AA 2018 SSP-US – Non-California
6676729-v5\GESDMS

IN WITNESS WHEREOF, the parties have accepted this Agreement as of the date hereof.

**AON PLC**

*Gregory C. Case*

Gregory C. Case
President and Chief Executive Officer

**AON GROUP, INC.**

*Gregory C. Case*

Gregory C. Case
President and Chief Executive Officer

**Signed Electronically**                    **12/07/2018**
**RSU Recipient (Participant)**                    **Date**

**IXJ8LMKX**

**12/07/2018 02:44 PM U.S. Eastern Standard Time**

**ACCEPTED**

**CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT**

CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT ("Agreement") dated as of <u>03/15/2019</u>

(Print Start Date)

(the "Effective Date") between Aon Risk Services Companies, Inc., a Maryland corporation with its headquarters

located at 200 East Randolph Street, Chicago, Illinois 60601 (the "Company"), and <u>Tara Brusek</u>

(Print Full Name)

residing at <u>313 Elgin Ave Forest Park, IL 60130</u> (the "Employee").

(Print Home Address, City, State, Zip)

R E C I T A L S

This Agreement is entered into in consideration of the Employee's employment by the Company and the further mutual consideration and covenants by the parties as set forth herein.

NOW, THEREFORE, the Company and the Employee hereby agree to be bound by this Non-Solicitation Agreement, as follows:

Section 1. **Business Considerations**; **Restrictive Covenants; Other Covenants; Acknowledgements.**

(a) **Business Considerations**. Aon plc and its subsidiary, Aon Group, Inc., a Maryland corporation with its corporate and business headquarters in Chicago, Illinois, and Aon Group, Inc.'s subsidiaries and affiliates (and divisions thereof) including the Company (collectively, with Aon plc, "Aon"), are in the business of providing conventional and alternative risk management products and services covering the businesses of insurance brokerage, reinsurance brokerage, benefits consulting, compensation consulting, human resources consulting, human resources and benefits outsourcing, management, investigatory and security consulting, managing underwriting and related services, including accounting, actuarial, claims management and handling, and information systems on behalf of commercial and individual clients which are national and international and are not confined to any geographic area (the "Business"). The Employee further acknowledges that the Employee's material employment duties and responsibilities, including without limitation with respect to Aon clients, prospective clients, and other employees, span geographic areas that extend well beyond the state in which the Employee is physically employed and resides. An essential element of the Business is the development and maintenance of personal contacts and relationships with clients and prospective clients. Aon invests considerable time and money to develop and maintain client relationships, including payment of employees' salaries, benefits, travel, entertainment and other business expenses and assistance in servicing clients by making available to its employees specially developed and researched industry data, client-specific information, legal support, accounting support, marketing, advertising and other corporate services, as well as providing training and professional development and valuable confidential business and professional information, toward the development and maintenance of its client relationships and related goodwill. While these clients and prospective clients may be secured or serviced by Aon employees, including the Employee, the Employee acknowledges that such clients and prospective clients remain at all times the clients and prospective clients of Aon and that the goodwill engendered by the relationships is intended to inure only to the benefit of Aon; the goodwill is owned by Aon; and Aon shall be the sole beneficiary of such goodwill during and after termination of the Employee's employment with Aon.

In addition, the Employee acknowledges that he has acquired and/or will acquire, for the purpose of furthering the Business, knowledge of Aon's confidential and proprietary information, as defined in Section 3 of this Agreement. Employee further acknowledges Aon's legitimate interest in safeguarding confidential and proprietary information from disclosure.

The personal identification of clients of Aon with an Aon employee, including the Employee, creates the potential for the Employee's appropriation of the benefits of the relationships developed with clients on behalf of and at the expense of Aon. Since Aon would suffer irreparable harm if the Employee left its employ and solicited the Business of the clients and prospective clients of Aon, or solicited employees of Aon, it is reasonable to protect Aon against certain competitive activities by the Employee for a limited period of time after the Employee leaves employment so that Aon may renew or restore its business relationship with its clients, prospective clients and employees.

NSA-Risk-all states-no CA

Consequently, the Employee is willing to enter into the covenants set forth herein in order to provide Aon with reasonable protection for its client and prospective client relationships and its investment therein as above-described, its goodwill, and its confidential and proprietary Information.

(b) **Covenant Not to Solicit Clients and Prospective Clients**. The Employee hereby covenants and agrees that, except with the prior written consent of Aon, the Employee (on the Employee's own behalf or on behalf of any other person or entity) will not, during the course of employment, and for a period of two (2) years after the Employee's termination of employment with Aon (the "Restricted Period"), directly or indirectly, call upon, solicit, accept, engage in, service or perform, other than on behalf of Aon, any business of the same type or kind as the business performed by Aon from or with respect to (i) clients of Aon with respect to whom the Employee provided services, either alone or with others, or had a business relationship, or on whose account the Employee worked or became familiar, or supervised directly or indirectly the servicing activities related to such clients, during the twenty-four (24) months prior to the Employee's termination of employment and, further provided, such clients were clients of Aon either on the date of the Employee's termination of employment or within twelve (12) months prior to such termination of employment and (ii) prospective clients of Aon which the Employee alone, in combination with others, or in a supervisory capacity, solicited during the six (6) months prior to the Employee's termination of employment and to which a proposal for services was rendered by Aon during the six (6) months prior to the Employee's termination of employment. "Client" means any person or entity listed on the books of Aon as such, or any majority owned subsidiary of a person or entity listed on the books of Aon as a client.

(c) **Covenant Not to Solicit Employees**. The Employee hereby also agrees, for the duration of the Restricted Period, not to, directly or indirectly, solicit or induce, or cause any person or other entity to solicit or induce any employee of Aon to work for the Employee or for any third party or entity, or to leave the employ of Aon.

(d) **Other Covenants**. Notwithstanding any other language in the Agreement, this Agreement does not preclude the enforceability of any restrictive covenant provision contained in any prior or subsequent agreement entered into by the Employee (any such covenant, an "Other Covenant"). Further, no Other Covenant precludes the enforceability of any provision contained in this Agreement. No subsequent agreement entered into by the Employee may amend, supersede, or override the covenants contained herein unless such subsequent agreement specifically references subsections (b) and (c) of this Section.

(e) **Acknowledgments**. Aon and the Employee acknowledge and agree that the covenants contained in subsections (b) and (c) of this Section are necessary and reasonable for the protection of Aon and are reasonably limited with respect to the activities prohibited, duration, geographical scope and their effect on the Employee and the public. The parties acknowledge that the purpose and effect of the covenants simply are to protect Aon for a limited period of time from unfair competition by the Employee.

The Employee acknowledges that there is no general geographical restriction contained in the preceding paragraphs because the restrictions apply only to the specified clients of Aon and because the Employee's material duties, responsibilities and relationships with Aon clients, prospective clients and employees are not limited to any particular geographic area. Nothing in this Agreement shall prohibit the Employee from obtaining a livelihood for the Employee or the Employee's family by being engaged in the Business.

Section 2. **Aon's Right to Injunctive Relief; Attorneys' Fees and Costs.**

The Employee acknowledges that the Employee's services to Aon are of a unique character which gives them a special value to Aon, the loss of which cannot reasonably or adequately be compensated in damages in an action at law, and that a breach of this Agreement will result in irreparable and continuing harm to Aon, and that therefore, in addition to any other remedy which Aon may have at law or in equity, Aon shall be entitled to temporary, preliminary and permanent injunctive relief for a breach or threatened breach of this Agreement by the Employee (without the need to post any bond or other security). The parties acknowledge and agree that each Aon entity is an intended third-party beneficiary of this Agreement, and may be a named plaintiff in any subsequent suit brought by Aon to enforce the terms of this Agreement. In the event that any action is filed to enforce the terms and conditions of this Agreement, the prevailing party in the action shall recover from the non-prevailing party, in addition to any other sum that either party may be called upon to pay, a reasonable sum for the prevailing party's' attorney's fees and costs.

Section 3. **Trade Secrets and Confidential Information; Proceedings with Government Agencies; Inventions.**

(a) **Trade Secrets and Confidential Information; Proceedings with Government Agencies**

NSA-Risk-all states-no CA

(i)    The Employee acknowledges that Aon's business depends to a significant degree upon the possession of confidential, proprietary and trade secret information which is not generally known to others, and that the profitability of such Business requires that this information remain proprietary to Aon. The Employee recognizes that, by virtue of the Employee's employment with Aon, and to assist the Employee in the solicitation, production and servicing of client Business, the Employee will be granted otherwise prohibited access to such information. This information (hereinafter referred to as "Confidential Information") includes, without limitation: lists of clients and prospective clients; contract terms and conditions; client information relating to services, insurance, benefits programs, employees, finances, and compensation; copyrighted materials; corporate, management and business plans and strategies; compensation and revenues; methods and strategies of marketing; market research and data; technical know-how; computer software and manuals; policies and procedures; and the conduct of the affairs of Aon. Confidential Information does not include any information that lawfully is or has become generally or publicly known other than through the Employee's breach of this Agreement or a breach by another person of some other obligation to Aon. The Employee shall not, except as required in the course of employment by Aon or as otherwise provided by applicable law or in this Section 3, disclose or use during or subsequent to the course of employment, any Confidential Information.

(ii)    The Employee understands that nothing contained in this Agreement limits the Employee's ability to report possible violations of law or regulation to, or file a charge or complaint with, the Securities and Exchange Commission, the Equal Employment Opportunity Commission, the National Labor Relations Board, the Occupational Safety and Health Administration, the Department of Justice, the Congress, any Inspector General, or any other federal, state or local governmental agency or commission ("Government Agencies"). The Employee further understands that this Agreement does not limit the Employee's ability to participate in any investigation or proceeding that may be conducted by any Government Agency, without notice to Aon.

Nothing in this Agreement shall limit the Employee's ability under applicable United States federal law to (i) disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law or (ii) disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure.

(iii)   Upon termination of employment or upon Aon's request (whichever is earlier), the Employee will promptly return to Aon all Confidential Information and all materials and all copies or tangible embodiments of materials involving Confidential Information, and all other Aon property, in the Employee's possession or control, except as otherwise provided by law or in this Section 3. The Employee agrees to represent in writing to Aon upon termination of employment that he or she has complied with the provisions of this Section 3.

(b) **Inventions.** The Employee hereby assigns to Aon the Employee's entire right, title and interest in and to all discoveries and improvements, patentable or otherwise, trade secrets and ideas, writings and copyrightable material, which may be conceived by the Employee or developed or acquired by the Employee during his employment and which may pertain directly or indirectly to the Business, and which the Employee agrees is work for hire performed in the scope of his employment. The Employee agrees to disclose fully all such developments to Aon upon its request, which disclosure will be made in writing promptly following any such request. The Employee will upon Aon's request, execute, acknowledge and deliver to Aon all instruments and do all other acts which are necessary or desirable to enable Aon to file and prosecute applications for, and to acquire, maintain and enforce, all patents, trademarks, and copyrights in all countries. The Employee acknowledges and agrees that the Employee hereby is and has been notified by Aon, and understands, that the foregoing provisions of this subsection (3)(b) do not apply to an invention for which no equipment, supplies, facilities, or Confidential Information was used and which was developed entirely on the Employee's own time, unless: (x) the invention relates (i) to the Business or (ii) to Aon's actual or demonstrably anticipated research and development, or (y) the invention results from any work performed by the Employee for Aon.

Section 4. **Mergers and Consolidations; Assignability.**

The rights and obligations under this Agreement shall inure to the benefit of and be binding upon the Company and its successors and assigns. By way of explanation, and without limiting the generality of the foregoing sentence, if the Company or any entity resulting from any merger or consolidation referred to in this Section 4 is merged with or consolidated into any other entity or entities, or if substantially all of the assets of the Company or any such entity are sold or otherwise transferred to another entity, the provisions of this Agreement shall be binding upon and shall inure

NSA-Risk-all states-no CA

to the benefit of the continuing entity in or the entity resulting from such merger or consolidation or the entity to which such assets are sold or transferred. This Agreement shall not be assignable by the Employee.

Section 5. **Miscellaneous.**

(a) **Waiver and Modification**. Waiver of any term or condition of this Agreement by any party shall not be construed as a waiver of a subsequent breach or failure of the same term or condition, or a waiver of any other term or condition of this Agreement. Any waiver must be in writing. This Agreement may not be amended, altered or modified without the prior written consent of both parties and such instrument must acknowledge that it is an amendment or modification of this Agreement.

(b) **Captions**. The captions in this Agreement are not part of its provisions, are merely for reference and have no force or effect. If any caption is inconsistent with any provision of this Agreement, such provision shall govern.

(c) **Governing Law.** The validity, interpretation, construction, performance, enforcement and remedies of or relating to this Agreement, and the rights and obligations of the parties hereunder, shall be governed by and construed in accordance with the substantive laws of the state of Employee's residence as indicated above, without regard to the conflict of law principles, rules or statutes of any jurisdiction.

(d) **Severability**. To the extent that the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable for any reason, such word, phrase, clause or sentence shall be modified or deleted in such manner so as to afford Aon the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws, and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent.

(e) **Employee-at-Will.** Nothing in this Agreement shall be construed to create contractual employment rights other than as an employee terminable at-will.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first above written.

**Aon Risk Services Companies, Inc.**

**By:**

Todd Stevenson
Title: Vice President and Head of Human Resources - US Retail

Signature of new colleague

March 22, 2019

Date

NSA-Risk-all states-no CA

# EXHIBIT E

**RESTRICTED STOCK UNIT AGREEMENT
UNDER AMENDED AND RESTATED
AON PLC 2011 INCENTIVE PLAN**

This Restricted Stock Unit Agreement (the "Agreement") is entered into between Aon plc, a public limited company incorporated under English law, and its subsidiary Aon Group, Inc., a Maryland corporation with its principal place of business at 200 East Randolph Street, Chicago, Illinois (collectively, the "Company") and **THOMAS LUBAS** (the "Participant").

The Company desires to grant the Participant restricted stock units ("RSUs"), each RSU representing the right to receive a Class A Ordinary Share of the Company ("Share"), $.01 par value per Share, to encourage the Participant to remain in the service of the Company or its Subsidiaries or Affiliates, to provide the Participant with an incentive to contribute to the financial progress of the Company, and to encourage ownership of Shares by the Participant. Capitalized terms used but not otherwise defined in the Agreement shall have the meaning ascribed to such terms in the Amended and Restated Aon plc 2011 Incentive Plan, as approved by the shareholders of Aon plc on June 24, 2014 (the "Plan").

NOW, THEREFORE, in consideration of the mutual promises hereinafter set forth, the parties hereto agree as follows:

1. **Grant of Restricted Stock Units.** The Company grants under the Plan an award of **488** RSUs on **05/21/2015** (the "Grant Date"). The Participant understands and agrees that the Participant has no obligation to accept this award (as a condition of employment or otherwise), and that the Participant's decision to do so by signing this Agreement, and thereby to accept all of the terms and conditions of this Agreement, is the Participant's knowing and voluntary choice after having had a full and fair opportunity to consult with legal counsel (at the Participant's cost).

2. **Vesting of Restricted Stock Units.** The RSUs will vest in accordance with the schedule set forth in the Participant's account. The Participant must access the www.netbenefits.fidelity.com website and follow the instructions in order to view the vesting schedule. Notwithstanding anything to the contrary in the foregoing, the Committee may cause the RSUs to vest prior to the vesting schedule set forth in the Participant's account in order to satisfy any Tax-Related Items (as defined below) that arise prior to the date of settlement of the RSUs, subject to the limitations set forth in Section 3(d) of this Agreement.

3. **Tax Withholding Obligations.** The Participant acknowledges that, regardless of any action taken by the Company and/or the Participant's employer (the "Employer"), the ultimate liability for all income tax, social insurance, payroll tax, payment on account or other tax-related items related to the Participant's participation in the Plan and legally applicable to the Participant ("Tax-Related Items"), is and remains the Participant's responsibility and may exceed the amount actually withheld by the Company or the Employer. The Participant further acknowledges that the Company and/or the Employer: (a) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the grant of RSUs, including, but not limited to, the grant, vesting or settlement of the RSUs, the issuance of Shares upon settlement of the RSUs, the subsequent sale of Shares acquired pursuant to such vesting/settlement and the receipt of any dividends and/or dividend equivalents; and (b) do not commit to and are under no obligation to structure the terms of the grant or any aspect of the RSUs to reduce or eliminate the Participant's liability for Tax-Related Items or achieve any particular tax result. Further, if the Participant is subject to Tax-Related Items in more than one jurisdiction, the Participant acknowledges that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

   a) Prior to any relevant taxable or tax withholding event, as applicable, the Participant agrees to make adequate arrangements satisfactory to the Company or the Employer, to satisfy all Tax-Related Items. In this regard, the Participant authorizes the Company and/or the Employer, or their respective agents, at the

Company's discretion, to satisfy the obligations with regard to all Tax-Related Items by one or a combination of the following:

**(i)** withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer; or

**(ii)** withholding in Shares to be issued upon vesting/settlement of the RSUs; or

**(iii)** withholding from the proceeds of the sale of Shares acquired upon vesting/settlement of the RSUs either through a voluntary sale or through a mandatory sale arranged by the Company (on the Participant's behalf pursuant to this authorization without further consent); provided, however, that if the Participant is a Section 16 officer under the U.S. Securities Exchange Act of 1934, the Committee shall establish the method of withholding from alternatives (i) – (iii) herein and if the Committee does not exercise its discretion prior to the Tax-Related Items withholding event, then the Participant shall be entitled to elect the method of withholding from the alternatives above.

**b)** Depending on the withholding method, the Company may withhold or account for Tax-Related Items by considering applicable minimum statutory withholding amounts or other applicable withholding rates, including maximum applicable rates, in which case, the Participant will receive a refund of any over-withheld amount in cash and will have no entitlement to the equivalent Shares. If the obligation for Tax-Related Items is satisfied by withholding in Shares, for tax purposes, the Participant shall be deemed to have been issued the full number of Shares subject to the vested RSUs, notwithstanding that a number of Shares are held back solely for the purpose of paying the Tax-Related Items.

**c)** Finally, the Participant shall pay to the Company and/or the Employer any amount of Tax-Related Items that the Company and/or the Employer may be required to withhold as a result of the Participant's participation in the Plan that cannot be satisfied by the means previously described. The Company may refuse to deliver the Shares or the proceeds of the sale of Shares if the Participant fails to comply with the Participant's obligations in connection with the Tax-Related Items.

**d)** Notwithstanding anything in this Section 3 to the contrary, to avoid a prohibited distribution under Code Section 409A, if Shares underlying the RSUs will be withheld (or sold on the Participant's behalf) to satisfy any Tax-Related Items arising prior to the date of settlement of the RSUs for any portion of the RSUs that is considered "nonqualified deferred compensation" subject to Code Section 409A ("Deferred Compensation"), then the number of Shares withheld (or sold on the Participant's behalf) shall not exceed the number of Shares that equals the liability for the Tax-Related Items.

**4. Nominal Value.** At the time of settlement, this Award will be subject to the Participant's appropriate undertaking to pay to Aon plc a nominal value of $.01 per share (as determined in the sole discretion of Aon plc, subject to the provisions of Aon plc's articles of association and the U.K. Companies Act 2006, as amended from time to time), and such obligation may be satisfied by the Participant in cash in any manner to be established by Aon plc in its sole discretion, including but not limited to withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer.

**5. Effect of Termination of Employment.**
   **a)** <u>Voluntary termination prior to Retirement.</u> In the event that the Participant's Termination Date occurs because of the Participant's voluntary termination prior to Retirement (as defined in Section 5(d) below), the unvested portion of the RSU will be forfeited.
   **b)** <u>Termination due to death.</u> In the event that the Participant's Termination Date occurs due to the Participant's death, all unvested RSUs will be fully vested immediately and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof.
   **c)** <u>Termination due to disability.</u> In the event that the Participant's Termination Date occurs due to the Participant's disability, all unvested RSUs will be fully vested immediately and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof. "Disability" for purposes of this Agreement, shall mean disability pursuant to the standards set forth in, or

in circumstances where the Participant qualifies for receipt of benefits under, the long-term disability plan of the Employer. In the absence of such a plan, the Committee shall have exclusive discretion to determine whether a Participant's employment is terminated due to disability.

**d) Involuntary termination (other than for cause) or voluntary termination on or after Retirement.** In the event that the Participant's Termination Date occurs as a result of the Participant's involuntary termination (other than for cause) or the Participant's voluntary termination on or after Retirement, the RSUs shall be immediately vested pro rata and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof. The pro rata portion of the vested RSUs shall be calculated by multiplying (i) the number of RSUs subject to the award, by (ii) a fraction, the numerator of which shall be the number of days that have elapsed between the Grant Date and the date of the Participant's termination, and the denominator of which shall be the total number of days in the vesting schedule set forth in the Participant's account, and subtracting from the resulting product the number of RSUs previously vested. The remaining unvested portion of the RSU shall be forfeited. For purposes of this Agreement, "Retire" or "Retirement" means a voluntary termination of employment on or after the Participant's 55th birthday for employees whose principal place of work is outside of the European Union ("EU"). A Participant on secondment will be subject to the vesting rule applicable to his or her home country. For a Participant whose principal place of work is inside the EU, the unvested portion of the RSU will be forfeited. The Committee shall have exclusive discretion to determine a Participant's principal place of work for purposes of this Section 5(d).

**e) Termination for cause.** In the event that the Participant's Termination Date occurs because the Participant is terminated for cause, all unvested shares shall be forfeited. Termination for cause shall mean performing a deliberate act of dishonesty, fraud, theft, embezzlement, or misappropriation involving the Participant's employment with the Company or its Subsidiaries or Affiliates, or breach of the duty of loyalty to the Company, its Subsidiaries or Affiliates; performing an act of race, sex, national origin, religion, disability, or age-based discrimination which after investigation, counsel to the Company reasonably concludes will result in liability being imposed on the Company, its Subsidiaries or Affiliates and / or the Participant; material violation of Company policies and procedures including, but not limited to, the Aon Code of Business Conduct; material non-compliance with any terms of this Agreement or an employment agreement; or, performing any criminal act resulting in a criminal felony charge brought against the Participant or a criminal conviction of the Participant (other than conviction of a minor traffic violation).

6. **Receipt by the Participant of the Prospectus.** The Participant acknowledges receipt of the Plan prospectus that contains the entire Plan, and is incorporated herein by reference. The Participant represents and warrants that the Participant has read the Plan and agrees that all RSUs awarded under it shall be subject to all of the terms and conditions of the Plan.

7. **Issuance of Shares.** RSUs shall be converted to Shares as of the vesting date. Shares will be issued to the Participant as soon as practicable (within 60 days) after the vesting date, subject to Sections 3 and 4 of this Agreement. Notwithstanding the foregoing, for purposes of complying with Code Section 409A, if the RSUs are considered Deferred Compensation and the Shares are to be settled in connection with a termination contemplated under Section 5(c) or 5(d), the Company and the Participant shall take all steps necessary (including with regard to any post-termination services by the Participant) to ensure that a termination contemplated under Section 5 constitutes a "separation from service" within the meaning of Code Section 409A. In addition, if the RSUs are Deferred Compensation, the RSUs are settled upon the Participant's separation from service and the Participant is a "specified employee," within the meaning of Code Section 409A, on the date the Participant experiences a separation from service, then the RSUs shall be settled on the first business day of the seventh month following the Participant's separation from service, or, if earlier, on the date of the Participant's death, to the extent such delayed payment is required in order to avoid a prohibited distribution under Code Section 409A.

8. **Rights as Shareholder.** The Participant shall not have voting or any other right as a shareholder of Aon plc with respect to the RSUs. Upon issuance of the Shares pursuant to and in accordance with Section 7, the Participant will obtain full voting and other rights as a shareholder of Aon plc.

9. **Business Considerations; Restrictive Covenants; Acknowledgments; Injunctive Relief; Confidential Information; Incentive Repayment Policy.**

a) **Business Considerations.** Aon plc and its Subsidiary, Aon Group, Inc., a Maryland corporation with its corporate and business headquarters in Chicago, Illinois, and Aon Group, Inc.'s Subsidiaries and Affiliates (and divisions thereof) (collectively, with Aon plc, "Aon") are in the business of providing conventional and alternative risk management products and services covering the businesses of insurance brokerage, reinsurance brokerage, benefits consulting, compensation consulting, human resources consulting, human resources and benefits outsourcing management, investigatory and security consulting, managing underwriting and related services, including accounting, actuarial, claims management and handling, and information systems on behalf of commercial and individual clients which are national and international and are not confined to any geographic area (the "Business"). The Participant further acknowledges that the Participant's material employment duties and responsibilities, including without limitation with respect to Aon clients, prospective clients, and other employees, span geographic areas that extend well beyond the state in which the Participant is physically employed and resides. An essential element of the Business is the development and maintenance of personal contacts and relationships with clients and prospective clients. Aon invests considerable time and money to develop and maintain personal contacts and relationships with clients and prospective clients. Aon invests considerable time and money to develop and maintain client relationships, including payment of employees' salaries, benefits, travel, entertainment and other business expenses and assistance in servicing clients by making available to its employees specially developed and researched industry data, client-specific information, legal support, accounting support, marketing, advertising and other corporate services, as well as providing training and professional development and valuable confidential business and professional information, toward the development and maintenance of its client relationships and related goodwill. While these clients and prospective clients may be secured or serviced by Aon employees, including the Participant, the Participant acknowledges that such clients and prospective clients remain at all times the clients and prospective clients of Aon and that the goodwill engendered by the relationships is intended to inure only to the benefit of Aon; the goodwill is owned by Aon; and Aon shall be the sole beneficiary of such goodwill during and after termination of the Participant's employment with Aon. In addition, the Participant acknowledges that the Participant has acquired and/or will acquire, solely for the purpose of furthering the Business, knowledge of Aon's confidential and proprietary information; the Participant further acknowledges Aon's legitimate interest in safeguarding confidential and proprietary information from disclosure.

The personal identification of clients of Aon with an employee, including the Participant, creates the potential for the Participant's appropriation of the benefits of the relationships developed with clients on behalf of and at the expense of Aon. Since Aon would suffer irreparable harm if the Participant left its employ and solicited the Business of the clients and prospective clients of Aon, or solicited the employees of Aon, it is reasonable to protect Aon against certain competitive activities by the Participant for a limited period of time after the Participant leaves employment so that Aon may renew or restore its business relationship with its clients, prospective clients and employees. Consequently, the Participant is willing to enter into the covenants set forth herein in order to provide Aon with reasonable protection for its client, prospective client and employee relationships and its investment therein as above-described, its goodwill, and its confidential and proprietary information.

b) **Covenant Not to Solicit Clients and Prospective Clients.** The Participant hereby covenants and agrees that, except with the prior written consent of Aon, the Participant (on the Participant's own behalf or on behalf of any other person or entity) will not, during the course of employment, and for a period of two (2) years after the Participant's Termination Date, directly or indirectly, call upon, solicit, accept, engage in, service or perform, other than on behalf of Aon, any business of the same type or kind as the Business performed by Aon from or with respect to (i) clients of Aon with respect to whom the Participant provided services, either alone or with others, or had a business relationship, or on whose account the Participant worked or became familiar, or supervised directly or indirectly the servicing activities related to such clients, during the twenty-four (24) months prior to the Participant's Termination Date and, further

provided, such clients were clients of Aon either on the Participant's Termination Date or within twelve (12) months prior to such Termination Date and (ii) prospective clients of Aon which the Participant alone, in combination with others, or in a supervisory capacity, solicited during the six (6) months prior to the Participant's Termination Date and to which a proposal for services was rendered by Aon during the six (6) months prior to the Participant's Termination Date. "Client" means any person or entity listed on the books of Aon as such.

c) **Covenant Not to Solicit Employees.** The Participant hereby also agrees, for the duration of the term of the covenant set forth in Section 9(b) herein not to, directly or indirectly, solicit, induce, or cause any person or other entity to solicit, induce, any employee of Aon to work for the Participant or for any third party or entity, or to leave the employ of Aon.

d) **Other Covenants.** Notwithstanding any other language in the Agreement, including, but not limited to that found in Section 10(b), this Agreement does not preclude the enforceability of any restrictive covenant provision contained in any prior or subsequent agreement entered into by the Participant, (any such covenant, an "Other Covenant"), including without limitation any covenant contained in any Confidentiality and Non-Solicitation Agreement between the Participant and any Aon entity, and further including without limitation any covenant not to compete, to solicit or perform services for clients, or to solicit employees, any confidentiality or intellectual property covenant, and any covenant with respect to a pre-resignation notice period. Further, no Other Covenant precludes the enforceability of any provision contained in this Agreement.

e) **Acknowledgments.** Aon and the Participant acknowledge and agree that the covenants contained in Sections 9(b) and 9(c) herein are necessary and reasonable for the protection of Aon and are reasonably limited with respect to the activities prohibited, duration, geographical scope and their effect on the Participant and the public. The parties acknowledge that the purpose and effect of the covenants simply are to protect Aon for a limited period of time from unfair competition by the Participant.

The Participant acknowledges that there is no general geographical restriction contained in the preceding paragraphs because the restrictions apply only to the specified clients of Aon and because the Participant's material duties, responsibilities and relationships with Aon clients, prospective clients and employees are not limited to any particular geographic area. Nothing in this Agreement shall prohibit the Participant from obtaining a livelihood for himself or herself or his or her family by being engaged in the Business. The intent of the parties is that the Participant's restrictive covenant is limited only to those clients as above specified.

f) **Company's Right to Injunctive Relief; Attorneys' Fees.** The Participant acknowledges that the Participant's services to Aon are of a unique character which gives them a special value to Aon, the loss of which cannot reasonably or adequately be compensated in damages in an action at law, and that a breach of this Agreement will result in irreparable and continuing harm to Aon, and that therefore, in addition to any other remedy which Aon may have at law or in equity, Aon shall be entitled to temporary, preliminary and permanent injunctive relief for a breach or threatened breach of this Agreement by the Participant (without the need to post any bond or other security). The parties acknowledge and agree that Aon Group, Inc. and the Participant's Employer each is an intended third-party beneficiary of this Agreement, and may be a named plaintiff in any subsequent suit brought by the Company to enforce the terms of this Agreement. In the event that Aon brings an action to enforce the terms and conditions of the Agreement, the Participant shall pay the costs and expenses incurred by Aon in bringing such action, including without limitation attorneys' and other legal fees.

g) **Trade Secrets and Confidential Information.** The Participant acknowledges that Aon's business depends to a significant degree upon the possession of information which is not generally known to others, and that the profitability of such business requires that this information remain proprietary to Aon. The Participant shall not, except as required in the course of employment by Aon or by applicable law (provided that the Participant shall first give Aon plc reasonable advance written notice of any subpoena or other legal disclosure requirement (Attn: General Counsel), with a contemporaneous copy to Aon Group, Inc.), disclose or use during or subsequent to the course of employment, any trade secrets or confidential or

proprietary information relating to the business of Aon of which the Participant becomes aware by reason of being employed or to which the Participant gains access during his or her employment by Aon and which has not been publicly disclosed (it being understood and agreed that trade secrets and confidential or proprietary information shall remain subject to this Section 9(g), and shall not be considered "publicly disclosed" for purposes of the preceding clause, if any public disclosure thereof results from a breach by the Participant of this provision, or a breach by the Participant or another person of some other contractual or legal obligation to Aon).

Such information includes, without limitation, lists of clients and prospective clients; contract terms and conditions; client information relating to services, insurance, benefits programs, employees, finances, and compensation; copyrighted materials; corporate, management and business plans and strategies; compensation and revenues; methods and strategies of marketing; market research and data; technical know-how; computer software and manuals; policies and procedures; and the conduct of the affairs of Aon. All records and equipment and other materials constituting or relating in any way to any trade secrets, confidential or proprietary information, or relating to clients or business of Aon, and all other Aon property, shall be and remain the sole property of Aon during and after the end of employment and shall be returned to Aon by the Participant immediately upon its request or the Participant's Termination Date (whichever is earlier).

h) **Incentive Repayment Policy.** If the Participant has been designated and notified by the board of directors of Aon plc that he or she is a reporting officer for purposes of Section 16 of the U.S. Securities Exchange Act of 1934, the Participant is subject to Aon's Incentive Repayment Policy (the "Policy"). The Policy provides that Aon plc will have the discretion to cancel or require reimbursement to the Company of the long-term equity based incentive award set forth in this Agreement if the grant or vesting was based on the achievement of financial results that were subsequently restated. The Participant can obtain a copy of the Policy from the Global Compensation team. If the Participant is subject to the Policy, by accepting this Agreement, the Participant hereby agrees and acknowledges that he or she will be bound by it.

10. **Other Provisions.**

a) **Plan Terms Take Precedence over Agreement Terms.** RSUs are granted pursuant to the Plan, the terms and conditions of which are incorporated into this Agreement by reference. If there are any inconsistencies between the terms of this Agreement and the Plan, the terms of the Plan will govern.

b) **Prior Agreement(s) Will Not Control.** The Participant's acceptance of this Agreement will supersede provisions of any prior agreement that could be construed as governing the terms of this grant.

c) **Section 409A.** The RSUs and amounts payable thereunder are intended to be exempt from or compliant with Code Section 409A and the U.S. Treasury Regulations relating thereto so as not to subject the Participant to the payment of additional taxes and interest under Code Section 409A or other adverse tax consequences. In furtherance of this intent, the provisions of this Agreement will be interpreted, operated, and administered in a manner consistent with these intentions. The Committee may modify the terms of this Agreement, the Plan or both, without the consent of the Participant, in the manner that the Committee may determine to be necessary or advisable in order to comply with Code Section 409A or to mitigate any additional tax, interest and/or penalties or other adverse tax consequences that may apply under Code Section 409A if compliance is not practical. This Section 10(c) does not create an obligation on the part of the Company to modify the terms of this Agreement or the Plan and does not guarantee that the RSUs or the delivery of Shares upon vesting/settlement of the RSUs will not be subject to taxes, interest and penalties or any other adverse tax consequences under Code Section 409A. Nothing in this Agreement shall provide a basis for any person to take any action against the Company or any of its Subsidiaries or Affiliates based on matters covered by Code Section 409A, including the tax treatment of any amounts paid under this Agreement, and neither the Company nor any of its Subsidiaries or Affiliates will have any liability under any circumstances to the Participant or any other party if the RSUs, the delivery of Shares upon vesting/settlement of the RSUs or other payment or tax event hereunder that is intended to be exempt from, or compliant with, Code

Section 409A, is not so exempt or compliant or for any action taken by the Committee with respect thereto. Further, settlement of any portion of the RSUs that is Deferred Compensation may not be accelerated or postponed except to the extent permitted by Code Section 409A.

d) **Restriction on Transfer.** RSUs may not be sold, transferred, pledged, assigned, or otherwise alienated at any time.

e) **Right of Employment.** Grants of RSUs under the Plan and of this Agreement do not confer upon the Participant any right to continue in the employ or service of the Employer. This Agreement shall survive any termination of the Participant's employment for any or no reason.

f) **Electronic Delivery and Acceptance.** The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means. The Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

g) **Need to Accept Grant.** The Participant acknowledges that this grant must be accepted within ninety (90) days of the Grant Date in order to be eligible to receive any benefits from this grant. If this grant is not accepted within the ninety (90)-day period specified in the foregoing sentence, all benefits under this grant may be forfeited, as determined in the sole discretion of the Committee. To accept this grant, the Participant must access the www.netbenefits.fidelity.com website and follow the instructions for acceptance. If this grant was distributed to the Participant via mail, the Participant must sign the Agreement and return it to Aon's Executive Compensation Department within ninety (90) days.

h) **Waiver; Section Headings.** Waiver of any term or condition of this Agreement by any party shall not be construed as a waiver of a subsequent breach or failure of the same term or condition, or a waiver of any other term or condition of this Agreement. Any waiver must be in writing. The Section headings in this Agreement are for convenience only and are not to be used in interpreting this Agreement.

i) **Severability.** To the extent that the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable by a court of competent jurisdiction for any reason, such term, word, phrase, clause or sentence shall be modified in such manner so as to afford the Company the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws. If, however, a court of competent jurisdiction finds that any such term, word, phrase, clause or sentence cannot be so modified and thus made enforceable, or otherwise declines for any reason to do so, such term, word, phrase, clause or sentence shall be deemed severed from this Agreement and of no force and effect, and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent.

j) **Governing Law.** The validity, interpretation**,** instruction, performance, enforcement and remedies of or relating to this Agreement, and the rights and obligations of the parties hereunder, shall be governed by and construed in accordance with the substantive internal laws of the State of Illinois, without regard to the conflict of law principles, rules or statutes of any jurisdiction. The foregoing provisions of this Section 10(j) shall apply irrespective of whether the Participant is a party to or bound by another restrictive covenant of any kind that may be governed by the laws of another jurisdiction (if any).

k) **Venue and Jurisdiction.** Venue for any legal proceedings instituted related to this Agreement shall be exclusively in the state and/or federal courts located in Cook County, Illinois, and the Participant hereby knowingly, voluntarily and irrevocably agrees, consents and submits to the exclusive jurisdiction and venue of such courts within the State of Illinois. The Participant further hereby knowingly, voluntarily and irrevocably waives, and agrees not to assert, any objection, challenge or defense to such exclusive venue or jurisdiction (including without limitation any defense of forum non conveniens), and further agrees not to file any claim or action related to this Agreement in any other jurisdiction or venue. The foregoing provisions of this Section 10(k) shall apply irrespective of whether the Participant is a party to or bound by another restrictive covenant of any kind that may

provide for or permit venue or jurisdiction with respect to such other restrictive covenant in any other court or forum (if any).

l) **Notice.** All notices given hereunder shall be in writing and, if intended for Aon plc, shall be addressed to it or delivered to it at its principal office in London, England to the attention of the General Counsel or its principal office in Chicago, Illinois to the attention of the Chief Human Resources Officer. If intended for the Participant, notices shall be delivered personally or shall be addressed (if sent by mail) to the Participant's then current residence address as shown on the Company's records, or to such other address as the Participant directs in a notice to the Company. All notices shall be deemed to be given on the date received at the address of the addressee or, if delivered personally, on the date delivered.

m) **No Advice Regarding Grant.** The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding the Participant's participation in the Plan, or the acquisition or sale of the underlying Shares. The Participant is hereby advised to consult with his or her own personal tax, legal and financial advisors regarding his or her participation in the Plan and execution of this Agreement, before executing this Agreement or otherwise taking any action at any time related to the Plan.

n) **Imposition of Other Requirements.** The Company reserves the right to impose other requirements on the Participant's participation in the Plan, on the RSUs and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable for legal or administrative reasons, and to require the Participant to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

IN WITNESS WHEREOF, the parties have accepted this Agreement as of the date hereof.

**AON PLC**

*Gregory C. Case*

Gregory C. Case
President and Chief Executive Officer

**AON GROUP, INC.**

*Gregory C. Case*

Gregory C. Case
President and Chief Executive Officer

| | |
|---|---|
| `Signed Electronically` | `06/12/2015` |
| **RSU Recipient (Participant)** | **Date** |

`FH04YG2X`

`06/12/2015 08:33 am U.S. Eastern Standard Time`

`ACCEPTED`

## RESTRICTED STOCK UNIT AGREEMENT
## UNDER AMENDED AND RESTATED
## AON PLC 2011 INCENTIVE PLAN

This Restricted Stock Unit Agreement (the "Agreement") is entered into between Aon plc, a public limited company incorporated under English law, and its Subsidiary Aon Group, Inc., a Maryland corporation with its principal place of business at 200 East Randolph Street, Chicago, Illinois (collectively, the "Company") and **THOMAS  LUBAS**_____ (the "Participant").

The Company desires to grant the Participant restricted stock units ("RSUs"), each RSU representing the right to receive a Class A Ordinary Share of the Company ("Share"), $.01 par value per Share, to encourage the Participant to remain in the service of the Company or its Subsidiaries or Affiliates, to provide the Participant with an incentive to contribute to the financial progress of the Company, and to encourage ownership of Shares by the Participant.  Capitalized terms used but not otherwise defined in the Agreement shall have the meaning ascribed to such terms in the Amended and Restated Aon plc 2011 Incentive Plan, as amended from time to time (the "Plan").

NOW, THEREFORE, in consideration of the mutual promises hereinafter set forth, the parties hereto agree as follows:

1. **Grant of Restricted Stock Units.**   The Company grants under the Plan an award of _____**474**_____ RSUs on **05/20/2016** (the "Grant Date"). The Participant understands and agrees that the Participant has no obligation to accept this award (as a condition of employment or otherwise), and that the Participant's decision to do so by signing this Agreement, and thereby to accept all of the terms and conditions of this Agreement, is the Participant's knowing and voluntary choice after having had a full and fair opportunity to consult with legal counsel (at the Participant's cost).

2. **Vesting of Restricted Stock Units.**   The RSUs will vest in accordance with the schedule set forth in the Participant's account.   The Participant must access the www.netbenefits.fidelity.com website and follow the instructions in order to view the vesting schedule.  Notwithstanding anything herein to the contrary, the Committee may cause the RSUs to vest prior to the date(s) set forth in the vesting schedule in order to satisfy any Tax-Related Items (as defined below) that arise prior to the date of settlement of the RSUs, subject to the limitations set forth in Section 3(d) of this Agreement.

3. **Tax Withholding Obligations.**   The Participant acknowledges that, regardless of any action taken by the Company and/or the Participant's employer (the "Employer"), the ultimate liability for all income tax, social insurance, payroll tax, payment on account or other tax-related items related to the Participant's participation in the Plan and legally applicable to the Participant ("Tax-Related Items"), is and remains the Participant's responsibility and may exceed the amount actually withheld by the Company or the Employer.  The Participant further acknowledges that the Company and/or the Employer: (a) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the grant of RSUs, including, but not limited to, the grant, vesting or settlement of the RSUs, the issuance of Shares upon settlement of the RSUs, the subsequent sale of Shares acquired pursuant to such vesting/settlement and the receipt of any dividends and/or dividend equivalents; and (b) do not commit to and are under no obligation to structure the terms of the grant or any aspect of the RSUs to reduce or eliminate the Participant's liability for Tax-Related Items or achieve any particular tax result.  Further, if the Participant is subject to Tax-Related Items in more than one jurisdiction, the Participant acknowledges that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

   a) Prior to any relevant taxable or tax withholding event, as applicable, the Participant agrees to make adequate arrangements satisfactory to the Company or the Employer, to satisfy all Tax-Related Items.  In this regard, the Participant authorizes the Company and/or the Employer, or their respective agents, at the Company's discretion, to satisfy the obligations with regard to all Tax-Related Items by one or a combination of the following:

      (i)   withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer; or

      (ii)   withholding in Shares to be issued upon vesting/settlement of the RSUs; or

      (iii)   withholding from the proceeds of the sale of Shares acquired upon vesting/settlement of the RSUs either through a voluntary sale or through a mandatory sale arranged by the Company (on the Participant's behalf pursuant to this authorization without further consent); provided, however, that if the Participant is a Section 16 officer under the U.S. Securities Exchange Act of 1934, the Committee shall establish the method of withholding from alternatives (i) – (iii) herein and if the Committee does not exercise its discretion prior to the Tax-Related Items withholding event, then the Participant shall be entitled to elect the method of

withholding from the alternatives above.

b) Depending on the withholding method, the Company may withhold or account for Tax-Related Items by considering applicable minimum statutory withholding amounts or other applicable withholding rates, including maximum applicable rates, in which case, any over-withheld amount will be refunded to the Participant in cash by the Company or the Employer (with no entitlement to the equivalent Shares) or if not refunded, the Participant may seek a refund from the local tax authorities. If the obligation for Tax-Related Items is satisfied by withholding in Shares, for tax purposes, the Participant shall be deemed to have been issued the full number of Shares subject to the vested RSUs, notwithstanding that a number of Shares are held back solely for the purpose of paying the Tax-Related Items.

c) Finally, the Participant shall pay to the Company and/or the Employer any amount of Tax-Related Items that the Company and/or the Employer may be required to withhold as a result of the Participant's participation in the Plan that cannot be satisfied by the means previously described. The Company may refuse to deliver the Shares or the proceeds of the sale of Shares if the Participant fails to comply with the Participant's obligations in connection with the Tax-Related Items.

d) Notwithstanding anything in this Section 3 to the contrary, to avoid a prohibited distribution under Code Section 409A, if Shares underlying the RSUs will be withheld (or sold on the Participant's behalf) to satisfy any Tax-Related Items arising prior to the date of settlement of the RSUs for any portion of the RSUs that is considered "nonqualified deferred compensation" subject to Code Section 409A ("Deferred Compensation"), then the number of Shares withheld (or sold on the Participant's behalf) shall not exceed the number of Shares that equals the liability for the Tax-Related Items.

4. **Nominal Value.** At the time of settlement, this Award will be subject to the Participant's appropriate undertaking to pay to Aon plc a nominal value of $.01 per share (as determined in the sole discretion of Aon plc, subject to the provisions of Aon plc's articles of association and the U.K. Companies Act 2006, as amended from time to time), and such obligation may be satisfied by the Participant in cash in any manner to be established by Aon plc in its sole discretion, including but not limited to withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer.

5. **Effect of Termination of Employment.**

a) <u>**Voluntary termination (other than Retirement).**</u>  In the event that the Participant's Termination Date occurs because of the Participant's voluntary termination that does not qualify as Retirement (as defined in Section 5(d) below), the unvested portion of the RSU will be forfeited.

b) <u>**Termination due to death.**</u>  In the event that the Participant's Termination Date occurs due to the Participant's death, all unvested RSUs will be fully vested immediately and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof.

c) <u>**Termination due to disability.**</u>  In the event that the Participant's Termination Date occurs due to the Participant's disability, all unvested RSUs will be fully vested immediately and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof. "Disability" for purposes of this Agreement, shall mean disability pursuant to the standards set forth in, or in circumstances where the Participant qualifies for receipt of benefits under, the long-term disability plan of the Employer. In the absence of such a plan, the Committee shall have exclusive discretion to determine whether a Participant's employment is terminated due to disability.

d) <u>**Involuntary termination (other than for Cause) or Retirement.**</u>  In the event that the Participant's Termination Date occurs as a result of the Participant's involuntary termination by the Company or Employer (other than for Cause) or the Participant's Retirement, the RSUs shall be immediately vested pro rata and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof. The pro rata portion of the RSUs that shall vest shall be calculated by multiplying (i) the number of RSUs subject to the award, by (ii) a fraction, the numerator of which shall be the number of days that have elapsed between the Grant Date and the date of the Participant's termination, and the denominator of which shall be the total number of days covered by the vesting schedule set forth in the Participant's account, and subtracting from the resulting product the number of RSUs previously vested. The remaining unvested portion of the RSUs shall be forfeited. For purposes of this Agreement, "Retire" or "Retirement" means a voluntary termination of employment on or after the Participant's 55th birthday for employees whose principal place of work is outside of the European Union ("EU"). A Participant on secondment will be subject to the vesting rule applicable to his or her home country. Participants whose principal place of work is

- 2 -

inside the EU shall not be eligible for Retirement, and their voluntary termination at any age shall be treated in accordance with Section 5(a). The Committee shall have exclusive discretion to determine a Participant's principal place of work for purposes of this Section 5(d).

e) **Termination for Cause.** In the event that the Participant's Termination Date occurs because the Participant is terminated by the Company or Employer for Cause, all unvested RSUs shall be forfeited. "Cause" shall mean the Participant's (i) performing a deliberate act of dishonesty, fraud, theft, embezzlement, or misappropriation involving the Participant's employment with the Company, its Subsidiaries or Affiliates, or breach of the duty of loyalty to the Company, its Subsidiaries or Affiliates; (ii) performing an act of race, sex, national origin, religion, disability, or age-based discrimination which after investigation, counsel to the Company reasonably concludes will result in liability being imposed on the Company, its Subsidiaries or Affiliates and / or the Participant; (iii) material violation of Company policies and procedures including, but not limited to, the Aon Code of Business Conduct; (iv) material non-compliance with any terms of this Agreement or an employment agreement; or (v) performing any criminal act resulting in a criminal felony charge brought against the Participant or a criminal conviction of the Participant (other than conviction of a minor traffic violation).

6. **Receipt by the Participant of the Prospectus.** The Participant acknowledges receipt of the Plan prospectus that contains the entire Plan, and is incorporated herein by reference. The Participant represents and warrants that the Participant has read the Plan and agrees that all RSUs awarded under it shall be subject to all of the terms and conditions of the Plan.

7. **Issuance of Shares.** RSUs shall be converted to Shares as of the applicable vesting date. Shares will be issued to the Participant as soon as practicable (within 60 days) after the vesting date, subject to Sections 3 and 4 of this Agreement. Notwithstanding the foregoing, for purposes of complying with Code Section 409A, if the RSUs are considered Deferred Compensation and the Shares are to be settled in connection with a termination contemplated under Section 5(c) or 5(d), the Company and the Participant shall take all steps necessary (including with regard to any post-termination services by the Participant) to ensure that a termination contemplated under Section 5 constitutes a "separation from service" within the meaning of Code Section 409A. In addition, if the RSUs are Deferred Compensation, the RSUs are settled upon the Participant's separation from service and the Participant is a "specified employee," within the meaning of Code Section 409A, on the date the Participant experiences a separation from service, then the RSUs shall be settled on the first business day of the seventh month following the Participant's separation from service, or, if earlier, on the date of the Participant's death, to the extent such delayed payment is required in order to avoid a prohibited distribution under Code Section 409A.

8. **Rights as Shareholder.** The Participant shall not have voting or any other rights as a shareholder of Aon plc with respect to the RSUs. Upon issuance of the Shares pursuant to and in accordance with Section 7, the Participant will obtain full voting and other rights as a shareholder of Aon plc.

9. **Business Considerations; Restrictive Covenants; Acknowledgments; Injunctive Relief; Confidential Information; Incentive Repayment Policy.**

a) **Business Considerations.** Aon plc and its Subsidiary, Aon Group, Inc., a Maryland corporation with its corporate and business headquarters in Chicago, Illinois, and Aon Group, Inc.'s Subsidiaries and Affiliates (and divisions thereof) (collectively, with Aon plc, "Aon") are in the business of providing conventional and alternative risk management products and services covering the businesses of insurance brokerage, reinsurance brokerage, benefits consulting, compensation consulting, human resources consulting, human resources and benefits outsourcing management, investigatory and security consulting, managing underwriting and related services, including accounting, actuarial, claims management and handling, and information systems on behalf of commercial and individual clients which are national and international and are not confined to any geographic area (the "Business"). The Participant further acknowledges that the Participant's material employment duties and responsibilities, including without limitation with respect to Aon clients, prospective clients, and other employees, span geographic areas that extend well beyond the state in which the Participant is physically employed and resides. An essential element of the Business is the development and maintenance of personal contacts and relationships with clients and prospective clients. Aon invests considerable time and money to develop and maintain personal contacts and relationships with clients and prospective clients. Aon invests considerable time and money to develop and maintain client relationships, including payment of employees' salaries, benefits, travel, entertainment and other business expenses and assistance in servicing clients by making available to its employees specially developed and researched industry data, client-specific information, legal support, accounting support, marketing, advertising and other corporate services, as well as providing training and professional development and valuable confidential business and professional information, toward the development and maintenance of its client relationships and related goodwill. While these clients and

- 3 -

prospective clients may be secured or serviced by Aon employees, including the Participant, the Participant acknowledges that such clients and prospective clients remain at all times the clients and prospective clients of Aon and that the goodwill engendered by the relationships is intended to inure only to the benefit of Aon; the goodwill is owned by Aon; and Aon shall be the sole beneficiary of such goodwill during and after termination of the Participant's employment with Aon.  In addition, the Participant acknowledges that the Participant has acquired and/or will acquire, solely for the purpose of furthering the Business, knowledge of Aon's confidential and proprietary information; the Participant further acknowledges Aon's legitimate interest in safeguarding confidential and proprietary information from disclosure.

The personal identification of clients of Aon with an employee, including the Participant, creates the potential for the Participant's appropriation of the benefits of the relationships developed with clients on behalf of and at the expense of Aon.  Since Aon would suffer irreparable harm if the Participant left its employ and solicited the Business of the clients and prospective clients of Aon, or solicited the employees of Aon, it is reasonable to protect Aon against certain competitive activities by the Participant for a limited period of time after the Participant leaves employment so that Aon may renew or restore its business relationship with its clients, prospective clients and employees. Consequently, the Participant is willing to enter into the covenants set forth herein in order to provide Aon with reasonable protection for its client, prospective client and employee relationships and its investment therein as above-described, its goodwill, and its confidential and proprietary information.

b)  **Covenant Not to Solicit Clients and Prospective Clients.**  The Participant hereby covenants and agrees that, except with the prior written consent of Aon, the Participant (on the Participant's own behalf or on behalf of any other person or entity) will not, during the course of employment, and for a period of two (2) years after the Participant's Termination Date, directly or indirectly, call upon, solicit, accept, engage in, service or perform, other than on behalf of Aon, any business of the same type or kind as the Business performed by Aon from or with respect to (i) clients of Aon with respect to whom the Participant provided services, either alone or with others, or had a business relationship, or on whose account the Participant worked or became familiar, or supervised directly or indirectly the servicing activities related to such clients, during the twenty-four (24) months prior to the Participant's Termination Date and, further provided, such clients were clients of Aon either on the Participant's Termination Date or within twelve (12) months prior to such Termination Date and (ii) prospective clients of Aon which the Participant alone, in combination with others, or in a supervisory capacity, solicited during the six (6) months prior to the Participant's Termination Date and to which a proposal for services was rendered by Aon during the six (6) months prior to the Participant's Termination Date.  "Client" means any person or entity listed on the books of Aon as such.

c)  **Covenant Not to Solicit Employees.**  The Participant hereby also agrees, for the duration of the term of the covenant set forth in Section 9(b) herein not to, directly or indirectly, solicit, induce, or cause any person or other entity to solicit, induce, any employee of Aon to work for the Participant or for any third party or entity, or to leave the employ of Aon.

d)  **Other Covenants.**  Notwithstanding any other language in the Agreement, including, but not limited to that found in Section 10(b), this Agreement does not preclude the enforceability of any restrictive covenant provision contained in any prior or subsequent agreement entered into by the Participant, (any such covenant, an "Other Covenant"), including without limitation any covenant contained in any Confidentiality and Non-Solicitation Agreement between the Participant and any Aon entity, and further including without limitation any covenant not to compete, to solicit or perform services for clients, or to solicit employees, any confidentiality or intellectual property covenant, and any covenant with respect to a pre-resignation notice period.  Further, no Other Covenant precludes the enforceability of any provision contained in this Agreement.

e)  **Acknowledgments.**  Aon and the Participant acknowledge and agree that the covenants contained in Sections 9(b) and 9(c) herein are necessary and reasonable for the protection of Aon and are reasonably limited with respect to the activities prohibited, duration, geographical scope and their effect on the Participant and the public. The parties acknowledge that the purpose and effect of the covenants simply are to protect Aon for a limited period of time from unfair competition by the Participant.

The Participant acknowledges that there is no general geographical restriction contained in the preceding paragraphs because the restrictions apply only to the specified clients of Aon and because the Participant's material duties, responsibilities and relationships with Aon clients, prospective clients and employees are not limited to any particular geographic area.  Nothing in this Agreement shall prohibit the Participant from obtaining a livelihood for himself or herself or his or her family by being engaged in the Business.  The intent of the parties is that the Participant's restrictive covenant is limited only to those clients as above specified.

f)  **Company's Right to Injunctive Relief; Attorneys' Fees.**    The Participant acknowledges that the Participant's services to Aon are of a unique character which gives them a special value to Aon, the loss of which cannot

reasonably or adequately be compensated in damages in an action at law, and that a breach of this Agreement will result in irreparable and continuing harm to Aon, and that therefore, in addition to any other remedy which Aon may have at law or in equity, Aon shall be entitled to temporary, preliminary and permanent injunctive relief for a breach or threatened breach of this Agreement by the Participant (without the need to post any bond or other security). The parties acknowledge and agree that Aon Group, Inc. and the Participant's Employer each is an intended third-party beneficiary of this Agreement, and may be a named plaintiff in any subsequent suit brought by the Company to enforce the terms of this Agreement. In the event that Aon brings an action to enforce the terms and conditions of the Agreement, the Participant shall pay the costs and expenses incurred by Aon in bringing such action, including without limitation attorneys' and other legal fees.

**g)** **Trade Secrets and Confidential Information.** The Participant acknowledges that Aon's business depends to a significant degree upon the possession of information which is not generally known to others, and that the profitability of such business requires that this information remain proprietary to Aon. The Participant shall not, except as required in the course of employment by Aon or by applicable law (provided that the Participant shall first give Aon plc reasonable advance written notice of any subpoena (Attn: General Counsel), with a contemporaneous copy to Aon Group, Inc.), disclose or use during or subsequent to the course of employment, any trade secrets or confidential or proprietary information relating to the business of Aon of which the Participant becomes aware by reason of being employed or to which the Participant gains access during his or her employment by Aon and which has not been publicly disclosed (it being understood and agreed that trade secrets and confidential or proprietary information shall remain subject to this Section 9(g), and shall not be considered "publicly disclosed" for purposes of the preceding clause, if any public disclosure thereof results from a breach by the Participant of this provision, or a breach by the Participant or another person of some other contractual or legal obligation to Aon). Nothing in this paragraph is intended to limit the Participant's right or ability to communicate with the U.S. Equal Employment Opportunity Commission, the National Labor Relations Board, the Securities and Exchange Commission, or other federal, state or local agency, and such communication may be initiated by the Participant or in response to the government inquiry.

Such information includes, without limitation, lists of clients and prospective clients; contract terms and conditions; client information relating to services, insurance, benefits programs, employees, finances, and compensation; copyrighted materials; corporate, management and business plans and strategies; compensation and revenues; methods and strategies of marketing; market research and data; technical know-how; computer software and manuals; policies and procedures; and the conduct of the affairs of Aon. All records and equipment and other materials constituting or relating in any way to any trade secrets, confidential or proprietary information, or relating to clients or business of Aon, and all other Aon property, shall be and remain the sole property of Aon during and after the end of employment and shall be returned to Aon by the Participant immediately upon its request or the Participant's Termination Date (whichever is earlier).

**h)** **Incentive Repayment Policy.** If the Participant has been designated and notified by the board of directors of Aon plc that he or she is a reporting officer for purposes of Section 16 of the U.S. Securities Exchange Act of 1934, the Participant is subject to Aon's Incentive Repayment Policy (the "Policy"). The Policy provides that Aon plc will have the discretion to cancel or require reimbursement to the Company of the long-term equity based incentive award set forth in this Agreement if the grant or vesting was based on the achievement of financial results that were subsequently restated. The Participant can obtain a copy of the Policy from the Global Compensation team. If the Participant is subject to the Policy, by accepting this Agreement, the Participant hereby agrees and acknowledges that he or she will be bound by it.

**10.** **Other Provisions.**

**a)** **Plan Terms Take Precedence over Agreement Terms.** RSUs are granted pursuant to the Plan, the terms and conditions of which are incorporated into this Agreement by reference. If there are any inconsistencies between the terms of this Agreement and the Plan, the terms of the Plan will govern.

**b)** **Prior Agreement(s) Will Not Control.** The Participant's acceptance of this Agreement will supersede provisions of any prior agreement that could be construed as governing the terms of this grant.

**c)** **Code Section 409A.** The RSUs and amounts payable thereunder are intended to be exempt from or compliant with Code Section 409A and the U.S. Treasury Regulations relating thereto so as not to subject the Participant to the payment of additional taxes and interest under Code Section 409A or other adverse tax consequences. In furtherance of this intent, the provisions of this Agreement will be interpreted, operated, and administered in a manner consistent with these intentions. The Committee may modify the terms of this Agreement and/or the

Plan, without the consent of the Participant, in the manner that the Committee may determine to be necessary or advisable in order to comply with Code Section 409A or to mitigate any additional tax, interest and/or penalties or other adverse tax consequences that may apply under Code Section 409A if compliance is not practical. This Section 10(c) does not create an obligation on the part of the Company to modify the terms of this Agreement or the Plan and does not guarantee that the RSUs or the delivery of Shares upon vesting/settlement of the RSUs will not be subject to taxes, interest and penalties or any other adverse tax consequences under Code Section 409A. Nothing in this Agreement shall provide a basis for any person to take any action against the Company or any of its Subsidiaries or Affiliates based on matters covered by Code Section 409A, including the tax treatment of any amounts paid under this Agreement, and neither the Company nor any of its Subsidiaries or Affiliates will have any liability under any circumstances to the Participant or any other party if the RSUs, the delivery of Shares upon vesting/settlement of the RSUs or other payment or tax event hereunder that is intended to be exempt from, or compliant with, Code Section 409A, is not so exempt or compliant or for any action taken by the Committee with respect thereto. Further, settlement of any portion of the RSUs that is Deferred Compensation may not be accelerated or postponed except to the extent permitted by Code Section 409A.

d) **Restriction on Transfer.** RSUs may not be sold, transferred, pledged, assigned, or otherwise alienated at any time.

e) **Right of Employment.** Grants of RSUs under the Plan and of this Agreement do not confer upon the Participant any right to continue in the employ or service of the Employer. This Agreement shall survive any termination of the Participant's employment for any or no reason.

f) **Electronic Delivery and Acceptance.** The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means. The Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

g) **Need to Accept Grant.** The Participant acknowledges that this grant must be accepted within ninety (90) days of the Grant Date in order to be eligible to receive any benefits from this grant. If this grant is not accepted within the ninety (90)-day period specified in the foregoing sentence, all benefits under this grant may be forfeited, as determined in the sole discretion of the Committee. To accept this grant, the Participant must access the www.netbenefits.fidelity.com website and follow the instructions for acceptance. If this grant was distributed to the Participant via mail, the Participant must sign the Agreement and return it to Aon's Executive Compensation Department within ninety (90) days.

h) **Waiver; Section Headings.** Waiver of any term or condition of this Agreement by any party shall not be construed as a waiver of a subsequent breach or failure of the same term or condition, or a waiver of any other term or condition of this Agreement. Any waiver must be in writing. The Section headings in this Agreement are for convenience only and are not to be used in interpreting this Agreement.

i) **Severability.** To the extent that the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable by a court of competent jurisdiction for any reason, such term, word, phrase, clause or sentence shall be modified in such manner so as to afford the Company the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws. If, however, a court of competent jurisdiction finds that any such term, word, phrase, clause or sentence cannot be so modified and thus made enforceable, or otherwise declines for any reason to do so, such term, word, phrase, clause or sentence shall be deemed severed from this Agreement and of no force and effect, and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent.

j) **Governing Law.** The validity, interpretation**,** instruction, performance, enforcement and remedies of or relating to this Agreement, and the rights and obligations of the parties hereunder, shall be governed by and construed in accordance with the substantive internal laws of the State of Illinois, without regard to the conflict of law principles, rules or statutes of any jurisdiction. The foregoing provisions of this Section 10(j) shall apply irrespective of whether the Participant is a party to or bound by another restrictive covenant of any kind that may be governed by the laws of another jurisdiction (if any).

k) **Venue and Jurisdiction.** Venue for any legal proceedings instituted related to this Agreement shall be exclusively in the state and/or federal courts located in Cook County, Illinois, and the Participant hereby knowingly, voluntarily and irrevocably agrees, consents and submits to the exclusive jurisdiction and venue of such courts within the State of Illinois. The Participant further hereby knowingly, voluntarily and irrevocably waives, and agrees not to assert, any objection, challenge or defense to such exclusive venue or jurisdiction (including without limitation any defense of forum non conveniens), and further agrees not to file any claim or

action related to this Agreement in any other jurisdiction or venue. The foregoing provisions of this Section 10(k) shall apply irrespective of whether the Participant is a party to or bound by another restrictive covenant of any kind that may provide for or permit venue or jurisdiction with respect to such other restrictive covenant in any other court or forum (if any).

l)   **Notice.**   All notices given hereunder shall be in writing and, if intended for Aon plc, shall be addressed to it or delivered to it at its principal office in London, England to the attention of the General Counsel or its principal office in Chicago, Illinois to the attention of the Chief Human Resources Officer. If intended for the Participant, notices shall be delivered personally or shall be addressed (if sent by mail) to the Participant's then current residence address as shown on the Company's records, or to such other address as the Participant directs in a notice to the Company. All notices shall be deemed to be given on the date received at the address of the addressee or, if delivered personally, on the date delivered.

m)   **Compliance with Law.**   Notwithstanding any other provision of the Plan or this Agreement, unless there is an available exemption from any registration, qualification or other legal requirement applicable to the Shares, the Company shall not be required to deliver any Shares issuable upon vesting/settlement of the RSUs prior to the completion of any registration or qualification of the Shares under any local, state, federal or foreign securities or exchange control law or under rulings or regulations of the U.S. Securities and Exchange Commission ("SEC") or of any other governmental regulatory body, or prior to obtaining any approval or other clearance from any local, state, federal or foreign governmental agency, which registration, qualification or approval the Company shall, in its absolute discretion, deem necessary or advisable. The Participant understands that the Company is under no obligation to register or qualify the Shares with the SEC or any state or foreign securities commission or to seek approval or clearance from any governmental authority for the issuance or sale of the Shares. Further, the Participant agrees that the Company shall have unilateral authority to amend the Plan and the Agreement without the Participant's consent to the extent necessary to comply with securities or other laws applicable to issuance of Shares.

n)   **Intellectual Property.**   The Participant hereby assigns to the Company the Participant's entire right, title and interest in and to all discoveries and improvements, patentable or otherwise, trade secrets and ideas and writings and copyrightable material, which are conceived, developed, reduced to practice, or acquired by the Participant (collectively "IP") during the Participant's employment and which relate to the business of the Company or any of its Affiliates, parent companies or Subsidiaries. The Participant further acknowledges that all original works of authorship which are made by the Participant (solely or jointly with others) within the scope of and during the period of his/her employment with the Company and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. The Participant agrees to disclose promptly, fully and in writing all such IP to the Company. The Participant will upon the Company's request, execute, acknowledge and deliver to the Company all instruments and do all other acts which are necessary or desirable to enable the Company or any of its Affiliates, parent companies, or Subsidiaries to file and prosecute applications for, and to acquire, maintain and enforce, all patents, trademarks, and copyrights in all countries. To the extent the Participant is bound by an employee handbook or contract provision that protects the Company's intellectual property at least to the extent provided in this Section 10(n), the provision set forth in such employment handbook or contractual arrangement between the Participant and the Company will prevail and govern.

o)   **No Advice Regarding Grant.**   The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding the Participant's participation in the Plan, or the acquisition or sale of the underlying Shares. The Participant should consult with his or her own personal tax, legal and financial advisors regarding his or her participation in the Plan and execution of this Agreement, before executing this Agreement or otherwise taking any action at any time related to the Plan.

p)   **Imposition of Other Requirements.**   The Company reserves the right to impose other requirements on the Participant's participation in the Plan, on the RSUs and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable for legal or administrative reasons, and to require the Participant to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

IN WITNESS WHEREOF, the parties have accepted this Agreement as of the date hereof.

**AON PLC**

Aon RSU AA 2016 SSP-US – Non-California
6636492-v4\GESDMS

*Gregory C. Case*

Gregory C. Case
President and Chief Executive Officer

**AON GROUP, INC.**

*Gregory C. Case*

Gregory C. Case
President and Chief Executive Officer

**Signed Electronically**                              **06/09/2016**
**RSU Recipient (Participant)**                                    **Date**

**GGX5LCWW**

**06/09/2016 09:39 am U.S. Eastern Standard Time**

**ACCEPTED**

**RESTRICTED STOCK UNIT AGREEMENT**
**UNDER AMENDED AND RESTATED**
**AON PLC 2011 INCENTIVE PLAN**

This Restricted Stock Unit Agreement (the "Agreement") is entered into between Aon plc, a public limited company incorporated under English law, and its Subsidiary Aon Group, Inc., a Maryland corporation with its principal place of business at 200 East Randolph Street, Chicago, Illinois (collectively, the "Company") and **THOMAS LUBAS** (the "Participant").

The Company desires to grant the Participant restricted stock units ("RSUs"), each RSU representing the right to receive a Class A Ordinary Share of the Company ("Share"), $.01 par value per Share, to encourage the Participant to remain in the service of the Company or its Subsidiaries or Affiliates, to provide the Participant with an incentive to contribute to the financial progress of the Company, and to encourage ownership of Shares by the Participant. Capitalized terms used but not otherwise defined in the Agreement shall have the meaning ascribed to such terms in the Amended and Restated Aon plc 2011 Incentive Plan, as amended from time to time (the "Plan").

NOW, THEREFORE, in consideration of the mutual promises hereinafter set forth, the parties hereto agree as follows:

1. **Grant of Restricted Stock Units.** The Company grants under the Plan an award of ____**139**____ RSUs on **05/21/2019** (the "Grant Date"). The Participant understands and agrees that the Participant has no obligation to accept this Award (as a condition of employment or otherwise), and that the Participant's decision to do so by signing or accepting this Agreement, and thereby to accept all of the terms and conditions of this Agreement, is the Participant's knowing and voluntary choice after having had a full and fair opportunity to consult with legal counsel (at the Participant's cost).

2. **Vesting of Restricted Stock Units.** The RSUs will vest in accordance with the schedule set forth in the Participant's account. The Participant must access the www.netbenefits.com website and follow the instructions in order to view the vesting schedule. Notwithstanding anything herein to the contrary, the Committee may cause the RSUs to vest prior to the date(s) set forth in the vesting schedule in order to satisfy any Tax-Related Items (as defined below) that arise prior to the date of settlement of the RSUs, subject to the limitations set forth in Section 3(d) of this Agreement.

3. **Tax Withholding Obligations.** The Participant acknowledges that, regardless of any action taken by the Company and/or the Participant's employer (the "Employer"), the ultimate liability for all income tax, social insurance contributions, payroll tax, payments on account or other tax-related items related to the Participant's participation in the Plan and legally applicable to the Participant ("Tax-Related Items"), is and remains the Participant's responsibility and may exceed the amount, if any, actually withheld by the Company or the Employer. The Participant further acknowledges that the Company and/or the Employer: (a) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the Award, including, but not limited to, the grant, vesting or settlement of the RSUs, the issuance of Shares upon settlement of the RSUs, the subsequent sale of Shares acquired pursuant to such vesting/settlement and the receipt of any dividends and/or dividend equivalents; and (b) do not commit to and are under no obligation to structure the terms of the Award or any aspect of the RSUs to reduce or eliminate the Participant's liability for Tax-Related Items or achieve any particular tax result. Further, if the Participant is subject to Tax-Related Items in more than one jurisdiction, the Participant acknowledges that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

   a) Prior to any relevant taxable or tax withholding event, as applicable, the Participant agrees to make adequate arrangements satisfactory to the Company or the Employer, to satisfy all Tax-Related Items. In this regard, the Participant authorises the Company and/or the Employer, or their respective agents, at the Company's discretion, to satisfy the obligations with regard to all Tax-Related Items by one or a

- 1 -

combination of the following:

**(i)**     withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer; or

**(ii)**    withholding in Shares to be issued upon vesting/settlement of the RSUs; or

**(iii)**   withholding from the proceeds of the sale of Shares acquired upon vesting/settlement of the RSUs either through a voluntary sale or through a mandatory sale arranged by the Company (on the Participant's behalf pursuant to this authorisation without further consent); provided, however, that if the Participant is a Section 16 officer under the Exchange Act, the Committee shall establish the method of withholding from alternatives (i) – (iii) herein.

**b)**  The Company and/or the Employer may withhold or account for Tax-Related Items by considering applicable statutory withholding rates or other applicable withholding rates in the Participant's jurisdiction(s), including maximum applicable rates. If Tax-Related Items are withheld in excess of the Participant's actual tax liability, any over-withheld amount may be refunded to the Participant in cash by the Company or the Employer (with no entitlement to the equivalent in Shares) or, if not refunded, the Participant may seek a refund from the local tax, social security or other applicable authorities.  If the obligation for Tax-Related Items is satisfied by withholding in Shares, for tax purposes, the Participant shall be deemed to have been issued the full number of Shares subject to the vested RSUs, notwithstanding that a number of Shares are held back solely for the purpose of paying the Tax-Related Items.

**c)**  Finally, the Participant shall pay to the Company and/or the Employer any amount of Tax-Related Items that the Company and/or the Employer may be required to withhold as a result of the Participant's participation in the Plan that cannot be satisfied by the means previously described.  The Company may refuse to deliver the Shares or the proceeds of the sale of Shares if the Participant fails to comply with the Participant's obligations in connection with the Tax-Related Items.

**d)**  Notwithstanding anything in this Section 3 to the contrary, to avoid a prohibited distribution under Code Section 409A, if Shares underlying the RSUs will be withheld (or sold on the Participant's behalf) to satisfy any Tax-Related Items arising prior to the date of settlement of the RSUs for any portion of the RSUs that is considered "nonqualified deferred compensation" subject to Code Section 409A ("Deferred Compensation"), then the number of Shares withheld (or sold on the Participant's behalf) shall not exceed the number of Shares that equals the liability for the Tax-Related Items.

**4.  Nominal Value.**  At the time of settlement, this Award will be subject to the Participant's appropriate undertaking to pay to Aon plc a nominal value of \$.01 per share (as determined in the sole discretion of Aon plc, subject to the provisions of Aon plc's articles of association and the U.K. Companies Act 2006, as amended from time to time), and such obligation may be satisfied by the Participant in cash in any manner to be established by Aon plc in its sole discretion, including but not limited to withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer.

**5.  Effect of Termination of Employment; Breach of Restrictive Covenants; Misconduct.**

**a)  <u>Voluntary termination (other than Retirement)</u>.**  In the event that the Participant's Termination Date occurs because of the Participant's voluntary termination that does not qualify as Retirement (as defined in Section 5(d) below), the unvested portion of the RSU will be forfeited.

**b)  <u>Termination due to death</u>.**  In the event that the Participant's Termination Date occurs due to the Participant's death, all unvested RSUs will be fully vested immediately and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof.

**c)  <u>Termination due to disability</u>.**  In the event that the Participant's Termination Date occurs due to the Participant's disability, all unvested RSUs will be fully vested immediately and the date of such

- 2 -

termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof. "Disability" for purposes of this Agreement, shall mean disability pursuant to the standards set forth in, or in circumstances where the Participant qualifies for receipt of benefits under, the long-term disability plan of the Employer. In the absence of such a plan, the Committee shall have exclusive discretion to determine whether a Participant's employment is terminated due to disability.

**d)** **Involuntary termination (other than for Cause) or Retirement.** In the event that the Participant's Termination Date occurs as a result of the Participant's involuntary termination by the Company or Employer (other than for Cause) or the Participant's Retirement, the RSUs shall be immediately vested pro rata and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof. The pro rata portion of the RSUs that shall vest shall be calculated by multiplying (i) the number of RSUs subject to the Award, by (ii) a fraction, the numerator of which shall be the number of days that have elapsed between the Grant Date and the date of the Participant's termination, and the denominator of which shall be the total number of days covered by the vesting schedule set forth in the Participant's account, and subtracting from the resulting product the number of RSUs previously vested. The remaining unvested portion of the RSUs shall be forfeited. For purposes of this Agreement, "Retire" or "Retirement" means a voluntary termination of employment on or after the Participant's 55th birthday for employees whose principal place of work is outside of the European Union ("EU") or the United Kingdom. A Participant on secondment will be subject to the vesting rule applicable to his or her home country. Participants whose principal place of work is inside the EU or the United Kingdom shall not be eligible for Retirement, and their voluntary termination at any age shall be treated in accordance with Section 5(a). The Committee shall have exclusive discretion to determine a Participant's principal place of work for purposes of this Section 5(d).

**e)** **Termination for Cause.** In the event that the Participant's Termination Date occurs because the Participant is terminated by the Company or Employer for Cause, all unvested RSUs shall be forfeited. "Cause" shall mean the Participant's (i) performing a deliberate act of dishonesty, fraud, theft, embezzlement, or misappropriation involving the Participant's employment with the Company, its Subsidiaries or Affiliates, or breach of the duty of loyalty to the Company, its Subsidiaries or Affiliates; (ii) performing an act of race, sex, national origin, religion, disability, or age-based discrimination which after investigation, counsel to the Company reasonably concludes will result in liability being imposed on the Company, its Subsidiaries or Affiliates and / or the Participant; (iii) material violation of Company policies and procedures including, but not limited to, the Aon Code of Business Conduct; (iv) material noncompliance with any terms of this Agreement or an employment agreement; or (v) performing any criminal act resulting in a criminal felony charge brought against the Participant or a criminal conviction of the Participant (other than conviction of a minor traffic violation).

**f)** **Misconduct; Breach of Restrictive Covenants.** In the event that the Company's Chief Executive Officer determines (or, in the case of the Chief Executive Officer as Participant, the Board of Directors of the Company determines), in his or its sole discretion, as applicable, that forfeiture is appropriate based on the finding that (i) the Participant has materially violated Company policies and procedures, including (but not limited to) performing an act of race, sex, national origin, religion, disability, or age-based discrimination, or sexual harassment or any other material violation of the Aon Code of Business Conduct, or (ii) the Participant is in breach of any non-competition, non-solicitation, and/or confidentiality provisions or other restrictive covenants that apply to the Participant, all unvested RSUs shall be forfeited.

**6.** **Receipt by the Participant of the Prospectus.** The Participant acknowledges receipt of the Plan prospectus that contains the entire Plan, and is incorporated herein by reference. The Participant represents and warrants that the Participant has read the Plan and agrees that all RSUs awarded under it shall be subject to all of the terms and conditions of the Plan.

**7.** **Issuance of Shares.** RSUs shall be converted to Shares as of the applicable vesting date. Shares will be issued to the Participant as soon as practicable (within 60 days) after the vesting date, subject to Sections 3 and 4 of

- 3 -

this Agreement. Notwithstanding the foregoing, for purposes of complying with Code Section 409A, if the RSUs are considered Deferred Compensation and the Shares are to be settled in connection with a termination of service, the Company and the Participant shall take all steps necessary (including with regard to any post-termination services by the Participant) to ensure that a termination contemplated under Section 5 constitutes a "separation from service" within the meaning of Code Section 409A. In addition, if the RSUs are Deferred Compensation and payable in connection with the Participant's separation from service, and if the Participant is a "specified employee" within the meaning of Code Section 409A on the date the Participant experiences a separation from service, then the RSUs shall be settled on the first business day of the seventh month following the Participant's separation from service, or, if earlier, on the date of the Participant's death, solely to the extent such delayed payment is required in order to avoid a prohibited distribution under Code Section 409A.

8. **Rights as Shareholder.** The Participant shall not have voting or any other rights as a shareholder of Aon plc with respect to the RSUs. Upon issuance of the Shares pursuant to and in accordance with Section 7, the Participant will obtain full voting and other rights as a shareholder of Aon plc.

9. **Business Considerations; Restrictive Covenants; Acknowledgments; Injunctive Relief; Confidential Information; Incentive Repayment Policy.**

a) **Business Considerations.** Aon plc and its Subsidiary, Aon Group, Inc., a Maryland corporation with its corporate and business headquarters in Chicago, Illinois, and Aon Group, Inc.'s Subsidiaries and Affiliates (and divisions thereof) (collectively, with Aon plc, "Aon") are in the business of providing conventional and alternative risk management products and services covering the businesses of insurance brokerage, reinsurance brokerage, benefits consulting, compensation consulting, human resources consulting, human resources and benefits outsourcing management, investigatory and security consulting, managing underwriting and related services, including accounting, actuarial, claims management and handling, and information systems on behalf of commercial and individual clients which are national and international and are not confined to any geographic area (the "Business"). The Participant further acknowledges that the Participant's material employment duties and responsibilities, including without limitation with respect to Aon clients, prospective clients, and other employees, span geographic areas that extend well beyond the state in which the Participant is physically employed and resides. An essential element of the Business is the development and maintenance of personal contacts and relationships with clients and prospective clients. Aon invests considerable time and money to develop and maintain client relationships, including payment of employees' salaries, benefits, travel, entertainment and other business expenses and assistance in servicing clients by making available to its employees specially developed and researched industry data, client-specific information, legal support, accounting support, marketing, advertising and other corporate services, as well as providing training and professional development and valuable confidential business and professional information, toward the development and maintenance of its client relationships and related goodwill. While these clients and prospective clients may be secured or serviced by Aon employees, including the Participant, the Participant acknowledges that such clients and prospective clients remain at all times the clients and prospective clients of Aon and that the goodwill engendered by the relationships is intended to inure only to the benefit of Aon; the goodwill is owned by Aon; and Aon shall be the sole beneficiary of such goodwill during and after termination of the Participant's employment with Aon. In addition, the Participant acknowledges that the Participant has acquired and/or will acquire, for the purpose of furthering the Business, knowledge of Aon's confidential and proprietary information; the Participant further acknowledges Aon's legitimate interest in safeguarding confidential and proprietary information from disclosure.

The personal identification of clients of Aon with an Aon employee, including the Participant, creates the potential for the Participant's appropriation of the benefits of the relationships developed with clients on behalf of and at the expense of Aon. Since Aon would suffer irreparable harm if the Participant left its employ and solicited the Business of the clients and prospective clients of Aon, or solicited the employees of Aon, it is reasonable to protect Aon against certain competitive activities by the Participant for a limited period of time after the Participant leaves employment so that Aon may renew or restore its business relationship with its clients, prospective clients and employees. Consequently, the Participant is willing to

- 4 -

enter into the covenants set forth herein in order to provide Aon with reasonable protection for its client, prospective client and employee relationships and its investment therein as above-described, its goodwill, and its confidential and proprietary information.

**b)** **Covenant Not to Solicit Clients and Prospective Clients.** The Participant hereby covenants and agrees that, except with the prior written consent of Aon, the Participant (on the Participant's own behalf or on behalf of any other person or entity) will not, during the course of employment, and for a period of two years after the Participant's Termination Date (the "Restricted Period"), directly or indirectly, call upon, solicit, accept, engage in, service or perform, other than on behalf of Aon, any business of the same type or kind as the Business performed by Aon from or with respect to (i) clients of Aon with respect to whom the Participant provided services, either alone or with others, or had a business relationship, or on whose account the Participant worked or became familiar, or supervised directly or indirectly the servicing activities related to such clients, during the 24 months prior to the Participant's Termination Date and, further provided, such clients were clients of Aon either on the Participant's Termination Date or within 12 months prior to such Termination Date and (ii) prospective clients of Aon which the Participant alone, in combination with others, or in a supervisory capacity, solicited during the six months prior to the Participant's Termination Date and to which a proposal for services was rendered by Aon during the six months prior to the Participant's Termination Date. "Client" means any person or entity listed on the books of Aon as such, or any majority owned subsidiary of a person or entity listed on the books of Aon as a client.

**c)** **Covenant Not to Solicit Employees.** The Participant hereby also agrees, for the duration of the Restricted Period, not to, directly or indirectly, solicit or induce, or cause any person or other entity to solicit or induce, any employee of Aon to work for the Participant or for any third party or entity, or to leave the employ of Aon.

**d)** **Other Covenants.** Notwithstanding any other language in the Agreement, including, but not limited to that found in Section 10(b), this Agreement does not preclude the enforceability of any restrictive covenant provision contained in any prior or subsequent agreement entered into by the Participant, (any such covenant, an "Other Covenant"), including without limitation any covenant contained in any Confidentiality and Non-Solicitation Agreement between the Participant and any Aon entity, and further including without limitation any covenant not to compete, to solicit or perform services for clients, or to solicit employees, any confidentiality or intellectual property covenant, and any covenant with respect to a pre-resignation notice period. Further, no Other Covenant precludes the enforceability of any provision contained in this Agreement. No subsequent agreement entered into by the Participant may amend, supersede, or override the covenants contained herein unless such subsequent agreement specifically references subsections (b) and (c) of this Section.

**e)** **Acknowledgments.** Aon and the Participant acknowledge and agree that the covenants contained in subsections (b) and (c) of this Section are necessary and reasonable for the protection of Aon and are reasonably limited with respect to the activities prohibited, duration, geographical scope and their effect on the Participant and the public. The parties acknowledge that the purpose and effect of the covenants simply are to protect Aon for a limited period of time from unfair competition by the Participant.

The Participant acknowledges that there is no general geographical restriction contained in the preceding paragraphs because the restrictions apply only to the specified clients of Aon and because the Participant's material duties, responsibilities, and relationships with Aon clients, prospective clients, and employees are not limited to any particular geographic area. Nothing in this Agreement shall prohibit the Participant from obtaining a livelihood for the Participant or the Participant's family by being engaged in the Business.

**f)** **Company's Right to Injunctive Relief; Attorneys' Fees and Costs.** The Participant acknowledges that the Participant's services to Aon are of a unique character which gives them a special value to Aon, the loss of which cannot reasonably or adequately be compensated in damages in an action at law, and that a breach of Section 9 of this Agreement will result in irreparable and continuing harm to Aon, and that therefore, in addition to any other remedy which Aon may have at law or in equity, Aon shall be entitled to temporary, preliminary and permanent injunctive relief for a breach or threatened breach of this Agreement by the

Participant (without the need to post any bond or other security). The parties acknowledge and agree that each Aon entity, including the participant's employer, is an intended third-party beneficiary of this Agreement, and may be a named plaintiff in any subsequent suit brought by Aon to enforce the terms of this Agreement. In the event that any action is filed to enforce the terms and conditions of this Agreement, the prevailing party in the action will recover from the non-prevailing party, in addition to any other sum that either party may be called upon to pay, a reasonable sum for the prevailing party's attorney's fees and costs.

**g) Trade Secrets and Confidential Information.**

**(i)** The Participant acknowledges that Aon's Business depends to a significant degree upon the possession of confidential, proprietary, and trade secret information which is not generally known to others, and that the profitability of such Business requires that this information remain proprietary to Aon. The Participant recognises that, by virtue of the Participant's employment with Aon, and to assist the Participant in the solicitation, production and servicing of client Business, the Participant will be granted otherwise prohibited access to such information. This information (hereinafter referred to as "Confidential Information") includes, without limitation, lists of clients and prospective clients; contract terms and conditions; client information relating to services, insurance, benefits programs, employees, finances, and compensation; copyrighted materials; corporate, management and business plans and strategies; compensation and revenues; methods and strategies of marketing; market research and data; technical know-how; computer software and manuals; policies and procedures; and the conduct of the affairs of Aon. Confidential Information does not include any information that lawfully is or has become generally or publicly known other than through the Participant's breach of this Agreement or a breach by another person of some other obligation to Aon. The Participant shall not, except as required in the course of employment by Aon or as otherwise provided by applicable law or in this subsection (g), disclose or use during or subsequent to the course of employment, any Confidential Information.

**(ii)** The Participant understands that nothing contained in this Agreement limits the Participant's ability to report possible violations of law or regulation to, or file a charge or complaint with, the Securities and Exchange Commission, the Equal Employment Opportunity Commission, the National Labor Relations Board, the Occupational Safety and Health Administration, the Department of Justice, the Congress, any Inspector General, or any other federal, state or local governmental agency or commission ("Government Agencies"). The Participant further understands that this Agreement does not limit the Participant's ability to participate in any investigation or proceeding that may be conducted by any Government Agency, without notice to the Company.

Nothing in this Agreement shall limit the Participant's ability under applicable United States federal law to (i) disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law or (ii) disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure.

**(iii)** Upon termination of employment or upon Aon's request (whichever is earlier), the Participant will promptly return to Aon all Confidential Information and all materials and all copies or tangible embodiments of materials involving Confidential Information, and all other Aon property, in the Participant's possession or control, except as otherwise provided by law or in this subsection (g). The Participant agrees to represent in writing to Aon upon termination of employment that he or she has complied with the provisions of this subsection (g).

**h) Incentive Repayment Policy.** If the Participant has been designated and notified by the board of directors of Aon plc that he or she is a reporting officer for purposes of Section 16 of the Exchange Act, the Participant is subject to Aon's Incentive Repayment Policy (the "Policy"). The Policy provides that Aon

- 6 -

plc will have the discretion to cancel or require reimbursement to the Company of the Award set forth in this Agreement if the grant or vesting was based on the achievement of financial results that were subsequently restated. The Participant can obtain a copy of the Policy from the Global Compensation team. If the Participant is subject to the Policy, by accepting this Agreement, the Participant hereby agrees and acknowledges that he or she will be bound by it.

## 10. Other Provisions.

a) **Plan Terms Take Precedence over Agreement Terms.** RSUs are granted pursuant to the Plan, the terms and conditions of which are incorporated into this Agreement by reference. If there are any inconsistencies between the terms of this Agreement and the Plan, the terms of the Plan will govern. For the avoidance of doubt, the parties expressly acknowledge and agree that Sections 9, 10(j), and 10(k) of this Agreement are not inconsistent with any term or provision of the Plan, including (without limitation) Section 9.16 of the Plan (and nothing herein shall be construed to state or suggest that any other provision of this Agreement is inconsistent with the Plan).

b) **Prior Agreement(s) Will Not Control.** The Participant's acceptance of this Agreement will supersede provisions of any prior agreement that could be construed as governing the terms of this Award.

c) **Code Section 409A.** The RSUs and amounts payable thereunder are intended to be exempt from or compliant with Code Section 409A and the U.S. Treasury Regulations relating thereto so as not to subject the Participant to the payment of additional taxes and interest under Code Section 409A or other adverse tax consequences. In furtherance of this intent, the provisions of this Agreement will be interpreted, operated, and administered in a manner consistent with these intentions. The Committee may modify the terms of this Agreement and/or the Plan, without the consent of the Participant, in the manner that the Committee may determine to be necessary or advisable in order to comply with Code Section 409A or to mitigate any additional tax, interest and/or penalties or other adverse tax consequences that may apply under Code Section 409A if compliance is not practical. This Section 10(c) does not create an obligation on the part of the Company to modify the terms of this Agreement or the Plan and does not guarantee that the RSUs or the delivery of Shares upon vesting/settlement of the RSUs will not be subject to taxes, interest and penalties or any other adverse tax consequences under Code Section 409A. Nothing in this Agreement shall provide a basis for any person to take any action against the Company or any of its Subsidiaries or Affiliates based on matters covered by Code Section 409A, including the tax treatment of any amounts paid under this Agreement, and neither the Company nor any of its Subsidiaries or Affiliates will have any liability under any circumstances to the Participant or any other party if the RSUs, the delivery of Shares upon vesting/settlement of the RSUs or other payment or tax event hereunder that is intended to be exempt from, or compliant with, Code Section 409A, is not so exempt or compliant or for any action taken by the Committee with respect thereto. Further, settlement of any portion of the RSUs that is Deferred Compensation may not be accelerated or postponed except to the extent permitted by Code Section 409A.

d) **Restriction on Transfer.** RSUs may not be sold, transferred, pledged, assigned, or otherwise alienated at any time.

e) **Right of Employment.** Grants of RSUs under the Plan and this Agreement do not confer upon the Participant any right to continue in the employ or service of the Employer. This Agreement shall survive any termination of the Participant's employment for any or no reason.

f) **Electronic Delivery and Acceptance.** The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means. The Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

g) **Need to Accept Grant.** The Participant acknowledges that this grant must be accepted within 90 days of the Grant Date in order to be eligible to receive any benefits from this grant. If this grant is not

accepted within the 90-day period specified in the foregoing sentence, all benefits under this grant may be forfeited, as determined in the sole discretion of the Committee. To accept this grant, the Participant must access the www.netbenefits.com website and follow the instructions for acceptance. If this grant was distributed to the Participant via mail, the Participant must sign the Agreement and return it to the Company within 90 days.

**h) Waiver; Section Headings.** Waiver of any term or condition of this Agreement by any party shall not be construed as a waiver of a subsequent breach or failure of the same term or condition, or a waiver of any other term or condition of this Agreement. Any waiver must be in writing. The Section headings in this Agreement are for convenience only and are not to be used in interpreting this Agreement.

**i) Severability.** To the extent that the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable by a court of competent jurisdiction for any reason, such term, word, phrase, clause or sentence shall be modified in such manner so as to afford the Company the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws. If, however, a court of competent jurisdiction finds that any such term, word, phrase, clause or sentence cannot be so modified and thus made enforceable, or otherwise declines for any reason to do so, such term, word, phrase, clause or sentence shall be deemed severed from this Agreement and of no force and effect, and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent.

**j) Governing Law.** The validity, interpretation**,** instruction, performance, enforcement and remedies of or relating to Section 9 of this Agreement, and the rights and obligations of the parties thereunder, shall be governed by and construed in accordance with the substantive internal laws of the State of Illinois, without regard to the conflict of law principles, rules or statutes of any jurisdiction. With respect to all other Sections of this Agreement, the validity, interpretation, instruction, performance, enforcement and remedies of or relating to those Sections, and the rights and obligations of the parties thereunder, shall be governed and construed in accordance with the substantive internal laws of the State of Delaware, without regard to the conflict of law principles, rules or statutes of any jurisdiction. The foregoing provisions of this subsection shall apply irrespective of whether the Participant is a party to or bound by another restrictive covenant of any kind that may be governed by the laws of another jurisdiction (if any).

**k) Venue and Jurisdiction.** Venue for any legal proceedings instituted related to this Agreement shall be exclusively in the state and/or federal courts located in Cook County, Illinois, and the Participant hereby knowingly, voluntarily and irrevocably agrees, consents and submits to the exclusive jurisdiction and venue of such courts within the State of Illinois. The Participant further hereby knowingly, voluntarily and irrevocably waives, and agrees not to assert, any objection, challenge or defense to such exclusive venue or jurisdiction (including without limitation any defense of forum non conveniens), and further agrees not to file any claim or action related to this Agreement in any other jurisdiction or venue. The foregoing provisions of this Section 10(k) shall apply irrespective of whether the Participant is a party to or bound by another restrictive covenant of any kind that may provide for or permit venue or jurisdiction with respect to such other restrictive covenant in any other court or forum (if any).

**l) Notice.** All notices given hereunder shall be in writing and, if intended for Aon plc, shall be addressed to it or delivered to it at its principal office in London, England to the attention of the General Counsel or its principal office in Chicago, Illinois to the attention of the Chief Human Resources Officer. If intended for the Participant, notices shall be delivered personally or shall be addressed (if sent by mail) to the Participant's then current residence address as shown on the Company's records, or to such other address as the Participant directs in a notice to the Company. All notices shall be deemed to be given on the date received at the address of the addressee or, if delivered personally, on the date delivered.

**m) Compliance with Law.** Notwithstanding any other provision of the Plan or this Agreement, unless there is an available exemption from any registration, qualification or other legal requirement applicable to the Shares, the Company shall not be required to deliver any Shares issuable upon

vesting/settlement of the RSUs prior to the completion of any registration or qualification of the Shares under any local, state, federal or foreign securities or exchange control law or under rulings or regulations of the U.S. Securities and Exchange Commission ("SEC") or of any other governmental regulatory body, or prior to obtaining any approval or other clearance from any local, state, federal or foreign governmental agency, which registration, qualification or approval the Company shall, in its absolute discretion, deem necessary or advisable. The Participant understands that the Company is under no obligation to register or qualify the Shares with the SEC or any state or foreign securities commission or to seek approval or clearance from any governmental authority for the issuance or sale of the Shares. Further, the Participant agrees that the Company shall have unilateral authority to amend the Plan and the Agreement without the Participant's consent to the extent necessary to comply with securities or other laws applicable to issuance of Shares.

**n)** **Intellectual Property.** The Participant hereby assigns to the Company the Participant's entire right, title and interest in and to all discoveries and improvements, patentable or otherwise, trade secrets and ideas and writings and copyrightable material, which are conceived, developed, reduced to practice, or acquired by the Participant (collectively "IP") during the Participant's employment and which relate to the business of the Company or any of its Affiliates, parent companies or Subsidiaries. The Participant further acknowledges that all original works of authorship which are made by the Participant (solely or jointly with others) within the scope of and during the period of his/her employment with the Company and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. The Participant agrees to disclose promptly, fully and in writing all such IP to the Company. The Participant will upon the Company's request, execute, acknowledge and deliver to the Company all instruments and do all other acts which are necessary or desirable to enable the Company or any of its Affiliates, parent companies, or Subsidiaries to file and prosecute applications for, and to acquire, maintain and enforce, all patents, trademarks, and copyrights in all countries. To the extent the Participant is bound by an employee handbook or contract provision that protects the Company's intellectual property at least to the extent provided in this Section 10(n), the provision set forth in such employment handbook or contractual arrangement between the Participant and the Company will prevail and govern.

**o)** **No Advice Regarding Grant.** The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding the Participant's participation in the Plan, or the acquisition or sale of the underlying Shares. The Participant should consult with his or her own personal tax, legal and financial advisors regarding his or her participation in the Plan and execution of this Agreement, before executing this Agreement or otherwise taking any action at any time related to the Plan.

**p)** **Imposition of Other Requirements.** The Company reserves the right to impose other requirements on the Participant's participation in the Plan, on the RSUs and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable for legal or administrative reasons, and to require the Participant to sign or accept any additional agreements or undertakings that may be necessary to accomplish the foregoing.

Aon RSU AA 2019 SSP-US – Non-California
6697981-v3\GESDMS

IN WITNESS WHEREOF, the parties have accepted this Agreement as of the date hereof.

**AON PLC**

*Gregory C. Case*

Gregory C. Case
President and Chief Executive Officer

**AON GROUP, INC.**

*Gregory C. Case*

Gregory C. Case
President and Chief Executive Officer

**Signed Electronically**                **06/09/2019**
**RSU Recipient (Participant)**                      **Date**

**JGXDWYOI**

**06/09/2019 11:37 PM U.S. Eastern Standard Time**

**ACCEPTED**

Aon RSU AA 2019 SSP-US – Non-California
6697981-v3\GESDMS

agreement with your former employer, we ask that you strictly adhere to those agreements.  If you have any such agreement or any other agreement that restricts your post-termination activities, we require that you disclose those obligations to us and provide us with a copy of such agreements.

**Attachment 2**

**NON-SOLICITATION AGREEMENT**

NON-SOLICITATION AGREEMENT ("Agreement") dated as of April 8, 2013 (the "Effective Date") between Aon Risk Services Companies, Inc., a Maryland corporation, including its affiliates, subsidiaries and parent companies (the "Company"), with its headquarters located at 200 East Randolph Street, Chicago, Illinois 60601, and Thomas Lubas residing at 1295 Sterling Ave Unit 202, Palatine IL 60067 (the "Employee").

R E C I T A L S

This Agreement is entered into in consideration of the Employee's employment by the Company and the further mutual consideration and covenants by the parties as set forth herein.

NOW, THEREFORE, the Company and the Employee hereby agree to be bound by this Non-Solicitation Agreement, as follows:

Section 1.  **Recitals and Acknowledgements; Covenants.**

(a)  **Recitals and Acknowledgments**. Aon Group, Inc., a Maryland corporation with its corporate and business headquarters in Chicago, Illinois, and its subsidiaries and affiliates (and divisions thereof) including the Company, and its parent Aon plc, (collectively "Aon") are in the business of providing conventional and alternative risk management products and services covering the businesses of insurance brokerage, reinsurance brokerage, benefits consulting, compensation consulting, human resources consulting, human resources and benefits outsourcing, management, investigatory and security consulting, managing underwriting and related services, including accounting, actuarial, claims management and handling, and  information systems  on behalf of commercial and individual clients which are national and international and are not confined to any geographic area (the "Business").  An essential element of the Business is the development and maintenance of personal contacts and relationships with clients and prospective clients.  Aon invests considerable time and money to develop and maintain client relationships, including payment of  employees' salaries, benefits, travel, entertainment and other business expenses and assistance in servicing clients by making available to its employees specially developed and researched industry data, client-specific information, legal advice, accounting support, marketing, advertising and other corporate services, as well as providing training and professional development and valuable confidential business and professional information, toward the development and maintenance of its client relationships and related goodwill.  While these clients and prospective clients may be secured or serviced by Aon employees, including the Employee, the Employee acknowledges that such clients and prospective clients remain at all times the clients and prospective clients of Aon and that the goodwill engendered by the relationships is intended to inure only to the benefit of Aon; the goodwill is owned by Aon; and Aon shall be the sole beneficiary of such goodwill during and after termination of the Employee's employment with Aon.

In addition, the Employee acknowledges that he has acquired and will acquire, solely for the purpose of furthering the Business, knowledge of Aon's Confidential Information, as defined in Section 3 of this Agreement.  Employee further acknowledges Aon's legitimate interest in safeguarding Confidential Information from disclosure.

The personal identification of clients of Aon with an Aon employee, including the Employee, creates the potential for the Employee's appropriation of the benefits of the relationships developed with clients on behalf of and at the expense of Aon.  Since Aon would suffer irreparable harm if the Employee left its employ and solicited the Business of the clients and prospective clients of Aon, it is reasonable to protect Aon against certain competitive activities by the Employee for a limited period of time after the Employee leaves employment so that Aon may renew or restore its business relationship with its clients and prospective clients.

Consequently, the Employee is willing to enter into the covenants set forth herein in order to provide Aon with reasonable protection for its client and prospective client relationships and its investment therein as above-described, its goodwill, and its Confidential Information, and acknowledges and agrees that the covenants contained in Sections 1(b) and 1(c) below are necessary for the protection of Aon and are reasonably limited with respect to the activities prohibited, duration, geographical scope and their effect on the Employee and the public.

(b)     **Covenant Not to Solicit.** The Employee hereby covenants and agrees that, except with the prior written consent of Aon, the Employee (on the Employee's own behalf or on behalf of any other person or entity) will not, during the course of employment, and for two (2) years after the end of employment, directly or indirectly, call upon, solicit, accept, engage in, service or perform, other than on behalf of Aon, any business of the same type or kind as the business performed by Aon from or with respect to (i) clients of Aon with respect to whom the Employee provided services, either alone or with others, or had a business relationship, or on whose account he worked or became familiar, or supervised directly or indirectly the servicing activities related to such clients, during the twenty-four (24) months prior to the termination of the Employee's employment with the Company and, further provided, such clients were clients of Aon either on the date of termination of Employee's employment with the Company or within twelve (12) months prior to such termination and (ii) prospective clients of Aon which the Employee alone, in combination with others, or in a supervisory capacity, solicited during the six (6) months prior to the end of employment and to which a proposal for services was rendered by the Company during the six (6) months prior to the end of the Employee's employment with the Company. "Client" means any person or entity listed on the books of Aon as such.

The Employee acknowledges that there is no general geographical restriction contained in the preceding paragraph because the restriction applies only to the specified clients of Aon. Nothing in this Agreement shall prohibit the Employee from obtaining a livelihood for himself or his family by being engaged in the Business. The intent of the parties is that the Employee's restrictive covenant is limited only to those clients as above specified.

(c)     **Non-Solicitation of Employees and Covenant Not to Hire.** The Employee hereby also agrees, for the duration of the term of the covenant set forth in Section 1(b) of this Agreement, not to, directly or indirectly, solicit or induce, or to cause any person or other entity to solicit or induce, any employee of Aon to work for Employee or for any third party or entity, or to leave the employ of Aon.

Section 2.     **Company's Right to Injunctive Relief; Attorneys' Fees.**

The Employee acknowledges that the Employee's services to the Company are of a unique character which gives them a special value to the Company, the loss of which cannot reasonably or adequately be compensated in damages in an action at law, and that a breach of Section 1 or 3 of this Agreement will result in irreparable and continuing harm to the Company or Aon, or both, and that therefore, in addition to any other remedy which the Company or Aon, or both, may have at law or in equity, the Company and Aon shall be entitled to injunctive relief for a breach of this Agreement by the Employee. The parties acknowledge and agree that Aon plc and Aon Group, Inc. are intended third-party beneficiaries of this Agreement, and may be named plaintiffs in any subsequent suit brought by the Company to enforce the terms of this Agreement. In the event that any action is filed in relation to Section 1 or 3 of this Agreement, the prevailing party in the action shall recover from the non-prevailing party, in addition to any other sum that either party may be called upon to pay, a reasonable sum for the prevailing party's attorney's fees.

Section 3.     **Trade Secrets and Confidential Information; Inventions.**

(a)     **Trade Secrets and Confidential Information.** The Employee acknowledges that Aon's business depends to a significant degree upon the possession of confidential, proprietary and trade secret information which is not generally known to others, and that the profitability of the Business of Aon requires that this information remain proprietary to Aon. The Employee recognizes that, by virtue of his employment by the Company, and to assist him in the solicitation, production and servicing of client business, he will be granted otherwise prohibited access to such information. This information (hereinafter referred to as "Confidential Information") includes, without limitation: lists of clients and prospective clients; contract terms and conditions; client information relating to services, insurance, benefits programs, employees, finances, and compensation; copyrighted materials; corporate, management and business plans and strategies;

compensation and revenues; methods and strategies of marketing; market research and data; technical know-how; computer software and manuals; policies and procedures; and the conduct of the affairs of Aon.

The Employee shall not, except as required in the course of employment hereunder, disclose or use during or subsequent to the course of employment, any Confidential Information which has not been publicly disclosed (other than by Employee in breach of this provision). All Confidential Information and all records and equipment and other materials relating in any way to Confidential Information shall be and remain the sole property of Aon during and after the end of employment.

Upon termination of employment, the Employee shall promptly return to the Company all Confidential Information and all materials and all copies or tangible embodiments of materials involving Confidential Information in the Employee's possession or control. The Employee agrees to represent in writing to the Company upon termination of employment that he has complied with the provisions of this Section 3.

(b) **Inventions.** The Employee hereby assigns to the Company his entire right, title and interest in and to all discoveries and improvements, patentable or otherwise, trade secrets and ideas, writings and copyrightable material, which may be conceived by the Employee or developed or acquired by him during his employment and which may pertain directly or indirectly to the business of the Company or any of its affiliates, parent companies, or subsidiaries, and which the Employee agrees is work for hire performed in the scope of his employment. The Employee agrees to disclose fully all such developments to the Company upon its request, which disclosure shall be made in writing promptly following any such request. The Employee shall upon the Company's request, execute, acknowledge and deliver to the Company all instruments and do all other acts which are necessary or desirable to enable the Company or any of its affiliates, parent companies, or subsidiaries to file and prosecute applications for, and to acquire, maintain and enforce, all patents, trademarks, and copyrights in all countries.

Section 4. **Mergers and Consolidations; Assignability.**

The rights and obligations under this Agreement shall inure to the benefit of and be binding upon the Company and its successors and assigns. By way of explanation, and without limiting the generality of the foregoing sentence, if the Company or any entity resulting from any merger or consolidation referred to in this Section 4 is merged with or consolidated into any other entity or entities, or if substantially all of the assets of the Company or any such entity are sold or otherwise transferred to another entity, the provisions of this Agreement shall be binding upon and shall inure to the benefit of the continuing entity in or the entity resulting from such merger or consolidation or the entity to which such assets are sold or transferred. This Agreement shall not be assignable by the Employee.

Section 5. **Miscellaneous.**

(a) **Waiver and Modification.** Waiver of any term or condition of this Agreement by any party shall not be construed as a waiver of a subsequent breach or failure of the same term or condition, or a waiver of any other term or condition of this Agreement. Any waiver must be in writing. This Agreement may not be amended, altered or modified without the prior written consent of both parties and such instrument must acknowledge that it is an amendment or modification of this Agreement.

(b) **Captions.** The captions in this Agreement are not part of its provisions, are merely for reference and have no force or effect. If any caption is inconsistent with any provision of this Agreement, such provision shall govern.

(c) **Governing Law.** The validity, interpretation, construction, performance, enforcement and remedies of or relating to this Agreement, and the rights and obligations of the parties hereunder, shall be governed by and construed in accordance with the substantive laws of the state of Employee's residence as indicated above, without regard to the conflict of law principles, rules or statutes of any jurisdiction.

(d) **Severability.** To the extent that the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable for any reason, such word, phrase, clause or sentence shall be modified or deleted in such manner so as to afford the Company and Aon the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable

laws, and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent.

(e)  **Employee-at-Will.**  Nothing in this Agreement shall be construed to create contractual employment rights other than as an employee terminable at-will.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first above written.

**Aon Risk Services Companies, Inc.**

By: _____

Steve Keogh                                               Thomas Lubas

Title:  VP and Head of Human Resources - Aon Risk Solutions US