# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **AON RISK SERVICES COMPANIES, INC., AON PLC, AND AON GROUP, INC.,** <br><br> Plaintiffs, <br><br> vs. <br><br> **ALLIANT INSURANCE SERVICES, INC., TARA BRUSEK, JAMES JANIC, THOMAS LUBAS, DANIELLE ROSS, JAMIE TAYLOR, JOSHUA VICK, AND MATTHEW WALSH,** <br><br> Defendants. | Case No. 19-cv-7312 <br><br> Honorable Jorge L. Alonso <br><br> Magistrate Judge Jeffrey Cole |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

*s/ James M. Witz*
James M. Witz
Matthew J. Ruza
Orly Henry
LITTLER MENDELSON, P.C.
321 N. Clark Street, Suite 1000
Chicago, Illinois 60654
(312) 372-5520

Dated: November 18, 2019

**I.     INTRODUCTION**

Plaintiffs Aon plc, Aon Group, Inc., and Aon Risk Services Companies, Inc. (collectively, "Aon") are the victims of an unlawful corporate raid by Defendant Alliant Insurance Services, Inc. ("Alliant"). Alliant is following its well-honed strategy of: (1) raiding large groups of key Aon employees, (2) inducing them to breach their fiduciary duties to, and restrictive covenants with, Aon and to steal Aon's confidential and trade secret information, and (3) using them and the misappropriated trade secrets to unfairly compete against Aon by taking key clients. Alliant has repeatedly used this tactic – against Aon and other competitors – resulting in dozens of lawsuits against Alliant and multiple injunctions entered by courts to stop it. Compl., ¶¶ 2-4, 16.

Alliant is back at it, and Plaintiffs find themselves now in the position of a coach whose players have left, playbook in hand, to join the other team before the big game. Aon brings this Motion for entry of a temporary restraining order pursuant to Fed. R. Civ. P. 65 to stop this unfair competition. As of the filing of the Verified Complaint, Alliant orchestrated a targeted exodus of eight key employees and officers, including Defendants Brusek, Janic, Lubas, Ross, Taylor, Vick, and Walsh (the "Former Employees"), from Aon's Construction Services Group ("CSG"). *Id*. at ¶ 1. The Former Employees and Alliant coordinated their departures the week of October 21, 2019 to cause maximum disruption to Aon. *Id.* at ¶¶ 6-8. In the weeks leading up to their departures, they took Aon's confidential and trade secret information, described in detail in the Gloriod Declaration, which in the hands of a competitor provides a roadmap and platform to solicit Aon's clients and compete against Aon's CSG, including (without limitation):

1) **Lubas**: downloaded client specific information pertaining to some of Aon's largest clients, as well as information concerning a project that Aon is using as a "model," along with a project tracker which contains a pipeline of future revenue streams and projects Aon is working on across the country;

2) **Brusek**: copied years' worth of Aon intellectual capital, including proprietary data compilations with client exposures, premiums, rates, insurance carrier, policy information

1

(historical and current), benchmarking data, peer analysis, proprietary online systems and databases prepared by Aon to customize and negotiate coverage for its clients, and diagnostic tools to identify risks;

3) **Janic**: printed and took a professional contacts list with client contact information, including phone numbers and email addresses; and

4) **Walsh**: asked for detailed client premium data two weeks before his resignation.

*Id*. at ¶¶ 6, 129-132. Walsh, Ross and Taylor also furtively met with key Aon clients shortly before their resignations, while they were in discussions with Alliant, in order to solicit these clients and lay the groundwork to take their business from Aon to Alliant. *Id*. at ¶¶ 7, 118-128. Since their departures and immediately upon joining Alliant, Ross and Taylor then, with the encouragement and assistance of Alliant, solicited and serviced on behalf of Alliant clients with whom they worked at Aon. *Id*. at ¶¶ 153-160. As of the filing of the Verified Complaint, Aon lost two clients, one of over 20 years, which are accountable for over $1 million in annual revenue. *Id*. at ¶14.

The assault has not stopped since the filing of the Verified Complaint. Since then:

- Aon lost another four employees from its CSG to Alliant: Theresa Lovell, Greg Melton, Dana Moriarity and Kyle Goddard. In messages exchanged between Melton and Moriarity on October 29, 2019 (before their departures from Aon, but after the Former Employees resigned to join Alliant), Melton stated: "I just hope Matt and Jamie are pushing," plainly indicating that Walsh and Taylor were working behind the scenes at Alliant to facilitate Melton's and Moriarity's departures from Aon. Melton and Moriarity reported to Taylor when they were employed by Aon.

- Aon learned that Walsh and Janic *had a 2 hour and 23 minute* phone conversation on Saturday, October 12, two days after Janic exchanged a call and text with Mike Cusack ("Cusack") from Alliant. It is highly unusual for Walsh and Janic to have a phone call of that length. In addition, forensic analyses revealed calls and texts between certain of the Former Employees shortly before and after they spoke with Cusack.

- Aon lost a third client (an Aon client since 2002, serviced by Janic until his resignation, and valued in excess of $500,000 in annual revenue), believed to have gone to Alliant.

- Aon learned that a client met Taylor and Melton at the IRMI Conference, a construction risk conference (held November 10-13, 2019), and Melton and Taylor told the client that they could help her with anything she needed. Taylor attempted to lay the groundwork for converting this same client while she was with Aon and in discussions with Alliant.

2

- Specifically, Taylor had only worked with this client for approximately one month before resigning from Aon yet, in that short time period, removed the long-term broker from the account and directed that she take over the account.

- Ross contacted a different Aon client at IRMI. The client met with Ross and Walsh at the conference. Ross worked on this client account while at Aon; Walsh supervised Ross and was brought in to meet with this client for Aon within the last two years.

- Aon learned that Lubas contacted the Risk Manager of another Aon client he formerly serviced at Aon shortly after his departure from Aon. Lubas was introduced to this client by the Aon producer for the account and had no reason to call or contact the client but to solicit the client for business for Alliant.

- Defendants' scheme to hide their unlawful activities is crystallizing. To avoid detection, Defendants are communicating through family members. For example, on October 9, 2019, Alliant asked Janic for his *wife's email address.* Taylor also stored Aon files on her *spouse's Macbook. See* Compl., Ex. Q.

Decl. of Jim Gloriod ("Gloriod Decl."), ¶¶ 5-10, 22-25; Decl. of Domenic Rizzolo ("Rizzolo Decl."), ¶¶ 34, 36.

The above explains why, despite Aon's simple direct request, the Former Employees refused to confirm their intentions to abide by their covenants: they have no intention of complying. Thus, Aon has no choice but to file this Motion and seek injunctive relief to stop Defendants' unlawful assault on Aon's business. Unless halted, Defendants seriously threaten and continue to threaten Aon's clients, key employees, good will, and trade secrets.

## II.     STATEMENT OF FACTS

Aon incorporates by reference the facts set forth in the Verified Complaint, Gloriod Declaration, and Rizzolo Declaration. *See* Compl.; Gloriod Decl.; Rizzolo Decl.

## III.    ARGUMENT

To obtain a temporary restraining order, a movant must demonstrate: 1) some likelihood of success on the merits; 2) an inadequate remedy at law and irreparable harm if preliminary relief is denied; 3) the irreparable harm that the non-movant will suffer if the relief is granted, balanced against the irreparable harm to the movant if the relief is denied; and 4) the public interest.

3

*Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 811 (7th Cir. 2002). A "likelihood of success on the merits" exists if a party has a "better than negligible chance of succeeding on the merits." *Meridian Mut. Ins. Co. v. Meridian Ins. Group*, 128 F.3d 1111, 1114 (7th Cir. 1997). This "is a relatively low bar." *Vendavo, Inc. v. Long,* 397 F. Supp. 3d 1115, 1129 (N.D. Ill. 2019).

### A. Aon Will Likely Prevail On Its Trade Secrets Claims.

Aon seeks an order requiring Defendants to return Aon's trade secret information, and barring them from using this information in the future. It is undisputed that certain Defendants took its trade secret information, including printing and saving it to removable devices shortly before their departures. Defendants' counsel represented that they attempted to purge Aon information from certain of the Former Employees' devices/accounts, but Aon does not have to accept these representations, especially given its sordid history with Alliant, the threat posed by the disclosure and use of the trade secrets, and because certain of the Defendants are actively soliciting Aon clients. A Court order is necessary to protect Aon's trade secret information.

A court may enjoin misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA") where: (1) the information is a trade secret used or intended for use in interstate or foreign commerce, and (2) has been, or is threatened to be, misappropriated. 18 U.S.C. § 1836(b)(1) & (3)(A). The Illinois Trade Secrets Act ("ITSA") provides for similar relief. *See* 765 ILCS 1065/3; *Covenant Aviation Sec., LLC v. Berry*, 15 F. Supp. 3d 813, 817-19 (N.D. Ill. 2014); *Strata Mktg. v. Murphy*, 317 Ill. App. 3d 1054 (1st Dist. 2000). This standard is met here.

#### 1. Aon's Trade Secrets are Protectable.

At this early stage, it is sufficient to generally describe the trade secret information and Aon's efforts to keep it confidential. *See Scan Top Enterpr. Co. v. Winplus N.A., Inc.*, 2015 WL 4945240, *3-4 (N.D. Ill. Aug. 19, 2015). The information at issue here constitutes protectable trade secrets:

4

| Trade Secret | Illinois Law Affording Trade Secret Protection |
|---|---|
| Data Compilations – TCOR Benchmarking Master Data, Benchmarking data; Peer Analysis; Project Tracker containing a pipeline of future revenue streams and projects Aon is working on across the country. *See* Compl., ¶ 130, Gloriod Decl., ¶¶ 15, 18. | 765 ILCS § 1065/d(d); *Vendavo,* 397 F. Supp. 3d at 1135 (financial information, including "sales pipelines" and "sales revenue reports" are trade secrets); *Master Tech Prods., Inc. v. Prism Enters., Inc.*, 2002 WL 475192, at *5 (N.D. Ill. Mar. 27, 2002) (trade secret "may include a compilation of confidential business and financial information"). |
| Proprietary Tools – Construction Risk portal, policy optimizer, national casualty coverage diagnostic tool, coverage specs, brokerage process, builder's risk workflow model. *See* Compl., ¶ 131, Gloriod Decl., ¶ 18. | *Vendavo,* 397 F. Supp. 3d at 1132 (information produced by Plaintiff's efforts to identify and solve pricing issues for clients is trade secret). |
| Client Information – Client-specific proposals, policies, loss runs, peer analysis, binders, training information, premium data. *See* Compl., ¶ 131, Gloriod Decl., ¶ 18. | *Vendavo,* 397 F. Supp. 3d at 1132 (customer-specific information, including "pain points" and "solutions developed" for clients are trade secrets.); *Mickey's Linen v. Fischer,* No. 17 C 2154, 2017 WL 3970593, *9 (N.D. Ill. Sept. 8, 2017) (customer purchasing preferences, contract terms, pricing, expirations, and renewal terms and discounts are trade secrets). |
| Client Lists with client contact information including email addresses and phone numbers. *See* Compl., ¶129. | *Lakeview Tech., Inc. v. Robinson,* 446 F.3d 655, 656 (7th Cir. 2006) (plans, pricing and customer lists were considered trade secrets); *Vendavo,* 397 F. Supp. 3d at 1134 (names and contact information for customers, including identities of decision makers, are trade secrets if kept secret); *Mickey's Linen*, 2017 WL 3970593, *9 (customer list identifying top 150 customers, highest revenue producing customers, are trade secrets). |
| Intellectual Property – 50 State Liability Guide, Construction Risk and Opportunity State Analysis, Aon Global Risk Consulting Value Proposition, CSG Capabilities Presentation, Weather Risk information, CCIP v. Traditional Analysis. *See* Gloriod Decl., ¶ 18. | *Vendavo,* 397 F. Supp. 3d at 1136 (information produced by Plaintiff's efforts to identify and solve issues for clients is trade secret). |
| Insurance Company Intelligence – Specific coverage endorsements and forms that Aon has negotiated for clients. *See* Gloriod Decl., ¶_18. | *Vendavo,* 397 F. Supp. 3d at 1131 (customer-specific information, including "solutions developed" for clients are trade secrets.). |

This information is not generally known to the public and has significant commercial value in the hands of a competitor that could use it to undercut Aon pricing, target clients, tailor

5

proposals specific to those clients, and induce those clients to leave Aon for a competitor. Aon has engaged in reasonable efforts to maintain the secrecy of this information, including through confidentiality agreements, password-protected networks and devices, multiple policies concerning the protection of confidential information, and training employees on the code of conduct, including information security. Compl., ¶¶ 70-76; *see Vendavo,* 397 F. Supp. 3d at 1136 (employer took reasonable efforts to keep information secret by "implement[ing] technological security" such as requiring encryption, limiting access to information, requiring employees to sign non-disclosure agreements, and training employees on security).[1] In addition, "the fact that a trade secret was not misappropriated from an external source, but rather from an employee's memory, does not remove its trade secret protection." *Id.* at 1139, n. 15.

        2.        <u>Defendants misappropriated and will inevitably disclose the trade secrets</u>.

The Court has the power to enjoin both "threatened" and "actual" misappropriation—both are present here. 735 ILCS 1065/3. <u>First</u>, Lubas, Brusek and Janic admittedly misappropriated Aon's trade secret information shortly before their departures, and retain this information at least in the hands of their counsel or his agent. *See* Compl. ¶¶ 6, 129-132, 181. Aon requested that Defendants provide Taylor's passcode to her Aon issued phone, and Defendants refused. Walsh requested shortly before his departure information concerning clients that Defendants have subsequently solicited and/or converted to Alliant. Compl., ¶¶ 129-132, Gloriod Decl., ¶¶ 11-20. *See PrimeSource Building Prod's, Inc.,* No. 16-cv-11465 (N.D. Ill. Mar. 3, 2017) (Alonso, J.) (granting TRO against former CEOs of PrimeSource who uploaded substantial amounts of data and other trade secret information including customer lists); *Mintel Intern. Group, Ltd. v.*

---

[1] *See also Strata Mktg.*, 317 Ill. App. 3d at 1069 (employer that limited computer network use, kept confidential information under lock and key, and required employee to sign a confidentiality agreement took sufficient measures to keep information secret); *Huawei Tech. Co. v. Motorola*, Case No. 11-cv-497, at * 9-10 (N.D. Ill. Feb. 22, 2011) (marking documents confidential and requiring third parties to sign NDA sufficient to warrant trade secret protection).

6

*Neergheen*, 2008 WL 2782818, at *3 (N.D. Ill. Jul. 16, 2008) (granting TRO on ITSA claim where former employee "copied, e-mailed and/or printed [highly sensitive information] in the days leading up to his resignation"). Second, all Defendants threaten to misappropriate Aon's trade secrets by refusing to provide assurances regarding their retention and use of Aon's trade secrets, and characterization of same as "unreasonable." *Id.* at ¶¶ 161-170, 181.

In addition, the Seventh Circuit has concluded that Illinois and federal law recognize a cause of action for "inevitable disclosure" of trade secrets—*i.e.*, a "plaintiff may prove a claim of trade secret misappropriation by demonstrating that a defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." *Vendavo,* 397 F. Supp. 3d. at 1139; *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1270-72 (7th Cir. 1995). Courts employ a three-factor analysis to evaluate whether a defendant will inevitably disclose trade secrets in her new position: (1) level of competition between the former employer and new employer; (2) whether the employee's position with the new employer is comparable to the position he held with the former employer; and (3) the actions the new employer has taken to prevent the former employee from using or disclosing trade secrets of the former employer. *Vendavo,* 397 F. Supp. 3d at 1140. Here, Aon and Alliant are direct competitors. The Former Employees assumed virtually identical positions at Alliant to those they held with Aon. Further, Alliant took no steps to prevent the Former Employees from working on or contacting the clients they formerly serviced at Aon about whom them have trade secret information. To the contrary, Alliant encouraged it. *See RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 874 (N.D. Ill. 2001) (granting permanent injunction against former employees who violated ITSA based on talking of information and threat of inevitable disclosure). At bottom, if the Former Employees are allowed to use "even the information in [their] head" about Aon's customers, including pricing information and premium data that Walsh conveniently

7

requested weeks before his departure and while he was talking to Alliant, and client specific information that the Former Employees possess, they will have an "unfair advantage by avoiding the costly process of actually discovering" this information and be able to pitch these clients using same. *Vendavo,* 397 F. Supp. 3d at 1142. Such a situation poses a threat of irreparable harm and therefore supports the grant of a preliminary injunction. *Id.*

That Alliant will likely claim that it took measures to prevent the transfer of trade secrets is of no moment, because "none of these measures prevent [Former Employees] from providing one of Plaintiff's trade secrets to one of [competitor's] other employees upon request." *Id*. An injunction is necessary to prevent the inevitable disclosure of Plaintiffs' trade secrets. As one Court noted: "There is, however, an easy solution to the problem … prohibiting [Former Employee] from working on any client that she previously worked with while she worked for Plaintiff." *Id.* In the same vein, Walsh and Taylor have information concerning employees with whom they previously worked, including important clients those employees serviced, which they cannot compartmentalize in their brains, and if not restrained from soliciting these employees, will result in the inevitable disclosure of Plaintiffs' trade secrets as well. *See Mickey's Linen,* 2017 WL 3970593, *13 (granting injunction based on inevitable disclosure of trade secrets).

### B. Aon Will Likely Prevail On Its Breach Of Contract And Declaratory Judgment Claims.

Aon is also likely to succeed on its breach of contract and declaratory judgment claims. Breach of contract requires: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damages or injury resulting from the breach. *Carlson v. Rehab. Inst. of Chi.*, 2016 IL App (1st) 143853, at ¶ 13. Each element is met here.

1. <u>The Restrictive Covenant Agreements Are Enforceable.</u>

The Former Employees voluntarily entered into agreements with restrictive covenants in exchange for valid consideration. Compl. ¶¶ 77-89, Exs. A-G. The covenants provide that for two years after their employment ends, they would not "directly or indirectly, call upon, solicit, accept, engage in, service or perform, other than on behalf of Aon," any business of the same type performed by Aon with respect to clients with whom they had formerly worked during the 24 months prior to their termination date (and further provided the clients were clients of Aon within 12 months prior to their termination date). *Id.* They also agreed that, during this same time period, they would not "directly or indirectly" solicit or induce, or cause another person to solicit or induce, any employee of Aon to leave Aon or work for another entity. *Id.*[2]

Courts consider three factors in determining whether a restrictive covenant contains a reasonable restraint: (1) whether the restraint is greater than required to protect an employer's legitimate business interest; (2) whether it imposes undue hardship on the employee; and (3) whether it poses an injury to the public. *Mickey's Linen,* 2017 WL 3970593, *14. These factors require enforcement of the covenants here.

As a threshold matter, multiple courts, including in this District, have held that the exact same covenants at issue here are enforceable under Illinois law, and granted injunctive relief to protect Aon from Alliant's past attacks on the CSG. *See Aon Risk Servs. v. Cusack*, 34 Misc. 3d 1205(A) (N.Y. Sup. Ct. Dec. 20, 2011) (finding covenants enforceable under Illinois law and granting broad injunctive relief), *aff'd* 102 A.D.3d 461 (1st Dept. 2013); *Aon PLC, et al. v.*

---

[2] The Former Employees repeatedly acknowledged these covenants were reasonable. Compl. at ¶ 87. They agreed that a breach would cause irreparable harm and that Aon would be entitled to injunctive relief for a breach or threatened breach of the agreements. *Id.* at ¶ 88.

9

*Heffernan, et al.,* No. 16-cv-1924, Dkt. No. 28 (N.D. Ill. Feb. 10, 2016) (granting TRO restraining Alliant and former employee from soliciting certain Aon employees).

Indeed, the narrowly tailored and limited covenants protect Aon's legitimate business interests in its long-term customer relationships, goodwill, confidential information, trade secrets, investment in its employees, and the stability of its workforce. *See, e.g., Hanchett Paper Co. v. Melchiorre,* 341 Ill. App. 3d 345, 351-52 (2d Dist. 2003); *Reliable Fire Equip. Co. v. Arredondo*, 2011 IL 11871, at ¶ 16; *Abel v. Fox*, 274 Ill. App. 3d 811, 819 (4th Dist. 1995) ("In Illinois, confidential information and customer relationships can be a protectable interest of an employer."); *TSD Enter., LLC v. Secora,* 2016 IL App (5th) 160056-U, ¶ 17 ("An employer has a valid interest in protecting its long-standing client relationships against the subterfuge and sabotage of former employees."); *Packaging House, Inc. v. Hoffman,* 114 Ill. App. 3d 284, 286 (1st Dist. 1983) ("an employer can utilize a restrictive covenant to protect itself from the disadvantageous use of confidential information revealed to an employee during the course of his employment."); *Arpac Corp. v. Murray*, 226 Ill. App. 3d 65, 76 (1st Dist. 1992) (maintaining stable workforce is a legitimate business interest in Illinois).

Moreover, activity restraints such as the non-solicit, non-servicing, and non-acceptance of work provisions are also enforceable to protect these legitimate interests. *See Aon Risk Servs.*, 34 Misc. 3d 1205(A) ("It is clear that, under Illinois law, a restrictive covenant prohibiting both solicitations and the acceptance of certain limited business is enforceable"); *Aon PLC, et al.,* No. 16-cv-1924, Dkt. No. 28 (enforcing Aon non-acceptance provision); *see also e.g., Hanchett Paper Co.*, 341 Ill. App. 3d at 350 (affirming injunction where agreement provided that employee would not "solicit, service, sell or cater to any business similar to plaintiff's . . . ."); *Russell Dean, Inc. v. Maher,* No. 17 C 8440, 2018 WL 4679573, at *7 (N.D. Ill. Sept. 28, 2018) (enforcing

customer restriction as to customers the defendant served); *Call One, Inc. v. Anzine*, No. 18 C 124, 2018 WL 2735089, at *7 (N.D. Ill. June 7, 2018) (same); *see also Abbott-Interfast Corp. v. Harkabus,* 250 Ill. App. 3d 13, 20 (2d Dist. 1993) ("Prohibiting a former employee from accepting orders or doing business with a customer .... can be reasonable" even though it "places restrictions on that customer").

Aon's protectable interest and significant investment in its confidential information, client relationships, and employees warrants protection here. Compl. ¶¶ 40, 43-44, 49, 53, 58, 62, 66, 78-79, 106-117. Aon paid the Former Employees lucrative salaries, bonuses, and provided extensive expense reimbursements to nurture and develop Aon's long-term client relationships (two of the stolen clients were Aon clients for 17 and 20 years). *Id.* at ¶ 156; Gloriod Decl., ¶¶ 21-22. The non-solicitation provisions are narrowly tailored to protect these interests, reasonable in scope and duration[3], and customary in the highly competitive insurance brokerage industry. Indeed, Alliant requires the employees it hires to sign similar two-year customer non-solicitation agreements. *See Corp. Synergies Group v. Andrews, et al.,* No. 18-cv-13381, Dkt. No. 11-2.

Moreover, the covenants impose no hardship on the Former Employees. The agreements do not contain non-competes, but rather are limited to a small subset of Aon clients with whom the Former Employees worked. *Id.* The Former Employees acknowledged that Aon required time after their employment ended to renew or restore its business relationships with its clients and prospective clients. *Id.* at Exs. A-G, § 9(a). The Former Employees are free to work wherever

---

[3] The 24-month duration is reasonable under Illinois law. *Arpac Corp.*, 226 Ill. App. 3d at 76 (affirming enforceability of a two-year prohibition); *Tyler Enter. of Elwood, Inc. v. Shafer*, 214 Ill. App. 3d 145, 148 (3d Dist. 1991) (three year restrictive period reasonable); *Decker, Berta & Co. v. Berta*, 225 Ill. App. 3d 24, 32 (4th Dist. 1992) (same). No geographic limitation is necessary where, as here, the restriction is limited to customers with whom the Former Employees had certain contacts or relationships. "Courts have upheld restrictions which lack geographic limitations where the purpose of these restrictions 'was to protect the employer from losing customers to a former employee who, by virtue of his prior relationship, gained special knowledge and familiarity with the customers' requirements.'" *Abbott-Interfast Corp.*, 250 Ill. App. 3d at 17-18.

11

they wish, including Alliant—they are just precluded from working with a small subset of clients with whom they formerly worked, and from soliciting their former Aon colleagues about whom they possess confidential information. In addition, as set forth below, there is no harm to the public. *See Mickey's Linen,* 2017 WL 3970593, *16 (covenant prohibiting former employee from soliciting or accepting business from customers with whom he formerly worked "meets all three reasonableness factors required under Illinois law," including it protects former employer's legitimate interest in its "customers relationships and confidential information," and caused no undue hardship to employee or public because employee was able to work in his chosen field).

2. Former Employees Breached Or Threaten To Breach Their Covenants

The following Former Employees breached or threaten to breach their customer non-solicitation covenants:

- Taylor and Ross are servicing their former clients for Alliant;
- Taylor and Ross met with a client, and introduced this client to Alliant's preferred wholesale broker while they were in discussions with Alliant and in preparation to transition this client to Alliant, and shut out Aon's broker;
- Ross and Walsh secretly met with a client, while they were in discussions with Alliant and in preparation to transition this client to Alliant;
- Ross called upon Aon clients on behalf of Alliant;
- Taylor told a client at a networking event to contact her if they needed anything;
- Ross and Walsh met with a Aon client at a networking event, presumably to solicit;
- Lubas contacted the Risk Manager of a client he formerly serviced at Aon; and
- All of the Former Employees have through counsel refused to acknowledge their obligations, and refused to assure Aon of their intent to comply with same.[4]

Compl., ¶¶ 118-128; Gloriod Decl., ¶¶ 21-25.

Walsh and Taylor also breached their covenants not to solicit or induce Aon employees by:

- "Pushing" Alliant to hire Melton, Moriarity, and the other Aon employees; and

---

[4] This underscores Aon's urgent need for a TRO and declaration that the Former Employees' agreements are enforceable. Indeed, after the filing of the Verified Complaint, Taylor filed a declaratory judgment action requesting same. The need for urgent relief is particularly pressing here, given Alliant's past practices and behaviors to both Aon and other competitors (*see* Compl. ¶¶ 3, 4, 16), the theft of confidential information by certain of the Former Employees, as well as the ongoing contact with and solicitation of Aon's clients by Defendants.

- "The timing and breadth of the exodus from Aon suggests that Plaintiffs have a reasonable likelihood of establishing that [Walsh and Taylor, to whom the employees reported], in violation of [their] contractual commitment[s], played some role in the moves to Alliant." *Heffernan,* Dkt. 28 at p. 4. This is corroborated by the forensic evidence that shows, for example, that Walsh engaged in a lengthy phone conversation with Janic, at the same time that Janic was communicating with Alliant.

Rizzolo Decl., ¶¶ 36, 40.

Last, for the reasons set forth in Section III.A, certain of the Former Employees have breached their confidentiality commitments, including their commitment not to "disclose or use" Aon's confidential information. If not enjoined, the Former Employees will continue to use and disclose Aon's confidential information, usurp its goodwill, further rock the stability of its work force, and steal even more clients. This will cause further substantial revenue losses beyond the now $1.5 million in annual revenue Aon has already suffered, employee losses beyond the twelve who have already left for Alliant, and destroy the years of hard work and significant monetary investments Aon has made in developing its long-term client and employee relationships and confidential information.

## C. Aon Is Likely To Prevail On Its Claim of Tortious Inference With Contract.

Alliant has also knowingly and tortiously interfered with the Former Employees' agreements with Aon. The elements of tortious interference with contract are: 1) the existence of a valid and enforceable contract; 2) the defendant's awareness of the contract; 3) the defendant's intentional inducement of a breach of the contract; 4) a subsequent breach by a third party as a result of defendant's conduct; and 5) resulting damages. *Traffic Tech, Inc. v. Kreiter*, 2015 WL 9259544, at *13 (N.D. Ill. Dec. 18, 2015); *see also PrimeSource Bldg. Prod's, Inc. v. Huttig Bldg. Prod's, Inc.*, 2017 WL 7795125, at *26 (N.D. Ill. Dec. 9, 2017) (noting likelihood of success on the merits of tortious interference claim against former employees who solicited clients in violation of non-solicitation covenant). As set forth above, Aon's agreements with the Former Employees

13

are enforceable and were breached. Alliant is, and was, aware of the agreements, and disregarded them. Compl. ¶¶ 2-4, 161-171. Alliant's conduct in this and other cases further demonstrates that it has aided and encouraged the breaches. *Id*. Indeed, Alliant appointed Taylor to work on a client she formerly serviced at Aon, in direct breach of her agreements. Alliant also hired Melton and Moriarity. Gloriod Decl., ¶¶ 6-7. Finally, Aon has suffered and continues to suffer damages from these breaches. Compl. at ¶¶ 10, 13-14.

### D. Aon Does Not Have an Adequate Remedy at Law And Will Suffer Irreparable Harm Without Injunctive Relief.

Aon will suffer irreparable harm without injunctive relief, for which there is no adequate remedy at law. There is a "presumption of irreparable harm" in "cases of trade secret misappropriation." *Jano Justice Sys., Inc. v. Burton,* 636 F. Supp. 2d 763, 767 (C.D. Ill. 2009). This is because "it would be essentially impossible to determine the costs [competitor] unjustly avoided by using these trade secrets, or the damage to Plaintiff's sales that could be caused by allowing [former employee] to use its own secrets against it." *Vendavo,* 397 F. Supp. 3d at 1144. In addition, the "loss of business that [the Former Employees] have caused and threaten to cause and the profits lost with such business are unquantifiable at this time." *Mickey's Linen,* 2017 WL 3970593, at *18. It is "precisely the difficulty of pinning down what business has been or will be lost that makes an injury 'irreparable.'" *Id.; see also Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc*., 420 F. Supp. 2d 866, 872 (N.D. Ill. 2006) (loss of goodwill, competitive position, and customer relationships constitute irreparable harm "oftentimes fatal to businesses, [that] cannot be readily calculated and cured by an award of monetary damages."). In addition, Plaintiffs have suffered "intangible damages" such as loss of goodwill and competitive position. *Id.; Scheffel & Co., P.C. v. Fessler,* 356 Ill. App. 3d 308, 314 (5th Dist. 2005) (injunctive relief granted to enforce restrictive covenant that precluded defendant from providing services to his

former firm's clients; damages could not remedy injury to firm's reputation and goodwill from loss of clients). This is "especially true" where the language of the agreements indicate that the parties contemplated injunctive relief to prevent future violations—as the Former Employees acknowledged here. *See* Compl., ¶ 88; *Mickey's Linen,* 2017 WL 3970593, at *19.

Without injunctive relief, this case will be just another chapter in Alliant's underhanded playbook. Aon will bleed clients and employees, the secrecy of its trade secrets and confidential information will be forever destroyed. Its goodwill, in which it has substantially invested, will be ruined. These losses are intangible and cannot be quantified. The buck must stop here.

### E. The Balance Of Hardships Weighs In Favor Of An Injunction.

Finally, the balance of the hardships tips in Aon's favor. *Gateway E. Ry. Co. v. Terminal R.R. Assoc. of St. Louis*, 35 F.3d 1134, 1137 (7th Cir. 1994). As set forth above, Aon will suffer irreparable and unquantifiable harm if Defendants are not enjoined. On the other hand, maintaining the *status quo* causes no harm to Defendants. The Former Employees can continue to be employed by Alliant and work in their chosen field, and Alliant can continue to compete fairly. The only potential harm to the Former Employees is that they would be enjoined from violating their contractual obligations and disclosing Aon's trade secrets, and the only potential harm to Alliant is that it will not be able to use the Former Employees' breaches and Aon's trade secret information to its anti-competitive benefit. Thus, the balancing of the potential harms weighs decidedly in favor of the relief sought. The public interest is also served by upholding the sanctity of contracts, and preventing Defendants from reaping the benefits of their tortious conduct, breach of contract, misappropriation of trade secrets, and other unlawful behavior.

For all of the above reasons, Aon prays that this Court enter a TRO, pending a preliminary injunction hearing after expedited discovery.

15

Dated: November 18, 2019                    *Respectfully submitted,*

*s/ James M. Witz*
James M. Witz
jwitz@littler.com
Orly Henry
ohenry@littler.com
Matthew Ruza
mruza@littler.com
LITTLER MENDELSON, P.C.
321 N. Clark Street, Suite 1000
Chicago, Illinois 60654
(312) 372-5520

Jessica F. Pizzutelli (*pro hac application pending*)
jpizzutelli@littler.com
LITTLER MENDELSON, P.C.
375 Woodcliff Drive, Suite 2D
Fairport, New York 14450
(585) 203-3400

## **CERTIFICATE OF SERVICE**

I, James M. Witz, an attorney, certify that I served a copy of Plaintiffs' Memorandum in Support of Motion for a Temporary Restraining Order on the parties below via email and U.S. Mail on November 18, 2019:

Seth Gerber
Debra Fischer
Morgan, Lewis & Bockius LLP
2049 Century Park East
Suite 700
Los Angeles, CA 90067
Seth.gerber@morganlewis.com
debra.fischer@morganlewis.com

*s/ James M. Witz*_____
James M. Witz